1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

RYAN KARNOSKI; STAFF SERGEANT
CATHRINE SCHMID; D.L., formerly known as
K.G., by his next friend and mother, LAURA
GARZA; HUMAN RIGHTS CAMPAIGN; and
GENDER JUSTICE LEAGUE,

        *Plaintiffs*,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States; the UNITED
STATES OF AMERICA; JAMES N. MATTIS, in
his official capacity as Secretary of Defense; and
the UNITED STATES DEPARTMENT OF
DEFENSE,

        *Defendants*.

Case No. 2:17-cv-1297

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## NATURE OF ACTION

1.      This action challenges the constitutionality of an official federal policy of discrimination against transgender people regarding military service. There are currently thousands of transgender individuals who are bravely serving in our nation's military across myriad roles, and there are many transgender individuals who seek to follow the same noble path. Like other service members, these transgender individuals are willing to place themselves in harm's way—and potentially pay the ultimate price—in service of our country. But their President deprives them of an opportunity to serve on equal terms as others simply because they

COMPLAINT - 1
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  are transgender.

2      2.      The U.S. military previously excluded open service by transgender individuals but

3  it reversed that policy in 2016. Following extensive study and deliberation, the U.S. Department

4  of Defense ("DoD") concluded that a ban on open service by transgender individuals was

5  inconsistent with the military's goal of maintaining an all-volunteer force in which any individual

6  who is qualified to serve has the opportunity to do so. On June 30, 2016, DoD lifted its previous

7  categorical ban. For more than a year after that change, transgender individuals in the military

8  were able to serve openly and authentically alongside their fellow service members. This change

9  strengthened our nation's military readiness.

10      3.      On July 26, 2017, President Donald J. Trump unexpectedly and abruptly reversed

11  course on the military's policy. He took to social media to announce, through three tweets, that

12  "the United States Government will not accept or allow . . . [t]ransgender individuals to serve in

13  any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming

14  . . . victory and cannot be burdened with the tremendous medical costs and disruption that

15  transgender [sic] in the military would entail. Thank you[.]"

16      4.      This unilateral decision to exclude transgender people from the military was made

17  without any meaningful deliberative process and was directly contrary to the considered

18  judgment of the military. For example, President Trump failed to engage in any meaningful

19  consultation with Secretary of Defense James N. Mattis or the other range of military officials

20  who would ordinarily be consulted about a policy change of this nature and magnitude.

21      5.      In the evening of Friday, August 25, 2017, President Trump followed up on his

22  tweets and implemented an official federal policy of discrimination against transgender

23  individuals in military service ("the Ban"). Among other things, President Trump has mandated

24  that the U.S. military return to its earlier policy and practice of discrimination against

25  transgender people, including by discharging them. He has also maintained and extended the

26  current bar on accession into the military of individuals known to be transgender ("the current

27  accessions bar"). Last, he has singled out for adverse treatment the health care needs of

28  transgender service members.

COMPLAINT - 2
[2:17-cv-1297]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

6.      Dripping with animus, the Ban and the current accessions bar violate the equal protection and due process guarantees of the Fifth Amendment and the free speech guarantee of the First Amendment. They are unsupported by any compelling, important, or even rational justification.

## PARTIES

**A.      Plaintiffs**

7.      Plaintiff Ryan Karnoski is a 22-year-old man who resides in Seattle, Washington. He wishes to serve in the military. Mr. Karnoski is transgender.

8.      Plaintiff Staff Sergeant Cathrine Schmid ("Staff Sergeant Schmid") is a 33-year-old woman who resides in Lakewood, Washington. She has served in the U.S. Army for approximately twelve-and-a-half years and is currently stationed at Joint Base Lewis-McChord in Washington. Staff Sergeant Schmid is transgender.

9.      Plaintiff D.L., formerly known as K.G., is a male high school student who resides in Corpus Christi, Texas. He wishes to serve in the military. D.L. is transgender. (Mr. Kanorski, Staff Sergeant Schmid, and D.L. are referred to collectively as the "individual plaintiffs.")

10.     Plaintiff Human Rights Campaign ("HRC") is largest national lesbian, gay, bisexual, transgender, and queer ("LGBTQ") civil rights organization in America. HRC's principal place of business is in Washington, D.C.

11.     Plaintiff Gender Justice League ("GJL") is a Washington state gender and sexuality civil and human rights organization. GJL's principal place of business is in Seattle, Washington. (HRC and GJL are referred to collectively as the "organizational plaintiffs.")

**B.      Defendants**

12.     President Donald J. Trump is the President of the United States of America and Commander in Chief of the U.S. military. President Trump instituted the Ban.

13.     The United States of America encompasses all federal agencies and departments responsible for implementing the Ban and the current accessions bar, including the U.S. Department of Defense and the Department of Homeland Security.

14.     Secretary James N. Mattis is the Secretary of the U.S. Department of Defense. He

COMPLAINT - 3
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  is responsible for the implementation of the Ban and for the administration and enforcement of

2  the current accessions bar.

3      15.     The U.S. Department of Defense is an executive branch department of the U.S.

4  federal government composed of the office of the Secretary of Defense; the Joint Chiefs of Staff;

5  the Joint Staff; America's Defense Agencies; the Department of Defense Field Activities; the

6  Departments of the Army, Navy, and Air Force; the unified and specified combatant commands,

7  such other offices, agencies, activities, and commands as may be established or designated by law

8  or by the President; and all offices, agencies, activities, and commands under any of their control

9  or supervision. Under the direction of Secretary Mattis, DoD is also responsible for

10  administration and enforcement of the Ban and of the current accessions bar.

11                              **JURISDICTION AND VENUE**

12      16.     Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1346 because this

13  action arises under, is founded upon, and seeks to redress the deprivation of rights secured by,

14  the United States Constitution.

15      17.     Venue is proper in the Western District of Washington under 28 U.S.C. § 1391(e).

16  Mr. Karnoski, Staff Sergeant Schmid, and GJL all reside within this district. In addition, the ban

17  is enforced, and the impact of it is felt, in this district. A substantial part of the events or

18  omissions that gave rise to Plaintiffs' claims, including particularly those of Mr. Karnoski, HRC,

19  and GJL, occurred in King County, Washington.

