1

2

The Honorable Marsha J. Pechman

3

4

5

6

7

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

| | |
|---|---|
| RYAN KARNOSKI; STAFF SERGEANT CATHRINE SCHMID; D.L., formerly known as K.G., by his next friend and mother, LAURA GARZA; CHIEF WARRANT OFFICER LINDSEY MULLER; PETTY OFFICER FIRST CLASS TERECE LEWIS; PETTY OFFICER SECOND CLASS PHILLIP STEPHENS; PETTY OFFICER SECOND CLASS MEGAN WINTERS; JANE DOE; CONNER CALLAHAN; HUMAN RIGHTS CAMPAIGN; GENDER JUSTICE LEAGUE; AND AMERICAN MILITARY PARTNER ASSOCIATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; JAMES N. MATTIS, in his official capacity as Secretary of Defense; and the UNITED STATES DEPARTMENT OF DEFENSE, <br><br> *Defendants*. | Case No. 2:17-cv-01297-MJP <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## NATURE OF ACTION

25

      1.    This action challenges the constitutionality of an official federal policy of

26

discrimination against transgender people regarding military service. There are currently

27

thousands of transgender individuals who are bravely serving in our nation's military across

28

myriad roles, and there are many transgender individuals who seek to follow the same noble path.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Like other service members, these transgender individuals are willing to place themselves in harm's way—and potentially pay the ultimate price—in service of our country. But their President deprives them of an opportunity to serve on equal terms as others simply because they are transgender.

2.      The U.S. military previously excluded open service by transgender individuals but it reversed that policy in 2016. Following extensive study and deliberation, the U.S. Department of Defense ("DoD") concluded that a ban on open service by transgender individuals was inconsistent with the military's goal of maintaining an all-volunteer force in which any individual who is qualified to serve has the opportunity to do so. On June 30, 2016, DoD lifted its previous categorical ban. For more than a year after that change, transgender individuals in the military were able to serve openly and authentically alongside their fellow service members. This change strengthened our nation's military readiness.

3.      On July 26, 2017, President Donald J. Trump unexpectedly and abruptly reversed course on the military's policy. He took to social media to announce, through three tweets, that "the United States Government will not accept or allow . . . [t]ransgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming . . . victory and cannot be burdened with the tremendous medical costs and disruption that transgender [sic] in the military would entail. Thank you[.]"

4.      This unilateral decision to exclude transgender people from the military was made without any meaningful deliberative process and was directly contrary to the considered judgment of the military. For example, President Trump failed to engage in any meaningful consultation with Secretary of Defense James N. Mattis or the other range of military officials who would ordinarily be consulted about a policy change of this nature and magnitude.

5.      In the evening of Friday, August 25, 2017, President Trump followed up on his tweets and implemented an official federal policy of discrimination against transgender individuals in military service ("the Ban"). Among other things, President Trump has mandated that the U.S. military return to its earlier policy and practice of discrimination against transgender people, including by discharging them. He has also maintained and extended the

FIRST AMENDED COMPLAINT - 2
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  current bar on accession into the military of individuals known to be transgender ("the current

2  accessions bar"). Last, he has singled out for adverse treatment the health care needs of

3  transgender service members.

4      6.      Dripping with animus, the Ban and the current accessions bar violate the equal

5  protection and due process guarantees of the Fifth Amendment and the free speech guarantee of

6  the First Amendment. They are unsupported by any compelling, important, or even rational

7  justification.

8                                    **PARTIES**

9  **A.   Plaintiffs**

10     7.      Plaintiff Ryan Karnoski is a 22-year-old man who resides in Seattle, Washington.

11  He wishes to serve in the military. Mr. Karnoski is transgender.

12     8.      Plaintiff Staff Sergeant Cathrine Schmid ("Staff Sergeant Schmid") is a 33-year-

13  old woman who resides in Lakewood, Washington. She has served in the U.S. Army for

14  approximately twelve-and-a-half years and is currently stationed at Joint Base Lewis-McChord in

15  Washington. Staff Sergeant Schmid is transgender.

16     9.      Plaintiff D.L., formerly known as K.G., is a male high school student who resides

17  in Corpus Christi, Texas. He wishes to serve in the military. D.L. is transgender.

18     10.     Plaintiff Chief Warrant Officer Lindsey Muller ("Chief Warrant Officer Muller")

19  is a 35-year-old woman who resides in Poplar Bluff, Missouri. She has served in the U.S. Army

20  for more than seventeen years and is currently stationed at U.S. Army Garrison Yongsan Army

21  Base in Seoul, South Korea. Chief Warrant Officer Muller is transgender.

22     11.     Plaintiff Petty Officer First Class Terece Lewis ("Petty Officer Lewis") is a 33-

23  year-old woman who resides in Bremerton, Washington. She has served in the U.S. Navy for

24  approximately fourteen years and is currently stationed on the U.S.S. John C. Stennis. Petty

25  Officer Lewis is transgender.

26     12.     Plaintiff Petty Officer Second Class Phillip Stephens ("Petty Officer Stephens")

27  is a 30-year-old man who resides in Crestview, Florida. He has served in the U.S. Navy for

28  roughly five years and is currently stationed at Eglin Air Force Base in Florida. Petty Officer

1  Stephens is transgender.

2      13.    Plaintiff Petty Officer Second Class Megan Winters ("Petty Officer Winters") is a

3  29-year-old woman who resides in Alexandria, Virginia. She has served in the U.S. Navy for

4  approximately five years and is currently stationed at Hopper Information Service Center, in the

5  Office of Naval Intelligence in Washington, D.C. Petty Officer Winters is transgender.

6      14.    Plaintiff Jane Doe is a 29-year-old woman. She currently serves in the U.S.

7  military. She is transgender. In order to protect her, she has sought leave to proceed as a Doe

8  plaintiff and does not allege her further details about where she resides or her military service.

9      15.    Plaintiff Conner Callahan is a 29-year-old man who resides in Asheville, North

10  Carolina. He wishes to serve in the military. Mr. Callahan is transgender. (Mr. Kanorski, Staff

11  Sergeant Schmid, D.L., Chief Warrant Officer Muller, Petty Officer Lewis, Petty Officer

12  Stephens, Petty Officer Winters, Jane Doe, and Mr. Callahan are referred to collectively as the

13  "individual plaintiffs.")

14      16.    Plaintiff Human Rights Campaign ("HRC") is largest national lesbian, gay,

15  bisexual, transgender, and queer ("LGBTQ") civil rights organization in America. HRC's

16  principal place of business is in Washington, D.C.

17      17.    Plaintiff Gender Justice League ("GJL") is a Washington state gender and

18  sexuality civil and human rights organization. GJL's principal place of business is in Seattle,

19  Washington.

20      18.    Plaintiff American Military Partner Association ("AMPA") is the nation's largest

21  organization of LGBT military families and their allies. AMPA's principal place of business is in

22  Washington, D.C. (HRC, GJL, and AMPA are referred to collectively as the "organizational

23  plaintiffs.")

24  **B.    Defendants**

25      19.    President Donald J. Trump is the President of the United States of America and

26  Commander in Chief of the U.S. military. President Trump instituted the Ban.

27      20.    The United States of America encompasses all federal agencies and departments

28  responsible for implementing the Ban and the current accessions bar, including the U.S.

1   Department of Defense and the Department of Homeland Security.

2       21.      Secretary James N. Mattis is the Secretary of the U.S. Department of Defense. He

3   is responsible for the implementation of the Ban and for the administration and enforcement of

4   the current accessions bar.

5       22.      The U.S. Department of Defense is an executive branch department of the U.S.

6   federal government composed of the office of the Secretary of Defense; the Joint Chiefs of Staff;

7   the Joint Staff; America's Defense Agencies; the Department of Defense Field Activities; the

8   Departments of the Army, Navy, and Air Force; the unified and specified combatant commands,

9   such other offices, agencies, activities, and commands as may be established or designated by law

10  or by the President; and all offices, agencies, activities, and commands under any of their control

11  or supervision. Under the direction of Secretary Mattis, DoD is also responsible for

12  administration and enforcement of the Ban and of the current accessions bar.

13                            **JURISDICTION AND VENUE**

14      23.      Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1346 because this

15  action arises under, is founded upon, and seeks to redress the deprivation of rights secured by,

16  the United States Constitution.

17      24.      Venue is proper in the Western District of Washington under 28 U.S.C. § 1391(e).

18  Mr. Karnoski, Staff Sergeant Schmid, and GJL all reside within this district. In addition, the ban

19  is enforced, and the impact of it is felt, in this district. A substantial part of the events or

20  omissions that gave rise to Plaintiffs' claims, including particularly those of Mr. Karnoski, HRC,

21  and GJL, occurred in King County, Washington.

