1

2

The Honorable Marsha J. Pechman

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

9

10

11

RYAN KARNOSKI, et al.,

Plaintiffs,

12

v.

13

DONALD J. TRUMP, et al.,

14

Defendants.

15

16

CASE NO. 2:17-cv-1297

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

NOTE ON MOTION CALENDAR: October 6, 2017

ORAL ARGUMENT REQUESTED

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

# TABLE OF CONTENTS

**Page**

I.   Introduction ...................................................................................................1

II.  Statement of Facts ..........................................................................................2
     A.   Background on Military Service by Transgender Individuals ..................................2
     B.   President Trump's Ban on Military Service by Transgender Individuals ..............3
     C.   Plaintiffs' Backgrounds and Injuries from the Ban ...................................4

III. Argument ........................................................................................................6
     A.   Legal Standard ...........................................................................................6
     B.   Plaintiffs are Likely to Succeed on the Merits........................................................6
          1.   The Ban Violates Plaintiffs' Equal Protection Rights. ...............................6
               a.   The Ban Requires Strict Scrutiny. ..................................................7
               b.   The Ban Discriminates on the Basis of Sex.....................................8
               c.   The Ban Fails Under Any Level of Review....................................10
          2.   The Ban Violates Plaintiffs' Rights to Due Process. ................................13
               a.   The Ban Violates Plaintiffs' Substantive Due Process Rights.......13
               b.   The Ban Violates Plaintiffs' Procedural Due Process Rights........15
          3.   The Ban Violates Plaintiffs' First Amendment Rights. ............................16
               a.   The Ban Runs Afoul of the First Amendment's Proscription
                    Against Content and Viewpoint-Based Regulations....................16
               b.   The Ban Chills Constitutionally Protected Expression in
                    Violation of the First Amendment. ................................................17
               c.   The Ban Does Not Survive the Level of Constitutional Scrutiny
                    Applied to Speech in a Military Context. ......................................18
     C.   Plaintiffs Will Suffer Irreparable Injury Absent an Injunction. ............................19
     D.   The Balance of Equities and the Public Interest Both Favor an Injunction...........21

IV.  Conclusion ...................................................................................................24

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - i
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Abbott*,
560 U.S. 1 (2010)............................................................................................................13

*Able v. United States*,
968 F. Supp. 850 (E.D.N.Y. 1997) ................................................................................20

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015).........................................................................7, 8

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .........................................................................................6

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) .........................................................................18, 20, 21

*Baker v. City of SeaTac*,
994 F. Supp. 2d 1148 (W.D. Wash. 2014)....................................................................15

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ...........................................................................7

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972)........................................................................................................15

*Brocksmith v. United States*,
99 A.3d 690 (D.C. 2014) .................................................................................................7

*Brown v. Glines*,
444 U.S. 348 (1980)........................................................................................................17

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988) .........................................................................................20

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985)..........................................................................................................6

*Collins v. Brewer*,
727 F. Supp. 2d 797 (D. Ariz. 2010) .......................................................................19, 21

*Cornelius v. NAACP Legal Defense & Educ. Fund*,
473 U.S. 788 (1985)........................................................................................................16

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - ii
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*Cota v. Maxwell-Jolly,*
    688 F. Supp. 2d 980 (N.D. Cal. 2010) ........................................................21

*Cupolo v. Bay Area Rapid Transit,*
    5 F. Supp. 2d 1078 (N.D. Cal. 1997) ..........................................................19

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) ................................................................6, 21

*Fabian v. Hosp. of Cent. Conn.,*
    172 F. Supp. 3d 509 (D. Conn. 2016) ...........................................................9

*Fricke v. Lynch,*
    491 F. Supp. 381 (D.R.I. 1980) ...................................................................17

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ......................................................................................9

*Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.,*
    24 Cal. 3d 458 (Cal. 1979) .........................................................................17

*Gay Students Org. of Univ. of N.H. v. Bonner,*
    509 F.2d 652 (1st Cir. 1974) .......................................................................17

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011) ....................................................................9

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.,*
    739 F.2d 466 (9th Cir. 1984) .......................................................................19

*Golinski v. Office of Pers. Mgmt.,*
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ..........................................................7

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ....................................................................19

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ....................................................................................15

*Int'l Franchise Ass'n, Inc. v. City of Seattle,*
    803 F.3d 389 (9th Cir. 2015) .........................................................................6

*Ixcot v. Holder,*
    646 F.3d 1202 (9th Cir. 2011) ....................................................................15

*Kankamalage v. INS,*
    335 F.3d 858 (9th Cir. 2003) ......................................................................15

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - iii
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ...................................................................19

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994).........................................................................14, 15

*Lawrence v. Texas*,
    539 U.S. 558 (2003).........................................................................13, 14

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010) ...................................................................17

*Majors v. Jeanes*,
    48 F. Supp. 3d 1310 (D. Ariz. 2014) .........................................................20

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................................21

*Mem. Hosp. v. Maricopa Cty.*,
    415 U.S. 250 (1974)................................................................................12

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) ...................................................................17

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ...................................................................19

*N. Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ...................................................................21

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    508 U.S. 656 (1993)................................................................................20

*Nieto v. Flatau*,
    715 F. Supp. 2d 650 (E.D.N.C. 2010).......................................................16

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1104 (N.D. Cal. 2014) .....................................................7, 8

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015)......................................................................13, 19

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)................................................................................12

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992)................................................................................13

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - iv
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992)..........................................................................................16

*Rahman v. Napolitano*,
    814 F. Supp. 2d 1087 (W.D. Wash. 2010).....................................................23

*Roberts v. Clark Cty Sch. Dist.*,
    215 F. Supp. 3d 1001 (D. Nev. 2016)..............................................................8

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..........................................................................................13

*Romer v. Evans*,
    517 U.S. 620 (1996)..........................................................................................10

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..........................................................................................16

*Rostker v. Goldberg*,
    453 U.S. 57 (1981)............................................................................................10

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) ..................................................................9

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) .......................................................................8, 9

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017).......................................................................................9

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ........................................................................18

*Texas v. Johnson*,
    491 U.S. 397 (1989)..........................................................................................16

*United States v. Virginia*,
    518 U.S. 515 (1996).........................................................................................8, 9

*Weaver v. Graham*,
    450 U.S. 24 (1981)............................................................................................15

*Weaver v. Nebo Sch. Dist.*,
    29 F. Supp. 2d 1279 (D. Utah 1998)................................................................17

*Whitaker v. Kenosha Unified Sch. Dist.*,
    858 F.3d 1034 (7th Cir. 2017) ........................................................................7, 9

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - v
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012)...........................................................................................7, 8

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................................................21

*Witt v. U.S. Dep't of the Air Force*,
    527 F.3d 806 (9th Cir. 2008) ............................................................................9, 14, 15

**Other Authorities**

11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.)....................................................................19

U.S. CONST., amend. I..............................................................................................................16

U.S. CONST., amend. V. .............................................................................................................6, 13

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - vi
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

## I.   INTRODUCTION

Transgender service members are currently standing shoulder-to-shoulder with their fellow Americans in defense of our shared national interests, and many are waiting in the wings to join their ranks. On July 26, 2017, however, President Trump unexpectedly took to Twitter to announce that he was categorically excluding transgender people from military service.

