The Honorable Marsha J. Pechman

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| RYAN KARNOSKI, et al., | Case No. 2:17-cv-01297-MJP |
| *Plaintiffs*, | |
| v. | **DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | NOTE ON MOTION CALENDAR: October 6, 2017 |
| | ORAL ARGUMENT REQUESTED |

I, Raymond Edwin Mabus, Jr., declare as follows:

**Background and Experience**

1.      I served as the United States Secretary of the Navy from May 19, 2009 to January 20, 2017.

2.      Prior to serving as Secretary of the Navy, I earned a Bachelor's degree in English and Political Science from the University of Mississippi in 1969, a Master's Degree in political science from Johns Hopkins University in 1970, and a J.D. from Harvard Law School in 1976. Prior to attending law school, I served from 1970 until 1972 in the Navy aboard the cruiser USS Little Rock, achieving the rank of Lieutenant, junior grade. Following law school, I worked as a law clerk in the United States Court of Appeals for the Fifth Circuit. From 1977 until 1978, I worked as legal counsel for the Cotton Subcommittee of the Agriculture Committee of the United States House of Representatives. From 1979 to 1980, I was an associate at the law firm of

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1 [2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

Fried, Frank, Harris, Shriver and Kampleman in Washington, D.C. and from 1980 to 1983, I was Legal Counsel and Legislative Assistant to the Governor of Mississippi. From 1984 to 1988, I served as Mississippi State Auditor (an elected position), and from 1988 to 1992 as Governor of Mississippi. From 1994 to 1996 I served as the United States Ambassador to Saudi Arabia. From 1998 to 2000 I served as President of Frontline Global Services, a consulting company. From 2003-2007 I served as Chairman of Foamex, Incorporated, a public manufacturing company, and from 2006 to 2007 as Foamex's Chief Executive Officer as well.

3.      As Secretary of the Navy, I functioned as the chief executive of the Department of the Navy, with the authority to conduct all of its affairs. As Secretary, I had comprehensive oversight responsibility for (i) the Department of the Navy's annual budget, (ii) overseeing the recruitment, organization, training, supplying, equipping, mobilizing, and demobilizing of Navy personnel, and (iii) overseeing the construction, outfitting, and repair of naval equipment, ships, and facilities. I was also responsible for the formulation and implementation of policies and programs that are consistent with the national security policies and objectives established by the President and the Secretary of Defense.

4.      In connection with my personnel-related oversight responsibilities, I oversaw the administration of recruitment, retention, and medical policies for active duty and reserve Navy personnel. As Secretary, I performed these duties before, during, and after the end of the "Don't Ask, Don't Tell" ban on gay service members serving openly in the military in 2011.

5.      Also during this period, I oversaw the Navy and the Marine Corps through the end of United States military operations in Iraq and the surge of tens of thousands of United States troops in Afghanistan. I am keenly aware that the recruitment and retention of capable and qualified service members is of critical importance to the readiness of the Navy and the Marines.

### The Navy

6.      The Department of the Navy comprises two uniformed Services of the United States Armed Forces: the United States Navy and the United States Marine Corps. It is one of the three military departments of the Department of Defense ("DoD"). The Navy, with an annual budget of more than $160 billion, maintains more than 270 deployable battle force ships,

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2 [2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

operates more than 3,700 military aircraft, and employs nearly 900,000 active duty, reserve, and civilian employees.

7.      The mission of the Navy is to maintain, train and equip combat-ready Naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas.

**Development of DoD Policy Relating to Service by Openly Transgender Persons**

8.      On July 28, 2015, Secretary of Defense Ashton Carter ordered Brad Carson, Acting Undersecretary of Defense for Personnel and Readiness, to convene a working group to identify and address the practical issues related to transgender Americans serving openly in the Armed Forces, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness (the "Working Group"). A true and accurate copy of this order is attached hereto as Exhibit A. The Working Group was ordered to present its findings and recommendations to the Secretary of Defense within 180 days. In the interim, pursuant to the July 28, 2015 order, no service member could "be involuntarily separated or denied reenlistment or continuation of active or reserve service on the basis of their gender identity, without the personal approval of the Under Secretary of Defense for Personnel and Readiness."

9.      As Secretary of the Navy, I was responsible for supervising the Department of the Navy's participation in the Working Group. The Working Group met as a whole and also assigned various sub-groups to research and analyze discrete issues and report their findings.  I met multiple times per week with my deputy to the Working Group, the Navy General Counsel, who would update me on the progress of the Working Group and the Navy's positions on the issues discussed.

