1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    RYAN KARNOSKI, et al.                        CASE NO. C17-1297-MJP

11                         Plaintiffs,           ORDER GRANTING IN PART
                                                 AND DENYING IN PART
12              v.                               DEFENDANTS' MOTION TO
                                                 DISMISS
13    DONALD J. TRUMP, et al.
                                                 ORDER GRANTING
14                         Defendants.           PLAINTIFFS' MOTION FOR
                                                 PRELIMINARY INJUNCTION
15

16                                  **INTRODUCTION**

17          THIS MATTER comes before the Court on Plaintiffs Ryan Karnoski, et al.'s Motion

18    for Preliminary Injunction (Dkt. No. 32) and Defendants Donald J. Trump, et al.'s Motion to

19    Dismiss (Dkt. No. 69).  Plaintiffs challenge the constitutionality of Defendant President Donald

20    J. Trump's Presidential Memorandum excluding transgender individuals from the military.

21    Defendants respond that Plaintiffs lack standing, that their claims are neither properly plead nor

22    ripe for review, and that they are not entitled to injunctive relief.  Having reviewed the Motions

23    (Dkt. Nos. 32, 69), the Responses (Dkt. Nos. 69, 84), the Replies (Dkt. Nos. 84, 90), and all

24    related papers, and having considered the arguments made in proceedings before the Court, the

1  Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss and GRANTS

2  Plaintiffs' Motion for Preliminary Injunction.

3                                          **ORDER SUMMARY**

4         On July 26, 2017, President Donald J. Trump announced on Twitter that "the United

5  States Government will not accept or allow transgender individuals to serve in any capacity in

6  the U.S. Military."  A Presidential Memorandum followed, directing the Secretaries of Defense

7  and Homeland Security to "return" to the military's policy authorizing the discharge of openly

8  transgender service members (the "Retention Directive"); to prohibit the accession (bringing into

9  service) of openly transgender individuals (the "Accession Directive"); and to prohibit the

10  funding of certain surgical procedures for transgender service members (the "Medical Care

11  Directive").  Plaintiffs filed this action challenging the constitutionality of the policy prohibiting

12  military service by openly transgender individuals.  Plaintiffs contend the policy violates their

13  equal protection and due process rights and their rights under the First Amendment.  Plaintiffs

14  include transgender individuals currently serving in the military and seeking to join the military;

15  the Human Rights Campaign, the Gender Justice League, and the American Military Partner

16  Association; and the State of Washington.  Plaintiffs have moved for a preliminary injunction to

17  prevent implementation of the policy set forth in the Presidential Memorandum, and Defendants

18  have moved to dismiss.

19         The Court finds that Plaintiffs have standing to bring this action, and that their claims for

20  violation of equal protection, substantive due process, and the First Amendment are properly

21  plead and ripe for resolution.  The Court finds that Plaintiffs' claim for violation of procedural

22  due process is defective.  The Court finds that the policy prohibiting openly transgender

23  individuals from serving in the military is likely unconstitutional.  Accordingly, the Court

24

1  GRANTS in part and DENIES in part Defendants' Motion to Dismiss and GRANTS Plaintiffs'

2  Motion for Preliminary Injunction.

<strong>BACKGROUND</strong>

3

4  **I.    Presidential Memorandum and Interim Guidance**

5       On July 26, 2017, President Donald J. Trump announced on Twitter that the United

6  States government will no longer allow transgender individuals to serve in any capacity in the

7  military. (Dkt. No. 34, Ex. 6.) President Trump's announcement read as follows:



16       Thereafter, President Trump issued a memorandum (the "Presidential Memorandum")

17  directing the Secretaries of Defense and Homeland Security to "return" to the military's policy

18  authorizing the discharge of openly transgender service members (the "Retention Directive");

19  to prohibit the accession (bringing into service) of openly transgender individuals (the

20  "Accession Directive"); and to prohibit the funding of certain surgical procedures for

21  transgender service members (the "Medical Care Directive"). (Id. at §§ 1-3.) The Accession

22  Directive takes effect on January 1, 2018; the Retention and Medical Care Directives take

23  effect on March 23, 2018. (Id. at § 3.)

24

On September 14, 2017, Secretary of Defense James N. Mattis issued a memorandum providing interim guidance to the military (the "Interim Guidance").  (Dkt. No. 69, Ex. 1.)  The Interim Guidance identified the intent of the Department of Defense ("DoD") to "carry out the President's policy and directives" and to identify "a plan to implement the policy and directives in the Presidential Memorandum."  (Id. at 2.)  The Interim Guidance explained that transgender individuals would be prohibited from accession effective immediately.  (Id. at 3.)

