The Honorable Marsha J. Pechman

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| RYAN KARNOSKI, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants*. | Case No. 2-17-cv-01297-MJP<br><br>**DECLARATION OF GEORGE R. BROWN, M.D., D.F.A.P.A. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

I, George R. Brown, M.D., D.F.A.P.A., declare as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2. The purpose of this declaration is to offer my expert opinion on: (1) the medical condition known as gender dysphoria; (2) the prevailing treatment protocols for gender dysphoria; (3) the United States military's pre-2016 ban on the enlistment and retention of men and women who are transgender; (4) the subsequent lifting of that ban; and (5) the unfounded medical justifications for banning individuals who are transgender from serving in the United States military.

3. I have knowledge of the matters stated in this declaration and have collected and cite to relevant literature concerning the issues that arise in this litigation.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 1
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

## PROFESSIONAL BACKGROUND

4. I am a Professor of Psychiatry and the Associate Chairman for Veterans Affairs in the Department of Psychiatry at the East Tennessee State University, Quillen College of Medicine. My responsibilities include advising the Chairman; contributing to the administrative, teaching, and research missions of the Department of Psychiatry; consulting on clinical cases at the University and at Mountain Home Veterans Health Administration ("VHA") Medical Center, where I also hold an appointment; and acting as a liaison between the VHA Medical Center and the East Tennessee State University Department of Psychiatry. The majority of my work involves researching, teaching, and consulting about health care in military and civilian transgender populations.

5. I also hold a teaching appointment related to my expertise with health care for transgender individuals and research at the University of North Texas Health Services Center ("UNTHSC"). My responsibilities include teaching and consultation with UNTHSC and the Federal Bureau of Prisons staff regarding health issues for transgender individuals.

6. In 1979, I graduated *Summa Cum Laude* with a double major in biology and geology from the University of Rochester in Rochester, New York. I earned my Doctor of Medicine degree with Honors from the University of Rochester School of Medicine in 1983. From 1983-1984, I served as an intern at the United States Air Force Medical Center at Wright-Patterson Air Force Base in Ohio. From 1984-1987, I worked in and completed the United States Air Force Integrated Residency Program in Psychiatry at Wright State University and Wright-Patterson Air Force Base in Dayton, Ohio. A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit A.

7. I first began seeing patients in 1983. I have been a practicing psychiatrist since 1987, when I completed my residency. From 1987-1991, I served as one of the few U.S. Air Force teaching psychiatrists. In this capacity, I performed more than 200 military disability evaluations and served as an officer on medical evaluation boards at the largest hospital in the Air Force.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 2
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

8. During the last 33 years, I have evaluated, treated, and/or conducted research in person with 600-1,000 individuals with gender disorders, and during the course of research, conducted chart reviews of more than 5,100 additional patients with gender dysphoria. The vast majority of the patients I have worked with have been active duty military personnel or veterans.

9. For three decades, my research and clinical practice has included extensive study of the health care for transgender individuals, including three of the largest studies focused on the health care needs of transgender service members and veterans. Throughout that time, I have done research with, taught on, and published peer-reviewed professional publications specifically addressing the needs of transgender military service members. *See* Brown Ex. A (CV).

10. I have authored or coauthored 40 papers in peer-reviewed journals and 19 book chapters on topics related to gender dysphoria and health care for transgender individuals, including the chapter concerning gender dysphoria in Treatments of Psychiatric Disorders (3d ed. 2001), a definitive medical text published by the American Psychiatric Association.

11. In 2014, I coauthored a study along with former Surgeon General Joycelyn Elders and other military health experts, including a retired General and a retired Admiral. The study was entitled "Medical Aspects of Transgender Military Service." *See* Elders J, Brown GR, Coleman E, Kolditz TA, *Medical Aspects of Transgender Military Service*. ARMED FORCES AND SOCIETY, 41(2): 199-220, 2015; published online ahead of print, DOI: 10.1177/0095327X14545625 (Aug. 2014) (the "Elders Commission Report"). The military peer-reviewed journal, Armed Forces and Society, published the Elders Commission Report. A true and correct copy of that report is attached hereto as Exhibit B.