20      18.     This Court has the authority to enter a declaratory judgment and to provide

21  preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

22  Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

23      19.     This Court has personal jurisdiction over Defendants because their enforcement

24  of the Ban and the current accessions bar occurs within Washington.

25                              **FACTUAL ALLEGATIONS**

26  **A.     Background Information Regarding Transgender Individuals**

27      20.     Gender identity is a person's fundamental, internal sense of belonging to a

28  particular gender. It is a core characteristic of human identity that everyone possesses. Gender

COMPLAINT - 4
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    identity is innate, biologically rooted, and fixed at an early age.

2         21.    Although most people have a gender identity that matches their sex assigned at

3    birth, this is not the case for transgender people, who are defined as transgender because their

4    gender identity does not match the sex they were assigned at birth. Transgender people have

5    existed throughout human history, although understanding of transgender people has grown in

6    modern times.

7         22.    An individual's sex is generally assigned at birth based on external genitalia. But

8    other sex-related characteristics can include chromosomes, hormone levels, internal reproductive

9    organs, and gender identity.

10        23.    When someone's sex-related characteristics are not in typical alignment with each

11   other, gender identity is the critical determinant of sex. Attempts to change an individual's

12   gender identity to bring it into alignment with the sex that the individual was assigned at birth are

13   ineffective and potentially harmful.

14        24.    The discordance between one's gender identity and the sex one was assigned at

15   birth can be associated with clinically significant distress, which is known as gender dysphoria.

16   Gender dysphoria can be treated in accordance with internationally recognized standards of care.

17        25.    Living in a manner consistent with one's gender identity is critical to the health

18   and well-being of transgender people and is a key aspect of treatment for gender dysphoria. The

19   process by which transgender individuals come to live in a manner consistent with their gender

20   identity, rather than the sex they were assigned at birth, is known as transition.

21        26.    The steps that transgender people take to transition are not identical, but they

22   generally include social, legal, and medical transition.

23        27.    Social transition entails the adoption of a gender role matching one's gender

24   identity. For example, for a man who is transgender, social transition can include wearing typical

25   male attire, using male pronouns, and otherwise living as a man in all aspects of everyday life.

26        28.    Legal transition involves steps to conform one's legal identity to one's gender

27   identity, such as legally changing one's name and updating the name and gender marker on one's

28   driver's license and birth certificate.

29.     Medical transition includes treatment that brings one's body into alignment with one's gender identity, such as hormone therapy. Whether any particular treatment is medically necessary or even appropriate, however, depends on the needs of the individual.

30.     These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, which is already determined by gender identity, but instead bring the individual's social presentation, legal identity, and physical appearance into greater typical alignment with their gender.

**B.     Plaintiff Ryan Karnoski**

31.     Plaintiff Ryan Karnoski comes from a family with a legacy of military service. His grandfather and step-grandfather served in the Army during the Korean War, and other of his relatives have served in the Army and Navy.

32.     Mr. Karnoski's desire to join the military came into sharper focus following the death of his cousin, who was killed in action in Afghanistan in 2009. His cousin's death—and the toll that it took on surviving family members—further impressed upon Mr. Karnoski the tremendous sacrifice that service members make for their country. Mr. Karnoski also realized that his own desire to serve in the military was motivated by more than simply a family legacy: it was a personal calling in life for him, and it is something that he has long dreamt of being able to fulfill.

33.     Mr. Karnoski works as a mental health clinician in Seattle, Washington.

34.     Mr. Karnoski holds a Masters in Social Work from the University of Washington School of Social Work's Child Welfare Training Advancement Program. He also holds a Bachelor of Arts degree in both Social Welfare and Gender, Women, and Sexuality Studies from the University of Washington. Mr. Karnoski is currently registered with the Selective Service.

35.     But for the Ban and the current accessions bar, and Defendants' enforcement of them both, Mr. Karnoski would seek to join the military, and he is ready and able to pursue a military career. In fact, he contacted military recruiters in or around September 2016, but he was open about his transgender status and discussed with a recruiter having to wait until the current accessions bar was lifted. Mr. Karnoski was referred to recruiting offices in King County,

COMPLAINT - 6
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Washington, his point of contact for further communications regarding his accession.

36.     Mr. Karnoski would like to put his social work skills to use for the military.  Social work is an area for which there can be significant need in the military, including in the Army and Navy. Given that Mr. Karnoski holds a master's degree in social work, he aspires to serve as an officer in the military.

37.     Mr. Karnoski is transgender. He was assigned the sex of female at birth but his gender identity is male.

38.     Mr. Karnoski began to come to terms with his gender identity approximately five years ago.

39.     Mr. Karnoski began living openly as male in 2014.

40.     In consultation with health care professionals, Mr. Karnoski has taken clinically appropriate steps to transition.

41.     Mr. Karnoski has taken legal steps to transition. He legally changed his first name to Ryan. He also changed his name and gender marker to male on his driver's license, birth certificate, social security card and records, and passport.

42.     Mr. Karnoski has engaged in speech and conduct disclosing his transgender status and expressing his gender identity and wants to continue to be able to do so.

**C.    Plaintiff Staff Sergeant Cathrine Schmid**

43.     Plaintiff Staff Sergeant Cathrine ("Katie") Schmid was born at K.I. Sawyer Air Force Base, Michigan, and was raised in Portland, Oregon. She has always been a patriotic American with a desire to serve others and was drawn to opportunities presented by serving in the Army. She is proud to put on her uniform each day and serve her country.

44.     Staff Sergeant Schmid holds the military occupational specialty of Signals Intelligence Analyst within the Army, currently performing duties as Brigade Land and Ammunition Manager. Before her current role, she performed duties as a Signals Intelligence Analyst, All-Source Analysis System Master Analyst, Human Intelligence Collector, and Counterintelligence Agent. She joined the Army in 2005.

COMPLAINT - 7
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

45. Staff Sergeant Schmid is transgender. She was assigned the sex of male at birth but has a female gender identity. She knew from a young age in life that she was female.

46. Staff Sergeant Schmid began to come to terms with her gender identity approximately four years ago. At that time, she started to see a mental health professional who diagnosed her with gender dysphoria.