22      25.      This Court has the authority to enter a declaratory judgment and to provide

23  preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

24  Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

25      26.      This Court has personal jurisdiction over Defendants because their enforcement

26  of the Ban and the current accessions bar occurs within Washington.

27

28

FIRST AMENDED COMPLAINT - 5
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

# FACTUAL ALLEGATIONS

**A.    Background Information Regarding Transgender Individuals**

27.    Gender identity is a person's fundamental, internal sense of belonging to a particular gender. It is a core characteristic of human identity that everyone possesses. Gender identity is innate, biologically rooted, and fixed at an early age.

28.    Although most people have a gender identity that matches their sex assigned at birth, this is not the case for transgender people, who are defined as transgender because their gender identity does not match the sex they were assigned at birth. Transgender people have existed throughout human history, although understanding of transgender people has grown in modern times.

29.    An individual's sex is generally assigned at birth based on external genitalia. But other sex-related characteristics can include chromosomes, hormone levels, internal reproductive organs, and gender identity.

30.    When someone's sex-related characteristics are not in typical alignment with each other, gender identity is the critical determinant of sex. Attempts to change an individual's gender identity to bring it into alignment with the sex that the individual was assigned at birth are ineffective and potentially harmful.

31.    The discordance between one's gender identity and the sex one was assigned at birth can be associated with clinically significant distress, which is known as gender dysphoria. Gender dysphoria can be treated in accordance with internationally recognized standards of care.

32.    Living in a manner consistent with one's gender identity is critical to the health and well-being of transgender people and is a key aspect of treatment for gender dysphoria. The process by which transgender individuals come to live in a manner consistent with their gender identity, rather than the sex they were assigned at birth, is known as transition.

33.    The steps that transgender people take to transition are not identical, but they generally include social, legal, and medical transition.

34.    Social transition entails the adoption of a gender role matching one's gender identity. For example, for a man who is transgender, social transition can include wearing typical

FIRST AMENDED COMPLAINT - 6
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

male attire, using male pronouns, and otherwise living as a man in all aspects of everyday life.

35.     Legal transition involves steps to conform one's legal identity to one's gender identity, such as legally changing one's name and updating the name and gender marker on one's driver's license and birth certificate.

36.     Medical transition includes treatment that brings one's body into alignment with one's gender identity, such as hormone therapy. Whether any particular treatment is medically necessary or even appropriate, however, depends on the needs of the individual.

37.     These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, which is already determined by gender identity, but instead bring the individual's social presentation, legal identity, and physical appearance into greater typical alignment with their gender.

**B.    Plaintiff Ryan Karnoski**

38.     Plaintiff Ryan Karnoski comes from a family with a legacy of military service. His grandfather and step-grandfather served in the Army during the Korean War, and other of his relatives have served in the Army and Navy.

39.     Mr. Karnoski's desire to join the military came into sharper focus following the death of his cousin, who was killed in action in Afghanistan in 2009. His cousin's death—and the toll that it took on surviving family members—further impressed upon Mr. Karnoski the tremendous sacrifice that service members make for their country. Mr. Karnoski also realized that his own desire to serve in the military was motivated by more than simply a family legacy: it was a personal calling in life for him, and it is something that he has long dreamt of being able to fulfill.

40.     Mr. Karnoski works as a mental health clinician in Seattle, Washington.

41.     Mr. Karnoski holds a Masters in Social Work from the University of Washington School of Social Work's Child Welfare Training Advancement Program. He also holds a Bachelor of Arts degree in both Social Welfare and Gender, Women, and Sexuality Studies from the University of Washington. Mr. Karnoski is currently registered with the Selective Service.

FIRST AMENDED COMPLAINT - 7
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

42.     But for the Ban and the current accessions bar, and Defendants' enforcement of them both, Mr. Karnoski would seek to join the military, and he is ready and able to pursue a military career. In fact, he contacted military recruiters in or around September 2016, but he was open about his transgender status and discussed with a recruiter having to wait until the current accessions bar was lifted. Mr. Karnoski was referred to recruiting offices in King County, Washington, his point of contact for further communications regarding his accession.

43.     Mr. Karnoski would like to put his social work skills to use for the military.  Social work is an area for which there can be significant need in the military, including in the Army and Navy. Given that Mr. Karnoski holds a master's degree in social work, he aspires to serve as an officer in the military.

44.     Mr. Karnoski is transgender. He was assigned the sex of female at birth but his gender identity is male.

45.     Mr. Karnoski began to come to terms with his gender identity approximately five years ago.

46.     Mr. Karnoski began living openly as male in 2014.

47.     In consultation with health care professionals, Mr. Karnoski has taken clinically appropriate steps to transition.

48.     Mr. Karnoski has taken legal steps to transition. He legally changed his first name to Ryan. He also changed his name and gender marker to male on his driver's license, birth certificate, social security card and records, and passport.

49.     Mr. Karnoski has engaged in speech and conduct disclosing his transgender status and expressing his gender identity and wants to continue to be able to do so.

C.     **Plaintiff Staff Sergeant Cathrine Schmid**

50.     Plaintiff Staff Sergeant Cathrine ("Katie") Schmid was born at K.I. Sawyer Air Force Base, Michigan, and was raised in Portland, Oregon. She has always been a patriotic American with a desire to serve others and was drawn to opportunities presented by serving in the Army. She is proud to put on her uniform each day and serve her country.

FIRST AMENDED COMPLAINT - 8
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    51.    Staff Sergeant Schmid holds the military occupational specialty of Signals

2    Intelligence Analyst within the Army, currently performing duties as Brigade Land and

3    Ammunition Manager. Before her current role, she performed duties as a Signals Intelligence

4    Analyst, All-Source Analysis System Master Analyst, Human Intelligence Collector, and

5    Counterintelligence Agent. She joined the Army in 2005.

6    52.    Staff Sergeant Schmid is transgender. She was assigned the sex of male at birth

7    but has a female gender identity. She knew from a young age in life that she was female.

8    53.    Staff Sergeant Schmid began to come to terms with her gender identity

9    approximately four years ago. At that time, she started to see a mental health professional who

10   diagnosed her with gender dysphoria.

11   54.    Staff Sergeant Schmid began living openly as a woman around 2014.

12   55.    In consultation with health care professionals, Staff Sergeant has taken clinically

13   appropriate steps to transition, and she has further transition-related health care needs.

14   56.    Staff Sergeant Schmid has taken legal steps to transition. She legally changed her

15   first name to Cathrine. She also changed her name and changed her gender marker to female on

16   her driver's license, passport, and social security records.

17   57.    Staff Sergeant Schmid has worked with her chain of command throughout her

18   transition, and both they and other enlisted personnel have been supportive of her throughout

19   that process. Her gender marker in the military's personnel management systems (including the

20   Defense Enrollment Eligibility Reporting System ("DEERS")) reflects that she is female.

21   58.    She is recognized and treated as female in all aspects of military life, including in

22   social interactions and in her compliance with women's grooming and physical training

23   requirements.

24   59.    The fact that Staff Sergeant Schmid is transgender has not prevented her from

25   doing her job in the military nor has it prevented others from doing their jobs in the military.

26   Staff Sergeant Schmid performs valuable services for the Army, and her performance of those

27   duties strengthen our nation's military readiness.

28

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

60.     Being able to serve openly as a transgender woman has made Staff Sergeant Schmid a stronger asset for the military. She is able to function as a productive, healthy member of the military, and she is able to forge stronger relationships with others in her unit.

61.     In June 2017, Staff Sergeant Schmid submitted an application to become an Army warrant officer. A warrant officer is a highly specialized expert and trainer in a technical area such as aviation, military police, or, in Staff Sergeant Schmid's case, intelligence. Her application was approved at the initial stages.

62.     But the military's current accessions bar not only excludes transgender individuals from enlistment but also from appointment as officers, even where an individual is already serving in the military. Staff Sergeant Schmid was informed in writing in July 2017 that her application was placed on hold, and thus was not being considered further at the time, because of the current accessions bar, which has now been indefinitely extended by the Ban.  Staff Sergeant Schmid has been deprived of an equal opportunity to become a warrant officer because of President Trump's issuance of the Ban, because of his extension of the current accessions bar, and because of the Defendants' enforcement of them both.

63.     Staff Sergeant Schmid has engaged in speech and conduct disclosing her transgender status and expressing her gender identity, including by coming out to her chain of command and her fellow service members, taking steps to transition, and living openly as a woman in military life. She wants to continue to be able to engage in speech and conduct disclosing her transgender status and expressing her gender identity.