This announcement was a stunning reversal of military policy. After a lengthy process of deliberative review, the military had previously concluded that there was no basis for a ban on open service by transgender individuals—including with respect to the very justifications asserted by the President for their exclusion. Multiple military leaders, including the former Chairman of the Joint Chiefs of Staff under both Presidents Bush and Obama, have sworn that after a "thorough" investigation, military leadership concluded in June 2016 that "inclusive policy for transgender troops *promotes* readiness" and morale. Decl. of Adm. Michael Mullen ¶ 7 (emphasis added). Since June 2016 and until recently, transgender service members were thus able to serve openly, relying on their government's promise of equal treatment. Now, the careers around which they have built their lives stand on the precipice of complete ruin.

President Trump has issued a formal directive for the military to implement his ban. His directive confirms the government's return to a discriminatory regime that stigmatizes an entire class of people as unfit to serve simply because they are transgender. As a result, transgender individuals who are currently serving face separation from the military, and transgender individuals who wish to join the military are indefinitely barred from doing so. The President's directive also singles out the health care needs of transgender service members for discriminatory, adverse treatment. Unless enforcement of the ban is preliminarily enjoined, the full brunt of its irreparable harms—some of which have already been felt—will reach fruition before judgment.

The ban cannot be squared with our constitutional commitments to equal protection, due process, and freedom of expression. It robs transgender individuals of the ability to serve their country on equal terms simply because of their gender identity. That is rank, invidious, status-based

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 1
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

discrimination repugnant to equal protection, and it penalizes transgender individuals for living openly in accord with their gender in violation of both due process and freedom of expression. There is no government interest that can sustain the presumptive exclusion of an entire group of people from military service on the basis of a characteristic that—as the government itself has previously concluded—has no bearing on an individual's fitness to serve.

For that same reason, the public interest would be served by preserving the *status quo* that existed prior to this unconstitutional change in policy, pending resolution of this case. The balance of equities also tips sharply in favor of a preliminary injunction:  the purge of a vulnerable minority from one of society's most important institutions would have dire, irreparable consequences for those directly affected and indeed for the military itself, while simultaneously staining this country's constitutional commitments and its promise of fair treatment under the law.

## II.    STATEMENT OF FACTS

### A.    Background on Military Service by Transgender Individuals

Transgender individuals have always served in the military. Until recently, however, they served in silence, because Department of Defense ("DoD") regulations barred them from serving openly. In 2014, DoD eliminated the military-wide categorical ban on service by transgender people, thereby enabling each branch of the military to reassess its own service-specific bans. Decl. of Dr. George Brown ¶ 47. In July 2015, Secretary of Defense Ashton Carter ordered a working group of senior DoD personnel to identify practical issues related to transgender Americans serving openly and to develop a plan to address those issues and maximize military readiness ("Working Group"). Decl. of Brad Carson ¶ 8; Mullen Decl. ¶ 6.

The Working Group considered the comprehensive advice of medical, personnel, and readiness experts, as well as health insurance companies, civilian employers, and commanders whose units included transgender service members. Carson Decl. ¶ 10. The Working Group also commissioned the RAND Corporation to study the impact of allowing transgender individuals to serve openly. RAND reviewed extensive data and found "no evidence" that allowing transgender people to serve

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 2
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

openly would negatively impact unit cohesion, operational effectiveness, or readiness. Carson Decl. ¶ 17, Ex. B (hereinafter, "RAND Report") at xiii, 39-47. Conversely, the RAND Report identified "significant costs" if transgender troops were separated through a ban on open service, as the military would lose skilled and qualified personnel, requiring expensive and time-consuming training to fill vacancies in units. Carson Decl. ¶ 21; Decl. of Raymond Mabus ¶ 18.

The Working Group, along with reviewing senior DoD personnel, ultimately concluded that transgender individuals should be permitted to serve openly. Carson Decl. ¶ 25; Mabus Decl. ¶ 18. Accordingly, on June 30, 2016, Secretary Carter issued a formal directive setting forth the policy "that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness" and that "transgender individuals shall be allowed to serve in the military." Mabus Decl., Ex. C at 2. The policy was designed to be implemented over the course of a year, with accessions (i.e., entry into the military) of transgender troops to begin on July 1, 2017, which was subsequently extended by six months to January 1, 2018. *Id.*, Ex. C at Attachment, 1; Decl. of Samantha Everett, Ex. 3. Each of the military services took steps to begin implementing the policy. Mabus Decl. ¶ 25.

For more than a year after June 2016, numerous service members disclosed their transgender status to the military in reliance upon DoD guidance that they would not be discharged on that basis. *Id.* ¶ 37. These service members risked their jobs, housing, and progress toward retirement benefits in reliance upon DoD's assurances. *Id.* ¶ 49.

**B.    President Trump's Ban on Military Service by Transgender Individuals**

On July 26, 2017, President Trump unexpectedly announced through a series of tweets that he would "not accept or allow transgender individuals to serve in any capacity in the U.S. Military." Everett Decl., Ex. 6. On August 25, 2017, the President issued a memorandum implementing this discriminatory policy (together with tweets, "the Ban"). In a complete and unprecedented reversal of military policy, the Ban provides for the discharge of openly transgender service members. *Id.*, Ex. 7 (directing the Secretaries of Defense and Homeland Security to "return" to the former policy of

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 3
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

excluding transgender service members). The Ban also indefinitely bars the accession of transgender individuals into the military, which had previously been scheduled to begin as early as January 1, 2018. *Id.* Finally, the Ban singles out the health care needs of transgender service members for adverse, discriminatory treatment. *Id.* (prohibiting the military from "fund[ing] sex reassignment surgical procedures for military personnel," subject to limited exceptions).

**C.      Plaintiffs' Backgrounds and Injuries from the Ban**

Plaintiffs include six transgender individuals who are currently serving in the military, three transgender individuals who wish to join the military, and three organizations whose members are injured by the Ban. Those currently serving have fought terrorism, served in far-flung locations around the world, and promoted stability in strife-riven regions. *E.g.*, Decl. of Lindsey Muller ¶ 9; Decl. of Phillip Stephens ¶ 7. They perform a wide range of roles vital to the military, including intelligence analysis, aviation, mechanical work, and servicing of information systems. Decl. of Cathrine Schmid ¶ 7; Muller Decl. ¶ 7; Decl. of Terece Lewis ¶ 6; Stephens Decl. ¶ 7; Decl. of Megan Winters ¶ 7. They have collectively served our country for decades, and each represents a significant investment of public resources, including specialized training. *E.g.*, Muller Decl. ¶ 11; Winters Decl. ¶ 7. Those who wish to join the military hope to perform social work, teach survival skills, and dispose of explosive ordnance. Decl. of Ryan Karnoski ¶ 4; Decl. of D.L. ¶ 4; Decl. of Conner Callahan ¶ 5. All the individual Plaintiffs are united by their common desire to serve our country, putting the needs of others before their own and enduring the dangers and sacrifices required by military life.