10.    The Working Group was tasked with evaluating the hurdles, impediments, and concerns potentially raised by open service of transgender service members. They sought to identify all potential impacts on the Services and develop recommendations to address them.

11.    The Working Group met and engaged in a detailed, deliberative, carefully run process. The goal was to ensure that the input of the Services would be fully considered before any changes in policy were made and that the Services were on board with those changes.

12.    The Working Group conducted a comprehensive review of relevant evidence,

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3 [2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

including: research and data; information obtained from medical, personnel, and readiness experts; and information obtained from discussions with transgender service members and commanders who supervised transgender service members. The Working Group also considered the experiences of civilian employers and insurance companies.

13.    The Working Group also considered a study that the DoD commissioned from the RAND Corporation.  That study examined all of the available research about the healthcare needs of transgender service members, the anticipated costs of providing healthcare coverage for transition-related treatments, and the potential readiness implications of allowing transgender service members to serve openly. A true and accurate copy of the report, entitled Assessing the Implications of Allowing Transgender Personnel to Serve Openly ("RAND Report"), is attached as Exhibit B.

14.    The RAND Report concluded that the cost of caring for the medical needs of transgender personnel would be extremely small and that there was no evidence that allowing transgender people to serve openly would negatively impact unit cohesion, operational effectiveness, or readiness. The RAND Report also concluded that the Military Health Service could provide appropriate transition-related healthcare to transgender persons. The RAND Report also identified various DoD policies that would need to be changed to permit transgender service members to serve openly, including "transgender-specific DoD instructions that may contain unnecessarily restrictive conditions and reflect outdated terminology and assessment processes."

15.    Members of the Working Group discussed the full range of considerations relevant to assessing the potential impacts of permitting transgender service members to serve openly, including evidence relating to the costs of providing appropriate healthcare and evidence relating to the impact of service by transgender people on operational effectiveness and readiness. For example, the Working Group considered that while some transgender service members might be undeployable for short periods due to medical treatments, the overall loss of deployable time would not be significant and was consistent with the standard applied to other service members, who may take time off due to comparable medical treatments.

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 4 [2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

16.     The Working Group also noted that many private and public health insurance plans now cover transition-related care and that all civilian federal employees have access to a health insurance plan that provides comprehensive coverage for such care. This was helpful to ascertain both the costs of providing such care and utilization rates, as well as to demonstrate the need for the military to keep pace with contemporary medical science and practice in the provision of healthcare to our service members.

17.     The Working Group also consulted with representatives from the Armed Forces of other nations that permit openly transgender persons to serve. Those consultations confirmed that permitting such service is not disruptive to military readiness and has not led to significantly increased costs or posed any other significant problems. The RAND Report considered the experiences of other countries as well and found no evidence of any adverse impacts. Noting the most extensive research on how a policy of open service affects readiness and unit cohesion has been conducted in Canada, the RAND Report noted that "the researchers heard from commanders that the increased diversity improved readiness."

18.     The Working Group considered that banning service by openly transgender people has numerous negative impacts, including requiring the discharge of highly trained and experienced service members, causing unexpected vacancies in operational units, and requiring the expensive and time-consuming recruitment and training of replacement personnel.

19.     The Working Group also recognized that despite a ban on transgender service members, transgender persons continued to serve in the military, but were forced to lie about and hide their identities, to the detriment both of those service members and of the military as a whole. As a result, the Working Group recognized that the primary impact of the policy was to cause harms similar to those caused by "Don't Ask, Don't Tell."

20.     During the period in which the Working Group was in operation, the proceedings of the Working Group were reported to and reviewed by upper level Department of Defense personnel at meetings attended by the Joint Chiefs of Staff, the Chairman, the Vice Chairman, the Service Secretaries, the Secretary of Defense, and the Assistant Secretary of Defense. At these meetings, the activities of the Working Group would be shared along with their preliminary

DECLARATION OF RAYMOND EDWIN
MABUS, JR. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 5
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

views. The meeting attendees would then discuss any comments they may have had on those views.

21.     By the conclusion of its discussions and analysis, all members of the Working Group (including the senior uniformed military personnel) expressed their agreement that transgender people should be permitted to serve openly in the United States Armed Forces.

22.     In or around April 2016, the Working Group communicated its view to the Secretary of Defense along with detailed recommendations regarding the full range of relevant policies and practical concerns, such as guidelines involving access to healthcare, housing and uniform standards, and when a transitioning service member should be authorized to conform to the standard of the gender to which they were transitioning.