## II.    Policy on Transgender Service Members Prior to July 26, 2017

Prior to President Trump's announcement, the military concluded that transgender individuals should be permitted to serve openly and was in the process of implementing a policy to this effect (the "June 2016 Policy").  (Dkt. Nos. 32 at 9-10; 46 at ¶¶ 8-27; 48 at ¶¶ 8-36, Ex. C.)  The June 2016 Policy was preceded by extensive research, including an independent study to evaluate the implications of military service by transgender individuals.  (Dkt. Nos. 30 at ¶¶ 159-162; 32 at 9-10; 46 at ¶ 11.)  This study concluded that allowing transgender individuals to serve would not negatively impact military effectiveness, readiness, or unit cohesion, and that the costs of providing transgender service members with transition-related healthcare would be "exceedingly small" compared with DoD's overall healthcare expenditures.  (Dkt. No. 32 at 30; 46 at ¶¶ 15-20.)  After consulting with medical experts, personnel experts, readiness experts, commanders whose units included transgender service members, and others, the working group concluded that transgender individuals should be allowed to serve openly.  (Dkt. Nos. 30 at ¶ 161; 46 at ¶ 10.)  The Secretary of Defense issued a directive-type memorandum on June 30, 2016 affirming that "service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," including transgender individuals.  (Dkt. No. 48, Ex. C.)  The memorandum established procedures for accession, retention, in-service

1  transition, and medical coverage, and provided that "[e]ffective immediately, no otherwise

2  qualified Service member may be involuntarily separated, discharged or denied reenlistment or

3  continuation of service, solely on the basis of their gender identity."  (Id.)  Relying upon the June

4  2016 Policy, transgender service members disclosed their transgender status to the military and

5  were serving openly at the time of President Trump's announcement.  (See Dkt. Nos. 30 at ¶¶

6  101-102, 112-114; 48 at ¶ 37.)

7  **III.    Plaintiffs Challenge to the Presidential Memorandum**

8  Plaintiffs challenge the constitutionality of the policy prohibiting military service by

9  openly transgender individuals and seek declaratory and injunctive relief.[1]  (Dkt. No. 30 at 39.)

10  Plaintiffs contend the policy violates their equal protection and due process rights, and their

11  rights under the First Amendment.  (Id. at ¶¶ 214-238.)

12  Plaintiffs include nine individuals (the "Individual Plaintiffs"), three organizations (the

13  "Organizational Plaintiffs"), and Washington State.  (See id. at ¶¶ 7-18; Dkt. No. 101.)

14  Plaintiffs Ryan Karnoski, D.L., and Connor Callahan seek to pursue a military career, and

15  contend that the policy set forth in the Presidential Memorandum forecloses this opportunity.

16  (Dkt. No. 30 at ¶¶ 38-49, 64-73, 130-139.)  Plaintiffs Staff Sergeant Cathrine Schmid, Chief

17  Warrant Officer Lindsey Muller, Petty Officer First Class Terece Lewis, Petty Officer Second

18  Class Phillip Stephens, and Petty Officer Second Class Megan Winters currently serve openly

19  in the military. (Id. at ¶¶ 50-63, 74-120.)  Plaintiff Jane Doe currently serves in the military, but

20

21  [1] Plaintiffs' suit is one of four lawsuits filed in response to President Trump's policy prohibiting transgender individuals from serving openly.  See Doe 1 v. Trump, No. 17-1597 (CKK) (D.D.C.

22  filed Aug. 9, 2017); Stone v. Trump, No. MJG-17-2459 (D. Md. filed Aug. 8, 2017); Stockman v. Trump, No. 17-cv-1799-JGB-KK (C.D. Cal. filed Sept. 5, 2017).  The District Courts for the

23  Districts of Columbia and Maryland have issued preliminary injunctions suspending enforcement of the policy.  See Doe 1, 2017 WL 4873042 (D.D.C. Oct. 30, 2017); Stone, 2017 WL 5589122

24  (D. Md. Nov. 21, 2017).

1     does not serve openly.  (Id. at ¶¶ 121-129.)  The Human Rights Campaign ("HRC"), the Gender

2     Justice League ("GJL"), and the American Military Partner Association ("AMPA") join as

3     Organizational Plaintiffs.  (Id. at ¶¶ 140-145.)  After the Individual and Organization Plaintiffs

4     filed this action, Washington State moved to intervene to protect its sovereign and quasi-

5     sovereign interests, which it alleged were harmed by the policy set forth in the Presidential

6     Memorandum.  (Dkt. No. 55; see also Dkt. No. 97.)  On November 27, 2017, the Court granted

7     Washington State's motion.  (Dkt. No. 101.)  Washington State now joins in Plaintiffs' Motion

8     for Preliminary Injunction based upon its interests in protecting "the health, and physical and

9     economic well-being of its residents" and "securing residents from the harmful effects of

10    discrimination."  (Id. at 4.)  Defendants include President Donald J. Trump, Secretary James N.

11    Mattis, the United States, and the DoD.  (Dkt. No. 30 at ¶¶ 19-22.)

12                                          **DISCUSSION**

13        **I.    Motion to Dismiss**

14             Defendants move to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil

15    Procedure 12(b)(1) and 12(b)(6).  (See Dkt. No. 69 at 16-22.)  The Court finds that Plaintiffs

16    have standing to challenge the Presidential Memorandum and have stated valid claims upon

17    which relief may be granted.  However, Plaintiffs have failed to state a valid claim for violation

18    of procedural due process.  The Court therefore DENIES Defendants' Motion to Dismiss as to

19    Plaintiffs' equal protection, substantive due process, and First Amendment claims; and GRANTS

20    Defendants' Motion to Dismiss as to Plaintiffs' procedural due process claim.

21            **A.  Rule 12(b)(1)**

22             Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of

23    Civil Procedure 12(b)(1).  Defendants contend the Court lacks subject matter jurisdiction for two

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS;
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6

1    reasons: First, they contend Plaintiffs lack standing because they have not suffered injuries in

2    fact. (Id. at 18-20.)  Second, they contend Plaintiffs' claims are not ripe for resolution.  (Id. at

3    20-22.)  Plaintiffs respond that the Presidential Memorandum gives rise to current harm and

4    credible threats of impending harm sufficient for both standing and ripeness.  (See Dkt. No. 84 at

5    11-27.)