12. I have served for more than 15 years on the Board of Directors of the World Professional Association for Transgender Health ("WPATH"), the leading international organization focused on health care for transgender individuals. WPATH has more than 2,000 members throughout the world and is comprised of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 3
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

13. I was a member of the WPATH committee that authored and published in 2011 the current version of the WPATH Standards of Care ("SoC") (Version 7). The SoC are the operative collection of evidence-based treatment protocols for addressing the health care needs of transgender individuals. I also serve as a chapter Co-Lead on the WPATH committee that will author and publish the next edition of the Standards of Care (Version 8).

14. Without interruption, I have been an active member of WPATH since 1987. Over the past three decades, I have frequently presented original research work on topics relating to gender dysphoria and the clinical treatment of transgender people at the national and international levels.

15. I have testified or otherwise served as an expert on the health issues of transgender individuals in numerous cases heard by several federal district and tax courts. A true and correct list of federal court cases in which I have served as an expert is contained in the "Forensic Psychiatry Activities" section of my Curriculum Vitae, which is attached hereto as Exhibit A.

16. I have conducted and continue to provide trainings on transgender health issues for the VHA as well as throughout the Department of Defense ("DoD"). After the DoD announced the policy that allowed for transgender individuals to serve openly in the Armed Forces in 2016, I conducted the initial two large military trainings on the provision of health care to transgender service members. The first training in Spring 2016 was for the Marine Corps. The second training in Fall 2016 was for a tri-service (Army, Navy, and Air Force) meeting of several hundred active duty military clinicians, commanders, and Flag officers.

17. Since the issuance of DoD Instruction ("DoDI") 1300.28 in October 2016, I have led trainings for a national group of military examiners (MEPCOM) in San Antonio, Texas (May, 2017) and for Army clinicians at Fort Knox, Kentucky (July, 2017). Among other things, DoDI 1300.28 implemented the policies and procedures in Directive-type

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 4
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

Memorandum 16-005, established a construct by which transgender service members may transition gender while serving, and required certain trainings for the military.

18. I have been centrally involved in the development, writing, and review of all national directives in the VHA relating to the provision of health care for transgender veterans. I also coauthored the national formulary that lists the medications provided by the VHA for the treatment of gender dysphoria in veterans. Finally, I regularly consult with VHA leadership regarding the training of VHA clinicians on transgender clinical care of veterans nationally.

**GENDER DYSPHORIA**

19. The term "transgender" is used to describe someone who experiences any significant degree of misalignment between their gender identity and their assigned sex at birth.

20. Gender identity describes a person's internalized, inherent sense of who they are as a particular gender (*i.e.*, male or female). For most people, their gender identity is consistent with their assigned birth sex. Most individuals assigned female at birth grow up, develop, and manifest a gender identity typically associated with girls and women. Most individuals assigned male at birth grow up, develop, and manifest a gender identity typically associated with boys and men. For transgender people, that is not the case. Transgender women are individuals assigned male at birth who have a persistent female identity. Transgender men are individuals assigned female at birth who have a persistent male identity.

21. Experts agree that gender identity has a biological component, meaning that each person's gender identity (transgender and non-transgender individuals alike) is the result of biological factors, and not just social, cultural, and behavioral ones.

22. Regardless of the precise origins of a person's gender identity, there is a medical consensus that gender identity is deep-seated, set early in life, and impervious to external influences.

23. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (2013) ("DSM-5") is the current, authoritative handbook on the diagnosis of

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 5
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

mental disorders. Mental health professionals in the United States, Canada, and other countries throughout the world rely upon the DSM-5. The content of the DSM-5 reflects a science-based, peer-reviewed process by experts in the field.