47. Staff Sergeant Schmid began living openly as a woman around 2014.

48. In consultation with health care professionals, Staff Sergeant has taken clinically appropriate steps to transition, and she has further transition-related health care needs.

49. Staff Sergeant Schmid has taken legal steps to transition. She legally changed her first name to Cathrine. She also changed her name and changed her gender marker to female on her driver's license, passport, and social security records.

50. Staff Sergeant Schmid has worked with her chain of command throughout her transition, and both they and other enlisted personnel have been supportive of her throughout that process. Her gender marker in the military's personnel management systems (including the Defense Enrollment Eligibility Reporting System) reflects that she is female.

51. She is recognized and treated as female in all aspects of military life, including in social interactions and in her compliance with women's grooming and physical training requirements.

52. The fact that Staff Sergeant Schmid is transgender has not prevented her from doing her job in the military nor has it prevented others from doing their jobs in the military. Staff Sergeant Schmid performs valuable services for the Army, and her performance of those duties strengthen our nation's military readiness.

53. Being able to serve openly as a transgender woman has made Staff Sergeant Schmid a stronger asset for the military. She is able to function as a productive, healthy member of the military, and she is able to forge stronger relationships with others in her unit.

54. In June 2017, Staff Sergeant Schmid submitted an application to become an Army warrant officer. A warrant officer is a highly specialized expert and trainer in a technical area such as aviation, military police, or, in Staff Sergeant Schmid's case, intelligence. Her application was

COMPLAINT - 8
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   approved at the initial stages.

2        55.    But the military's current accessions bar not only excludes transgender individuals

3   from enlistment but also from appointment as officers, even where an individual is already

4   serving in the military. Staff Sergeant Schmid was informed in writing in July 2017 that her

5   application was placed on hold, and thus was not being considered further at the time, because of

6   the current accessions bar, which has now been indefinitely extended by the Ban.  Staff Sergeant

7   Schmid has been deprived of an equal opportunity to become a warrant officer because of

8   President Trump's issuance of the Ban, because of his extension of the current accessions bar,

9   and because of the Defendants' enforcement of them both.

10        56.    Staff Sergeant Schmid has engaged in speech and conduct disclosing her

11   transgender status and expressing her gender identity, including by coming out to her chain of

12   command and her fellow service members, taking steps to transition, and living openly as a

13   woman in military life. She wants to continue to be able to engage in speech and conduct

14   disclosing her transgender status and expressing her gender identity.

15   **D.    Plaintiff D.L.**

16        57.    Plaintiff D.L. was born in Alice, Texas and currently resides in Corpus Christi,

17   Texas. D.L.'s great grandfather and great uncle both served in the Army, and the former earned a

18   Purple Heart for his service. D.L. is proud of his family's history of service and has a strong

19   desire to serve his country by joining the military as well.

20        58.    After years of consideration, research, and speaking to veterans of different

21   services, D.L. decided to pursue a career in the military. Specifically, D.L. wants to serve as a

22   Survival, Evasion, Resistance and Escape Specialist in the Air Force. This position entails

23   training other Airmen on survival-related techniques needed, for various terrains and climates, in

24   the event that their aircraft goes down.

25        59.    Existing regulations permit individuals to join the military at age 17 with parental

26   consent. Based on his age, D.L. is eligible to join the military as of August 2017, and D.L.'s

27   mother and next friend, Laura Garza, supports D.L. in his desire to join the military.

28

NEWMAN DU WORS LLP

1   60.     D.L. anticipates receiving his high school diploma in roughly September 2017.

2   D.L. has long planned and hoped to join the Air Force upon completion of high school.

3   61.     In preparation for enlistment, D.L. communicated with an Air Force recruiter in

4   early July 2017. When D.L. disclosed to the recruiter that he is transgender, the recruiter stopped

5   communicating with D.L.

6   62.     But for the Ban and the current accessions bar, and Defendants' enforcement of

7   them both, D.L. would seek to join the military, and he is ready and able to pursue a military

8   career.

9   63.     D.L. is transgender. He was assigned the sex of female at birth but his gender

10  identity is male.

11  64.     D.L. came out about his gender identity in the summer of 2015. He has lived

12  openly as male since that time.

13  65.     In consultation with health care professionals, D.L. has taken clinically

14  appropriate steps to transition.

15  66.     D.L. has engaged in speech and conduct disclosing his transgender status and

16  expressing his gender identity, including by coming out to the Air Force recruiter, taking steps to

17  transition, and living openly as male in his everyday life. He wants to be able to continue to

18  engage in speech and conduct disclosing his transgender status and expressing his gender

19  identity.

20  **E.      Plaintiff Human Rights Campaign**

21  67.     HRC is a private, non-profit membership organization with approximately

22  508,000 members throughout the United States, including transgender members serving in the

23  United States military and transgender members who wish to serve in the United States military.

24  The mission of HRC is to end discrimination against LGBTQ people and realize a world that

25  achieves fundamental fairness and equality for all, including ending discrimination against

26  LGBTQ people who wish to serve their country.

27  68.     HRC sues on behalf of its members, including Mr. Karnoski, Staff Sergeant

28  Schmid, and other prospective and current transgender service members who are currently

COMPLAINT - 10
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  adversely affected by the Ban and the current accessions bar.

2  **F.     Plaintiff Gender Justice League**

3          69.     GJL is a civil and human rights membership organization that, as relevant here,

4  advocates on behalf of transgender individuals in Washington state. It seeks to create a

5  community for transgender people and to empower them to combat the structural oppression,

6  discrimination, and violence they face in their daily lives.

7          70.     GJL sues on behalf of its members, including Mr. Karnoski, Staff Sergeant

8  Schmid, and other prospective and current transgender service members who are currently

9  adversely affected by the Ban and the current accessions bar.

10  **G.     Prior Military Ban Against Transgender Individuals**

11         71.     There has never been a federal statute excluding transgender people from military

12  service. Instead, the military previously had a policy of excluding transgender people from service

13  based on DoD and service-specific rules and regulations.

14         72.     This earlier military policy was based on an inaccurate, historical, pathological

15  view that regarded transgender people as deviants. This view was discredited long ago following

16  psychological and medical advances in the understanding of gender identity and of transgender

17  people.