**D.     Plaintiff D.L.**

64.     Plaintiff D.L. was born in Alice, Texas and currently resides in Corpus Christi, Texas. D.L.'s great grandfather and great uncle both served in the Army, and the former earned a Purple Heart for his service. D.L. is proud of his family's history of service and has a strong desire to serve his country by joining the military as well.

65.     After years of consideration, research, and speaking to veterans of different services, D.L. decided to pursue a career in the military. Specifically, D.L. wants to serve as a Survival, Evasion, Resistance and Escape Specialist in the Air Force. This position entails

FIRST AMENDED COMPLAINT - 10
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

training other Airmen on survival-related techniques needed, for various terrains and climates, in the event that their aircraft goes down.

66.     Existing regulations permit individuals to join the military at age 17 with parental consent. Based on his age, D.L. has been eligible to join the military since August 2017. D.L.'s mother and next friend, Laura Garza, supports D.L. in his desire to join the military.

67.     D.L. anticipates receiving his high school diploma in roughly September 2017. D.L. has long planned and hoped to join the Air Force upon completion of high school.

68.     In preparation for enlistment, D.L. communicated with an Air Force recruiter in early July 2017. When D.L. disclosed to the recruiter that he is transgender, the recruiter stopped communicating with D.L.

69.     But for the Ban and the current accessions bar, and Defendants' enforcement of them both, D.L. would seek to join the military, and he is ready and able to pursue a military career.

70.     D.L. is transgender. He was assigned the sex of female at birth but his gender identity is male.

71.     D.L. came out about his gender identity in the summer of 2015. He has lived openly as male since that time.

72.     In consultation with health care professionals, D.L. has taken clinically appropriate steps to transition.

73.     D.L. has engaged in speech and conduct disclosing his transgender status and expressing his gender identity, including by coming out to the Air Force recruiter, taking steps to transition, and living openly as male in his everyday life. He wants to be able to continue to engage in speech and conduct disclosing his transgender status and expressing his gender identity.

**E.     Plaintiff Chief Warrant Officer Muller**

74.     Plaintiff Chief Warrant Officer Muller is a Chief Warrant Officer 3 in the U.S. Army. She enlisted in the Army in 2000 and has been serving for more than seventeen years.

FIRST AMENDED COMPLAINT - 11
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

75.     Chief Warrant Officer Muller chose the military as a career path because of the abundant job opportunities and her strong sense of patriotism. She has proudly served in combat and takes great pride in wearing the uniform to serve her country. Chief Warrant Officer Muller has served in Operation Iraqi Freedom, Operation Enduring Freedom, and multiple assignments in the Republic of Korea.

76.     Chief Warrant Officer Muller's military occupation specialty is Attack Helicopter Pilot/Aviator within the Army and she currently performs duties as an Aviation Safety Officer. Her duties currently involve providing combat support and combat service support to various echelons of commands. She serves as advisor to Commanders on all aviation and ground related safety matters. Chief Warrant Officer Muller is responsible for managing the Battalion Commander's Safety Program and developing safety policies, safety goals, mission objectives, priorities, and integrating them into daily operations.

77.     The military has invested significant resources in training Chief Warrant Officer Muller. Her well-honed skills and leadership position make her a highly valued member of the military. Chief Warrant Officer Muller's performance has been consistently recognized throughout her career in military service.

78.     Chief Warrant Officer Muller wants to continue serving in the Army.

79.     Chief Warrant Officer Muller is transgender. She was assigned the sex of male at birth. She has known for more than twelve years that she is female, and began to come to terms with her gender identity approximately five years ago. At that time, Chief Warrant Officer Muller started to see a mental health professional who diagnosed her with gender dysphoria.

80.     Chief Warrant Officer Muller began living openly as a woman in 2014.

81.     In consultation with health care professionals, Chief Warrant Officer Muller has taken clinically appropriate steps to transition, and she has further transition-related health care needs—including medically necessary surgical treatment. However, in the aftermath of President Trump's announcement of the change in policy regarding service by transgender individuals, all efforts to arrange that surgical treatment were called off.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

82.     Chief Warrant Officer Muller has taken legal steps to transition. She has legally changed her first name to Lindsey. She has also changed her name and changed her gender marker to female on her driver's license, passport, and social security records.

83.     The fact that Chief Warrant Officer Muller is transgender has not prevented her from doing her job as Aviation Safety Officer nor has her gender identity prevented others from doing their jobs in the military. Chief Warrant Officer Muller performs valuable services for the Army, and her performance of those duties strengthens our nation's military readiness.

84.     Being able to serve openly as a transgender woman has made Chief Warrant Officer Muller a stronger asset to the military. Because she has been able to serve openly, she has been able to function as a productive, healthy member of the military, and has been able to forge stronger relationships with others in her unit.

85.     Chief Warrant Officer Muller has engaged in speech and conduct disclosing her transgender status and expressing her gender identity, including by coming out to her chain of command and fellow service members, taking steps to transition, and living openly as a woman in military life. She wants to continue to be able engage in speech and conduct disclosing her transgender status and expressing her gender identity.

F.     **Plaintiff Petty Officer Lewis**

86.     Plaintiff Petty Officer Lewis is steadfastly dedicated to the mission of the U.S. Navy—to maintain, train and equip combat-ready Naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas. During her fourteen years of service, Petty Officer Lewis has defended oil platforms in the Arabian Gulf, boarded vessels and seized tons of cocaine in route to the U.S. from South America, protected the shipping lanes from Somali pirates, and defended freedom of navigation in the South China Sea.

87.     Petty Officer Lewis has served in a variety of roles within the Navy, including as an Engineman and Machinists Mate, as a public affairs officer for a major shore command, and as a career counselor advising Sailors of their career options.

88.     Petty Officer Lewis is transgender. She was assigned the sex of male at birth. However, she has known since approximately early 2013 that she is female and began to come to

NEWMAN DU WORS LLP

1    terms with her gender identity shortly thereafter. Petty Officer Lewis then began seeing a mental

2    health professional who diagnosed her with gender dysphoria.

3        89.    Petty Officer Lewis began living openly as a woman in late 2016.

4        90.    Petty Officer Lewis is taking medical steps to bring her body into conformity with

5    her female gender identity. In consultation with her physician, Petty Officer Lewis began

6    hormone therapy on July 25, 2017, one day before President Trump released the transgender

7    military ban on Twitter.

8        91.    Petty Officer Lewis has taken legal steps to transition. She legally changed her first

9    name to Terece and changed her driver's license and social security documentation.

10        92.    Petty Officer Lewis has worked with her chain of command throughout her

11    transition, and both they and other enlisted personnel have been supportive.

12        93.    The fact that Petty Officer Lewis is transgender has not prevented her from doing

13    her job in the military. Petty Officer Lewis performs a valuable service for the Navy that

14    strengthens military readiness; excluding her from the military based on her transgender status

15    would weaken military readiness.

16        94.    Being able to serve openly as a transgender woman makes Petty Officer Lewis a

17    stronger asset for the military. Because she has been able to serve openly, she has been able to

18    function as a productive, healthy member of the military, without the distress that would

19    otherwise accompany untreated gender dysphoria, and she has been able to forge stronger

20    relationships with others in her unit, without having to pretend to live as someone she is not.

21        95.    If permitted to do so, Petty Officer Lewis will re-enlist in the military following the

22    expiration of her current term of service. Indeed, she intends to serve honorably in the military

23    until the age of retirement.

24        96.    Petty Officer Lewis has engaged in speech and conduct disclosing her transgender

25    status and expressing her gender identity, including by coming out to her chain of command and

26    fellow service members, taking steps to transition, and living openly as a woman in military life.

27    She wants to continue to be able engage in speech and conduct disclosing her transgender status

28    and expressing her gender identity.

**G.     Plaintiff Petty Officer Stephens**

97.     Over the past five years, Plaintiff Petty Officer Stephens has served one main role within the Navy: Aviation Structural Mechanic. Petty Officer Stephens has worked on the flight deck of an aircraft carrier ensuring that Navy aircraft pilots are able to safely eject from their aircraft in the event of an emergency. He has performed this duty with honor and precision both during simulated and active duty scenarios, including a deployment to the Persian Gulf.

98.     Petty Officer Stephens proudly joined the Navy to serve his country and for the security and stability that a military career provides.

99.     Petty Officer Stephens is transgender. He was assigned the sex of female at birth, but has known since he was a young child that he is male.

100.    Petty Officer Stephens began to come to terms with his gender identity approximately two years ago and thereafter started to see a mental health professional who diagnosed him with gender dysphoria.