The fact that the individual Plaintiffs are transgender has no bearing on their individual fitness to serve. To the contrary, the military has bestowed some of them with numerous honors in recognition of their exemplary service. *See, e.g.*, Schmid Decl. ¶ 15; Muller Decl. ¶ 12. Many also serve as officers, and one has more than a thousand service members under her command. Muller Decl. ¶ 7; Lewis Decl. ¶ 3; Winters Decl. ¶ 3; Stephens Decl. ¶ 3. The loss of their skill, talent, and experience would leave gaping holes in the military that would be difficult and costly to fill. Mullen Decl. ¶ 8.

**NEWMAN DU WORS LLP**

Plaintiffs relied on the government's assurances that they would be able to serve openly. Many took steps to transition only after the government lifted the ban on open service. Lewis Decl. ¶ 10; Stephens Decl. ¶ 12; Winters Decl. ¶ 12. One began hormone therapy on the day before President Trump announced the Ban, long after the military had implemented the framework for open service. Lewis Decl. ¶ 12. They have worked closely with their chain of command during their transition, as required by military policy, thereby ensuring that the needs of the military continue to be met. *E.g.*, Lewis Decl. ¶ 14; Stephens Decl. ¶ 16. Transitioning has not only helped transgender service members excel in their own performance by facilitating their health, but it has also allowed them to forge stronger relationships with other service members by fostering greater trust and cohesion. *E.g.*, Schmid Decl. ¶¶ 14, 17; Stephens Decl. ¶¶ 18, 30.

Plaintiffs feel profoundly betrayed by the Ban. Many have devoted the greater part of their adult lives to the military, and they have repeatedly jeopardized their own safety to protect and ensure the security of their fellow Americans. Their Commander in Chief has now publicly denigrated each of their sacrifices.

The harms caused by the Ban are far-reaching. All transgender service members woke up on the morning of July 26, 2017 to learn that they now occupy a second-class status in which they are presumed unfit to do what they have already been doing. The loss and diminishment of their careers also directly affects their families:  one Plaintiff, for instance, has a child with serious medical needs whose well-being hinges on the family health care coverage provided to service members. Lewis Decl. ¶¶ 7, 19; *accord* AMPA Decl. Meanwhile, due to the Ban, the path forward for transgender people planning to join the military has been indefinitely closed.

Several Plaintiffs currently serving have already begun to experience additional harms. Less than a month after President Trump's tweets, separation proceedings were threatened against one Plaintiff based on her transgender status. Winters Decl. ¶¶ 23-27. Another has been deprived of an equal opportunity to become a warrant officer. Schmid Decl. ¶¶ 28-29. Others face new barriers to obtaining medically necessary transition-related care. *E.g.*, Muller Decl. ¶ 35; Stephens Decl. ¶ 14.

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 5
[2:17-cv-01297-MJP]

**Newman Du Wors LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    One Plaintiff had been preparing to transition but has now been deterred from doing so, given that

2    disclosing her transgender status to the government exposes her to discharge. Decl. of Jane Doe

3    ¶¶ 7-14. All Plaintiffs stand to lose everything they have worked to achieve through a career of military

4    service if implementation of the Ban is allowed to proceed.

5                                   **III.    ARGUMENT**

6    **A.    Legal Standard**

7            A preliminary injunction is warranted where a party has shown that "(1) it is likely to succeed

8    on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief,

9    (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public

10   interest." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "When the

11   government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073,

12   1092 (9th Cir. 2014). Alternately, a preliminary injunction is also appropriate when "serious questions

13   going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor,"

14   combined with a likelihood of irreparable injury and a showing that the injunction serves the public

15   interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

16   **B.    Plaintiffs are Likely to Succeed on the Merits.**

17            **1.    The Ban Violates Plaintiffs' Equal Protection Rights.**

18           The Ban's open assault on transgender Americans violates Plaintiffs' right to equal protection

19   under the law. It facially discriminates on the basis of a suspect classification, thus triggering strict

20   scrutiny, because it singles out a minority group whose members have suffered a history of irrational

21   discrimination. At a minimum, the Ban discriminates on the basis of sex and thus demands

22   intermediate scrutiny. Regardless of the standard of review applied, however, the Ban lacks even a

23   rational basis for presumptively barring transgender persons who are otherwise qualified from serving

24   in the military—as the government itself concluded after careful consideration when lifting the prior

25   ban.

26

27

28

1

### a.     The Ban Requires Strict Scrutiny.

2      The equal protection guarantee of the Fifth Amendment "is essentially a direction that all

3 persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473

4 U.S. 432, 439 (1985); *see* U.S. CONST., amend. V. Certain government classifications are

5 presumptively unconstitutional because they are particularly likely to reflect unjustified discrimination

6 borne of historical animus. The Ban employs precisely such a suspect classification by targeting an

7 individual's transgender status. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2014)

8 ("discrimination based on transgender status independently qualifies as a suspect classification");

9 *accord Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D.

10 Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). Strict scrutiny is

11 warranted where the government targets a class that (1) has been "historically subject to

12 discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute

13 to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or

14 politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 133 S. Ct.

15 2675 (2013) (internal quotation marks omitted). The first two considerations alone can be dispositive.

16 *See Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012).

17      There is a long and ugly history of discrimination against transgender people, which remains

18 pervasive to this day. Transgender individuals experience "alarming rates" of harassment and physical

19 violence relative to the general population. *See* Everett Decl., Ex. 8. It is "common-sense knowledge

20 that transgender individuals face hostility and discrimination in our society." *Brocksmith v. United*

21 *States*, 99 A.3d 690, 698 (D.C. 2014); *see also Adkins*, 143 F. Supp. 3d at 139; *Whitaker v. Kenosha*

22 *Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender

23 individuals face discrimination, harassment, and violence because of their gender identity."). This

24 longstanding discrimination, moreover, is unrelated to a transgender individual's ability to contribute

25 to society. *See Adkins*, 143 F. Supp. 3d at 139 ("The Court is not aware of any data or argument

26 suggesting that a transgender person, simply by virtue of transgender status, is any less productive

27

28

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 7
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

than any other member of society."); Brown Decl. ¶¶ 86-89. For these reasons alone, government action that targets transgender individuals, such as the Ban, must be subjected to strict scrutiny.

While nothing more is needed to trigger strict scrutiny, the remaining two considerations militating in favor of strict judicial scrutiny are present here as well. Not only is gender identity an immutable characteristic, but transgender individuals are also relatively politically powerless. Brown Decl. ¶¶ 19-29; *see also Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (gender identity "equally immutable" as sexual orientation); *Adkins*, 143 F. Supp. 3d at 140 ("[T]ransgender people lack the political strength to protect themselves."). The government must therefore show that the Ban is necessary to further compelling interests. *See Windsor*, 699 F.3d at 196. Because discrimination against transgender people rings each and every alarm bell alerting courts to a suspect classification, the Ban is subject to strict scrutiny. *See id.* at 181.