23.     On June 30, 2016, Secretary of Defense Ashton Carter accepted the recommendations of the Working Group, and issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), a true and accurate copy of which is attached as Exhibit C.

### Change, Development, and Implementation of Navy Policy

24.     Following the Secretary of Defense's announcement, the Navy's implementation of the new policy was straightforward. We focused on the administrative tasks of promulgating and implementing the appropriate processes.  Having presided over the Navy during the rollout of prior policy changes such as the repeal of "Don't Ask, Don't Tell" and the complete integration of women into ground combat, I can confirm that the implementation of open service for transgender service members was relatively low-key, triggered fewer emotional responses, and was viewed as "no big deal."

25.     To implement DTM 16-005 as applied to the Navy, on November 4, 2016, I issued SECNAV Instruction 1000.11 concerning Service of Transgender Sailors and Marines (the "Instruction").  A true and accurate copy of the Instruction is attached hereto as Ex. D.

26.     The policy and guidance in the Instruction, which was effective immediately for all Department of Navy ("DON") personnel, established "policy for the accession and service of transgender Sailors and Marines, to include the process for transgender Service Members to

DECLARATION OF RAYMOND EDWIN
MABUS, JR. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 6
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

transition to transgender in-service." The policies and procedures in the Instruction "are based on the premise that open service by transgender persons who are subject to the same medical, fitness for duty, physical fitness, uniform and grooming, deployability, and retention standards and procedures is consistent with military service and readiness." The Instruction provides that "transgender individuals shall be allowed to serve openly in the DON," and that any "discrimination based on gender identity is a form of sex discrimination."

27.    Pursuant to the Instruction, on November 7, 2016, Chief of Naval Personnel, Vice Admiral R. P. Burke, issued interim guidance in NAVADMIN 248/16 (the "Policy") regarding "policy, regulations and procedures related to the service of transgender Navy personnel." The Policy, which "applies to all Navy military personnel," remains in effect "until superseded or cancelled." A true and accurate copy of the Policy is attached hereto as Ex. E.

28.    As with the Instruction, the Policy provides that "transgender individuals shall be allowed to serve openly in the Navy. The Policy was "premised on the conclusion that transgender persons are fully qualified and are subject to the same standards and procedures as other Service Members with regard to their medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention." The Policy thus declares that "[n]o otherwise qualified Service Member may be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity or an expressed intent to transition gender."

29.    With respect to individuals serving in the Navy or Marine Corps, the Instruction and Policy state that transgender Sailors and Marines will be responsible to meet all standards for uniforms and grooming, body composition assessment, physical readiness testing, Military Personnel Drug Abuse Testing Program participation and other military standards according to their gender marker in DEERS, subject to the approval of an Exception to Policy ("ETP") request.

30.    To allow DON commanders to address medical needs in a manner consistent with military mission and readiness, the Policy sets forth detailed procedures concerning medical treatment for transgender service members with a diagnosis from a medical military provider

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 7 [2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

indicating that gender transition is medically necessary. Service members with such a diagnosis must notify their commanding officer and request commanding officer approval for the timing of medical treatment associated with gender transition. The commanding officer is the final approval authority for a transition plan. Commanding officers must respond to a gender transition request "within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as the morale, welfare, and good order and discipline of the command." Furthermore, the Policy provides that timing of a medical treatment plan "should consider the individual's planned rotation date (PRD), deployment or other operational schedules, and potential impact on major career milestones, whenever possible."

31.    The Policy further provides detailed instructions regarding an in-service transition. The transition plan is considered complete once (1) a military medical provider documents that the service member has completed the care outlined in a medical treatment plan; (2) the service member obtains an appropriate document showing legal proof of gender change; (3) the service member's commanding officer provides written permission to change the gender marker in the Navy Personnel Administrative Systems/DEERS; (4) the service member submits for the gender marker change; and (5) the gender marker is changed in the Navy Personnel Administrative Systems/DEERS.

32.    As set forth in the Policy, in order to have a gender marker changed in the Navy Personnel Administrative Systems/DEERS, the service member must submit the required documentation showing legal proof of gender change and the commanding officer's written approval to Navy Personnel Command.

33.    The Policy also provides that "[a]ll Service Members are world-wide assignable as their medical fitness for duty permits." "Any determination that a transgender Sailor or Marine is non-deployable at any time will be consistent with established DON standards, as applied to other Sailors and Marines whose deployability is similarly affected in comparable circumstances unrelated to gender transition."

34.    Both the Instruction and Policy provide that effective July 1, 2017, the Navy and

DECLARATION OF RAYMOND EDWIN
MABUS, JR. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 8
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Marine Corps will begin accessing transgender applicants who meet all standards.