6                              **i.  *Individual Plaintiffs***

7            The Court finds that the Individual Plaintiffs have standing to challenge the Presidential

8    Memorandum.  To establish standing, Individual Plaintiffs must demonstrate: (1) an "injury in

9    fact"; (2) a causal connection between the injury and the conduct complained of; and (3) that it

10   is likely their injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife,

11   504 U.S. 555, 560-61 (1992).  "At the preliminary injunction stage, a plaintiff must make a

12   'clear showing' of his injury in fact."  Lopez v. Candaele, 630 F.3d 775, 785 (9th Cir. 2010)

13   (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  An "injury in fact"

14   exists where there is an invasion of a legally protected interest that is both "concrete and

15   particularized" and "actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at

16   560 (internal quotation marks and citations omitted).

17           Each of the Individual Plaintiffs satisfies these requirements: As a result of the

18   Retention Directive, Plaintiffs Schmid, Muller, Lewis, Stephens, Winters, and Doe face a

19   credible threat of discharge.  (See Dkt. No. 84 at 14-15.)  As a result of the Accession

20   Directive, Plaintiff Schmid has been refused consideration for appointment as a warrant officer

21   and faces a credible threat of being denied opportunities for career advancement.  (See Dkt.

22   Nos. 36 at ¶¶ 28-30; 70 at ¶ 3.)  Plaintiffs Karnoski, D.L., and Callahan also face a credible

23   threat of being denied opportunities to compete for accession on equal footing with non-

24

1   transgender individuals.  (See Dkt. Nos. 35 at ¶¶ 16-22; 37 at ¶¶ 3-16; 42 at ¶¶ 3-5, 10-21; see

2   also Doe 1, 2017 WL 4873042, at *18-19 (finding the Accession and Retention Directives

3   impose competitive barriers on transgender individuals who intend to accede).  As a result of

4   the Medical Care Directive, Plaintiff Stephens faces a credible threat of being denied surgical

5   treatment, as he is currently ineligible for surgery until after March 23, 2018, the date upon

6   which DoD is to cease funding of transition-related surgical procedures.[2]  (Dkt. Nos. 30 at ¶

7   102; 34, Ex. 7 at § 3; 40 at ¶ 14.)

8          In addition to these threatened harms, the Individual Plaintiffs face current harms in the

9   form of stigmatization and impairment of free expression.  The policy set forth in the Presidential

10  Memorandum currently denies Individual Plaintiffs the opportunity to serve in the military on

11  the same terms as other service members, deprives them of dignity, and subjects them to

12  stigmatization.  (Dkt. No. 30 at ¶¶ 217, 222, 238.)  Policies that "stigmatiz[e] members of the

13  disfavored group as 'innately inferior' . . . can cause serious non-economic injuries to those

14  persons who are personally denied equal treatment solely because of their membership in a

15  disfavored group."  Heckler v. Mathews, 465 U.S. 728, 737-740 (1984).  The Presidential

16  Memorandum currently impairs Plaintiff Jane Doe's rights to express her authentic gender

17  identity, as she fears discharge from the military as a result.  (Dkt. No. 33 at ¶¶ 3-15.)  Plaintiff

18  Doe's self-censorship is a "constitutionally sufficient injury," as it is based on her "actual and

19  well-founded fear" that the Retention Directive will take effect.  See Cal. Pro-Life Council, Inc.

20  v. Getman, 328 F.3d 1088, 1093 (9th Cir. 2003) ("an actual and well-founded fear that [a] law

21

22  ───────────────
    [2] While the Medical Care Directive includes an exception where necessary "to protect the health
23  of an individual who has already begun a course of treatment to reassign his or her sex" (Dkt.
    No. 34, Ex. 7 at § 2), the exception does not apply to Plaintiff Stephens and does not diminish
24  the threat of harm he faces.  (Dkt. No. 40 at ¶ 14.)

1  will be enforced against [him or her]" may create standing to bring pre-enforcement claims based

2  on the First Amendment) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393

3  (1988)).

4          Each of Defendants' arguments to the contrary is unavailing.  First, Defendants claim the

5  harms facing Plaintiffs are not certain, as the Presidential Memorandum directs "further study

6  before the military changes its longstanding policies regarding service by transgender

7  individuals."  (See Dkt. No. 69 at 18.)  However, the Accession Directive is already in place, and

8  the restrictions set forth in the Medical Care Directive are final and will be implemented on

9  March 23, 2018.  (See Dkt. No. 34, Ex. 7 at § 3.)  The Court finds that "[t]he directives of the

10  Presidential Memorandum, to the extent they are definitive, are the operative policy toward

11  military service by transgender service members."  Doe 1, 2017 WL 4873042, at *17.  Similarly,

12  the Court reads the Interim Guidance "as implementing the directives of the Presidential

13  Memorandum," and concludes that "any protections afforded by the Interim Guidance are

14  necessarily limited to the extent they conflict with the express directives of the memorandum."