24. Being transgender is not a mental disorder. *See* DSM-5. Men and women who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.

25. Gender dysphoria is the diagnostic term in the DSM-5 for the condition that can manifest when a person suffers from clinically significant distress or impairment associated with an incongruence or mismatch between a person's gender identity and their assigned sex at birth.

26. The clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex is the hallmark symptom associated with gender dysphoria.

27. Only the *subset* of transgender people who have clinically significant distress or impairment qualify for a diagnosis of gender dysphoria.

28. Individuals with gender dysphoria may live for a significant period of their lives in denial of these symptoms. Some transgender people may not initially understand the emotions associated with gender dysphoria and may not have the language or resources for their distress to find support until well into adulthood.

29. Particularly as societal acceptance towards transgender individuals grows and there are more examples of high-functioning, successful transgender individuals represented in media and public life, younger people in increasing numbers have access to medical and mental health resources that help them understand their experience and allow them to obtain medical support at an earlier age and resolve the clinical distress associated with gender dysphoria.

## TREATMENT FOR GENDER DYSPHORIA

30. Gender dysphoria is a condition that is amenable to treatment. *See* WPATH SoC (Version 7); Elders Commission Report at 9-16; Agnes Gereben Schaefer et al., *Assessing the*

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 6
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corporation (2016) at 7 ("RAND Report") (a true and correct copy of the report is attached hereto as Exhibit C).

31. With appropriate treatment, individuals with a gender dysphoria diagnosis can be fully cured of *all* symptoms.

32. Treatment of gender dysphoria has well-established community standards and is highly effective.

33. The American Medical Association ("AMA"), the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective. *See* American Medical Association (2008), Resolution 122 (A-08); American Psychiatric Association, Position Statement on Discrimination Against Transgender & Gender Variant Individuals (2012); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009). Additional organizations that have made similar statements include the American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Nurse Midwives, American College of Obstetrics and Gynecology, American College of Physicians, American Medical Student Association, American Nurses Association, American Public Health Association, National Association of Social Workers, and National Commission on Correctional Health Care.

34. The protocol for the treatment of gender dysphoria is set forth in the WPATH SoC and in the Endocrine Society Guidelines.[1] First developed in 1979 and currently in their seventh version, the WPATH SoC set forth the authoritative protocol for the evaluation and treatment of gender dysphoria. This approach is followed by clinicians caring for individuals with gender dysphoria, including veterans in the VHA. As stated above, I was a member of the

---

[1] *Available at* https://academic.oup.com/jcem/article/102/11/3869/4157558 .

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 7
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

1  WPATH committee that authored the SoC (Version 7), published in 2011. A true and correct
2  copy of that document is attached hereto as Exhibit D.

3      35.      Depending on the needs of the individual, a treatment plan for persons diagnosed
4  with gender dysphoria may involve components that are psychotherapeutic (*i.e.*, counseling as
5  well as social role transition – living in accordance with one's gender in name, dress, pronoun
6  use); pharmacological (*i.e.*, hormone therapy); and surgical (*i.e.*, gender confirmation surgeries,
7  like hysterectomy for those transitioning to the male gender and orchiectomy for those
8  transitioning to the female gender). Under each patient's treatment plan, the goal is to enable the
9  individual to live all aspects of one's life consistent with his or her gender identity, thereby
10 eliminating the distress associated with the incongruence.

11     36.      There is a wide range in the treatments sought by those suffering from gender
12 dysphoria. For example, some patients need both hormone therapy and surgical intervention,
13 while others need just one or neither. Generally, medical intervention is aimed at bringing a
14 person's body into some degree of conformity with their gender identity.

15     37.      As outlined further below, treatment protocols for gender dysphoria are
16 comparable to those for other mental health and medical conditions, including those regularly
17 treated within the United States military. *See* RAND Report at 8-9; Elders Commission Report at
18 13 ("the military consistently retains non-transgender men and women who have conditions that
19 may require hormone replacement").