18         73.     Despite this earlier policy of exclusion, transgender people have always served in

19  the military but, as noted by former Secretary of Defense Ash Carter ("Secretary Carter"),

20  "they often had to serve in silence alongside their fellow comrades in arms."

21         74.     Transgender people have played essential, mission-critical roles in the military,

22  even when they have not had the ability to serve openly. For example, a transgender woman

23  served on Navy SEAL Team 6 and earned a Purple Heart and a Bronze Star, among many other

24  ribbons and medals.

25         75.     According to a 2014 study conducted by the Williams Institute at the University of

26  California, Los Angeles, there are an estimated 134,300 transgender people who are veterans or

27  are retired from guard or reserve service.

28

COMPLAINT - 11
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

76.     It is a statistical certainty that there have been transgender people who have sacrificed their lives in the course of military service to the United States.

**H.    Rescission of Prior Military Ban Against Transgender Individuals**

77.     The military's prior ban against transgender people was the subject of extensive research and study, which concluded that it lacked any valid justification.

78.     For example, in March 2014, the Transgender Military Service Commission (the "Commission") issued a report analyzing the military's former ban. The Commission, which was co-chaired by a former U.S. Surgeon General, was convened to determine whether the ban was based on medically sound reasons. The Commission found that there was "no compelling medical rationale" for banning military service by transgender people.

79.     In May 2014, then-Secretary of Defense Chuck Hagel publicly stated that he was receptive to reviewing and reassessing the rules that govern service by transgender people. He explained that "[e]very qualified American who wants to serve our country should have an opportunity if they fit the qualifications and can do it."

80.     In July 2015, Secretary Carter admitted that DoD's regulations regarding transgender service members "[were] outdated and [were] causing uncertainty that distracted commanders from our core missions." He also recognized the many transgender people who were already serving in the military: "We have transgender soldiers, sailors, airmen and Marine—real, patriotic Americans—who I know are being hurt by an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit."

81.     Accordingly, Secretary Carter announced the creation of a working group to study for six months the policy and readiness implications of permitting transgender individuals to serve openly. This working group was chaired by the Under Secretary of Defense for Personnel and Readiness and comprised senior representatives from each of the military services, the Joint Staff, and relevant components from Office of the Secretary of Defense.

82.     In addition to creating a working group, Secretary Carter also directed that, effective July 13, 2015, no service member could be involuntarily separated or denied reenlistment or continuation of active or reserve service on the basis of their gender identity

COMPLAINT - 12
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1 without the approval of the Under Secretary of Defense for Personnel and Readiness.

2       83.    On information and belief, separations of service members on the basis of their

3 gender identity fell sharply after July 2015, and there were very few, if any, service members who

4 were separated on that basis from July 2015 to June 2016. In effect, transgender people served

5 openly in the military from July 2015 to June 2016, as well as likely before that period, albeit

6 under the threat of separation.

7       84.    In or around July 2015, Secretary Carter also directed the commencement of a

8 study to evaluate the implications of allowing transgender personnel to serve openly in the

9 military. DoD commissioned the RAND Corporation, a non-profit, non-partisan research

10 organization, to conduct the study. DoD asked RAND to (1) identify the health care needs of the

11 transgender population and the costs associated with providing transition-related care to

12 transgender service members, (2) assess the readiness implications of allowing transgender

13 service members to serve openly, and (3) review the experiences of foreign militaries that permit

14 transgender individuals to serve openly. The findings from the study, which reflected the

15 culmination of months of research and spanned 91 pages, were publicly released in May 2016.

16       85.    As detailed further below, the RAND study demonstrated that the cost of

17 providing transition-related care is exceedingly small relative to DoD's overall health care

18 expenditures, that there are no readiness implications that prevent transgender members from

19 serving openly, and that foreign militaries have successfully permitted open service without a

20 negative effect on effectiveness, readiness, or unit cohesion.

21       86.    The leadership of the Armed Services—including the Joint Chiefs of Staff, the

22 Service Secretaries, and Secretary Carter—together with personnel, training, readiness, and

23 medical specialists from across DoD, studied the available data, including the findings and

24 analysis from RAND. They also received input from transgender service members, from outside

25 expert groups, and from medical professionals outside DoD. They looked carefully at what

26 lessons could be learned from outside the U.S. military, including from allied militaries that

27 permit transgender people to serve openly, as well as from the private sector.

28

COMPLAINT - 13
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

87.     As a result of this deliberative process and year-long study, on June 30, 2016,

Secretary Carter announced that the military was ending the ban on open service by transgender

people. The conclusion was supported by, among other things, the need to recruit and retain the

individuals most highly qualified to serve. Effective immediately, transgender service members

were permitted to serve openly and could no longer be discharged or otherwise separated from

the military solely for being transgender. DoD materials explained that "[t]his policy change was

crafted through a comprehensive and inclusive process that included the leadership of the Armed

Services, medical and personnel experts across the Department, transgender Service members,

outside medical experts, advocacy groups, and the RAND Corporation."

88.     In the accompanying directive-type memorandum regarding the policy change,

Secretary Carter explained that the policies and procedures permitting open service were

premised on the conclusion that "open service by transgender Service members . . . is consistent

with military readiness and with strength through diversity."

89.     The policy change was announced through a press conference held by Secretary

Carter as well as through a section of the DoD website titled "Department of Defense

Transgender Policy," which was still active in the days following President Trump's July 26,

2017 tweets. That website lists the highlights of the policy change, links to various DoD resources

related to the policy change, and includes a video that assures transgender individuals:

"Transgender Members Can Now Serve Openly."

90.     DoD planned a 12-month implementation process that would proceed in stages,

beginning with the needs of current service members and their commanders, followed by training

for the entire force, and concluding with the accession of transgender recruits.

91.     On September 30, 2016, within 90 days after the lifting of the ban, DoD issued a

training handbook for commanders, transgender service members, and the force, titled

"Transgender Service in the U.S. Military: An Implementation Handbook." The 71-page

handbook was designed to help transgender service members in their transition, help

commanders with their duties and responsibilities, and help all service members understand the

new policies allowing open service by transgender service members. The handbook illustrates

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   that open service has been workable and practicable.