101.    On June 30, 2016, Petty Officer Stephens was deployed in the Persian Gulf. When he read that the ban on military service by transgender individuals was being lifted, he was filled with incredible relief and joy. Following this change in policy, Petty Officer Stephens decided to remain in the Navy and transition. He began living openly as a man in August 2016, as soon as he returned home from deployment.

102.    Petty Officer Stephens began scheduling the necessary medical appointments and phone interviews to acquire the required transition-related paperwork to submit to his Commanding Officer. He began taking medical steps to bring his body into conformity with his male gender identity. In consultation with his physician, Petty Officer Stephens began hormone therapy in November 2016. This approved treatment plan includes surgical treatment. The proposed ban on transition-related surgery will bar Petty Officer Stephens from obtaining this medically necessary care.

103.    Petty Officer Stephens is taking legal steps to transition. He will be legally changing his first name to Phillip and will be changing his name and gender marker on his driver's license and social security records.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

104.     Petty Officer Stephens has worked with his chain of command throughout his transition, and both they and other enlisted personnel have been supportive. Since coming out to his chain of command, other service members have addressed Petty Officer Stephens by male pronouns, which match his gender identity. He has been known, accepted, and treated as the man that he is.

105.     The fact that Petty Officer Stephens is transgender has not prevented him from doing his job in the military. He performs a valuable service for the Navy that strengthens military readiness—keeping our nation's aircraft systems safe and operational. Conversely, his exclusion from the military on the basis of his transgender status would weaken military readiness.

106.     Petty Officer Stephens has engaged in speech and conduct disclosing his transgender status and expressing his gender identity, including by coming out to his chain of command and fellow service members, taking steps to transition, and living openly as a man in military life. He wants to continue to be able engage in speech and conduct disclosing his transgender status and expressing his gender identity.

**H.     Plaintiff Petty Officer Winters**

107.     Plaintiff Petty Officer Winters is an Information Systems Technician in the U.S. Navy. During her five-years serving in the military, Petty Officer Winters has received specialized training and provided mission-related information technology and services to the Office of Naval Intelligence, its subordinate commands, the Fleet, and Joint Forces commands. Petty Officer Winters has performed her job duties in support of the Global War on Terrorism.

108.     Petty Officer Winters provides a valuable service for the Navy intelligence community that strengthens military readiness—providing information technology and services that, in turn, allows other service members to do their jobs.

109.     Growing up as the child of a veteran, the military's core values and creeds have been ingrained into every aspect of her life from a young age. The only career path that Petty Officer Winters has ever envisioned for herself has been the military.

FIRST AMENDED COMPLAINT - 16
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

110.     Petty Officer Winters is transgender. She was assigned the sex of male at birth, but she has known since approximately 2001 that she is female.

111.     After struggling for many years to receive family acceptance, Petty Officer Winters began to come to terms with accepting and living openly in her gender identity approximately one-and-a-half years ago. She then started to see a mental health professional who diagnosed her with gender dysphoria.

112.     When Petty Officer Winters found out, in June 2016, that the ban on open transgender military service had been lifted, she was absolutely ecstatic. She had informed her family that she was transgender immediately prior to the announcement because she realized that she needed to finally live her true, authentic life. Petty Officer Winters hoped to do that while continuing to proudly serve the country in the Navy.

113.     Following the lift on the ban, Petty Officer Winters began living openly as a woman. She disclosed her transgender status and expressed her gender identity openly in the military in reliance on the open service ban having been lifted.

114.     Petty Officer Winters has started taking medical steps to bring her body into conformity with her female gender identity. In June 2016, Navy medical officers created an individualized treatment plan for her gender transition. In consultation with her physician, Petty Officer Winters began hormone therapy in July 2016.

115.     Petty Officer Winters's treatment plan also includes medically necessary surgical treatment. Petty Officer Winters has made multiple attempts to make contact with relevant military personnel to determine if her paperwork for approval of this treatment is still in process or has been rejected. She has not received any response to her inquiries.

116.     Petty Officer Winters has taken legal steps to transition. She has legally changed my first and middle names to Megan Dawn. She has also changed her name on her driver's license and her social security card and records.

117.     Petty Officer Winters has also changed her gender marker in DEERS. She has worked with her chain of command throughout her transition. Since coming out, others have mostly addressed Petty Officer Winters by female pronouns, which match her gender identity.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

118.     The fact that Petty Officer Winters is transgender has not prevented her from doing her job in the military. She performs a valuable service for the Navy that strengthens military readiness. Excluding Petty Officer Winters from the military on the basis of her transgender status would weaken military readiness.

119.     If permitted to do so, Petty Officer Winters would re-enlist in the military following the expiration of her current term of service in March 2019. She intends to serve honorably in the military until retirement.

120.     Petty Officer Winters has engaged in speech and conduct disclosing her transgender status and expressing her gender identity, including by coming out to her chain of command and fellow service members, taking steps to transition, and living openly as a woman in military life. She wants to continue to be able engage in speech and conduct disclosing her transgender status and expressing her gender identity.

**I.     Plaintiff Jane Doe**

121.     Plaintiff Jane Doe currently serves in the U.S. Military.

122.     Jane Doe joined the military to serve her country and for the security and stability that a military career provides. She takes pride in her role in protecting our country and helping others save innocent lives.

123.     Jane Doe is transgender, although she has not yet transitioned to living openly as a woman. She was assigned the sex of male at birth, but she has known since she was 20 years old that she is female. Jane Doe has long hoped to be able to transition to living openly as a woman, but the prospect of doing so felt unattainable in the past, without a supportive environment in which to transition.

124.     On or around June 30, 2016, Jane Doe became aware that the ban on open military service by transgender individuals had been lifted. She was very excited and nervous about the possibility of serving openly as a woman. In October 2016, she began extensively reviewing the materials the military was releasing to implement the lifting of the ban. In December 2016, she attended her command-level training on the new policy. Around that time, she decided to come out as transgender to select colleagues whom she felt she could trust. She also researched what

NEWMAN DU WORS LLP

1    was required to formally change her gender marker in DEERS.

2    125.    Jane Doe decided to begin her legal and medical transition once she was posted at

3    her next assigned location. She planned to time and structure her transition so that it was as

4    smooth as possible for her colleagues and herself. Jane Doe wanted to give her Commanding

5    Officer plenty of time to prepare her unit and for other service members at her next assigned

6    location to get to know her as a valuable individual member of the team. She also wanted to give

7    herself some time to come out. She transferred to this assigned location in July 2017.

8    126.    On July 26, 2017, President Trump posted three tweets that said that transgender

9    people would not be able to serve in the military "in any capacity." After Jane Doe saw the

10   President's tweets, she decided to put her plans – to transition, come out as transgender, live

11   openly as a woman, and change her gender marker – on hold, fearing negative consequences.

12   127.    Because of this change in policy, Jane Does has not come out to anyone in her

13   chain of command. She is open to a few select individuals with whom she serves, as well as a

14   group of veterans with whom she communicates about her gender identity for support.

15   128.    As a result of the announced ban, Jane Doe has been forced to postpone the steps

16   required for her to transition and she questions whether she will be able to continue serving in the

17   military, a career that she loves and wants to continue.

18   129.    Jane Doe is terrified that her career will be brought to an early end because of the

19   President's decision to ban transgender individuals from military service. If she transitions, she

20   will lose her career and everything that comes with it. If she does not transition, then she gives up

21   the expression of herself on the most fundamental level and, instead, must continue living as

22   someone that she is not.

23   **J.    Plaintiff Conner Callahan**

24   130.    Plaintiff Conner Callahan is a Public Safety Officer at Warren Wilson College in

25   Asheville, North Carolina.

26   131.    Mr. Callahan has wanted to enlist in the military since age 13. He comes from a

27   family with a legacy of military service and considers it his personal calling to serve and protect

28   the people of the United States in this capacity.

132.    Mr. Callahan would like to put his investigative and problem-solving skills to use for the military. In 2014, with the help of a U.S. Air Force recruiter in Kent, Ohio, Mr. Callahan identified the enlisted position he would like to pursue: Explosive Ordnance Disposal.

133.    Mr. Callahan is transgender. He was assigned the sex of female at birth, but has known since approximately early 2012 that he is male.

134.    Mr. Callahan began living openly as male in 2014 and has done so consistently since that time.

135.    In consultation with health care professionals, Mr. Callahan has taken clinically appropriate steps to transition, which were completed in 2015.

136.    Mr. Callahan has taken legal steps to transition. He legally changed his first name to Conner. He has also changed his legal gender to male by court order. Mr. Callahan changed his name and gender marker to male on his driver's license and on social security card and records.

137.    Mr. Callahan is ready and able to pursue a military career. When he spoke with military recruiters he was open about his transgender status and discussed with a recruiter what position would be best for him after enlistment. Mr. Callahan also took practice Armed Services Vocational Aptitude tests, scoring above the 90th percentile on both tests.