### b.    The Ban Discriminates on the Basis of Sex.

Independently, discrimination against transgender individuals is also a form of sex-based discrimination, and the Ban must, at the very least, be supported by an "exceedingly persuasive justification" under intermediate scrutiny. *See Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) (holding that an attack motivated by transgender status was "committed because of gender"); *United States v. Virginia*, 518 U.S. 515, 535-36 (1996) ("VMI"). Discrimination against transgender individuals discriminates based on sex in at least three ways: (1) it turns on sex-based considerations, including gender identity; (2) it penalizes individuals for their perceived nonconformity to sex stereotypes; and (3) it treats individuals differently because of their gender transition.

First, Defendant DoD *admits* that discrimination against individuals "based on their gender identity is sex discrimination." Mabus Decl., Ex. C. That should be the end of the matter, because every element of the Ban discriminates based on gender identity. Application of the Ban explicitly turns on an individual's gender identity in relation to his or her sex assigned at birth: Staff Sergeant Schmid, whose gender identity is female, is affected by the Ban only because she was assigned the sex of male at birth. Schmid Decl. ¶¶ 22-30. Both gender identity and birth-assigned sex are sex-related

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 8
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

characteristics. *See Schwenk*, 204 F.3d at 1201-02 (holding that conduct motivated by an individual's "gender or sexual identity" is because of "gender," which is interchangeable with "sex"); *accord Roberts v. Clark Cty Sch. Dist.*, 215 F. Supp. 3d 1001, 1011-14 (D. Nev. 2016).

Second, discrimination against transgender individuals penalizes them for their perceived nonconformity to sex stereotypes. As the Ninth Circuit has explained, by definition, a transgender person's "inward identity [does] not meet social definitions of masculinity [or femininity]" associated with one's birth-assigned sex. *Schwenk*, 204 F.3d at 1201. In that sense, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *see also Whitaker*, 858 F.3d at 1049 (collecting cases).

Third, discrimination against transgender people treats them differently because of their gender transition. By analogy, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" and "[n]o court would take seriously the notion that 'converts' are not covered." *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008); *see also Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016).

In sum, as with other government discrimination based on sex—including in areas touching upon matters of defense and national security—the Ban is subject to at least intermediate scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (striking down a sex-based classification in the Immigration and Naturalization Act under intermediate scrutiny); *VMI*, 518 U.S. at 532-34 (requiring the government to provide an "exceedingly persuasive justification" for the exclusion of women from a military academy and forbidding reliance "on overbroad generalizations about the different talents, capacities, or preferences" of the excluded class); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality opinion) ("classifications based upon sex . . . are inherently suspect"); *see also Witt v. U.S. Dep't of the Air Force*, 527 F.3d 806, 817-18 (9th Cir. 2008) (applying heightened scrutiny to the discharge of a lesbian service member). Defendants must therefore show that the Ban, at a minimum, substantially furthers an important government interest. *VMI*, 518 U.S. at

PLAINTIFFS' MOTION FOR  PRELIMINARY INJUNCTION - 9
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

533. Under both intermediate and strict scrutiny, the government is limited to the actual justifications that motivated its action at the time; it cannot rely upon hypothetical or *post hoc* justifications conceived after the fact. *Morales-Santana*, 137 S. Ct. at 1696-97.

### c.   The Ban Fails Under Any Level of Review.

The purported rationale for the Ban fails even the most deferential standard of review. Under rational basis review, a classification must "bear a rational relationship to an independent and legitimate legislative end," to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 632-33 (1996).

The government offers three justifications for the Ban:  transgender individuals' purported impact on military effectiveness, unit cohesion, and military resources. Everett Decl., Ex. 7. Each is a smokescreen for the animus underlying the Ban. The thorough review and analysis conducted by the Working Group and DoD leaders belies the President's proffered reasons for treating transgender individuals differently than other persons capable of military service. *See Rostker v. Goldberg*, 453 U.S. 57, 72 (1981) (no deference in military matters where discriminatory acts are undertaken "unthinkingly or reflexively and not for any considered reason").

First, there is no rational connection between military effectiveness and the exclusion of transgender service members. DoD itself came to that conclusion after a lengthy process of exhaustive research and careful deliberation. Mabus Decl., Ex. C at 2 (concluding that open service is "consistent with military readiness and with strength through diversity"). Open service by transgender individuals has no negative effect on readiness or effectiveness; in fact, the Ban harms the military by arbitrarily excluding skilled and capable individuals based on a characteristic with "no relevance to a person's fitness to serve." Carson Decl. ¶¶ 17, 26; Mabus Decl. ¶ 14; Decl. of Margaret Wilmoth (attached as Ex. 15 to Everett Decl.) ¶ 23. That is evidenced by the individual Plaintiffs in this case, who have served honorably and with distinction, and are highly decorated as a result. For example, in her twelve years of service, Staff Sergeant Schmid has earned three Commendation Medals and three Achievement Medals. Schmid Decl. ¶ 15. The military would suffer "an immediate negative impact

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 10
[2:17-cv-01297-MJP]

**Newman Du Wors LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

on readiness" by separating qualified transgender service members who serve at all levels. Mabus Decl. ¶¶ 18, 45; Carson Decl., Ex. B at 46.

The military has invested considerable resources in training transgender individuals like Plaintiffs; it would incur a significant burden to fill vacancies due to the Ban; and the Ban reduces the potential recruiting pool by excluding transgender recruits. Mabus Decl. ¶ 45. In addition, the sudden abandonment of an inclusive policy in favor of a discriminatory one tarnishes the military's image and reputation of promoting fairness and equality. It thus damages the military's ability to attract talent, causing "real harm" and undercutting effectiveness. *Id.* ¶¶ 51-52.

In terms of deployability, there is no basis for singling out transgender service members' health care and any "negligible" short-term periods of deployment unavailability—particularly in comparison to the significantly larger periods of deployment unavailability experienced by other active-duty soldiers due to injuries, infectious disease, pregnancy, and myriad other conditions. Carson Decl. ¶ 22; Wilmoth Decl. ¶¶ 14-20; Brown Decl. ¶ 88. The RAND Report analyzed all available evidence and concluded that the total impact of transition-related medical care would be a mere "0.0015 percent of available deployable labor-years" across the entire force. Carson Decl., Ex. B at 42; *compare id.* at 46 (fourteen percent of Army active component troops are non-deployable at any given time). Foreign militaries with inclusive policies similarly report no reduced ability to serve from transgender service members. Wilmoth Decl. ¶ 19. There is, in short, no medical justification for banning transgender individuals from military service. *See generally* Brown Decl.

In addition, the abrupt policy reversal represented by the Ban is an "enormous distraction" and stressor to currently serving transgender troops, their chain of command, and their colleagues—one that erodes force morale and trust in command and detracts from readiness. Mabus Decl. ¶ 49; Carson Decl. ¶¶ 35-36. The policy "bait-and-switch" causes disruption that undermines military readiness and lethality. Carson Decl. ¶ 33. The Ban not only breaks faith with transgender service members, but it also breeds distrust among other minority groups within the military who may reasonably worry about whether they are next on the government chopping block. Mabus Decl. ¶ 51.