35.     In addition, the Policy included policy changes related to: (1) privacy in berthing and showering facilities as set forth in OPNAVINST 3120,32D, Standard Organization Regulations of the U.S. Navy; (2) drug testing and urinalysis as set forth in OPNAVINST 5350.4D, Navy Alcohol and Drug Abuse Prevention and Control Program; and (3) physical fitness assessment standards as set forth in OPNAVINST 6110.1J, Physical Readiness Program.

36.     On September 30, 2016, the Department of Defense issued Transgender Service in the Military, An Implementation Handbook ("DoD Handbook"). A true and accurate copy of the DoD Handbook is attached hereto at Exhibit F. The DoD Handbook is intended as a practical day-to-day guide to assist all service members in understanding the Department of Defense's policy of allowing the open service of transgender service members. To that end, the DoD Handbook instructs all service members:

> The cornerstone of DoD values is treating every Service member with dignity and respect. Anyone who wants to serve their country, upholds our values, and can meet our standards, should be given the opportunity to compete to do so. Being a transgender individual, in and of itself, does not affect a Service member's ability to perform their job.

**The Impact of Reversing the Policy Permitting Service by Openly Transgender People**

37.     Numerous military personnel disclosed their transgender status to the military in 2016 and 2017 in reliance upon the Department of Defense's statements that it would not discharge them on that basis, as articulated in DTM 16-005 and other documents. I did not receive any reports that such disclosures harmed the operational effectiveness of any Navy units.

38.     On July 26, 2017, President Donald Trump issued a statement that transgender individuals will not be permitted to serve in any capacity in the Armed Forces due to "the tremendous medical costs and disruption that transgender in the military would entail."

39.     On August 25, 2017, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security to reverse the policy adopted in June 2016 that permitted military service by openly transgender persons. That memorandum stated: "In my judgment, the previous Administration failed to identify a sufficient basis to conclude that

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 9 [2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500 Seattle, Washington 98121 (206) 274-2800

terminating the Departments' longstanding policy and practice would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."

40.     President Trump's stated rationales for reversing the policy and banning military service by transgender people make no sense. They have no basis in fact and are refuted by the comprehensive analysis of relevant data and information that was carefully, thoroughly, and deliberately conducted by the Working Group.

41.     As discussed above, the RAND Report concluded that any costs associated with providing appropriate healthcare to transgender service members would be "exceedingly small." In fact, the maximum financial impact estimated by the RAND Report is an amount so small it was considered to be "budget dust," hardly even a rounding error, by military leadership.

42.     The claim that permitting transgender people to serve openly would be "disruptive" has no foundation. The same claim was used to oppose racial integration of the military in the 1940s, the increased recruiting of women in the 1970s, and the repeal of "Don't Ask Don't Tell." In each case, the prediction that disruption would ensue has not been borne out. Studies have shown that diversity actually improves unit cohesion. Units become closer when individual service members are respected for who they are.

43.     Any evidence that permitting such service would be disruptive is entirely lacking. Since the policy permitting open service went into effect, transgender service members have been able to serve openly and have caused no disruption.

44.     In addition to being contrary to the overwhelming weight of the evidence considered by the Working Group and the Secretary of Defense, a reversal of the DoD policy permitting open service and the banning of accessions by transgender people, in my assessment, based on my experience as Secretary of the Navy, disserves the public interest, for several reasons.

///

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 10
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

45.     **Loss of Qualified Personnel**. First, banning transgender service members will produce vacancies in the Services, creating an immediate negative impact on readiness. The United States Armed Forces rely on an all-volunteer force, some portion of which are transgender service members. The impact of the loss of those individuals, who serve at all levels of service, is significant. Banning transgender service members will cause the loss of competent and experienced individuals, who will be difficult to replace. The Navy has invested in their education, and training. In addition to losing any return on that investment, taxpayers will bear the cost of identifying, recruiting, and training replacement personnel. Our ability to replace those individuals will also be hampered by the parallel reduction in the size of our potential recruiting pool.  Artificial exclusionary barriers like this weaken the military.

46.     **Unit Cohesion**. Second, banning transgender service members negatively impacts unit cohesion, a fundamental component of readiness.  The only relevant qualification for the job of serving in the Armed Forces is whether an individual is capable of performing the job. Diversity in the form of nationality, religion, race, who one loves, gender, or gender identity only strengthens the force.  Conversely, when the military asks people to lie about who they are in order to enlist or remain in the military, it weakens the military and has a negative impact on unit cohesion. Members of units know each other well and develop strong bonds. Unit members can tell when other unit members are lying. A policy that forces unit members to be dishonest with one another, including a ban on service by openly transgender people, weakens these bonds.