15  Id.

16          Second, Defendants claim Plaintiffs Karnoski, D.L., and Callahan have not suffered

17  injury in fact as they have yet to enlist in the military.  (Dkt. No. 69 at 19.)  However, as a result

18  of the Accession Directive, Plaintiffs Karnoski, D.L., and Callahan cannot compete for accession

19  on equal footing with non-transgender individuals.  Denial of this opportunity constitutes injury

20  in fact.  See Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 365-66 (1977)

21  ("When a person's desire for a job is not translated into a formal application solely because of his

22

23

24

1   unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who

2   goes through the motions of submitting an application.").[3]

3         Third, Defendants rely on Allen v. Wright, 468 U.S. 737 (1984) to claim that Plaintiffs

4   have not suffered stigmatic injury.  (Dkt. No. 69 at 18.)  But unlike the claimants in Allen, who

5   raised abstract instances of stigmatic injury only, the Individual Plaintiffs have identified

6   concrete interests in accession, career advancement, and medical treatment, and have

7   demonstrated that they are "'personally denied equal treatment' by the challenged discriminatory

8   conduct." Allen, 468 U.S. at 755 (quoting Heckler, 465 U.S. at 739-40).  Such stigmatic injury

9   is "one of the most serious consequences of discriminatory government action and is sufficient in

10  some circumstances to support standing." Id.[4]

### ii.  *Organizational Plaintiffs*

12        The Court finds that Organizational Plaintiffs HRC, GJL, and AMPA have standing to

13  challenge the Presidential Memorandum.  An organization has standing where "(a) its members

14  would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are

15  germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

16  requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple

17  Adver. Comm'n, 432 U.S. 333, 343 (1977).  Each of the Organizational Plaintiffs satisfies these

18  requirements.  Individual Plaintiffs Karnoski and Schmid are members of HRC, GJL, and

---

[3] Defendants' claim that Plaintiffs Karnoski and D.L. would not be able to accede under the June 2016 Policy because they have recently taken steps to transition does not compel a different finding.  Plaintiffs' injury "lies in the denial of an equal *opportunity* to compete, not the denial of the job itself," and thus the Court does not "inquire into the plaintiffs' qualifications (or lack thereof) when assessing standing."  Shea v. Kerry, 796 F.3d 42, 50 (D.C. Cir. 2015) (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 280-81 & n.14 (1978) (emphasis in original)).

[4] Allen addressed racial discrimination specifically.  However, the Supreme Court has also acknowledged stigmatic injury arising from gender-based discrimination.  See Heckler, 465 U.S. at 737-40.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS;
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 10

1   AMPA, and Individual Plaintiffs Muller, Stephens, and Winters are also members of AMPA.

2   (See Dkt. No. 30 at ¶¶ 141-145.)  The interests each Organizational Plaintiff seeks to protect are

3   germane to their organizational purposes, which include ending discrimination against LGBTQ

4   individuals (HRC and GJL) and supporting families and allies of LGBT service members and

5   veterans (AMPA).  (Id. at ¶¶ 16-18.)  As Plaintiffs seek injunctive and declaratory relief,

6   participation by the organizations' individual members is not required.  See Associated Gen.

7   Contractors of Cal., Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1408 (9th Cir. 1991)

8   (participation of individual members not required where "the claims proffered and relief

9   requested [by an organization] do not demand individualized proof on the part of its members").

10              **iii.  *Washington State***

11          The Court finds that Washington State has standing to challenge the Presidential

12   Memorandum.  A state has standing to sue the federal government to vindicate its sovereign and

13   quasi-sovereign interests.  See Massachusetts v. E.P.A., 549 U.S. 497, 518-520 (2007).

14   Sovereign interests include a state's interest in protecting the natural resources within its

15   boundaries.  Id. at 518-519.  Quasi-sovereign interests include a state's interest in the health and

16   physical and economic well-being of its residents, and in "securing residents from the harmful

17   effects of discrimination."  Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S.

18   592, 607, 609 (1982).  Washington State is home to approximately 45,000 active duty service

19   members and approximately 32,850 transgender adults.  (Dkt. No. 97 at 6.)  The Washington

20   National Guard is comprised of service members who assist with emergency preparedness and

21   disaster recovery planning, including protecting Washington State's natural resources from

22   wildfires, landslides, flooding, and earthquakes.  (Id. at 8.)  Washington State contends that

23   prohibiting transgender individuals from serving openly adversely impacts its ability to recruit

24

1   and retain members of the Washington National Guard, and thereby impairs its ability to protect

2   its territory and natural resources.  (Id.)  Additionally, Washington State contends that the

3   prohibition implicates its interest in maintaining and enforcing its anti-discrimination laws,

4   protecting its residents from discrimination, and ensuring that employment and advancement

5   opportunities are not unlawfully restricted based on transgender status.  (Id. at 8-9.)  The Court

6   agrees.