## PRE-2016 MILITARY POLICY

21     38.      Prior to 2016, military policy treated transgender individuals with gender
22 dysphoria differently than people with other curable conditions.

23 *Former Enlistment Policy*

24     39.      DODI 6130.03 established the medical standards for accession/entry into military
25 service. Enclosure 4 of the enlistment instruction contains an extensive list of physical and
26 mental conditions that disqualify a person from enlisting in the military. For instance, persons
27 with autism, schizophrenia, or delusional disorders (or a history of treatment for these

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 8
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

conditions) are excluded from enlistment. Prior to 2016, that list also contained "change of sex" and "transsexualism," which were outdated references to transgender individuals and individuals with gender dysphoria. *See* Elders Commission Report at 7.

40. The enlistment policy allows for the possibility of waivers for a variety of medical conditions. The instruction, however, specifies that entry waivers will not be granted for conditions that would disqualify an individual from the possibility of retention. As discussed further below, because certain conditions related to being transgender ("change of sex") were formerly grounds for discharge from the military, men and women who are transgender could not obtain medical waivers to enter the military. *Id.* at 7-8.

41. Under military instructions, the general purpose of disqualifying applicants based on certain physical and mental conditions is to ensure that service members are: (1) free of contagious diseases that endanger others, (2) free of conditions or defects that would result in excessive duty-time lost and would ultimately be likely to result in separation, (3) able to perform without aggravating existing conditions, and (4) capable of completing training and adapting to military life. *Id.* at 7.

42. Because gender dysphoria, as described above, is a treatable and curable condition, unlike other excluded conditions, its inclusion on the list of disqualifying conditions was inappropriate. Individuals with gender dysphoria (or under the language at the time – those who had a "change of sex") were disqualified from joining the military, despite having a completely treatable, or already treated, condition.

43. The enlistment policy treated transgender individuals in an inconsistent manner compared with how the military addressed persons with other curable medical conditions. The result of this inconsistency was that transgender personnel were excluded or singled out for disqualification from enlistment, even when they were mentally and physically healthy.

44. For example, persons with certain medical conditions, such as Attention Deficit Hyperactivity Disorder ("ADHD") and simple phobias, could be admitted when their conditions could be managed without imposing undue burdens on others. Individuals with ADHD are

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 9
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

prohibited from enlisting unless they meet five criteria, including documenting that they maintained a 2.0 grade point average after the age of 14. Similarly, individuals with simple phobias are banned from enlisting, unless they meet three criteria including documenting that they have not required medication for the past 24 continuous months.

45. In short, even though the DoD generally allowed those with manageable conditions to enlist, the former regulation barred transgender service without regard to the condition's treatability and the person's ability to serve.

*Former Separation Policy*

46. The medical standards for retiring or separating service members who have already enlisted are more accommodating and flexible than the standards for new enlistments.

47. Until recently, the medical standards for separation were set forth in DoDI 1332.38. On August 5, 2014, the DoD replaced DoDI 1332.38 with DoDI 1332.18, which permits greater flexibility for the service branches to provide detailed medical standards.

48. The separation instructions divide potentially disqualifying medical conditions into two different tracks. Service members with "medical conditions" are placed into the medical system for disability evaluation. Under this evaluation system, a medical evaluation board ("MEB") conducts an individualized inquiry to determine whether a particular medical condition renders a service member medically unfit for service. If a service member is determined to be medically unfit, the service member may receive benefits for medical separation or retirement, or may be placed on the Temporary Duty Retirement List with periodic reevaluations for fitness to return to duty. While in the U.S. Air Force, I served as an officer on at least two hundred of these MEBs.

49. Under the separation instruction, service members with genitourinary conditions, endocrine system conditions, and many mental health conditions are all evaluated through the medical disability system. *See* DoDI 1332.38 §§ E4.8, E4.11, E4.13; AR 40-501 §§ 2-8, 3-11, 3-17, 3-18, 3-31, 3-32; SECNAVIST 180.50_4E §§ 8008, 8011, 8013; U.S. Airforce Medical Standards Directory §§ J, M, Q.