2       92.    Also within 90 days of the lifting of the prior ban, DoD issued medical guidance

3   for providing transition-related care to transgender service members, who were also able to begin

4   the process to officially change their gender marker in the military's personnel management

5   systems.

6       93.    Over the next nine months following the lifting of the prior ban (i.e., from October

7   2016 to June 2017), the services conducted training of the force based on detailed guidance and

8   training materials regarding the policy change.

9       94.    Finally, it was envisioned that by July 1, 2017, the military would begin accessing

10   transgender people who meet all relevant standards—holding them to the same physical and

11   mental fitness standards as everyone else who wishes to serve in the military.

12       95.    On or around June 30, 2017, Secretary Mattis deferred the accession of

13   transgender individuals until January 1, 2018. There was no change in the decision about whether

14   transgender individuals would be able to join the military but instead merely a change in when

15   they could begin to do so.

16       96.    But for President Trump's implementation of the Ban, the military would have

17   begun the accession of transgender individuals on January 1, 2018.

18   **I.    Current Policy of Discrimination Against Transgender Individuals in Military Service**

19

20       97.    Through a series of three tweets on July 26, 2017, President Trump unilaterally

21   reversed the U.S. military's policy of permitting open service by transgender individuals and

22   dismantled the years of work that led to the development and implementation of that policy.

23       98.    At 8:55 a.m. Eastern time, President Trump tweeted: "After consultation with my

24   Generals and military experts, please be advised that the United States Government will not

25   accept or allow......"

26       99.    At 9:04 a.m. Eastern time, President Trump tweeted: "....Transgender

27   individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive

28   and overwhelming....."

COMPLAINT - 15
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

100.   At 9:08 a.m. Eastern time, President Trump tweeted: "....victory and cannot be burdened with the tremendous medical costs and disruption that transgender [sic] in the military would entail. Thank you[.]"

101.   The "process" that led to the Ban—to the extent there was any meaningful process at all—was the antithesis of the deliberative, comprehensive, and inclusive process that led to the rescission of the prior ban.

102.   President Trump failed to engage in any meaningful study, deliberation, or consultation with key military officials, including Secretary Mattis, before making the decision to exclude transgender individuals from the military. Indeed, President Trump tweeted about his decision when Secretary Mattis was on vacation and reportedly provided Secretary Mattis with only one day's notice of the decision.

103.   Before the President's Twitter announcement, other top Pentagon officials were similarly unaware of his decision to ban transgender individuals from the military. In fact, in the nine minutes between the President's tweet at 8:55 a.m. Eastern Time (which stated, "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow......") and his next tweet at 9:04 a.m. Eastern Time, there were concerns that President Trump was declaring war on North Korea.

104.   The Joint Chiefs of Staff, including Chairman General Joseph Dunford, were not aware that President Trump planned to tweet about a renewed ban on transgender service members. Military service chiefs from the U.S. Army, Marine Corps, Navy, Air Force, and, upon information and belief, the U.S. Coast Guard were all blindsided by the President's Twitter announcement.

105.   Indeed, on June 19, 2017, Chairman General Dunford stated: "Transgender personnel are serving right now, and there is no ongoing review that would affect the ability of those currently serving to continue serving, provided they can meet the physical and mental qualifications of service, be worldwide deployable, and [meet] the same standards that every other soldier, sailor, airmen, [and] marine meets."

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

106.    Before the President's Twitter announcement, the Pentagon press office was also unaware of the President's decision to again ban transgender people from the military. Immediately after the President's tweets, a Pentagon spokesperson, Navy Captain Jeff Davis, declined to answer media questions about them, instead telling media: "call the White House."

107.    On July 26, 2017, White House Press Secretary Sarah Huckabee Sanders also could not answer a basic question about the proposed new ban: whether transgender individuals currently serving in the military would be discharged. Instead, she responded that DoD and the White House "[would] have to work together" to figure that out. She also could not say for certain who would even take the lead on implementation but "imagine[d]" that it would be DoD.

108.    Even White House lawyers and aides, who had advised President Trump against banning transgender individuals from the military, were blindsided by the President's tweets announcing the intended ban. Indeed, one White House official admitted that President Trump took to Twitter to announce the change because the President was frustrated that others wanted to engage in further discussion and analysis of the issues involved. According to a White House official, President Trump stated that the announcement "would stop the lawyers from arguing with him anymore" and trying to dissuade him from reinstituting a ban on transgender military service.

109.    On information and belief, President Trump also never spoke to a single transgender person regarding the potential impact of his proposed ban before deciding to institute it.

110.    Several congressional and White House sources reported that part of the President's motivation for the policy change was to shore up support for a spending bill that would have funded his desired border wall with Mexico and other campaign promises. There was concern that the spending bill would not pass the House of Representatives because some Republican members wanted a ban on military funding for transition-related care, which Republican leadership would not permit, and thus these members might cause the defeat of the entire spending bill. Indeed, on July 13, 2017—almost two weeks before the tweets—the House had previously rejected a proposed amendment that would have banned coverage for transition-

COMPLAINT - 17
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  related care for transgender service members. These Republican members turned to President

2  Trump, who quickly went much further than banning coverage for transition-related care and

3  instead announced his intention to ban transgender members from military service altogether,

4  presumably as a last-ditch to save the spending bill at issue.

5      111.    A Trump administration official also suggested that the President's policy change

6  was motivated by a desire to gain political advantage over Democrats, stating: "This forces

7  Democrats in Rust Belt states like Ohio, Michigan, and Wisconsin, to take complete ownership of

8  this issue. How will the blue collar voters in these states respond when senators up for re-election

9  in 2018 like Debbie Stabenow are forced to make their opposition to this a key plank of the

10  campaigns?"

11      112.    Then-Deputy Assistant to President Trump Sebastian Gorka stated on July 28,

12  2017, that the military is "not there to reflect America" but instead "to kill people and blow stuff

13  up." He derided the inclusion of transgender service members in the military as "Obama-era

14  social engineering." He also cited reports that 40 percent of transgender people have attempted

15  suicide at some point in their lives as a justification for excluding them from military service—

16  failing to recognize or acknowledge the role that discrimination plays in that statistic—and

17  asserted that "we don't need to try and force them into the hierarchical military environment

18  where they are under the utmost pressure to kill or be killed." Mr. Gorka continued, "that is why

19  the President is doing this—out of warmth of his consideration for this population." That

20  statement is false.