138.    But for the Ban and the current accessions bar, Mr. Callahan would seek to join the military, and he is ready and able to pursue a military career.

139.    Mr. Callahan has engaged in speech and conduct disclosing his transgender status and expressing his gender identity, including by coming out to military recruiters, taking steps to transition, and living openly as male in his everyday life. He wants to be able to continue to engage in speech and conduct disclosing his transgender status and expressing his gender identity.

**K.    Plaintiff Human Rights Campaign**

140.    HRC is a private, non-profit membership organization with approximately 508,000 members throughout the United States, including transgender members serving in the United States military and transgender members who wish to serve in the United States military. The mission of HRC is to end discrimination against LGBTQ people and realize a world that

FIRST AMENDED COMPLAINT - 20
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

achieves fundamental fairness and equality for all, including ending discrimination against LGBTQ people who wish to serve their country.

141.    HRC sues on behalf of its members, including Mr. Karnoski, Staff Sergeant Schmid, and other prospective and current transgender service members who are currently adversely affected by the Ban and the current accessions bar.

**L.    Plaintiff Gender Justice League**

142.    GJL is a civil and human rights membership organization that, as relevant here, advocates on behalf of transgender individuals in Washington state. It seeks to create a community for transgender people and to empower them to combat the structural oppression, discrimination, and violence they face in their daily lives.

143.    GJL sues on behalf of its members, including Mr. Karnoski, Staff Sergeant Schmid, and other prospective and current transgender service members who are currently adversely affected by the Ban and the current accessions bar.

**M.    Plaintiff American Military Partner Association**

144.    With more than 50,000 members and supporters across the country and around the world, AMPA's mission is to connect, support, honor, and serve the partners, spouses, families, and allies of America's LGBT service members and veterans.

145.    AMPA's members include transgender individuals currently serving in the military, including for example, Chief Warrant Officer Muller, Staff Sergeant Schmid, Petty Officer Stephens, and Petty Officer Megan Winters. AMPA's members also include transgender individuals who wish to access into the military, including for example Mr. Karnoski. AMPA sues on behalf of its individual transgender members who are directly affected by the Ban and the accessions bar.

**N.    Prior Military Ban Against Transgender Individuals**

146.    There has never been a federal statute excluding transgender people from military service. Instead, the military previously had a policy of excluding transgender people from service based on DoD and service-specific rules and regulations.

FIRST AMENDED COMPLAINT - 21
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

147.     This earlier military policy was based on an inaccurate, historical, pathological view that regarded transgender people as deviants. This view was discredited long ago following psychological and medical advances in the understanding of gender identity and of transgender people.

148.     Despite this earlier policy of exclusion, transgender people have always served in the military but, as noted by former Secretary of Defense Ash Carter ("Secretary Carter"), "they often had to serve in silence alongside their fellow comrades in arms."

149.     Transgender people have played essential, mission-critical roles in the military, even when they have not had the ability to serve openly. For example, a transgender woman served on Navy SEAL Team 6 and earned a Purple Heart and a Bronze Star, among many other ribbons and medals.

150.     According to a 2014 study conducted by the Williams Institute at the University of California, Los Angeles, there are an estimated 134,300 transgender people who are veterans or are retired from guard or reserve service.

151.     It is a statistical certainty that there have been transgender people who have sacrificed their lives in the course of military service to the United States.

**O.      Rescission of Prior Military Ban Against Transgender Individuals**

152.     The military's prior ban against transgender people was the subject of extensive research and study, which concluded that it lacked any valid justification.

153.     For example, in March 2014, the Transgender Military Service Commission (the "Commission") issued a report analyzing the military's former ban. The Commission, which was co-chaired by a former U.S. Surgeon General, was convened to determine whether the ban was based on medically sound reasons. The Commission found that there was "no compelling medical rationale" for banning military service by transgender people.

154.     In May 2014, then-Secretary of Defense Chuck Hagel publicly stated that he was receptive to reviewing and reassessing the rules that govern service by transgender people. He explained that "[e]very qualified American who wants to serve our country should have an opportunity if they fit the qualifications and can do it."

FIRST AMENDED COMPLAINT - 22
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

155.     In July 2015, Secretary Carter admitted that DoD's regulations regarding transgender service members "[were] outdated and [were] causing uncertainty that distracted commanders from our core missions." He also recognized the many transgender people who were already serving in the military: "We have transgender soldiers, sailors, airmen and Marine—real, patriotic Americans—who I know are being hurt by an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit."

156.     Accordingly, Secretary Carter announced the creation of a working group to study for six months the policy and readiness implications of permitting transgender individuals to serve openly. This working group was chaired by the Under Secretary of Defense for Personnel and Readiness and comprised senior representatives from each of the military services, the Joint Staff, and relevant components from Office of the Secretary of Defense.

157.     In addition to creating a working group, Secretary Carter also directed that, effective July 13, 2015, no service member could be involuntarily separated or denied reenlistment or continuation of active or reserve service on the basis of their gender identity without the approval of the Under Secretary of Defense for Personnel and Readiness.

158.     On information and belief, separations of service members on the basis of their gender identity fell sharply after July 2015, and there were very few, if any, service members who were separated on that basis from July 2015 to June 2016. In effect, transgender people served openly in the military from July 2015 to June 2016, as well as likely before that period, albeit under the threat of separation.

159.     In or around July 2015, Secretary Carter also directed the commencement of a study to evaluate the implications of allowing transgender personnel to serve openly in the military. DoD commissioned the RAND Corporation, a non-profit, non-partisan research organization, to conduct the study. DoD asked RAND to (1) identify the health care needs of the transgender population and the costs associated with providing transition-related care to transgender service members, (2) assess the readiness implications of allowing transgender service members to serve openly, and (3) review the experiences of foreign militaries that permit transgender individuals to serve openly. The findings from the study, which reflected the

1   culmination of months of research and spanned 91 pages, were publicly released in May 2016.

2          160.    As detailed further below, the RAND study demonstrated that the cost of

3   providing transition-related care is exceedingly small relative to DoD's overall health care

4   expenditures, that there are no readiness implications that prevent transgender members from

5   serving openly, and that foreign militaries have successfully permitted open service without a

6   negative effect on effectiveness, readiness, or unit cohesion.

7          161.    The leadership of the Armed Services—including the Joint Chiefs of Staff, the

8   Service Secretaries, and Secretary Carter—together with personnel, training, readiness, and

9   medical specialists from across DoD, studied the available data, including the findings and

10  analysis from RAND. They also received input from transgender service members, from outside

11  expert groups, and from medical professionals outside DoD. They looked carefully at what

12  lessons could be learned from outside the U.S. military, including from allied militaries that

13  permit transgender people to serve openly, as well as from the private sector.

14         162.    As a result of this deliberative process and year-long study, on June 30, 2016,

15  Secretary Carter announced that the military was ending the ban on open service by transgender

16  people. The conclusion was supported by, among other things, the need to recruit and retain the

17  individuals most highly qualified to serve. Effective immediately, transgender service members

18  were permitted to serve openly and could no longer be discharged or otherwise separated from

19  the military solely for being transgender. DoD materials explained that "[t]his policy change was

20  crafted through a comprehensive and inclusive process that included the leadership of the Armed

21  Services, medical and personnel experts across the Department, transgender Service members,

22  outside medical experts, advocacy groups, and the RAND Corporation."

23         163.    In the accompanying directive-type memorandum regarding the policy change,

24  Secretary Carter explained that the policies and procedures permitting open service were

25  premised on the conclusion that "open service by transgender Service members . . . is consistent

26  with military readiness and with strength through diversity."

27         164.    The policy change was announced through a press conference held by Secretary

28  Carter as well as through a section of the DoD website titled "Department of Defense

Transgender Policy," which was still active in the days following President Trump's July 26, 2017 tweets. That website lists the highlights of the policy change, links to various DoD resources related to the policy change, and includes a video that assures transgender individuals: "Transgender Members Can Now Serve Openly."

165.    DoD planned a 12-month implementation process that would proceed in stages, beginning with the needs of current service members and their commanders, followed by training for the entire force, and concluding with the accession of transgender recruits.

166.    On September 30, 2016, within 90 days after the lifting of the ban, DoD issued a training handbook for commanders, transgender service members, and the force, titled "Transgender Service in the U.S. Military: An Implementation Handbook." The 71-page handbook was designed to help transgender service members in their transition, help commanders with their duties and responsibilities, and help all service members understand the new policies allowing open service by transgender service members. The handbook illustrates that open service has been workable and practicable.