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 11
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Second, the Ban does not rationally advance unit cohesion. Rather, it "negatively impacts unit cohesion, a fundamental component of readiness." Mabus Decl. ¶ 46. The qualification that matters is the ability to perform—not one's race, religion, sexual orientation, or gender identity. *Id.* When service members are required to hide parts of their identity, it can undermine cohesion by weakening bonds among unit members. *Id.* Recognizing that any concerns about open service by transgender people could be addressed with proper leadership and training, DoD embarked upon a year-long process of developing and disseminating guidance and training for the military. Mabus Decl. ¶¶ 24, 36. Over the last year, transgender service members have served openly without any adverse effect on cohesion. *Id.* ¶ 43. Indeed, Plaintiffs' experiences illustrate that open service can promote unit cohesion. *E.g.*, Schmid Decl. ¶¶ 14, 17; Stephens Decl. ¶¶ 18, 30. This echoes the experience of foreign militaries with inclusive policies toward transgender soldiers, which have experienced improved cohesion and readiness. Mabus Decl. ¶¶ 17, 42; Carson Decl. ¶ 19.

Similar concerns about unit cohesion were raised as to women in combat positions, racial integration, and open service by lesbian, gay, and bisexual service members—but in every case those fears "proved to be unfounded." Carson Decl. ¶ 19; Mabus Decl. ¶ 42; Carson Decl., Ex. B at 44. And just as lesbian, gay, and bisexual soldiers should not have to lie about who they are in order to serve, neither should transgender soldiers. Mullen Decl. ¶ 12. In any event, the government cannot give legal effect to "private biases." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

The asserted justification of military resources fares no better. As a legal matter, the government may not "protect the public fisc by drawing an invidious distinction between classes" of persons. *Mem. Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974). As a factual matter, the RAND Report estimated that providing transition-related care to active-duty service members would cost (at most) $8.4 million annually, compared to the $49.3 billion actually spent on DoD healthcare in 2014. Carson Decl., Ex. B at 36, 70. In other words, the costs of providing appropriate medical care amount to "budget dust," and "hardly even a rounding error, by military leadership." Mabus Decl. ¶ 41. Even this minimal cost associated with providing transition-related care is offset by savings in other

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 12
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1    healthcare expenses that can be avoided. Carson Decl., Ex. B at 9-10. Meanwhile, the estimated cost

2    of separating transgender service members and finding and training replacements is $960 million—

3    *more than 100 times greater* than the cost of providing medically necessary care to transgender service

4    members. Mabus Decl. ¶ 18; Carson Decl. ¶ 32.

5         In sum, the Ban flies in the face of all reasoned logic, all available evidence, and the considered

6    judgment of the military itself. Mabus Decl. ¶ 44. It is the epitome of arbitrary and capricious

7    government action lacking a rational basis.

8                    **2.**       **The Ban Violates Plaintiffs' Rights to Due Process.**

9                    **a.**       **The Ban Violates Plaintiffs' Substantive Due Process Rights.**

10        The Ban violates the substantive guarantee of the Fifth Amendment's Due Process Clause,

11   which protects each person's fundamental liberty interest in individual dignity, autonomy, and privacy

12   from unwarranted government intrusion. *See* U.S. CONST., amend. V. "It is a promise of the

13   Constitution that there is a realm of personal liberty which the government may not enter." *Planned*

14   *Parenthood of Se. Pa. v. Casey,* 505 U.S. 833 (1992). Courts protect as fundamental the right to make

15   intimate decisions concerning marriage, procreation, family life, bodily integrity, and self-definition

16   because such decisions are core to each person's identity, central to an individual's dignity and

17   autonomy, and can "shape an individual's destiny." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593,

18   2597, 2599 (2015).

19        The Supreme Court has emphasized the fundamental nature of decisions that are both intimate

20   and self-defining, and that mediate a person's interactions with loved ones, communities, and broader

21   society. *Id.* at 2584 ("The Constitution promises liberty to all within its reach, a liberty that includes

22   certain specific rights that allow persons, within a lawful realm, to define and express their identity.");

23   *see also Casey*, 505 U.S. at 851 (the right of self-definition is at the heart of liberty shielded by the

24   due process guarantee against unwarranted government interference); *Roberts v. U.S. Jaycees*, 468

25   U.S. 609, 619 (1984) (Due Process Clause "safeguards the ability independently to define

26   one's identity that is central to any concept of liberty"); *Abbott v. Abbott*, 560 U.S. 1, 11 (2010) (sense

27

28   PLAINTIFFS' MOTION FOR  PRELIMINARY
     INJUNCTION - 13                                    **NEWMAN DU WORS LLP**
     [2:17-cv-01297-MJP]

of "identity" about the country in which a person grows up is essential to "self-definition"). These are decisions that people must be able to make for themselves, as they are essential to "retain[ing] their dignity as free persons." *Lawrence v. Texas*, 539 U.S. 558, 567 (2003).

A person's gender identity—their internalized, inherent sense of what their sex is—is fundamental. Brown Decl. ¶ 20. Each person's ability to live and express themselves in accord with their fundamental understanding of their sex constitutes a core aspect of individual self-definition, dignity, and autonomy. *See Lawrence*, 539 U.S. at 562 ("Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."). Indeed, it is hard to imagine a greater intrusion than government requiring a person to live, work, express herself, and define herself as a gender she is not. Plaintiffs have chosen to live authentically in accord with their gender identity, and to serve this country as the men and women they are—just as other male and female service members do, and as the prior policy invited them to do. The Ban penalizes Plaintiffs for exercising this fundamental right, depriving them of employment, educational opportunities, and of their calling to serve their country in their chosen profession. The Ban thus diminishes the personhood and "demean[s] the lives" of transgender persons in a manner the due process guarantee condemns. *Lawrence*, 539 U.S. at 575.

When government intrudes on a person's liberty interest in dignity and autonomy in the context of military service, heightened scrutiny applies. *Witt*, 527 F.3d at 819. "[G]overnment must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest. In other words . . . a less intrusive means must be unlikely to achieve substantially the government's interest." *Id*. Defendants cannot advance even a legitimate governmental interest, let alone the important one required; nor can they demonstrate that the intrusion is necessary to further any interest at all. *See* Section III(B)(1)(c). Plaintiffs thus are likely to succeed on the merits of their substantive due process claim as well.