47.     **Erosion of Trust in Command**. Third, arbitrary decisionmaking erodes trust in military leadership. I was dismayed by the abrupt reversal, because so much careful thought had gone into development of the policy, with consensus at the highest levels of military leadership. Furthermore, the initial directive to reverse policy through the Twitter medium was delivered entirely outside the normal pathway of legitimate orders issued through the chain of command, and the most recent memorandum of August 25, 2017 was also issued in a highly unusual manner. It is also unprecedented to reverse policy in such an abrupt manner. I cannot recall another instance in United States military history of such a stark and unfounded reversal of

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 11
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

policy, or of any example in our nation's history in which a minority group once permitted to serve has been excluded from the military after its members had been allowed to serve openly and honestly.

48.     Even individuals who had reservations at the time the Working Group was announced trusted in the process and believed it was a fair and deliberative process that met the high standards of the military. This abrupt reversal leaves the impression among service members that military decision making is instead arbitrary and subject to political whims.

49.     For transgender service members themselves, the reversal represents the ultimate mistreatment and breach of trust. In DTM-005 and in other documents issued by the Department of Defense, the military informed transgender service members that they could come forward to disclose their transgender status and serve openly, rather than facing discharge. Many transgender service members came forward based on those statements. They risked their jobs, housing, and progress towards retirement benefits in reliance on our word that we would treat their disclosures fairly and in good faith. Using that information now as a basis for separating these soldiers from their service is an unprecedented betrayal of the trust that is so essential to achieving the mission of all of the armed forces. The reversal penalizes transgender service members for doing what DoD encouraged them to do. Transgender service members, their chain of command, and their colleagues who may lose people on whom they rely, must now deal with this enormous distraction, thus detracting from military readiness.

50.     This sudden reversal also undermines the morale and readiness of other groups who must now deal with the stress and uncertainty created by this dangerous precedent, which represents a stark departure from the foundational principle that military policy will be based on military, not political, considerations. In 2011, the "Don't Ask, Don't Tell" policy prohibiting gay, lesbian, and bisexual people from openly serving in the military (Department of Defense Directive 1304.26) was repealed. More recently, DoD also removed remaining barriers for women serving in certain ground combat positions. The sudden reversal of the DoD's policy with respect to transgender service members sets a precedent suggesting that these policies may

DECLARATION OF RAYMOND EDWIN MABUS, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 12
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

be abruptly reversed for baseless reasons as well.

51.     This sudden reversal may also have a chilling effect on the confidence of other service members that they will continue to be able to serve. Religious and ethnic minorities who have seen an increase in discrimination under the current administration may fear that the military may seek to ban them next, creating a culture of fear that is anathema to the stability and certainty that makes for an effective military.

52.     This sudden reversal undermines the confidence of all service members that important military policy decisions will be made under careful review and consistent with established process.  Rational decisionmaking in the adoption of and change to policy impacts the military's ability to recruit and retain competent, high-performing people. The sudden reversal of policy makes recruitment and retention more difficult, as does the damage done to the military's image and reputation as promoting fairness and equality and of being open to all qualified Americans. That image and reputation are critical to the military's ability to attract talented and idealistic young people. Actions that tarnish that reputation cause real harm.


I declare under the penalty of perjury that the foregoing is true and correct.


DATED: September _13_, 2017          _____
                                     Raymond Edwin Mabus, Jr.

DECLARATION OF RAYMOND EDWIN
MABUS, JR. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION -
13
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the United States of America and the laws of the State of Washington that on September 14, 2017, I caused true and correct copies of the foregoing documents to be served by the method(s) listed below on the following interested parties:

**By Hand Delivery:**

US Attorney's Office
700 Stewart St., Suite 5220
Seattle, WA 98101-1271

**By Registered or Certified Mail:**

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Department of Defense
1400 Defense Pentagon
Washington, DC 20301-1400

Secretary of Defense James N. Mattis
1000 Defense Pentagon
Washington, DC 20301-1000

President Donald J. Trump
1600 Pennsylvania Ave. NW
Washington, DC 20500

I hereby certify under the penalty of perjury that the foregoing is true and correct. Executed on September 14, 2017 at Seattle, Washington.

s/Rachel Horvitz
Rachel Horvitz, *Paralegal*

DECLARATION – 14
[2:17-cv-01297-MJP]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800