7           The injuries to the Individual Plaintiffs, the Organizational Plaintiffs, and to Washington

8   State are indisputably traceable to the policy set forth in the Presidential Memorandum, and may

9   be redressed by a favorable ruling from this Court.  Therefore, the Court DENIES Defendants'

10  Motion to Dismiss for lack of standing.

11                          **iv.  *Ripeness***

12          The Court finds that Plaintiffs' claims are ripe for review.  Ripeness "ensure[s] that

13  courts adjudicate live cases or controversies" and do not "issue advisory opinions [or] declare

14  rights in hypothetical cases."  Bishop Paiute Tribe v. Inyo Cnty., 863 F.3d 1144, 1153 (9th Cir.

15  2017) (citation omitted).  "A proper ripeness inquiry contains a constitutional and a prudential

16  component."  Id. (citation omitted).  Because Plaintiffs have standing to challenge the

17  Presidential Memorandum, their claims satisfy the requirement for constitutional ripeness.  See

18  id. (constitutional ripeness "is often treated under the rubric of standing").  Because they raise

19  purely legal issues (i.e., whether the Presidential Memorandum violates their constitutional

20  rights), and because withholding consideration of these issues will subject Plaintiffs to hardships

21  (i.e., denial of career opportunities and transition-related medical care, stigmatic injury, and

22  impairment of self-expression), they also satisfy the requirement for prudential ripeness.  See id.

23  at 1154 (prudential ripeness is "guided by two overarching considerations: the fitness of the

24

1   issues for judicial decision and the hardship to the parties of withholding court consideration.")

2   (citation and internal quotation marks omitted).

3        Defendants claim this case is not ripe for resolution because the policy on military service

4   by transgender individuals is "still being studied, developed, and implemented." (Dkt. No. 69 at

5   20.) However, President Trump's announcement on Twitter and his Presidential Memorandum

6   did not order a study, but instead unilaterally proclaimed a prohibition on transgender service

7   members. See Stone, 2017 WL 5589122, at *10 ("The Court cannot interpret the plain text of

8   the President's Memorandum as being a request for a study to determine whether or not the

9   directives should be implemented. Rather, it orders the directives to be implemented by

10   specified dates."). Defendants' contention that Plaintiffs must first exhaust administrative

11   remedies before the Court can consider their claims is also unavailing, as the Ninth Circuit has

12   explained that "[r]esolving a claim founded solely upon a constitutional right is singularly suited

13   to a judicial forum and clearly inappropriate to an administrative board." Downen v. Warner,

14   481 F.2d 642, 643 (9th Cir. 1973).

15        Therefore, the Court DENIES Defendants' Motion to Dismiss for lack of subject matter

16   jurisdiction.

17        **B.  Rule 12(b)(6)**

18        To survive a motion to dismiss for failure to state a claim upon which relief can be

19   granted, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

20   relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

21   Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This requirement is met where the

22   complaint "pleads factual content that allows the court to draw the reasonable inference that the

23   defendant is liable for the misconduct alleged." Id. The complaint need not include detailed

24

1    allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the

2    elements of a cause of action will not do." Twombly, 550 U.S. at 555.  In evaluating a motion

3    under Rule 12(b)(6), the Court accepts all facts alleged in the complaint as true, and makes all

4    inferences in the light most favorable to the non-movant.  Barker v. Riverside Cnty. Office of

5    Educ., 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted).

6          The Court finds that Plaintiffs' Amended Complaint states valid claims for violation of

7    equal protection, substantive due process, and the First Amendment.  Plaintiffs have established

8    a likelihood of success on the merits with regard to each of these claims (see discussion of

9    Plaintiffs' Motion for Preliminary Injunction, infra), and for the same reasons, these claims

10   survive under Rule 12(b)(6).  However, the Court finds that Plaintiffs' Amended Complaint fails

11   to state a valid claim for violation of procedural due process.  Plaintiffs' Amended Complaint

12   alleges neither a "protectible liberty or property interest" nor a "denial of adequate procedural

13   protections" as required for a procedural due process claim.  (See Dkt. No. 30 at ¶¶ 225-230;

14   Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1103 (9th Cir. 2012).) [5]

15         Therefore, the Court DENIES Defendants' Motion to Dismiss with respect to Plaintiffs'

16   equal protection, substantive due process and First Amendment claims, and GRANTS

17   Defendants' Motion to Dismiss with respect to Plaintiffs' procedural due process claim.

18   **II.    Motion for Preliminary Injunction**

19         The Court finds that Plaintiffs are entitled to a preliminary injunction to preserve the

20   status quo that existed prior to the change in policy announced by President Trump on Twitter

21   and in his Presidential Memorandum.  The Court considers four factors in evaluating Plaintiffs'

22

23   _____

24   [5] The Court notes that the procedural due process claim is elaborated upon in detail in Plaintiffs'
     Motion for Preliminary Injunction and Reply.  (See Dkt. Nos. 32 at 22-23; 84 at 39-40.)