50. By contrast, under the separation instructions, a small number of medical and psychiatric conditions are not evaluated through the medical evaluation process. Instead, these conditions are deemed to render service members "administratively unfit." Service members with "administratively unfit" conditions do not have the opportunity to demonstrate medical fitness for duty or eligibility for disability compensation.

51. Under DoDI 1332.38, the "administratively unfit" conditions were listed in Enclosure 5 of the instruction. Since August 5, 2014, when DoDI 1332.18 replaced 1332.38, the "administratively unfit" conditions are determined by the service branches, as set forth in AR 40-501 § 3-35; SECNAVIST § 2016; and AFI36-3208 § 5.11.

52. Enclosure 5 of DoDI 1332.38 included, among other conditions, bed-wetting, sleepwalking, learning disorders, stuttering, motion sickness, personality disorders, mental retardation, obesity, shaving infections, certain allergies, and repeated infections of venereal disease. It also included "Homosexuality" and "Sexual Gender and Identity Disorders, including Sexual Dysfunctions and Paraphilias." *See* Elders Commission Report at 8.

53. Similarly, the "administratively unfit" conditions in the service branches included "psychosexual conditions, transsexual, gender identity disorder to include major abnormalities or defects of the genitalia such as change of sex or a current attempt to change sex," AR 40-501 § 3-35(a); "Sexual Gender and Identity Disorders and Paraphilias," SECNAVIST § 2016(i)(7); and "Transsexualism or Gender Identity Disorder of Adolescence or Adulthood, Nontranssexual Type (GIDAANT)," AFI36-3208 § 5.11.9.5. The service branches retained these bars to service by transgender individuals after DoDI 1332.18 replaced DoDI 1332.38.

54. DoDI 1332.14 controlled administrative separations for enlisted persons. Under the instruction, a service member may be separated for the convenience of the government and at the discretion of a commander for "other designated physical or mental conditions." Before 2016, this particular separation category included "sexual gender and identity disorders." *Id.*

55. Because service members with gender dysphoria were deemed to be "administratively unfit," they were not evaluated by MEBs and had no opportunity to

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 11
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

demonstrate that their condition did not affect their fitness for duty. They were disqualified from remaining in the military despite having a completely treatable condition.

56. This was inconsistent with the treatment of persons with other curable medical conditions, who are given the opportunity to demonstrate medical fitness for duty or eligibility for disability compensation. For example, mood and anxiety disorders are not automatically disqualifying for retention in military service. Service members can receive medical treatment and obtain relief in accordance with best medical practices. Mood and anxiety disorders result in separation only if they significantly interfere with duty performance and remain resistant to treatment. In contrast, transgender individuals were categorically disqualified from further service without consideration of their clinical symptoms and any impact on their service.

57. The result of this inconsistency was that transgender personnel were singled out for separation, even when they were mentally and physically healthy, solely because they were transgender.

## OPEN SERVICE DIRECTIVE

58. The DoD lifted the ban on open service by transgender military personnel following a June 30, 2016 announcement made by then-Secretary of Defense Ash Carter ("Open Service Directive").

59. Based on my extensive research and clinical experiences treating transgender individuals over decades, the Open Service Directive is consistent with medical science.

60. The Open Service Directive also aligns with the conclusions reached by the RAND National Defense Research Institute, the Elders Commission, and the AMA.

61. The RAND Report concluded that the military already provides health care comparable to the services needed to treat transgender individuals: "Both psychotherapy and hormone therapies are available and regularly provided through the military's direct care system, though providers would need some additional continuing education to develop clinical and cultural competence for the proper care of transgender patients. Surgical procedures quite similar

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 12
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

to those used for gender transition are already performed within the [Medical Health System] for other clinical indications." See RAND Report at 8.