21      113.    President Trump's unilateral decision to bar transgender individuals from the

22  military has been met with widespread opposition and condemnation, including by elected

23  representatives from both main political parties. For example, Republican Senator John McCain,

24  Chair of the Senate Armed Services Committee, stated "We should all be guided by the principle

25  that any American who wants to serve our country and is able to meet the standards should have

26  the opportunity to do so—and should be treated as the patriots they are." Similarly, Republican

27  Senator Richard Shelby stated, "You ought to treat everybody fairly and you ought to give

28  everybody a chance to serve." Republican Senator Lindsey Graham added, "This is something

NEWMAN DU WORS LLP

1  we should... not make a decision [about] based off a tweet." Furthermore, more than 50 House

2  members, including those on the House Judiciary Committee and Armed Services Committee,

3  joined a letter stating that the President's decision to ban transgender individuals from the

4  military was unconstitutional on its face.

5        114.    Attorneys general from 19 states and the District of Columbia joined a letter

6  denouncing the President's exclusion of transgender individuals from the military as "blatant

7  discrimination" that violates "fundamental constitutional and American values." The states

8  include California, Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Massachusetts,

9  Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia

10  and Washington.

11        115.    Fifty-six retired generals and admirals issued a public statement on August 1,

12  2017, warning that the proposed ban on transgender service members would downgrade military

13  readiness. The statement notes that two four-star generals and former chairmen of the Joint

14  Chiefs of Staff—Army General Martin Dempsey and Navy Admiral Mike Mullen—have publicly

15  supported open service by transgender individuals.

16  **J.**    **Implementation of Discrimination Against Transgender Individuals in Military**
**Service**

17

18        116.    On or around July 31, 2017, Navy Captain Jeff Davis stated that, upon receiving

19  any "formal direction" from the President, DoD officials "would provide implementing

20  guidance and implement accordingly." He added that the military was ready "to make [it]

21  happen" once the formal direction was received.

22        117.    On or around August 14, 2017, Secretary Mattis informed reporters: "I've got my

23  people over there in the room to give [the White House] any military background that they might

24  need to inform them." But he added, "[t]hey write their own policy of course, so we're in a

25  supporting role right now."

26        118.    On August 25, 2017, President Trump issued a memorandum entitled "Military

27  Service by Transgender Individuals" (the "Memorandum") to the Secretary of Defense and the

28  Secretary of Homeland Security ("DHS"). The Memorandum institutes the Ban.

NEWMAN DU WORS LLP

119. President Trump has admitted that, until June 2016, DoD and DHS "generally prohibited openly transgender individuals from accession in the United States military and authorized the discharge of such individuals." President Trump's avowed purpose in issuing the Memorandum and the Ban is to "return" the United States to that "longstanding" policy and practice of discrimination.

120. In light of both President Trump's tweets, his Memorandum, and the Ban, transgender service members are now no longer able to serve openly on the same terms as before his tweets, his Memorandum, and the Ban, notwithstanding any purported effective dates set forth in the Memorandum. Any present-day speech or conduct that "openly" discloses a transgender individual's gender identity or transgender status places them in violation of President Trump's Memorandum and the Ban, subjecting them to discharge and other "action . . . against [them]."

121. President Trump's Memorandum also mandates that the Secretary of Defense and the Secretary of Homeland Security "maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018." As a result, individuals known to be transgender are currently and now indefinitely barred from enlistment and appointment in the military.

122. Lastly, President Trump's Memorandum mandates that the Secretary of Defense and the Secretary of Homeland Security "halt all use of DoD or Department of Homeland Security resources to fund sex-reassignment [sic] surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." The Memorandum selectively targets the health care needs of transgender service members for adverse treatment for no legitimate reason.

123. Transition-related health care, including surgical care, can be medically necessary for an individual, regardless of whether that individual has already begun a course of treatment to transition.

124. All Defendants—President Trump, the U.S., Secretary Mattis, and DoD—are responsible for implementing and enforcing the Ban and the current accessions bar.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

**K.      Purported Justifications for Policy of Discrimination Against Transgender Individuals**

125.     The Ban and the current accessions bar are not supported by any compelling, important, or even rational government interest.

126.     The Ban and the current accessions bar lack any narrowly-tailored, substantially-related, or even rational relationship to any legitimate government interest, and they are not the least restrictive means of achieving any valid government interest.

127.     Neither of the purported justifications cited by President Trump for the reinstatement of the prior ban in his tweets—medical costs and disruption—nor any of the after-the-fact justifications drafted by others in defense of his tweets has any basis in reality. Indeed, they are rebutted by, among other things, the fact that transgender individuals have already served openly for more than a year without any of these concerns materializing.

**1.      Medical Costs**

128.     With respect to the issue of medical cost, DoD's own commissioned study by RAND estimated that providing transition-related care to active-duty service members would cost between $2.4 million and $8.4 million annually—which is "an amount that will have little impact on and represents exceedingly small proportion of [active component] health care expenditures (approximately $6 billion in FY 2014) and overall DoD health care expenditures ($49.3 billion actual expenditures [in FY 2014] . . .)."

129.     The RAND study mirrored earlier research findings. A 2015 article published in the New England Journal of Medicine estimated that the cost of providing transition-related care to service members would be approximately $5.6 million annually or 22 cents per member per month. The article concluded that any plausible estimate of the cost involved is equivalent to a "rounding error" in the military's nearly-$50 billion annual health care budget.

130.     The surgeon general of the Navy also noted in December 2016 that most of the medical care for transgender service members was already provided to others in relation to similar medical needs.

COMPLAINT - 21
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

131.    Providing transition-related care also mitigates other costs that the military would otherwise be required to bear. The RAND study noted that the adverse consequences of not providing transition-related care to transgender personnel could include causing these individuals to avoid other necessary health care altogether, such as important preventive services, as well as increased rates of mental and substance abuse disorders, and suicide, and reduced productivity.