167.    Also within 90 days of the lifting of the prior ban, DoD issued medical guidance for providing transition-related care to transgender service members, who were also able to begin the process to officially change their gender marker in the military's personnel management systems.

168.    Over the next nine months following the lifting of the prior ban (i.e., from October 2016 to June 2017), the services conducted training of the force based on detailed guidance and training materials regarding the policy change.

169.    Finally, it was envisioned that by July 1, 2017, the military would begin accessing transgender people who meet all relevant standards—holding them to the same physical and mental fitness standards as everyone else who wishes to serve in the military.

170.    On or around June 30, 2017, Secretary Mattis deferred the accession of transgender individuals until January 1, 2018. There was no change in the decision about whether transgender individuals would be able to join the military but instead merely a change in when they could begin to do so.

FIRST AMENDED COMPLAINT - 25
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

171.    But for President Trump's implementation of the Ban, the military would have begun the accession of transgender individuals on January 1, 2018.

**P.     Current Policy of Discrimination Against Transgender Individuals in Military Service**

172.    Through a series of three tweets on July 26, 2017, President Trump unilaterally reversed the U.S. military's policy of permitting open service by transgender individuals and dismantled the years of work that led to the development and implementation of that policy.

173.    At 8:55 a.m. Eastern time, President Trump tweeted: "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow......"

174.    At 9:04 a.m. Eastern time, President Trump tweeted: "....Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming....."

175.    At 9:08 a.m. Eastern time, President Trump tweeted: "....victory and cannot be burdened with the tremendous medical costs and disruption that transgender [sic] in the military would entail. Thank you[.]"

176.    The "process" that led to the Ban—to the extent there was any meaningful process at all—was the antithesis of the deliberative, comprehensive, and inclusive process that led to the rescission of the prior ban.

177.    President Trump failed to engage in any meaningful study, deliberation, or consultation with key military officials, including Secretary Mattis, before making the decision to exclude transgender individuals from the military. Indeed, President Trump tweeted about his decision when Secretary Mattis was on vacation and reportedly provided Secretary Mattis with only one day's notice of the decision.

178.    Before the President's Twitter announcement, other top Pentagon officials were similarly unaware of his decision to ban transgender individuals from the military. In fact, in the nine minutes between the President's tweet at 8:55 a.m. Eastern Time (which stated, "After consultation with my Generals and military experts, please be advised that the United States

FIRST AMENDED COMPLAINT - 26
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  Government will not accept or allow......") and his next tweet at 9:04 a.m. Eastern Time, there

2  were concerns that President Trump was declaring war on North Korea.

3      179.    The Joint Chiefs of Staff, including Chairman General Joseph Dunford, were not

4  aware that President Trump planned to tweet about a renewed ban on transgender service

5  members. Military service chiefs from the U.S. Army, Marine Corps, Navy, Air Force, and, upon

6  information and belief, the U.S. Coast Guard were all blindsided by the President's Twitter

7  announcement.

8      180.    Indeed, on June 19, 2017, Chairman General Dunford stated: "Transgender

9  personnel are serving right now, and there is no ongoing review that would affect the ability of

10  those currently serving to continue serving, provided they can meet the physical and mental

11  qualifications of service, be worldwide deployable, and [meet] the same standards that every

12  other soldier, sailor, airmen, [and] marine meets."

13      181.    Before the President's Twitter announcement, the Pentagon press office was also

14  unaware of the President's decision to again ban transgender people from the military.

15  Immediately after the President's tweets, a Pentagon spokesperson, Navy Captain Jeff Davis,

16  declined to answer media questions about them, instead telling media: "call the White House."

17      182.    On July 26, 2017, White House Press Secretary Sarah Huckabee Sanders also

18  could not answer a basic question about the proposed new ban: whether transgender individuals

19  currently serving in the military would be discharged. Instead, she responded that DoD and the

20  White House "[would] have to work together" to figure that out. She also could not say for

21  certain who would even take the lead on implementation but "imagine[d]" that it would be DoD.

22      183.    Even White House lawyers and aides, who had advised President Trump against

23  banning transgender individuals from the military, were blindsided by the President's tweets

24  announcing the intended ban. Indeed, one White House official admitted that President Trump

25  took to Twitter to announce the change because the President was frustrated that others wanted

26  to engage in further discussion and analysis of the issues involved. According to a White House

27  official, President Trump stated that the announcement "would stop the lawyers from arguing

28  with him anymore" and trying to dissuade him from reinstituting a ban on transgender military

FIRST AMENDED COMPLAINT - 27
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    service.

2         184.    On information and belief, President Trump also never spoke to a single

3    transgender person regarding the potential impact of his proposed ban before deciding to

4    institute it.

5         185.    Several congressional and White House sources reported that part of the

6    President's motivation for the policy change was to shore up support for a spending bill that

7    would have funded his desired border wall with Mexico and other campaign promises. There was

8    concern that the spending bill would not pass the House of Representatives because some

9    Republican members wanted a ban on military funding for transition-related care, which

10   Republican leadership would not permit, and thus these members might cause the defeat of the

11   entire spending bill. Indeed, on July 13, 2017—almost two weeks before the tweets—the House

12   had previously rejected a proposed amendment that would have banned coverage for transition-

13   related care for transgender service members. These Republican members turned to President

14   Trump, who quickly went much further than banning coverage for transition-related care and

15   instead announced his intention to ban transgender members from military service altogether,

16   presumably as a last-ditch attempt to save the spending bill at issue.

17        186.    A Trump administration official also suggested that the President's policy change

18   was motivated by a desire to gain political advantage over Democrats, stating: "This forces

19   Democrats in Rust Belt states like Ohio, Michigan, and Wisconsin, to take complete ownership of

20   this issue. How will the blue collar voters in these states respond when senators up for re-election

21   in 2018 like Debbie Stabenow are forced to make their opposition to this a key plank of the

22   campaigns?"

23        187.    Additional reports indicate that the President's policy change was undertaken at

24   the behest of Tony Perkins, president of the Family Research Council, a religious lobbying

25   organization that has been labeled an anti-LGBT hate group. That request reportedly was made

26   at a meeting held in the White House Oval Office on July 11, 2017, in which invited, conservative

27   religious leaders laid hands on President Trump and prayed.

28

188.     Then-Deputy Assistant to President Trump Sebastian Gorka stated on July 28, 2017, that the military is "not there to reflect America" but instead "to kill people and blow stuff up." He derided the inclusion of transgender service members in the military as "Obama-era social engineering." He also cited reports that 40 percent of transgender people have attempted suicide at some point in their lives as a justification for excluding them from military service— failing to recognize or acknowledge the role that discrimination plays in that statistic—and asserted that "we don't need to try and force them into the hierarchical military environment where they are under the utmost pressure to kill or be killed." Mr. Gorka continued, "that is why the President is doing this—out of warmth of his consideration for this population." That statement is false.

189.     President Trump's unilateral decision to bar transgender individuals from the military has been met with widespread opposition and condemnation, including by elected representatives from both main political parties. For example, Republican Senator John McCain, Chair of the Senate Armed Services Committee, stated "We should all be guided by the principle that any American who wants to serve our country and is able to meet the standards should have the opportunity to do so—and should be treated as the patriots they are." Similarly, Republican Senator Richard Shelby stated, "You ought to treat everybody fairly and you ought to give everybody a chance to serve." Republican Senator Lindsey Graham added, "This is something we should... not make a decision [about] based off a tweet." Furthermore, more than 50 House members, including those on the House Judiciary Committee and Armed Services Committee, joined a letter stating that the President's decision to ban transgender individuals from the military was unconstitutional on its face.

190.     Attorneys general from 19 states and the District of Columbia joined a letter denouncing the President's exclusion of transgender individuals from the military as "blatant discrimination" that violates "fundamental constitutional and American values." The states include California, Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and Washington.

FIRST AMENDED COMPLAINT - 29
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

191.     Fifty-six retired generals and admirals issued a public statement on August 1, 2017, warning that the proposed ban on transgender service members would downgrade military readiness. The statement notes that two four-star generals and former chairmen of the Joint Chiefs of Staff—Army General Martin Dempsey and Navy Admiral Michael Mullen—have publicly supported open service by transgender individuals.

**Q.     Implementation of Discrimination Against Transgender Individuals in Military Service**

192.     On or around July 31, 2017, Navy Captain Jeff Davis stated that, upon receiving any "formal direction" from the President, DoD officials "would provide implementing guidance and implement accordingly." He added that the military was ready "to make [it] happen" once the formal direction was received.

193.     On or around August 14, 2017, Secretary Mattis informed reporters: "I've got my people over there in the room to give [the White House] any military background that they might need to inform them." But he added, "[t]hey write their own policy of course, so we're in a supporting role right now."