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 14
[2:17-cv-01297-MJP]

**Newman Du Wors LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

### b.     The Ban Violates Plaintiffs' Procedural Due Process Rights.

The Ban also violates procedural due process principles of fundamental fairness by punishing Plaintiff service members for doing precisely what the prior policy invited and induced them to do—disclose their transgender status and take medical and other steps to transition. The Due Process Clause forbids such a bait and switch. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Plaintiff service members had settled expectations based on the prior policy, and reasonably relied on it when they came out as transgender and underwent medical and social transition. As Petty Officer Winters explains, when the prior policy was announced in June 2016, she was "ecstatic," realizing she finally could live authentically in accord with her gender while continuing to serve her country in the military, and she began living openly as a woman in reliance on that policy the following month. Winters Decl. ¶¶ 11-12. That month, she also commenced medical steps to transition, including hormone therapy, legally changed her name, and disclosed her transgender status to her chain of command. *Id.* ¶¶ 12-14. Petty Officer Winters had served the Navy in silence for years "at great personal cost." *Id.* ¶ 22. She "abided by every instruction placed in front of [her]," including with respect to her transition, but now, as a result of the Ban's reversal of prior policy, she faces a future without service for her country, deprived not only of employment but also of educational opportunities on which she relied in planning her life's course. *Id.* ¶¶ 34, 35.

Plaintiff service members who have been induced to disclose their transgender status thus are deprived of both a property and liberty interest as a result of the Ban's impact on their continued employment and educational opportunities, and the stigma of having been labeled by the Ban as presumptively unworthy of continued service. *Witt*, 527 F.3d at 812-13 (imposition of public stigma diminishing future employment opportunities can constitute deprivation of service member's liberty interest); *Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1154 (W.D. Wash. 2014) (public employees enjoy due process property interest in continued employment when they have reasonable expectation

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 15
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   or "legitimate claim of entitlement to the job," based on existing rules or mutually explicit

2   understandings, citing *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972)). The Ban thus "takes away

3   or impairs vested rights acquired under existing laws" and "attaches a new disability, in respect to

4   transactions or considerations already past," in violation of bedrock principles of due process.

5   *Landgraf*, 511 U.S. at 270; *see also Kankamalage v. INS*, 335 F.3d 858, 862-63 (9th Cir. 2003).

6   Procedural due process principles exist for precisely these circumstances—to protect against

7   "retribution against unpopular groups or individuals" by "restraining arbitrary and potentially

8   vindictive" measures. *Landgraf*, 511 U.S. at 266-67, quoting *Weaver v. Graham*, 450 U.S. 24, 28-29

9   (1981); *see also INS v. St. Cyr*, 533 U.S. 289, 323 (2001); *accord Ixcot v. Holder*, 646 F.3d 1202, 1207

10  (9th Cir. 2011). Accordingly, for this reason, too, Plaintiffs are likely to succeed on the merits of their

11  claim that the ban violates the Due Process Clause.

12          **3.      The Ban Violates Plaintiffs' First Amendment Rights.**

13          Plaintiffs also are likely to succeed on their First Amendment claim. The Ban is a content-based

14  restriction that plainly violates Plaintiffs' First Amendment rights to freedom of speech, expression,

15  and association. *See* U.S. CONST., amend. I. No government interest is served by the Ban's restriction

16  on transgender individuals' speech rights; rather, the Ban's infringement on speech impedes military

17  readiness and unit cohesion and thus cannot withstand constitutional scrutiny.

18          **a.      The Ban Runs Afoul of the First Amendment's Proscription**

19                  **Against Content and Viewpoint-Based Regulations.**

20          "The First Amendment generally prevents government from proscribing speech . . . or even

21  expressive conduct . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul,*

22  *Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). Content-based regulation is subject to "the most

23  exacting scrutiny," *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (citation omitted), and "[v]iewpoint

24  discrimination is . . . an egregious form of content discrimination," *Rosenberger v. Rector & Visitors*

25  *of Univ. of Va.*, 515 U.S. 819, 829 (1995). Notwithstanding any deference that may otherwise be

26  afforded to the military, "regulations restricting speech on military installations may not discriminate

27

28  PLAINTIFFS' MOTION FOR  PRELIMINARY
    INJUNCTION - 16                              **NEWMAN DU WORS LLP**
    [2:17-cv-01297-MJP]

against speech based on its viewpoint." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 806 (1985); *see also Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (E.D.N.C. 2010) ("[A] regulation is viewpoint based if it suppresses the expression of one side of a particular debate.").

The Ban "prohibits *openly* transgender individuals from accession into the United States military and authorizes the discharge of such individuals," reversing the current policy "permitting transgender individuals to serve *openly*." Everett Decl., Ex. 7 (emphasis added). The Ban thus impermissibly prohibits transgender individuals—but not others—from disclosing or expressing their gender identity, and it requires transgender individuals to engage only in gendered expressive conduct matching their birth-assigned sex, even though inconsistent with their gender identity. Plaintiffs have been harmed by this content and viewpoint-based regulation. For instance, when Plaintiff D.L. disclosed to the Air Force recruiter with whom he was communicating that he is transgender, "the recruiter stopped communicating with [him]." D.L. Decl. ¶ 6. This sudden halt in communications would not have happened if D.L. had expressed the alternative content:  that he is *not* transgender.

### b.  The Ban Chills Constitutionally Protected Expression in Violation of the First Amendment.

The Ban intentionally chills constitutionally protected speech, including disclosure of transgender status, *cf. Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85 (D. Utah 1998) (coming out as lesbian to employer protected by First Amendment); *Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 24 Cal. 3d 458, 489 (Cal. 1979) (coming out to employer a form of political freedom), and expressive conduct, including gender expression and expressive association, *cf. Fricke v. Lynch*, 491 F. Supp. 381, 385 (D.R.I. 1980) (gay student's attendance at prom with male date constituted expressive conduct protected by First Amendment); *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652 (1st Cir. 1974) (gay students' social events constitute expressive conduct and expressive association, especially in light of defendants' efforts to ban them).

The Ban would "chill a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted); *see*

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 17
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*also, e.g.*, Doe Decl. ¶¶ 9-10 (service member "decided to put [her] plans to transition . . . on hold" and has not informed her command that she is transgender solely because of the Ban); Winters Decl. ¶ 12 (service member delayed disclosure of transgender status and medical and social transition until military policy explicitly permitted open service). Plaintiffs face a "realistic danger of sustaining a direct injury as a result of the [Ban's] operation or enforcement," *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010), and can demonstrate self-censorship, *see* Doe Decl. ¶¶ 9-10.

<blockquote>

c.       **The Ban Does Not Survive the Level of Constitutional Scrutiny Applied to Speech in a Military Context.**

</blockquote>

Even content-neutral regulations of speech in the military context fail constitutional scrutiny unless they "restrict speech no more than is reasonably necessary to protect the substantial government interest." *Brown v. Glines,* 444 U.S. 348, 348, 355 (1980). The Ban cannot survive even this level of review; here, there is no governmental interest, let alone a substantial one, in prohibiting transgender individuals from disclosing their transgender status and expressing their accurate gender.