1    request for a preliminary injunction: (1) the likelihood of success on the merits; (2) the likelihood

2    of irreparable harm in the absence of an injunction; (3) the balance of equities; and (4) the public

3    interest.  Winter, 555 U.S. at 20.  "When the government is a party, these last two factors

4    merge."  Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v.

5    Holder, 556 U.S. 418, 435 (2009)).

6                      **A.  Likelihood of Success on the Merits**

7            The Court finds that Plaintiffs have established a likelihood of success on the merits of

8    their equal protection, substantive due process, and First Amendment claims.

9                            **i.  *Equal Protection***

10           Plaintiffs have established a likelihood of success on the merits of their equal protection

11   challenge.  The Equal Protection Clause prohibits government action "denying to any person

12   the equal protection of the laws."  United States v. Windsor, 133 S. Ct. 2675, 2695 (2013).

13   Plaintiffs contend the policy set forth in the Presidential Memorandum denies them equal

14   protection in that it impermissibly classifies individuals based on transgender status and gender

15   identity and is not substantially related to an important government interest.  (Dkt. No. 30 at

16   ¶¶ 217-224.)

17           The Court must first determine whether the policy burdens "a 'suspect' or 'quasi-

18   suspect' class."  See Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001).  The Court

19   concludes that the policy distinguishes on the basis of transgender status, a quasi-suspect

20   classification, and is therefore subject to intermediate scrutiny.  See id. (noting that gender is a

21   quasi-suspect classification); Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000)

22   (noting that discrimination based on a person's failure "to conform to socially-constructed

23

24

1    gender expectations" is a form of gender discrimination) (citing <u>Price Waterhouse v. Hopkins</u>,

2    490 U.S. 228, 240 (1989)).[6]

3        Next, the Court must determine whether the policy satisfies intermediate scrutiny.  <u>Id.</u>

4    A policy subject to intermediate scrutiny must be supported by an "exceedingly persuasive

5    justification."  <u>United States v. Virginia</u>, 518 U.S. 515, 531 (1996).  The policy must serve

6    important governmental objectives, and the government must show "that the discriminatory

7    means employed are substantially related to the achievement of those objectives."  <u>Id.</u> at 533

8    (citation omitted).  While Defendants identify important governmental interests including

9    military effectiveness, unit cohesion, and preservation of military resources, they fail to show

10   that the policy prohibiting transgender individuals from serving openly is related to the

11   achievement of those interests.  (<u>See</u> Dkt. No. 69 at 33-35.)  Indeed, "all of the reasons

12   proffered by the President for excluding transgender individuals from the military [are] not

13   merely unsupported, but [are] actually *contradicted* by the studies, conclusions, and judgment

14   of the military itself."  <u>Doe 1</u>, 2017 WL 4873042, at *30 (emphasis in original).  Not only did

15   the DoD previously conclude that allowing transgender individuals to serve openly would not

16   impact military effectiveness and readiness, the working group tasked to evaluate the issue also

17   concluded that *prohibiting* open service would have negative impacts including loss of

18   qualified personnel, erosion of unit cohesion, and erosion of trust in command.  (<u>See</u> Dkt. Nos.

19   46 at ¶¶ 25-26; 48 at ¶¶ 45-47.)

20       Defendants' arguments to the contrary are unavailing.  While Defendants raise concerns

21   about transition-related medical conditions and costs, their concerns "appear to be hypothetical

22

23   ──────────────────
     [6] The June 2016 Policy also stated it was DoD's position "consistent with the U.S. Attorney
     General's opinion, that discrimination based on gender identity is a form of sex

24   discrimination."  (<u>See</u> Dkt. No. 48, Ex. C at 6.)

1    and extremely overbroad." Doe 1, 2017 WL 4873042, at *29.  For instance, Defendants claim

2    that "at least some transgender individuals suffer from medical conditions that could impede

3    the performance of their duties," including gender dysphoria, and complications from hormone

4    therapy and sex reassignment surgery.  (See Dkt. No. 69 at 33-34.)  But *all* service members

5    might suffer from medical conditions that could impede performance, and indeed the working

6    group found that it is common for service members to be non-deployable for periods of time

7    due to an array of such conditions.  (Dkt. No. 46 at ¶ 22.)  Defendants claim that

8    accommodating transgender service members would "impose costs on the military."  (Dkt. No.

9    69 at 34.)  But the study preceding the June 2016 Policy indicates that these costs are

10   exceedingly minimal.  (Dkt. Nos. 48, Ex. B at 57 ("[E]ven in the most extreme scenario . . . we

11   expect only a 0.13-percent ($8.4 million out of $6.2 billion) increase in [active component]

12   health care spending."); 48 at ¶ 41 ("[T]he maximum financial impact . . . is an amount so small

13   it was considered to be 'budget dust,' hardly even a rounding error, by military leadership.'").)

14   Indeed, the cost to discharge transgender service members is estimated to be *more than 100*

15   *times greater* than the cost to provide transition-related healthcare.  (See Dkt. Nos. 32 at 20; 46

16   at ¶ 32; 48 at ¶ 18.)

17        Defendants' claim that the policy prohibiting transgender individuals from serving

18   openly is entitled to substantial deference is also unavailing.  (See Dkt. No. 69 at 29.)