62. The earlier Elders Commission, on which I served, concluded that "[t]ransgender medical care should be managed in terms of the same standards that apply to all medical care, and there is no medical reason to presume transgender individuals are unfit for duty. Their medical care is no more specialized or difficult than other sophisticated medical care the military system routinely provides." See Elders Commission Report at 4.

63. Additionally, in a unanimous resolution published on April 29, 2015, the AMA announced its support for lifting the ban on open transgender service in the military, based on the AMA's conclusion that there is no grounding in medical science for such a ban.[2]

*Enlistment Policy for Transgender Individuals*

64. The Open Service Directive's enlistment procedures are carefully designed to ensure that transgender individuals who enlist in the military do not have any medical needs that would make them medically unfit to serve or interfere with their deployment.

65. Under these standards, transgender individuals whose condition was stable for 18 months at the time of enlistment would be eligible to enlist, assuming a licensed medical provider certified that they met certain conditions. DTM-16-005 Memorandum and Attachment (June 30, 2016). For example, those seeking to enlist who had been treated with any counseling, cross-sex hormone therapy, or gender confirmation surgeries must have medical confirmation that they have been stable for the last 18 months. Similarly, those applicants taking maintenance cross-sex hormones as follow-up to their transition would also need certification that they had been stable on such hormones for 18 months.

*Retention Policy for Transgender Individuals*

66. Under the Open Service Directive, gender dysphoria is treated like other curable medical conditions. Individuals with gender dysphoria receive medically necessary care. Service

---

[2] *Available at* http://archive.palmcenter.org/files/A-15%20Resoultion%20011.pdf.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 13
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

members who are transgender are subject to the same standards of medical and physical fitness as any other service member.[3]

67. The Open Service Directive also permits commanders to have substantial say in the timing of any future transition-related treatment for transgender service members. The needs of the military can also take precedence over an individual's need to transition, if the timing of that request interferes with critical military deployments or trainings.

## MEDICAL JUSTIFICATIONS FOR BANNING TRANSGENDER SERVICE MEMBERS ARE UNFOUNDED

68. Based upon: (1) my extensive research and experience treating transgender people, most of whom have served this country in uniform, (2) my involvement reviewing the medical implications of a ban on transgender service members, and (3) my participation in implementing the Open Service Directive allowing transgender individuals to serve openly, it is my opinion that any medical objections to open service by transgender service members are wholly unsubstantiated and inconsistent with medical science and the ways in which other medical conditions are successfully addressed within the military.

*Mental Health*

69. Arguments based on the mental health of transgender persons to justify prohibiting individuals from serving in the military are wholly unfounded and unsupported in medical science. Being transgender is not a mental defect or disorder. Scientists have long abandoned psychopathological understandings of transgender identity, and do not classify the incongruity between a person's gender identity and assigned sex at birth as a mental illness. To the extent the misalignment between gender identity and assigned birth sex creates clinically significant distress (gender dysphoria), that distress is curable through appropriate medical care.

70. Sixty years of clinical experience have demonstrated the efficacy of treatment of the distress resulting from gender dysphoria. *See* Elders Commission Report at 10 ("a significant

---

[3] *Available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/Guidance_for_Treatment_of_Gender_Dysphoria_Memo_FINAL_SIGNED.pdf.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 14
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

body of evidence shows that treatment can alleviate symptoms among those who do experience distress"). Moreover, "empirical data suggest that many non-transgender service members continue to serve despite psychological conditions that may not be as amenable to treatment as gender dysphoria." *Id.* at 11.

71. The availability of a cure distinguishes gender dysphoria from other mental health conditions, such as autism, bipolar disorder, or schizophrenia, for which there are no cures. There is no reason to single out transgender personnel for separation, limitation of service, or bars to enlistment, based only on the diagnosis or treatment of gender dysphoria. Determinations can and should be made instead on a case-by-case basis depending on the individual's fitness to serve, as is done with other treatable conditions.