132.    Implementing a ban against transgender individuals in the military will cost the federal government many times more in taxpayer dollars than any cost associated with allowing transgender individuals to continue serving and to join the military. Implementation costs include the high expense of separating or dismissing people subject to the policy and the cost of finding replacements for and training non-transgender individuals to replace them. A recent study estimated that it would cost $960 million dollars to recruit and train the replacements for all the transgender individuals who are currently serving in the military—more than one hundred times the upper estimate of the cost of providing transition-related care for one year.

### 2.    Military Readiness

133.    There is also no military readiness justification for the policy of excluding transgender individuals from the military.

134.    The RAND study found that less than 0.0015 percent of total available labor-years, defined as the amount of work done by an individual in a year, would be affected by permitting transgender individuals to openly serve. This is because, even on the high end of estimates, less than 0.1 percent of the total force would seek transition-related care that could temporarily affect their ability to deploy.

135.    Existing data also show that there is no impact on unit cohesion that would prevent transgender individuals from serving openly.

136.    The military has previously adapted to the eradication of other forms of discrimination including racial desegregation, the end of the anti-lesbian, gay, and bisexual "Don't Ask, Don't Tell" policy, and the integration of women into direct combat positions. The military was able to adapt to the inclusion of transgender troops serving openly as well, particularly with the benefit of force-wide training and clear guidance implemented by the

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   military.

2   137.   Eighteen countries allow transgender people to serve openly in the military:

3   Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland,

4   France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United

5   Kingdom. The RAND study focused on the policies of four countries with the most well-

6   developed and publicly available policies on transgender military service members—Australia,

7   Canada, Israel, and the United Kingdom. In no case did the study find any evidence of an adverse

8   effect on operational effectiveness, operational readiness, or cohesion of the force.

9   ## CAUSES OF ACTION

10   ### FIRST CAUSE OF ACTION
### EQUAL PROTECTION VIOLATION
11   ### (By All Plaintiffs Against All Defendants)

12   138.   Plaintiffs incorporate paragraphs 1 through 137 as though fully set forth herein.

13   139.   All Plaintiffs state this cause of action against all Defendants (including President

14   Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking

15   declaratory and injunctive relief, and challenge the Ban and the current accessions bar both

16   facially and as applied to them or, as to the organizational plaintiffs, as applied to their members.

17   140.   The Fifth Amendment to the United States Constitution provides that no person

18   shall be deprived of life, liberty, or property without due process of law. The Due Process Clause

19   includes within it a prohibition against the denial of equal protection by the federal government,

20   its agencies, or its officials or employees.

21   141.   Defendants' disparate treatment of transgender individuals facially and

22   intentionally discriminates against transgender individuals based on sex-related considerations.

23   142.   Discrimination based on sex-related considerations includes, but is not limited to,

24   discrimination based on gender nonconformity, gender identity, transgender status, and gender

25   transition.

26   143.   The Department of Defense's Transgender Service Member Policy

27   Implementation Fact Sheet, posted on the Department of Defense's official website, admits that

28   "Any discrimination against a Service member based on their gender identity is sex

COMPLAINT - 23
[2:17-cv-1297]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    discrimination."

2         144.    Discrimination because an individual is transgender is both discrimination based

3    on a sex-related consideration, which at a minimum requires courts to apply intermediate

4    scrutiny in evaluating the constitutionality of the government's discrimination, and

5    discrimination based on transgender status, which requires courts to apply strict scrutiny to such

6    discrimination.

7         145.    Government discrimination against transgender individuals bears all the indicia of

8    a suspect classification requiring strict scrutiny by the courts.

9              a.    Transgender people have suffered a long history of extreme discrimination

10                   and continue to suffer such discrimination to this day.

11             b.    Transgender people are a discrete and insular group and lack the political

12                   power to protect their rights through the legislative process. Transgender

13                   people have largely been unable to secure express federal, state, and local

14                   protections specifically protecting them against discrimination, and have

15                   been and continue to be regularly targeted by anti-transgender legislation,

16                   regulations, bills, and other government action.

17             c.    A person's gender identity or transgender status bears no relation to that

18                   person's ability to contribute to society.

19             d.    Transgender people constitute a small minority of the population. In

20                   addition, gender identity is a core, defining trait and is so fundamental to

21                   one's identity and conscience that a person cannot be required to abandon

22                   it as a condition of equal treatment. Gender identity is also generally fixed

23                   at an early age and highly resistant to voluntary change. Efforts to change

24                   gender identity have been condemned by leading medical and

25                   psychological authorities as harmful, and have been barred by numerous

26                   states, the District of Columbia, and numerous local governments.

27        146.    Defendants' disparate treatment of transgender individuals like the individual

28    plaintiffs and the transgender members of the organizational plaintiffs deprives them of their

COMPLAINT - 24
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  right to equal dignity and stigmatizes them as second-class citizens in violation of equal

2  protection guarantees.

3       147.    There is not even a legitimate justification for such disparate treatment, let alone

4  the important or compelling one that is constitutionally required.

5       148.    The Ban and current accessions bar are motivated by impermissible animus

6  towards transgender people and are thus invalid as a whole.

7  **SECOND CAUSE OF ACTION**<br>**DUE PROCESS VIOLATION**

8  **(By All Plaintiffs Against All Defendants)**

9       149.    Plaintiffs incorporate paragraphs 1 through 137 as though fully set forth herein.

10       150.    All Plaintiffs state this cause of action against all Defendants (including President

11  Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking

12  declaratory and injunctive relief, and challenge the Ban and current accessions bar both facially

13  and as applied to them or, as to the organizational plaintiffs, as applied to their members.

14       151.    Defendants' conduct, including their enforcement of the Ban and current

15  accessions bar, violates the rights of the individual plaintiffs and of the transgender members of

16  the organizational plaintiffs under the Fifth Amendment's Due Process Clause. The Due Process

17  Clause protects each person's fundamental liberty to individual dignity, autonomy, and privacy.

18  That includes the right to define and express one's own identity, to define one's own concept of

19  existence, and to make intimate decisions concerning marriage, procreation, and family life, all

20  without undue government interference.

21       152.    A person's gender identity constitutes a core aspect of individual self-definition.