194.     On August 25, 2017, President Trump issued a memorandum entitled "Military Service by Transgender Individuals" (the "Memorandum") to the Secretary of Defense and the Secretary of Homeland Security ("DHS"). The Memorandum institutes and implements the Ban.

195.     President Trump has admitted that, until June 2016, DoD and DHS "generally prohibited openly transgender individuals from accession in the United States military and authorized the discharge of such individuals." President Trump's avowed purpose in issuing the Memorandum and the Ban is to "return" the United States to that "longstanding" policy and practice of discrimination.

196.     In light of both President Trump's tweets, his Memorandum, and the Ban, transgender service members are now no longer able to serve openly on the same terms as before his tweets, his Memorandum, and the Ban, notwithstanding any purported effective dates set forth in the Memorandum. Any present-day speech or conduct that "openly" discloses a

FIRST AMENDED COMPLAINT - 30
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  transgender individual's gender identity or transgender status places them in violation of

2  President Trump's Memorandum and the Ban, subjecting them to discharge and other "action . .

3  . against [them]."

4       197.    President Trump's Memorandum also mandates that the Secretary of Defense

5  and the Secretary of Homeland Security "maintain the currently effective policy regarding

6  accession of transgender individuals into military service beyond January 1, 2018." As a result,

7  individuals known to be transgender are currently and now indefinitely barred from enlistment

8  and appointment in the military.

9       198.    Lastly, President Trump's Memorandum mandates that the Secretary of Defense

10  and the Secretary of Homeland Security "halt all use of DoD or Department of Homeland

11  Security resources to fund sex-reassignment [sic] surgical procedures for military personnel,

12  except to the extent necessary to protect the health of an individual who has already begun a

13  course of treatment to reassign his or her sex." The Memorandum selectively targets the health

14  care needs of transgender service members for adverse treatment for no legitimate reason.

15       199.    Transition-related health care, including surgical care, can be medically necessary

16  for an individual, regardless of whether that individual has already begun a course of treatment to

17  transition.

18       200.    All Defendants—President Trump, the U.S., Secretary Mattis, and DoD—are

19  responsible for implementing and enforcing the Ban and the current accessions bar.

20  **R.**    **Purported Justifications for Policy of Discrimination Against Transgender**
   **Individuals**

21

22       201.    The Ban and the current accessions bar are not supported by any compelling,

23  important, or even rational government interest.

24       202.    The Ban and the current accessions bar lack any narrowly-tailored, substantially-

25  related, or even rational relationship to any legitimate government interest, and they are not the

26  least restrictive means of achieving any valid government interest.

27       203.    Neither of the purported justifications cited by President Trump for the

28  reinstatement of the prior ban in his tweets—medical costs and disruption—nor any of the after-

FIRST AMENDED COMPLAINT - 31
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

the-fact justifications drafted by others in defense of his tweets has any basis in reality. Indeed, they are rebutted by, among other things, the fact that transgender individuals have already served openly for more than a year without any of these concerns materializing.

### 1.   Medical Costs

204.   With respect to the issue of medical cost, DoD's own commissioned study by RAND estimated that providing transition-related care to active-duty service members would cost between $2.4 million and $8.4 million annually—which is "an amount that will have little impact on and represents exceedingly small proportion of [active component] health care expenditures (approximately $6 billion in FY 2014) and overall DoD health care expenditures ($49.3 billion actual expenditures [in FY 2014] . . .)."

205.   The RAND study mirrored earlier research findings. A 2015 article published in the New England Journal of Medicine estimated that the cost of providing transition-related care to service members would be approximately $5.6 million annually or 22 cents per member per month. The article concluded that any plausible estimate of the cost involved is equivalent to a "rounding error" in the military's nearly-$50 billion annual health care budget.

206.   The surgeon general of the Navy also noted in December 2016 that most of the medical care for transgender service members was already provided to others in relation to similar medical needs.

207.   Providing transition-related care also mitigates other costs that the military would otherwise be required to bear. The RAND study noted that the adverse consequences of not providing transition-related care to transgender personnel could include causing these individuals to avoid other necessary health care altogether, such as important preventive services, as well as increased rates of mental and substance abuse disorders, and suicide, and reduced productivity.

208.   Implementing a ban against transgender individuals in the military will cost the federal government many times more in taxpayer dollars than any cost associated with allowing transgender individuals to continue serving and to join the military. Implementation costs include the high expense of separating or dismissing people subject to the policy and the cost of finding replacements for and training non-transgender individuals to replace them. A recent study

FIRST AMENDED COMPLAINT - 32
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

estimated that it would cost $960 million dollars to recruit and train the replacements for all the transgender individuals who are currently serving in the military—more than one hundred times the upper estimate of the cost of providing transition-related care for one year.

### 2.    Military Readiness

209.    There is also no military readiness justification for the policy of excluding transgender individuals from the military.

210.    The RAND study found that less than 0.0015 percent of total available labor-years, defined as the amount of work done by an individual in a year, would be affected by permitting transgender individuals to openly serve. This is because, even on the high end of estimates, less than 0.1 percent of the total force would seek transition-related care that could temporarily affect their ability to deploy.

211.    Existing data also show that there is no impact on unit cohesion that would prevent transgender individuals from serving openly.

212.    The military has previously adapted to the eradication of other forms of discrimination including racial desegregation, the end of the anti-lesbian, gay, and bisexual "Don't Ask, Don't Tell" policy, and the integration of women into direct combat positions. The military was able to adapt to the inclusion of transgender troops serving openly as well, particularly with the benefit of force-wide training and clear guidance implemented by the military.

213.    Eighteen countries allow transgender people to serve openly in the military: Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom. The RAND study focused on the policies of four countries with the most well-developed and publicly available policies on transgender military service members—Australia, Canada, Israel, and the United Kingdom. In no case did the study find any evidence of an adverse effect on operational effectiveness, operational readiness, or cohesion of the force.

FIRST AMENDED COMPLAINT - 33
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## EQUAL PROTECTION VIOLATION
### (By All Plaintiffs Against All Defendants)

214.   Plaintiffs incorporate paragraphs 1 through 213 as though fully set forth herein.

215.   All Plaintiffs state this cause of action against all Defendants (including President Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking declaratory and injunctive relief, and challenge the Ban and the current accessions bar both facially and as applied to them or, as to the organizational plaintiffs, as applied to their members.

216.   The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, or its officials or employees.

217.   Defendants' disparate treatment of transgender individuals facially and intentionally discriminates against transgender individuals based on sex-related considerations.

218.   Discrimination based on sex-related considerations includes, but is not limited to, discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

219.   The Department of Defense's Transgender Service Member Policy Implementation Fact Sheet, posted on the Department of Defense's official website, admits that "Any discrimination against a Service member based on their gender identity is sex discrimination."

220.   Discrimination because an individual is transgender is both discrimination based on a sex-related consideration, which at a minimum requires courts to apply intermediate scrutiny in evaluating the constitutionality of the government's discrimination, and discrimination based on transgender status, which requires courts to apply strict scrutiny to such discrimination.

221.   Government discrimination against transgender individuals bears all the indicia of a suspect classification requiring strict scrutiny by the courts.

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

   a.  Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day.

   b.  Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure express federal, state, and local protections specifically protecting them against discrimination, and have been and continue to be regularly targeted by anti-transgender legislation, regulations, bills, and other government action.

   c.  A person's gender identity or transgender status bears no relation to that person's ability to contribute to society.

   d.  Transgender people constitute a small minority of the population. In addition, gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity is also generally fixed at an early age and highly resistant to voluntary change. Efforts to change gender identity have been condemned by leading medical and psychological authorities as harmful, and have been barred by numerous states, the District of Columbia, and numerous local governments.

222. Defendants' disparate treatment of transgender individuals like the individual plaintiffs and the transgender members of the organizational plaintiffs deprives them of their right to equal dignity and stigmatizes them as second-class citizens in violation of equal protection guarantees.

223. There is not even a legitimate justification for such disparate treatment, let alone the important or compelling one that is constitutionally required.

224. The Ban and current accessions bar are motivated by impermissible animus towards transgender people and are thus invalid as a whole.

FIRST AMENDED COMPLAINT - 35
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

**SECOND CAUSE OF ACTION**
**DUE PROCESS VIOLATION**
**(By All Plaintiffs Against All Defendants)**

225.    Plaintiffs incorporate paragraphs 1 through 213 as though fully set forth herein.

226.    All Plaintiffs state this cause of action against all Defendants (including President Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking declaratory and injunctive relief, and challenge the Ban and current accessions bar both facially and as applied to them or, as to the organizational plaintiffs, as applied to their members.