To the contrary, the Ban chills a wide swath of speech that is beneficial and in some cases critical to the effective functioning of the military. Like other sweeping discriminatory restrictions that the military has since eliminated, such as the "Don't Ask, Don't Tell" policy, the Ban prevents transgender service members from engaging in mundane but critical social interaction:  it forces them to conceal information about themselves and it prevents them from disclosing their true and authentic selves—which is essential to building trust and cohesion. *See* Adm. Mullen Decl. ¶ 12 ("Just as gay and lesbian soldiers should not have to lie about who they are to serve, nor should transgender soldiers."). For example, Plaintiff Staff Sergeant Schmid explains that "[b]eing able to serve openly as a transgender woman has made me a stronger asset to the military," including being "able to forge stronger relationships with others in my unit." Schmid Decl. ¶ 15. Petty Officers Lewis and Stephens likewise explain that, by being able to serve openly, they forge stronger relationships because they do not have to pretend to be someone they are not. Lewis Decl. ¶ 22; Stephens Decl. ¶ 32.

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 18
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Because the Ban harms rather than advances the government's interests, Plaintiffs are likely to succeed on their First Amendment claim.

**C.  Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.**

If denied preliminary relief, Plaintiffs will suffer a litany of further, irreparable harms as a result of the Ban and its implementation. Irreparable harm has "traditionally [been] defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). For purposes of a preliminary injunction, a plaintiff "need not prove that irreparable harm is certain or even nearly certain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). Instead, a plaintiff must only demonstrate a "likelihood" of irreparable harm. *Id.* at 1187. That is particularly true when the practice to be enjoined has employment-related consequences, as the Ninth Circuit has repeatedly emphasized, since "permitting an alleged unfair labor practice to reach fruition . . . *is* irreparable harm." *Id.* at 1191 (emphasis in original). Here, each of the Plaintiffs is subject to exclusion from military service under the Ban under discriminatory terms, and their imminent injuries plainly satisfy this standard.

As explained above, the Ban violates Plaintiffs' constitutional rights in multiple respects, and the constitutional nature of each of these harms is inherently irreparable. "An alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary."). Indeed, the constitutional violations Plaintiffs face result in immediate irreparable injury as a matter of law. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding that an equal protection violation constitutes irreparable harm); *Collins v. Brewer*, 727 F. Supp. 2d 797, 813 (D. Ariz. 2010) (finding irreparable harm from the "serious constitutional and dignitary harms" from likely violation of equal protection of being denied equal health care benefits), *aff'd sub nom. Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("prospective violation" of substantive due process rights

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 19
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

constitutes irreparable injury); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (loss or chilling of First Amendment rights "for even minimal periods of time unquestionably constitutes irreparable injury"). Each of these constitutional violations caused Plaintiffs to suffer irreparable injuries the moment President Trump issued the Ban. They only grow in severity over time.

While no further demonstration of harm is required to enjoin the Ban, the Ban also subjects Plaintiffs to the categorical presumption that they are not fit to serve—and to do the jobs that many of them are already doing—merely because they are transgender. This has publicly branded and stigmatized Plaintiffs as second-class citizens, inferior to their peers. *E.g.*, Schmid Decl. ¶ 18; Winters Decl. ¶¶ 21-22; Stephens Decl. ¶¶ 21-22. Simply put, the Ban deprives Plaintiffs of their equal dignity and status. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015) ("Dignitary wounds cannot always be healed with the stroke of a pen."); *see, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) ("Injuries to individual dignity and deprivations of civil rights constitute irreparable injury."); *Majors v. Jeanes*, 48 F. Supp. 3d 1310, 1317 (D. Ariz. 2014) ("[O]n the basis of the loss of dignity and status . . . , the court holds that [plaintiff] has shown the requisite irreparable harm.").

The clear implication of the Ban is that non-transgender service members are judged by one standard, and transgender service members are judged by a different standard. The deprivation of "equal footing" is itself an equal protection injury. *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). As a result of the Ban, Plaintiffs are presumptively barred from carrying out our nation's long-established "primary act of public citizenship." *Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997), *rev'd on other grounds*, 155 F.3d 628 (2d Cir. 1998).

Plaintiffs will also suffer additional concrete and irreparable harms if the Ban is not preliminarily enjoined. Absent this Court's immediate intervention, the Ban will diminish each individual Plaintiff's career prospects within the military. *E.g.*, Schmid Decl. ¶ 22; Winters Decl. ¶ 23. The "diminished . . . opportunity to pursue [one's] chosen profession . . . constitutes irreparable harm."

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 20
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800


*Ariz. Dream Act Coal.*, 757 F.3d at 1068; *see also Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709-10 (9th Cir. 1988) (school's reassignment of teacher diagnosed with AIDS caused irreparable harm, because "[s]uch non-monetary deprivation is a substantial injury"). Furthermore, those who were planning to join the military also face irreparable harm from the indefinite delay of their future careers. *E.g.*, Callahan Decl. ¶¶ 14-19; D.L. Decl. ¶ 15. "Plaintiffs' entire careers may be constrained by professional opportunities they are denied today." *Ariz. Dream Act Coal*, 757 F.3d at 1068.

Beyond the loss of their careers, those currently serving also stand to lose health care coverage for themselves and their families, all causing extreme anxiety and stress. For instance, Petty Officer Lewis has a young child with serious medical needs, and the family depends on the health care coverage she receives for her military service. Lewis Decl. ¶¶ 7, 19. Other Plaintiffs have similar family health care coverage needs. *E.g.*, Schmid Decl. ¶¶ 25-28; *accord* AMPA Decl. Denial of health care coverage and the accompanying "anxiety and stress" qualify as irreparable harm as a matter of law. *Collins*, 727 F. Supp. 2d at 812; *accord Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 997 (N.D. Cal. 2010) (reduction in medical benefits "is sufficient to establish irreparable harm to those likely to be affected by the program cuts").

In sum, absent an order preliminarily enjoining its enforcement until the resolution of this case, the Ban will continue to cause Plaintiffs serious, worsening, and irreparable harm.

**D.    The Balance of Equities and the Public Interest Both Favor an Injunction.**

Finally, the balance of equities and the public interest both tip decisively in favor of an injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 27 (2008) (courts must "give serious consideration to the balance of equities and the public interest"); *Drakes Bay Oyster Co.*, 747 F.3d at 1092 (noting that these factors merge when the government is a party). To make that determination, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007).

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 21
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

That task is straightforward where, as here, the impending harm to the plaintiffs involves a violation of constitutional rights. Indeed, "by establishing a likelihood that [the government's] policy violates the U.S. Constitution," as Plaintiffs have done here, they "ha[ve] also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069 ("[T]he public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'"). Simply put, "it is *always* in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (emphasis added).

Additionally, the balance of equities tips sharply in Plaintiffs' favor, given the severe harms that ending and forbidding open service inflicts on them. The Ban cleaves devoted service members apart from careers built collectively over decades, indefinitely blocks others from starting a career of service to their country, and irrevocably damages their professional and personal lives—stripping the security of stable income and health coverage from their families, some of whom include seriously ill children. *See, e.g.*, Muller Decl. ¶ 4; Karnoski Decl. ¶ 16; Lewis Decl. ¶¶ 7, 19.