19   Defendants rely on Rostker v. Goldberg, 453 U.S. 57 (1981).  In Rostker the Supreme Court

20   considered whether the Military Selective Service Act ("MSSA"), which compelled draft

21   registration for men only, was unconstitutional.  Id. at 59.  Finding that the MSSA was enacted

22   after extensive review of legislative testimony, floor debates, and committee reports, the

23   Supreme Court held that Congress was entitled to deference when, in "exercising the

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS;
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 17

1    congressional authority to raise and support armies and make rules for their governance," it

2    does not act "unthinkingly" or "reflexively and not for any considered reason."  See id. at 71-

3    72.  In contrast, the prohibition on military service by transgender individuals was announced

4    by President Trump on Twitter, abruptly and without any evidence of considered reason or

5    deliberation.  (See Dkt. No. 30 at ¶¶ 172-184.)  The policy is therefore not entitled to Rostker

6    deference.[7]

7         Because Defendants have failed to demonstrate that the policy prohibiting transgender

8    individuals from serving openly is substantially related to important government interests, it does

9    not survive intermediate scrutiny.[8]  Plaintiffs are therefore likely to succeed on the merits of their

10   equal protection claim.

11              **ii.   *Substantive Due Process*[9]**

12        The Court finds that Plaintiffs have established a likelihood of success on the merits of

13   their substantive due process challenge.  Substantive due process protects fundamental liberty

14   interests in individual dignity, autonomy, and privacy from unwarranted government intrusion.

15   See U.S. Const., amend. V.  These fundamental interests include the right to make decisions

16   concerning bodily integrity and self-definition central to an individual's identity.  See Obergefell

17   v. Hodges, 135 S. Ct. 2584, 2584 (2015) ("The Constitution promises liberty to all within its

18   reach, a liberty that includes certain specific rights that allow persons . . . to define and express

19

20   ────────────────

21   [7] Defendants' reliance on Goldman v. Weinberger, 475 U.S. 503 (1986), is also misplaced.  See
     Doe 1, 2017 WL 4873042, at *30 n.11 (distinguishing the policy at issue in Weinberger as
     having been "based on the 'considered professional judgment" of the military).

22   [8] For the same reasons, the policy is also unlikely to survive rational basis review.

23   [9] Having granted Defendants' Motion to Dismiss with regard to Plaintiffs' procedural due
     process challenge, the Court does not reach the merits of that claim at this time.

24

1    their identity."); see also Roberts v. U.S. Jaycees, 468 U.S. 609, 619 (1984) (due process

2    "safeguards the ability independently to define one's identity that is central to any concept of

3    liberty").  To succeed on their substantive due process challenge, Plaintiffs must establish a

4    governmental intrusion upon a fundamental liberty interest.  The Court concludes that the policy

5    set forth in the Presidential Memorandum constitutes such an intrusion.  The policy directly

6    interferes with Plaintiffs' ability to define and express their gender identity, and penalizes

7    Plaintiffs for exercising their fundamental right to do so openly by depriving them of

8    employment and career opportunities.  As discussed in the context of Plaintiffs' equal protection

9    challenge, supra, Defendants have not demonstrated that this intrusion is necessary to further an

10   important government interest.  Plaintiffs are therefore likely to succeed on the merits of their

11   substantive due process challenge.

12                           **iii.  *First Amendment***

13          The Court finds that Plaintiffs have established a likelihood of success on the merits of

14   their First Amendment challenge.  In general, laws that regulate speech based on its content (i.e.,

15   because of "the topic discussed or the idea or message expressed") are presumptively

16   unconstitutional and subject to strict scrutiny.  Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218,

17   2226-27 (2015).  Military regulations on speech are permitted so long as they "restrict speech no

18   more than is reasonably necessary to protect the substantial governmental interest."  Brown v.

19   Glines, 444 U.S. 348, 355 (1980).

20          Plaintiffs contend the policy set forth in the Presidential Memorandum impermissibly

21   burdens "speech or conduct that 'openly' discloses a transgender individual's identity or

22   transgender status" by subjecting openly transgender individuals to discharge and other adverse

23   actions.  (See Dkt. No. 30 at ¶¶ 196-197, 234-236.)  The Court agrees.  The policy penalizes

24

1  transgender service members—but not others—for disclosing their gender identity, and is

2  therefore a content-based restriction.  Even giving the government the benefit of a more

3  deferential standard of review under <u>Brown</u>, 444 U.S. at 355, the policy does not survive.  As

4  discussed in the context of Plaintiffs' equal protection challenge, <u>supra</u>, Defendants have not

5  demonstrated that the intrusion upon protected expression furthers an important government

6  interest.

7  **B.  Irreparable Harm**

8        The Court finds that Plaintiffs are likely to suffer irreparable harm if an injunction does

9  not issue.  The Individual and Organizational Plaintiffs have demonstrated a likelihood of

10  irreparable harm in the form of current and threatened injuries in fact, including denial of career

11  opportunities and transition-related medical care, stigmatic injury, and impairment of self-

12  expression.  While Defendants claim these harms can be remedied with money damages (Dkt.