72. The military already provides mental health evaluation services and counseling, which is the first component of treatment for gender dysphoria. *See* RAND Report at 8.

73. Concerns about suicide and substance abuse rates among transgender individuals are also unfounded when it comes to military policy. At enlistment, all prospective military service members undergo a rigorous examination to identify any pre-existing mental health diagnoses that would preclude enlistment. Once someone is serving in the military, they must undergo an annual mental and physical health screen, which includes a drug screen. If such a screening indicates that a person suffers from a mental illness or substance abuse, then that would be the potential impediment to retention in the military. The mere fact that a person is transgender, however, does not mean that person has a mental health or substance abuse problem or is suicidal.

**Hormone Treatment**

74. The argument that cross-sex hormone treatment should be a bar to service for transgender individuals is not supported by medical science or current military medical protocols.

75. Hormone therapy is neither too risky nor too complicated for military medical personnel to administer and monitor. The risks associated with use of cross-sex hormone therapy

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 15
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

to treat gender dysphoria are low and not any higher than for the hormones that many non-transgender active duty military personnel currently take. There are active duty service members currently deployed in combat theaters who are receiving cross-sex hormonal treatment, following current DoD instructions, without reported negative impact upon readiness or lethality.

76. The military has vast experience with accessing, retaining, and treating non-transgender individuals who need hormone therapies or replacement, including for gynecological conditions (*e.g.*, dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, male hypogonadism, hysterectomy, or oophorectomy) and genitourinary conditions (*e.g.*, renal or voiding dysfunctions). Certain of these conditions are referred for a fitness evaluation only when they affect duty performance. *See* Elders Commission at 13.

77. In addition, during service when service members develop hormonal conditions whose remedies are biologically similar to cross-sex hormone treatment, those members are not discharged and may not even be referred for a MEB. Examples include male hypogonadism, menstrual disorders, and current, or history of, pituitary dysfunction. *Id.*

78. Military policy also allows service members to take a range of medications, including hormones, while deployed in combat settings. *Id.* Under DoD policy only a "few medications are inherently disqualifying for deployment," and none of those medications are used to treat gender dysphoria. *Id.* (quoting Dept. of Defense, Policy Guidance for Deployment-Limiting Psychiatric Conditions and Medications, 2006 at para. 4.2.3). Similarly, Army regulations provide that "[a] psychiatric condition controlled by medication should not automatically lead to non-deployment." *See* AR 40-501 § 5-14(8)(a).

79. Access to medication is predictable, as "[t]he Medical Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide." *See* Elders Commission at 13. At least as to cross-sex hormones, clinical monitoring for risks and effects is not complicated, and with training and/or access to consultations, can be performed by a variety of medical personnel in the DoD, just as is the case in the VHA. This is the military services' current practice in support of the limited medical needs

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 16
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

of their transgender troops in CONUS (Continental United States) and in deployment stations worldwide.

80. The RAND Corporation confirms the conclusions I draw from my experience with the military and the Elders Commission. Specifically, the RAND Report notes that the Medical Health System maintains and supports all of the medications used for treatment of gender dysphoria and has done so for treatment of non-transgender service members. In other words, all of the medications utilized by transgender service members for treatment of gender dysphoria are used by other service members for conditions unrelated to gender dysphoria. *See* RAND Report at 8 ("Both psychotherapy and hormone therapies are available and regularly provided through the military's direct care system, though providers would need some additional continuing education to develop clinical and cultural competence for the proper care of transgender patients"). Part of my role with the DoD over the past 18 months has been to provide this continuing education.

**Surgery**

81. There is no basis in science or medicine to support the argument that a transgender service member's potential need for surgical care to treat gender dysphoria presents risks or burdens to military readiness. The risks associated with gender-confirming surgery are low, and the military already provides similar types of surgeries to non-transgender service members. *See* Elders Commission Report at 14; RAND Report at 8-9.