22  The Ban and current accessions bar diminish the personhood, dignity, and autonomy of the

23  individual plaintiffs and of the transgender members of the organizational plaintiffs, and

24  impermissibly interfere with the most intimate choices a person may make in a lifetime, including

25  the right to self-expression and to live openly and authentically.

26       153.    Where the government impermissibly burdens a fundamental liberty interest, such

27  government action may be sustained only upon a showing that it is, at the very least, substantially

28  related to an important government interest, if not narrowly tailored to serve a compelling

government interest. Here, the Ban and the current accessions bar lack adequate tailoring and fail to serve even a legitimate governmental interest. Indeed, they epitomize the very kind of arbitrary and capricious government action that the Due Process Clause forbids.

154.     Defendants have also violated the due process rights of the individual plaintiffs and of the transgender members of the organizational plaintiffs to the extent that they detrimentally relied on the military's policy, extant during the period of June 2016 to August 2017, of permitting open service by transgender individuals.

### THIRD CAUSE OF ACTION
### FREE SPEECH VIOLATION
### (By All Plaintiffs Against All Defendants)

155.     Plaintiffs incorporate paragraphs 1 through 137 as though fully set forth herein.

156.     All Plaintiffs state this cause of action against all Defendants (including President Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking declaratory and injunctive relief, and challenge the Ban and current accessions bar both facially and as applied to them or, as to the organizational plaintiffs, as applied to their members.

157.     The Ban and current accessions bar violate the Free Speech Clause of the First Amendment because they impermissibly burden and chill the exercise of the individual plaintiffs' and of the organizational plaintiffs' transgender members' constitutionally protected speech, expression, expressive conduct, and expressive association, based on the content and viewpoint of their speech.

158.     All the individual plaintiffs and transgender members of the organizational plaintiffs have been open about their status as transgender either in the context of seeking to join the military or in the course of their military service. All individual plaintiffs and transgender members of organizational plaintiffs want to continue being open about their status as transgender, and to continue expressing and conducting themselves consistently with their gender.

159.     The gender expression of the individual plaintiffs and of transgender members of the organizational plaintiffs, the conduct of those individuals that is consistent with their gender, and those individuals' disclosure of their transgender status, all constitute protected First

COMPLAINT - 26
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Amendment activity. Similarly, the advocacy of those individuals for fairness for transgender service members and an end to discrimination against transgender individuals in military service, and those individuals' association with other transgender people and their allies for expressive purposes, constitute protected First Amendment activity.

160. The purpose and effect of the Ban and current accessions bar are to chill constitutionally protected First Amendment activity. Indeed, the Memorandum on its face demonstrates that it is directed at suppressing the gender expression and related expressive conduct of transgender individuals, including that of the individual plaintiffs and transgender members of the organizational plaintiffs , and those individuals' disclosure of their transgender status: specifically, the Memorandum states that policy is changing by returning to one that prohibits "*openly* transgender individuals" from accession, authorizes the discharge of such individuals, and prevents transgender individuals from serving "*openly* in the military" (emphases added).

161. The Ban and current accessions bar penalize the individual plaintiffs, transgender members of the organizational plaintiffs, other transgender service members, and other transgender individuals who would like to join the military or be appointed as officers, for their gender expression. The Ban and current accessions bar chill the protected First Amendment activity of a person of ordinary firmness who is transgender by requiring such persons either to attempt to deny who they are and suppress expression of their gender or be denied military service on the same terms as others. The ban also chills these individuals' right to advocate for fair treatment for transgender service members for fear that this advocacy will identify them as transgender. For the same reason, the exclusion chills exercise of their right to associate with other transgender service members and their allies and form or participate in expressive associations for the purpose of advocating for an end to the exclusion.

162. The individual plaintiffs and transgender members of the organizational plaintiffs are harmed by being denied the opportunity to serve in the military on the same terms as other service members. All of the individual plaintiffs and transgender members of the organizational plaintiffs face a realistic danger of sustaining a direct injury as a result of implementation,

COMPLAINT - 27
[2:17-cv-1297]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

operation, or enforcement of the terms of the Ban as well as the current accessions bar. For example, Mr. Karnoski and D.L. are harmed by being denied the opportunity to serve in the military. Staff Sergeant Schmid is being refused appointment as a warrant officer due to the current accessions bar, and she also faces a realistic danger that she will sustain a direct injury from implementation of the Ban, which requires a return to the exclusion of transgender service members from the military.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the Ban and the current accessions bar unconstitutional on their face and as applied to the individual plaintiffs and transgender members of the organizational plaintiffs for the reasons set forth above;

2.      Preliminarily and permanently enjoin Defendants, their agents, employees, representatives, successors, and any other person or entity subject to their control or acting directly or indirectly in concert with them from enforcing the Ban or the current accessions bar, including by enjoining any separation, discharge, adverse action, or denial of promotion, reenlistment, continuation of service, accession, or appointment because an individual is transgender.

3.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable laws; and

4.      Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Respectfully submitted August 28, 2017.

NEWMAN DU WORS LLP

Derek A. Newman, WSBA #26967
dn@newmanlaw.com
2101 Fourth Ave., Ste. 1500
Seattle, WA 98121
(206) 274-2800

1

2          **LAMDBA LEGAL DEFENSE AND**
            **EDUCATION FUND, INC.**
3          Tara Borelli, WSBA #36759
            *tborelli@lambdalegal.org*
4          Jon W. Davidson (pro hac vice pending)
            Camilla B. Taylor (pro hac vice pending)
5          Peter Renn (pro hac vice pending)
            Natalie Nardecchia (pro hac vice pending)
6          Sasha Buchert (pro hac vice pending)
            Kara Ingelhart (pro hac vice pending)
7          Carl Charles (pro hac vice pending)
            730 Peachtree Street NE, Ste. 640
8          Atlanta, GA  30308
            (404) 897-1880
9

10         **OUTSERVE-SLDN, INC.**
            Peter Perkowski (pro hac vice pending)
11

12         **KIRKLAND & ELLIS LLP**
            James F. Hurst, P.C. (pro hac vice pending)
13         Jordan Heinz (pro hac vice pending)

14

15         Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28