227.    Defendants' conduct, including their enforcement of the Ban and current accessions bar, violates the rights of the individual plaintiffs and of the transgender members of the organizational plaintiffs under the Fifth Amendment's Due Process Clause. The Due Process Clause protects each person's fundamental liberty to individual dignity, autonomy, and privacy. That includes the right to define and express one's own identity, to define one's own concept of existence, and to make intimate decisions concerning marriage, procreation, and family life, all without undue government interference.

228.    A person's gender identity constitutes a core aspect of individual self-definition. The Ban and current accessions bar diminish the personhood, dignity, and autonomy of the individual plaintiffs and of the transgender members of the organizational plaintiffs, and impermissibly interfere with the most intimate choices a person may make in a lifetime, including the right to self-expression and to live openly and authentically.

229.    Where the government impermissibly burdens a fundamental liberty interest, such government action may be sustained only upon a showing that it is, at the very least, substantially related to an important government interest, if not narrowly tailored to serve a compelling government interest. Here, the Ban and the current accessions bar lack adequate tailoring and fail to serve even a legitimate governmental interest. Indeed, they epitomize the very kind of arbitrary and capricious government action that the Due Process Clause forbids.

230.    Defendants have also violated the due process rights of the individual plaintiffs and of the transgender members of the organizational plaintiffs to the extent that they

FIRST AMENDED COMPLAINT - 36
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   detrimentally relied on the military's policy, extant during the period of June 2016 to August

2   2017, of permitting open service by transgender individuals. In addition, Defendants' conduct

3   violates basic principles of equity.

### THIRD CAUSE OF ACTION
### FREE SPEECH VIOLATION
### (By All Plaintiffs Against All Defendants)

7      231.    Plaintiffs incorporate paragraphs 1 through 213 as though fully set forth herein.

8      232.    All Plaintiffs state this cause of action against all Defendants (including President

9   Trump and Secretary Mattis, in exclusively their official capacities) for purposes of seeking

10  declaratory and injunctive relief, and challenge the Ban and current accessions bar both facially

11  and as applied to them or, as to the organizational plaintiffs, as applied to their members.

12      233.    The Ban and current accessions bar violate the Free Speech Clause of the First

13  Amendment because they impermissibly burden and chill the exercise of the individual plaintiffs'

14  and of the organizational plaintiffs' transgender members' constitutionally protected speech,

15  expression, expressive conduct, and expressive association, based on the content and viewpoint

16  of their speech.

17      234.    All the individual plaintiffs and transgender members of the organizational

18  plaintiffs have been open about their status as transgender either in the context of seeking to join

19  the military or in the course of their military service. All individual plaintiffs and transgender

20  members of organizational plaintiffs want to continue being open about their status as

21  transgender, and to continue expressing and conducting themselves consistently with their

22  gender.

23      235.    The gender expression of the individual plaintiffs and of transgender members of

24  the organizational plaintiffs, the conduct of those individuals that is consistent with their gender,

25  and those individuals' disclosure of their transgender status, all constitute protected First

26  Amendment activity. Similarly, the advocacy of those individuals for fairness for transgender

27  service members and an end to discrimination against transgender individuals in military service,

28  and those individuals' association with other transgender people and their allies for expressive

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  purposes, constitute protected First Amendment activity.

2  236.    The purpose and effect of the Ban and current accessions bar are to chill

3  constitutionally protected First Amendment activity. Indeed, the Memorandum on its face

4  demonstrates that it is directed at suppressing the gender expression and related expressive

5  conduct of transgender individuals, including that of the individual plaintiffs and transgender

6  members of the organizational plaintiffs , and those individuals' disclosure of their transgender

7  status: specifically, the Memorandum states that policy is changing by returning to one that

8  prohibits "*openly* transgender individuals" from accession, authorizes the discharge of such

9  individuals, and prevents transgender individuals from serving "*openly* in the military"

10  (emphases added).

11  237.    The Ban and current accessions bar penalize the individual plaintiffs, transgender

12  members of the organizational plaintiffs, other transgender service members, and other

13  transgender individuals who would like to join the military or be appointed as officers, for their

14  gender expression. The Ban and current accessions bar chill the protected First Amendment

15  activity of a person of ordinary firmness who is transgender by requiring such persons either to

16  attempt to deny who they are and suppress expression of their gender or be denied military

17  service on the same terms as others. The ban also chills these individuals' right to advocate for

18  fair treatment for transgender service members for fear that this advocacy will identify them as

19  transgender. For the same reason, the exclusion chills exercise of their right to associate with

20  other transgender service members and their allies and form or participate in expressive

21  associations for the purpose of advocating for an end to the exclusion.

22  238.    The individual plaintiffs and transgender members of the organizational plaintiffs

23  are harmed by being denied the opportunity to serve in the military on the same terms as other

24  service members. All of the individual plaintiffs and transgender members of the organizational

25  plaintiffs face a realistic danger of sustaining a direct injury as a result of implementation,

26  operation, or enforcement of the terms of the Ban as well as the current accessions bar. For

27  example, Mr. Karnoski, D.L., and Mr. Callahan are harmed by being denied the opportunity to

28  serve in the military. Staff Sergeant Schmid is being refused appointment as a warrant officer due

FIRST AMENDED COMPLAINT - 38
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

to the current accessions bar, and she also faces a realistic danger that she will sustain a direct injury from implementation of the Ban, which requires a return to the exclusion of transgender service members from the military. Chief Warrant Officer Muller, Petty Officer Lewis, Petty Officer Stephens, Petty Officer Winters, and Jane Doe also face the realistic danger that they will sustain direct injuries from implementation of the Ban.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the Ban and the current accessions bar unconstitutional on their face and as applied to the individual plaintiffs and transgender members of the organizational plaintiffs for the reasons set forth above;

2.      Preliminarily and permanently enjoin Defendants, their agents, employees, representatives, successors, and any other person or entity subject to their control or acting directly or indirectly in concert with them from enforcing the Ban or the current accessions bar, including by enjoining any separation, discharge, adverse action, or denial of promotion, reenlistment, continuation of service, accession, or appointment because an individual is transgender.

3.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable laws; and

4.      Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Respectfully submitted September 14, 2017.

NEWMAN DU WORS LLP

_Samantha Everett_

Samantha Everett, WSBA #47533
samantha@newmanlaw.com
Derek A. Newman, WSBA #26967
dn@newmanlaw.com
2101 Fourth Ave., Ste. 1500
Seattle, WA 98121
(206) 274-2800

FIRST AMENDED COMPLAINT - 39
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
Tara Borelli, WSBA #36759
*tborelli@lambdalegal.org*
Jon W. Davidson (admitted pro hac vice)
Camilla B. Taylor (admitted pro hac vice)
Peter C. Renn (admitted pro hac vice)
Natalie Nardecchia (admitted pro hac vice)
Sasha Buchert (admitted pro hac vice)
Kara Ingelhart (admitted pro hac vice)
Carl Charles (admitted pro hac vice)
730 Peachtree Street NE, Ste. 640
Atlanta, GA  30308
(404) 897-1880


OUTSERVE-SLDN, INC.
Peter Perkowski (admitted pro hac vice)


KIRKLAND & ELLIS LLP
James F. Hurst, P.C. (admitted pro hac vice)
Jordan Heinz (admitted pro hac vice)


Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT - 40
[2:17-CV-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1

**CERTIFICATE OF SERVICE**

2          The undersigned certifies under penalty of perjury under the laws of the United States of

3    America and the laws of the State of Washington that on September 14, 2017, I caused true and

4    correct copies of the foregoing documents to be served by the method(s) listed below on the

5    following interested parties:

6          **By Hand Delivery:**

7     US Attorney's Office
      700 Stewart St., Suite 5220
8     Seattle, WA 98101-1271

9
          **By Registered or Certified Mail:**
10

11    Attorney General of the United States        Department of Defense
      U.S. Department of Justice                   1400 Defense Pentagon
      950 Pennsylvania Avenue, NW                  Washington, DC 20301-1400
12    Washington, DC 20530-0001

13

14    Secretary of Defense James N. Mattis         President Donald J. Trump
      1000 Defense Pentagon                        1600 Pennsylvania Ave. NW
      Washington, DC 20301-1000                    Washington, DC 20500
15

16          I hereby certify under the penalty of perjury that the foregoing is true and correct.

17    Executed on September 14, 2017 at Seattle, Washington.

18

19

20                                                  Rachel Horvitz, *Paralegal*

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 41
[2:17-CV-01297-MJP]                    NEWMAN DU WORS LLP            2101 Fourth Avenue, Suite 1500
                                                                    Seattle, Washington 98121
                                                                    (206) 274-2800