Examining the government's purported harms only underscores the necessity of injunctive relief. In contrast to the substantial and irreparable harm the Plaintiffs will suffer if the Ban remains in place, Defendants cannot credibly argue they will be harmed by a return to the pre-Ban *status quo*, especially given that Defendant DoD *voluntarily adopted that policy* after extensive study and deliberation, and it has been in effect for over a year without any documented negative effect. Nevertheless, President Trump has now asserted, without any factual substantiation, that "Generals and military experts" believe the Ban is necessary, because allowing transgender individuals to continue serving will purportedly "hinder military effectiveness and lethality, disrupt unit cohesion, [and] tax military resources." Everett Decl., Exs. 6, 7. Not so. The military already commissioned an intensive study by the RAND Corporation to analyze all available evidence, and these military experts weighing actual evidence found there was none whatsoever suggesting that allowing transgender individuals to serve openly in the military would negatively impact unit cohesion, operational

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 22
[2:17-cv-01297-MJP]

**Newman Du Wors LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

effectiveness, or readiness. Carson Decl. ¶ 17. Nor would a return to the *status quo ante* tax military resources, as the cost of providing health care coverage to transgender service members would be "exceedingly small"—just a fraction of a percent of the military's overall health care expenditure. Carson Decl. ¶ 16.

Indeed, all available evidence in fact shows that denying a preliminary injunction would not only harm Plaintiffs, but Defendants as well. Generals and military experts all agree that the relief Plaintiffs seek would promote—not "hinder"—every one of the government's stated goals.

As Admiral Michael Mullen, former Chairman of the Joint Chiefs of Staff under Presidents George W. Bush and Barack Obama, has affirmed under oath, "the military conducted a thorough research process on this issue and concluded that inclusive policy for transgender troops *promotes* readiness." Adm. Mullen Decl. ¶ 7 (emphasis added). His sworn testimony is that, having "led our armed forces" under the flawed "Don't Ask, Don't Tell" policy, he "saw firsthand the harm to readiness and morale when we fail to treat all service members according to the same standards" and "force[] young men and women to lie about who they are in order to defend their fellow citizens." Mullen Decl. ¶¶ 14-15. Implementation of the Ban would "go against the best interests of thousands of service members currently serving" and "harm military readiness as well as morale." *Id.* ¶ 8. The other generals and military experts who have extensively studied the evidence agree. *See, e.g.*, Wilmoth Decl. ¶ 23 ("The Working Group [convened by the military to study the policy and readiness implications of open service] concluded there were no barriers that should prevent transgender service members from serving openly in the military."); Mabus Decl. ¶ 21 ("All members of the Working Group (including the senior uniformed military personnel) expressed their agreement that transgender people should be permitted to serve openly.").

Furthermore, it is Defendants' new policy—not the *status quo ante*—that would tax military resources. The RAND Report exhaustively analyzed the issue and concluded that the cost of recruiting and training replacements for the discharges caused by the Ban dwarfs the cost of providing medical care to transgender service members. The evidence thus shows that from a military resource

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 23
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1   perspective, granting a preliminary injunction putting the Ban on hold pending resolution of this case

2   will help—not harm—Defendants.

3     At bottom, there simply is no fact-based argument that a return to the pre-Ban *status quo* would

4   harm the military or disserve the public interest. All evidence and argument shows the opposite,

5   leaving the government with nothing but rhetoric and innuendo. Mabus Decl. ¶ 40 ("President

6   Trump's stated rationales for reversing the policy . . . have no basis in fact and are refuted by the

7   comprehensive analysis of relevant data and information that was carefully, thoroughly, and

8   deliberately conducted by the Working Group."). Empty bluster, of course, cannot justify the violation

9   of constitutional rights. *See, e.g.*, *Rahman v. Napolitano*, 814 F. Supp. 2d 1087, 1097 (W.D. Wash.

10  2010) ("The public interest is best served by the orderly and fair treatment of persons subject to the

11  laws of this land."). The balance of equities here tips sharply in Plaintiffs' favor.

12  <div align="center">

**IV. CONCLUSION**
</div>

13    For the reasons set forth above, Plaintiffs have far exceeded their burden to raise serious

14  questions going to the merits, and in fact have demonstrated a likelihood of success on the merits on

15  each of their claims. Plaintiffs have also shown that the balance of hardships tips sharply in their favor;

16  that they are likely to suffer irreparable harm in the absence of preliminary relief; and that a

17  preliminary injunction is in the public interest. Based on that showing, Plaintiffs respectfully request

18  that the Court enter a preliminary injunction barring Defendants and those acting in concert with them

19  or subject to their control from taking any action relative to transgender individuals, pending resolution

20  of this case, that is inconsistent with the *status quo* that existed on July 25, 2017.

21

22  Respectfully submitted September 14, 2017.

23       **NEWMAN DU WORS LLP**

24

25       Derek A. Newman, WSBA #26967
     *dn@newmanlaw.com*

26       Samantha Everett, WSBA #47533
     *samantha@newmanlaw.com*

27

28

1

2101 Fourth Ave., Ste. 1500
Seattle, WA 98121
(206) 274-2800

2

Seattle, WA 98121

3

(206) 274-2800

4

**LAMDBA LEGAL DEFENSE AND**

5

**EDUCATION FUND, INC.**
Tara Borelli, WSBA #36759

6

*tborelli@lambdalegal.org*
Jon W. Davidson (admitted pro hac vice)

7

Camilla B. Taylor (admitted pro hac vice)
Peter C. Renn (admitted pro hac vice)

8

Natalie Nardecchia (admitted pro hac vice)
Sasha Buchert (admitted pro hac vice)

9

Kara Ingelhart (admitted pro hac vice)
Carl Charles (admitted pro hac vice)

10

730 Peachtree Street NE, Ste. 640
Atlanta, GA  30308

11

(404) 897-1880

12

**OUTSERVE-SLDN, INC.**
Peter Perkowski (admitted pro hac vice)

13

14

**KIRKLAND & ELLIS LLP**
James F. Hurst, P.C. (admitted pro hac vice)

15

Jordan Heinz (admitted pro hac vice)
Scott Lerner (pro hac vice pending)

16

Vanessa Barsanti (pro hac vice pending)
Daniel I. Siegfried (pro hac vice pending)
300 N. LaSalle

17

Chicago, IL 60654
(312) 862-2000

18

19

Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 25
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the United States of America and the laws of the State of Washington that on September 14, 2017, I caused true and correct copies of the foregoing documents to be served by the method(s) listed below on the following interested parties:

**By Hand Delivery:**

U.S. Attorney's Office
700 Stewart St., Suite 5220
Seattle, WA 98101-1271

**By Registered or Certified U.S. Mail:**

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Department of Defense
1400 Defense Pentagon
Washington, DC 20301-1400

Secretary of Defense James N. Mattis
1000 Defense Pentagon
Washington, DC 20301-1000

President Donald J. Trump
1600 Pennsylvania Ave. NW
Washington, DC 20500

I hereby certify under the penalty of perjury that the foregoing is true and correct.  Executed on September 14, 2017 at Seattle, Washington.


s/Rachel Horvitz
Rachel Horvitz, *Paralegal*

PLAINTIFFS' MOTION FOR  PRELIMINARY
INJUNCTION - 26
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800