13  No. 69 at 23-24), they are incorrect.  Unlike the plaintiffs in <u>Anderson v. United States</u>, 612

14  F.2d 1112 (9th Cir. 1979) and <u>Hartikka v. United States</u>, 754 F.2d 1516 (9th Cir. 1985), who

15  alleged harms "common to most discharged employees" (<u>e.g.</u>, loss of income, loss of

16  retirement, loss of relocation pay, and damage to reputation) and not "attributable to any

17  unusual actions relating to the discharge itself," <u>Hartikka</u>, 754 F.2d at 1518, the harms facing

18  the Individual Plaintiffs are directly attributable to the policy set forth in the Presidential

19  Memorandum.  Back pay and other monetary damages proposed by Defendants will not

20  remedy the stigmatic injury caused by the policy, reverse the disruption of trust between

21  service members, nor cure the medical harms caused by the denial of timely health care.  (See

22  Dkt. No. 84 at 28.)  Moreover, to the extent Plaintiffs are likely to succeed on the merits of

23  their constitutional claims, these violations are yet another form of irreparable harm.  <u>See</u>

24

1   Associated Gen. Contractors, 950 F.2d at 1412 ("alleged constitutional infringement will often

2   alone constitute irreparable harm.") (citation omitted); see also Klein v. City of San Clemente,

3   584 F.3d 1196, 1207-08 (9th Cir. 2009) ("loss of First Amendment freedoms, for even minimal

4   periods of time, unquestionably constitutes irreparable injury") (quoting Elrod v. Burns, 427

5   U.S. 347, 373 (1976)).

6        Plaintiff Washington State has demonstrated a likelihood of irreparable harm to its

7   sovereign and quasi-sovereign interests if it is "forced to continue to expend its scarce

8   resources to support a discriminatory policy when it provides funding or deploys its National

9   Guard." (See Dkt. No. 97 at 8-9.)  Washington State has also demonstrated that its ability to

10  recruit and retain service personnel for the Washington National Guard may be irreparably

11  harmed.  See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d

12  597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts

13  and goodwill, qualify as irreparable harm.").

14              **C.  Balance of Equities and Public Interest**

15       The Court finds that the balance of equities and the public interest are in Plaintiffs'

16  favor.  If a preliminary injunction does not issue, Plaintiffs will continue to suffer injuries as a

17  result of the Presidential Memorandum, including deprivation of their constitutional rights.  On

18  the other hand, Defendants will face no serious injustice in maintaining the June 2016 Policy

19  pending resolution of this action on the merits.  Defendants claim they are in the process of

20  "gathering a panel of experts" to study the military's policy on transgender service members

21  and assert, without explanation, that an injunction will "directly interfere with the panel's work

22  and the military's ability to thoroughly study a complex and important issue regarding the

23  composition of the armed forces."  (Dkt. No. 69 at 40.)  The Court is not convinced that

24

1    reverting to the June 2016 Policy, which was voluntarily adopted by DoD after extensive study

2    and review, and which has been in place for over a year without documented negative effects,

3    will harm Defendants.  See Doe 1, 2017 WL 4873042, at *33 (recognizing "considerable

4    evidence that it is the *discharge* and *banning* of [transgender] individuals that would have such

5    [negative] effects . . . .") (emphasis in original).

6         Injunctive relief furthers the public interest as it "is always in the public interest to

7    prevent the violation of a party's constitutional rights."  Melendres v. Arpaio, 695 F.3d 990,

8    1002 (9th Cir. 2012) (citations omitted).  Defendants' contention that the public has a strong

9    interest in national defense does not change this analysis, as "[a] bare invocation of 'national

10   defense' simply cannot defeat every motion for preliminary injunction that touches on the

11   military."  Doe 1, 2017 WL 4873042, at *33; Stone, 2017 WL 5589122, at *16.

12                                       **CONCLUSION**

13        Plaintiffs have standing to bring this lawsuit challenging Defendants' policy of

14   prohibiting transgender individuals from serving openly in the military.  Plaintiffs' claims for

15   violations of equal protection, substantive due process, and the First Amendment are properly

16   plead and ripe for resolution, and Plaintiffs are entitled to a preliminary injunction to protect the

17   status quo with regard to each of these claims.  Plaintiffs have not properly plead a claim for

18   violation of procedural due process.  Therefore, the Court rules as follows:

19        1.      The Court GRANTS Defendants' Motion to Dismiss with respect to Plaintiffs'

20   procedural due process claim;

21        2.      The Court DENIES Defendants' Motion to Dismiss with respect to Plaintiffs'

22   equal protection, substantive due process, and First Amendment claims;

23

24

1    3.    The Court GRANTS Plaintiffs' Motion for a Preliminary Injunction, and hereby

2    enjoins Defendants and their officers, agents, servants, employees, and attorneys, and any other

3    person or entity subject to their control or acting directly or indirectly in concert or participation

4    with Defendants from taking any action relative to transgender individuals that is inconsistent

5    with the status quo that existed prior to President Trump's July 26, 2017 announcement.  This

6    Preliminary Injunction shall take effect immediately and shall remain in effect pending

7    resolution of this action on the merits or further order of this Court.

8

9    The clerk is ordered to provide copies of this order to all counsel.

10    Dated December 11, 2017.

11

12    Marsha J. Pechman
      United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24