82. For example, the military currently performs reconstructive breast/chest and genital surgeries on service members who have had cancer, been in vehicular and other accidents, or been wounded in combat. *See* RAND Report at 8. The military also permits service members to have elective cosmetic surgeries, like LeFort osteotomy and mandibular osteotomy, at military medical facilities. *See* Elders Commission Report at 14. The RAND Report notes that the "skills and competencies required to perform these procedures on transgender patients are often identical or overlapping. For instance, mastectomies are the same for breast cancer patients and female-to-male transgender patients." *See* RAND Report at 8.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 17
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

83. There is no reason to provide such surgical care to treat some conditions and withhold identical care and discharge individuals needing such care when it is provided to treat gender dysphoria. Based on risk and deployability alone, there is no basis to exclude transgender individuals from serving just because in some cases they may require surgical treatment that is already provided to others.

84. The RAND Report also notes the benefit of military medical coverage of transgender-related surgeries because of the contribution it can make to surgical readiness and training. *Id.* ("performing these surgeries on transgender patients may help maintain a vitally important skill required of military surgeons to effectively treat combat injuries during a period in which fewer combat injuries are sustained").

85. The suggestion by some critics that when it comes to enlistment, individuals would join the military just to receive surgical care, is completely unfounded. The level of commitment and dedication to service makes it unlikely that someone would enlist and complete a years-long term of initial service simply to access health care services. Moreover, because medically-necessary care for gender dysphoria is now increasingly available in the civilian context, there would be limited need to join the military in order to obtain treatment.

***Deployability***

86. Critics have also cited non-deployability, medical readiness, and constraints on fitness for duty as reasons to categorically exclude transgender individuals from military service. Such arguments are unsubstantiated and illogical.

87. Transgender service members – including service members who receive hormone medication – are just as capable of deploying as service members who are not transgender. DoD rules expressly permit deployment, without need for a waiver, for a number of medical conditions that present a much more significant degree of risk in a harsh environment than being transgender. For example, hypertension is not disqualifying if controlled by medication, despite the inherent risks in becoming dehydrated in desert deployment situations. Heart attacks experienced while on active duty or treatment with coronary artery bypass grafts are also not

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 18
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

disqualifying, if they occur more than a year preceding deployment. Service members may deploy with psychiatric disorders, if they demonstrate stability under treatment for at least three months. *See* DoDI 6490.07, Enclosure 3.

88. Moreover, although a service member undergoing surgery may be temporarily non-deployable, that is not a situation unique to people who are transgender. Numerous non-transgender service members are temporarily or permanently non-deployable, including pregnant individuals, who are not separated as a result. *See* Elders Commission Report at 17.

89. Finally, the RAND Report ultimately concluded that the impact of open service of men and women who are transgender on combat readiness would be "negligible." *See* RAND Report at 70. Based on the available evidence of over 18 foreign militaries, RAND found that open service has had "no significant effect on cohesion, operational effectiveness, or readiness." *Id.* at 60. This includes the experience of Canada, which has permitted open service for over 20 years. *Id.* at 52.

## CONCLUSION

90. There is no evidence that being transgender alone affects military performance or readiness. There is no medical or psychiatric justification for the categorical exclusion of transgender individuals from the Armed Forces.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 23, 2018

George R. Brown, M.D., D.F.A.P.A.

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 19
[2:17-cv-01297-MJP]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the United States of America and the laws of the State of Washington that all participants in the case are registered CM/ECF users and that service of the foregoing documents will be accomplished by the CM/ECF system on January 25, 2018.

Derek A. Newman, WSBA #26967
*dn@newmanlaw.com*
Newman Du Wors LLP
2101 Fourth Ave., Ste. 1500
Seattle, WA 98121
(206) 274-2800

DECL. OF GEORGE R. BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT - 20
[2:17-cv-01297-MJP]

Newman Du Wors LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800