The Honorable Marsha J. Pechman

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

RYAN KARNOSKI, et al.,

               Plaintiffs,

       v.

DONALD J. TRUMP, et al.,

              Defendants.

No. 2:17-cv-1297-MJP

**DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION**

NOTED FOR CONSIDERATION: APRIL 13, 2018

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

    I.    History of Policies Concerning Transgender Service Before 2017 ........................ 2

    II.   Development of the New Policy ............................................................................... 3

    III.  The New Policy ........................................................................................................ 5

ARGUMENT ....................................................................................................................... 7

    I.    Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits ............... 7

         A.   The Current Challenge to the 2017 Presidential Memorandum Is Moot ......... 7

         B.   The New Policy Withstands Constitutional Scrutiny ...................................... 9

             1.  The new policy is consistent with equal protection principles ................ 9

                a.  The new policy is subject to highly deferential review .............. 9

                b.  The new policy survives highly deferential scrutiny ................. 13

                    i.  Military Readiness ....................................................... 14

                    ii.  Order, Discipline, Leadership, and Unit Cohesion ...... 17

                    iii. Disproportionate Costs ............................................. 20

                c.  The new policy is consistent with the Court's prior

                    reasoning ................................................................................. 22

             2.  The new policy survives Plaintiffs' other constitutional

                challenges ............................................................................... 23

    II.   Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary

        Injunction ............................................................................................................. 23

CONCLUSION .................................................................................................................. 24

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

## INTRODUCTION

Last December, this Court entered a preliminary injunction forbidding the enforcement of several directives in a Presidential Memorandum from August 2017 concerning military service by transgender individuals (2017 Memorandum).  Dkt. 103 (Op.).  The Court understood these directives to institute a categorical policy "excluding transgender individuals from the military" that was based on reasons "'*contradicted* by the studies, conclusions, and judgment of the military itself.'" Op. 1, 16.  On that understanding, the Court issued a preliminary injunction precluding Defendants from implementing those specific directives.  Op. 1.

The bases for that preliminary injunction no longer exist.  Last month, the Secretary of Defense, with the agreement of the Secretary of Homeland Security, sent the President a memorandum recommending that the President revoke his 2017 Memorandum so that the military can implement a new policy.  Mattis Memorandum, Exhibit 1.  After an extensive review of the issue, the Department of Defense concluded that maintaining the policy on transgender service put in place by Secretary Carter in 2016 would pose substantial risks to military readiness and therefore proposed to adopt a new policy.  *Id.* at 1–2.  Far from a categorical ban based on transgender status, this new policy, like the Carter policy before it, would turn on the medical condition of gender dysphoria and contains a nuanced set of exceptions allowing some transgender individuals, including many Plaintiffs here, to serve.  *Id.* at 2–3.  Along with this memorandum, Secretary Mattis sent the President a 44-page report providing a detailed explanation for why, in the professional, independent judgment of the Defense Department, this new policy is necessary to further military interests. Department of Defense Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) (Report), Exhibit 2.  The President then issued a new memorandum on March 23, 2018, revoking his 2017 Memorandum, thus allowing the military to implement its preferred policy. Presidential Memorandum (2018 Memorandum), Exhibit 3.

In light of these changed circumstances, the preliminary injunction should be dissolved. Simply put, Plaintiffs can no longer meet any of the four criteria for this extraordinary relief.  On the merits, their challenge to the revoked 2017 Memorandum no longer presents a live controversy and, in any event, the military's new policy is constitutional.  Plaintiffs—many of whom may continue

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 1
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

1   serving under the new policy—cannot show that they would suffer any cognizable injury from the

2   new policy, much less an irreparable one.  And given the Department's judgment that retaining the

3   Carter policy would pose risks to military readiness, the balance of the equities and the public interest

4   strongly cut against prolonging this state of affairs.

5        To be clear, Defendants respectfully maintain that the Court's preliminary injunction, which

6   addressed only certain directives in the President's 2017 Memorandum, does not extend to Secretary

7   Mattis's new policy.  But in an abundance of caution, Defendants urge this Court to dissolve the

8   preliminary injunction in order to permit the military to implement the policy it believes will best

9   ensure our Nation's defense.  To the extent that Plaintiffs may seek to challenge that new policy,

10   that independent controversy should not be litigated under the shadow of a preliminary injunction

11   of a Presidential Memorandum that is no longer in effect.

## BACKGROUND

### I.   History of Policies Concerning Transgender Service Before 2017

14        For decades, military standards presumptively barred the accession and retention of certain

15   transgender individuals.  Report 7.  This approach was consistent with the third edition of the

16   Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American

17   Psychiatric Association (APA), which treated "transsexualism" as a disorder.  *Id.* at 10.

18        In 2013, the APA published the fifth edition of the DSM, which replaced the term "gender

19   identity disorder" (itself a substitute for "transsexualism" in the fourth) with "gender dysphoria."  *Id.*

20   at 10, 12.  The change reflected the APA's conclusion that, by itself, identification with a gender

21   different from one's biological sex—*i.e.*, transgender status—was not a disorder.  *Id.* at 12.  As the

22   APA stressed, "not all transgender people suffer from gender dysphoria."  *Id.* at 20 (brackets

23   omitted).  Instead, the mental condition of "gender dysphoria" was defined in the DSM as a "marked

24   incongruence between one's experience/expressed gender and assigned gender, of at least 6 months

25   duration" and "associated with clinically significant distress or impairment."  *Id.* 12–13.

26        In the wake of these changes, then-Secretary Carter ordered the creation of a working group

27   in July 2015 to study the possibility of "welcoming transgender persons to serve openly," and

28

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 2
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." *Id.* at 13.  As part of this review, the Department commissioned RAND to study the issue.  *Id.*  The resulting RAND report concluded that allowing transgender service members to serve in their preferred gender would limit deployability, impede readiness, and impose costs on the military, but dismissed these burdens as "negligible," "marginal," or "minimal."  Dkt. 46-2, at xii, 39–42, 46–47, 69–70; *accord* Report 14.

After this review, then-Secretary Carter ordered the Defense Department on June 30, 2016, to adopt a new policy on transgender service.  First, the military had until July 1, 2017, to revise its accession standards.  Report 14.  Under this revision, a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" would be disqualifying unless an applicant provided a certificate from a licensed medical provider that the applicant had been stable or free from associated complications for 18 months.  *Id.* at 15.  Second, and effective immediately, current service members could not be discharged based solely on their "gender identity" or their "expressed intent to transition genders," Dkt. 48-3, at 4, but, if diagnosed with gender dysphoria, could transition genders, Report 14.  Transgender service members who do not meet the clinical criteria for gender dysphoria, however, had to continue to serve in their biological sex.  *Id.* at 15.

## II.   Development of the New Policy

Before the Carter accession standards took effect on July 1, 2017, the Deputy Secretary of Defense "directed the Services to assess their readiness to begin accessions" and received their input.  Dkt. 197-4.  "Building upon that work and after consulting with the Service Chiefs and Secretaries," Secretary Mattis "determined that it [was] necessary to defer the start of [these] accessions" so that the military could "evaluate more carefully the impact of such accessions on readiness and lethality." *Id.*  Based on the recommendation of the services and in the exercise of his independent discretion and judgment, he thus delayed the implementation of the new accession standards on June 30, 2017, until January 1, 2018.  *Id.*; *see* Report 4; Dkt. 197-3.  He also ordered the Under Secretary of Defense for Personnel and Readiness to lead a review, which would "include all relevant considerations" and

last for five months, with an end date of December 1, 2017.  Dkt. 197-4.  Secretary Mattis explained that this study would give him "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department," and that he "in no way presupposes the outcome of the review."  *Id.*; *see* Report 17.

While that review was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  Op. 2.  The President then issued his 2017 Memorandum on August 25, 2017, calling for, *inter alia*, "further study" into the risks of maintaining the Carter policy in its entirety.  Report 17.[1]  In response, Secretary Mattis established a Panel of Experts on September 14, 2017, to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  Report 17.  The Panel consisted of the members of senior military leadership who had "the statutory responsibility to organize, train, and equip military forces" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force."  *Id.* at 18.

In 13 meetings over the course of 90 days, the Panel met with commanders of transgender service members, military medical professionals, civilian medical professionals, and transgender service members themselves.  *Id.*  It reviewed information regarding gender dysphoria, its treatment, and the effects this condition had on military effectiveness, unit cohesion, and military resources.  *Id.*  It received briefing from three working groups or committees dedicated to issues involving personnel, medical treatment, and military lethality.  *Id.*  It drew on the military's experience with the Carter policy thus far, and considered evidence that both supported and cut against its recommendations.  *Id.*  And, unlike those responsible for the Carter policy, it did not "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness," but made "no assumptions" at all.  *Id.* at 19.  Exercising its professional military judgment, the Panel provided Secretary Mattis with recommendations.  *Id.*

After considering these recommendations, along with additional information, Secretary

---

[1] Given the Court's familiarity, this filing omits a description of the 2017 Memorandum and the litigation up to now.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 4
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

Mattis, with the agreement of the Secretary of Homeland Security, sent the President a memorandum in February 2018 proposing a new policy consistent with the Panel's conclusions.  *Id.*; *see* Mattis Memo.  The memorandum was accompanied by a 44-page report setting forth in detail the bases for the Department's recommended new policy.  Mattis Memo 3; *see* Report.

### III.    The New Policy

In his memorandum, Secretary Mattis explained why a departure from the Carter policy was necessary.  "Based on the work of the Panel and the Department's best military judgment," the Department had concluded "that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender."  Mattis Memo 2.  In addition, it had found "that exempting such persons from well-established mental health, physical health, and sex-based standards … could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality."  *Id.*  And although Secretary Carter had concluded otherwise on the basis of the RAND study, that report "contained significant shortcomings."  *Id.*  It relied on "limited and heavily caveated data"; and "glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own."  *Id.*

Therefore, "in light of the Panel's professional military judgment and [his] own professional judgment," Secretary Mattis proposed a policy that continued some parts of the Carter policy and departed from others.  *Id.*; *see id.* at 2–3; Report 4–6, 33–43.  Like the Carter policy, the new policy does not draw lines on the basis of transgender status, but presumptively disqualifies individuals with a certain medical condition, gender dysphoria, from service.  *Compare* Report 4–6, 19, *with* Dkt. 48-3.  The key difference between the two policies is the exceptions to that presumptive disqualification.

Under the new policy, like the Carter policy, individuals who "identify as a gender other than their biological sex" but do not suffer clinically significant "distress or impairment of functioning in meeting the standards associated with their biological sex"—and therefore have no history or

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 5
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

diagnosis of gender dysphoria—may serve if "they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex." Report 4.

Individuals who both are "diagnosed with gender dysphoria, either before or after entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," are presumptively "ineligible for service." *Id.* at 5. This presumptive bar is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who relied on the Carter policy. *Id.* Specifically, service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy," including those who entered the military "after January 1, 2018," "may continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences." *Id.* at 5–6.

Individuals who "are diagnosed with, or have a history of, gender dysphoria" but who neither require nor have undergone gender transition are likewise "generally disqualified from accession or retention." *Id.* at 5. This presumptive disqualification is subject to the same exceptions discussed above as well as two new categorical ones. *Id.* With respect to accession, individuals with a history of gender dysphoria may enter the military if they (1) can demonstrate "36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application"; (2) "have not transitioned to the opposite gender"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.* With respect to retention, those diagnosed with gender dysphoria after entering the military may remain so long as they (1) can comply with Department and Service-specific "non-deployab[ility]" rules; (2) do "not require gender transition"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.*

On March 23, 2018, the President issued a new memorandum concerning transgender military service. 2018 Memorandum. The 2018 Memorandum revoked the 2017 Memorandum "and any other directive [the President] may have made with respect to military service by

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 6
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

transgender individuals," thereby allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender persons." *Id.*

## ARGUMENT

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.) (internal quotation marks, ellipsis, and citation omitted). Courts thus regularly dissolve preliminary injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g., CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1111 (9th Cir. 2017). Ordinarily, "dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"—*i.e.*, "[t]he familiar quartet" of "likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). The changed circumstances here bar Plaintiffs from meeting these criteria.

## I.     Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits

### A.     The Current Challenge to the 2017 Presidential Memorandum Is Moot

To start, Plaintiffs are no longer likely to succeed because their challenge is moot. A case is moot "'when it is impossible for a court to grant any effectual relief to the prevailing party,'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), and that is the situation here. The only relief Plaintiffs seek is a declaration that the policy implemented by "President Trump" in his 2017 Memorandum is unconstitutional and an injunction of its enforcement. Dkt. 30, at 2, 39; *accord* Dkt. 104, at 5, 7. But because that Memorandum has been revoked, a declaration from this Court as to the constitutionality of that Memorandum would amount to an impermissible advisory opinion. If Plaintiffs fear *future* injury from the proposed new policy, which they have not challenged, those harms would stem from the independent action of the Secretaries of Defense and Homeland Security in implementing that policy, not the 2017 or 2018 Memoranda. If Plaintiffs decide to challenge the

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 7
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

1    new policy upon implementation, courts can review it at that time.[2]

2        Nor can Plaintiffs find refuge in the doctrine that "a defendant's voluntary cessation of a

3    challenged practice" does not necessarily moot the case. *City of Mesquite v. Aladdin's Castle*, 455 U.S.

4    283, 289 (1982).  When the government repeals and replaces one of its policies, the relevant question

5    is "whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say

6    that the challenged conduct continues," or, put differently, whether the policy "has been 'sufficiently

7    altered so as to present a substantially different controversy from the one … originally decided.'"

8    *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993).

9    When a new policy has "changed substantially," the voluntary cessation exception does not apply,

10   as there is "no basis for concluding that the challenged conduct [is] being repeated."  *Id.*

11       Any dispute over the new policy "'present[s] a substantially different controversy'" than

12   Plaintiffs' challenge to the President's 2017 Memorandum.  *Id.*  The target of Plaintiffs' amended

13   complaint was a "categorical ban" on service "simply because [one is] transgender" in the face of

14   what they described as "extensive study and deliberation" by former military leadership.  Dkt. 30, at

15   2.  Likewise, this Court's preliminary injunction rested on its view that the President had ordered a

16   categorical "prohibition on transgender service members … on Twitter, abruptly and without any

17   evidence of considered reason or deliberation" or support from "the 'considered professional

18   judgment' of the military."  Op. 18 & n.7.  The new policy, by contrast, contains several exceptions

19   allowing some transgender individuals, including many Plaintiffs here, to serve, and it is the product

20   of independent military judgment following an extensive study.  *See infra* Parts I.B.1.c, II.

21       At a minimum, the replacement of an alleged categorical exclusion with a more nuanced

22   regime presents a substantially different controversy.  In *Department of Treasury v. Galioto*, 477 U.S. 556

23   (1986) (per curiam), for instance, a lower court held that a federal statute barring all former mental

24   patients who had been involuntarily committed from buying firearms was unconstitutional because

25   it created an "'irrebuttable presumption'" that anyone involuntarily committed was permanently a

26   threat "no matter the circumstances."  *Id.* at 559.  During the appeal, Congress amended the law to

27

28

---

[2] Any review in that scenario, which would be governed by the Administrative Procedure Act, would be limited to the administrative record.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 8
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

allow anyone prohibited from purchasing firearms to seek individualized relief from the Treasury Department. *Id.* Concluding that "no 'irrebuttable presumption' now exists since a hearing is afforded to anyone subject to firearms disabilities," the Supreme Court held the issue moot. *Id.*[3] This case is no different. Because Plaintiffs sought an injunction precluding enforcement of the 2017 Memorandum—and thereby effectively maintain the Carter policy, which, like the new policy, treats gender dysphoria as presumptively disqualifying, Op. 14—the heart of their challenge was necessarily limited to the (allegedly) categorical nature of that Memorandum. With that issue no longer live, the appropriate course is to dissolve the preliminary injunction.[4]

### B.  The New Policy Withstands Constitutional Scrutiny

In all events, Plaintiffs are not entitled to an injunction barring implementation of the new policy, as it does not violate equal protection, substantive due process, or free speech principles.

#### 1.  The new policy is consistent with equal protection principles

##### a.  The new policy is subject to highly deferential review

On its face, the new policy triggers rational basis review. That policy, like the Carter policy before it, draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status. *Compare* Report 3–5, *with* Dkt. 48-3, at 4–5. Such classifications receive rational basis review, which is why no one ever challenged the Carter policy on grounds that it was subject to heightened scrutiny. *See, e.g.*, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365–68 (2001); *Geduldig v. Aiello*, 417 U.S. 484, 494–97 & n.20 (1974).[5]

---

[3] In addressing Washington's challenge to the executive orders barring entry of certain foreign nationals, this Court took a similar tack. *Washington v. Trump*, No. 17-0141, 2017 WL 1045950 (W.D. Wash. Mar. 16, 2017) (Robart, J.). It held that its preliminary injunction against the first order did not extend to the second because of a new exception for lawful permanent residents and certain foreign nationals and a clarification that individuals could seek asylum. *Id.* at *3, *4.

[4] If the Court finds both that the challenge to the 2017 Memorandum still presents a live controversy and that at least some of the Plaintiffs would have standing to challenge the new policy, *but see infra* Part II, enjoining that Memorandum would not redress any of their purported injuries. If the new policy itself would necessarily disqualify any of those Plaintiffs from military service, an injunction against that (non-existent) Memorandum would not cure that harm.

[5] Even if the new policy could be characterized as turning on transgender status, such classifications warrant rational basis review, not intermediate scrutiny. *See, e.g.*, *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir. 2007) (rational basis review applies to classifications on the basis of transgender status, even in civilian context). Although this Court disagrees, and although cases such as *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000), could be read as holding to the contrary, they are distinguishable and, in all events, Defendants respectfully reiterate this position to preserve the issue for further review. Defendants agree with the Court, however, that strict scrutiny is inappropriate. *See* Op. 15–16.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 9
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

But even assuming *arguendo* that the new policy would trigger intermediate scrutiny outside of the military context, that context, unquestionably present here, requires a far less searching form of review. While the government is not "free to disregard the Constitution" when acting "in the area of military affairs," it is equally true that "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). "[R]eview of military regulations challenged on First Amendment grounds," for example, "is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). And the same is true for the constitutional "rights of servicemembers" more generally, including those within the Due Process Clause. *Weiss v. United States*, 510 U.S. 163, 177 (1994); *see also Solorio v. United States*, 483 U.S. 435, 448 (1987) (listing "variety of contexts" where deferential review applied). In short, "constitutional rights must be viewed in light of the special circumstances and needs of the armed forces," and "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." *Beller v. Middendorf*, 632 F.2d 788, 810–11 (9th Cir. 1980) (Kennedy, J.).

This different standard of review is necessary not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but also because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Rostker*, 453 U.S. at 65–66. That is particularly true with respect to the "'complex, subtle, and professional decisions as to the composition … of a military force,' which are 'essentially professional military judgments.'" *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

Although the Supreme Court has expressly refused to attach a "label[]" to the standard of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, several features of its decisions in this area demonstrate that rational basis review most closely describes its approach in practice. First, while the Court has generally refused "to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1697 (2017) (internal quotation marks, brackets, and citation

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 10
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

omitted), it has done so when military deference is required.  In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), it upheld a statutory scheme under which male naval officers were subject to mandatory discharge for failing twice to be promoted within roughly 10 years of service, while female officers were afforded 13 years to obtain equivalent promotions. *Id.* at 499–505, 510.  The Court explained that "Congress may … quite rationally have believed" that female officers "had less opportunity for promotion than did their male counterparts" and that this framework would correct the imbalance. *Id.* at 577.  In response, the main dissent criticized the choice "to conjure up a legislative purpose which may have underlain the gender-based distinction."  *Id.* at 511 (Brennan, J.); *cf. Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("recitation of a benign, compensatory purpose is not an automatic shield … against any inquiry into the actual purposes" of civilian sex-based classifications).

Similarly, the Court in *Rostker* rejected an equal protection challenge to a statute exempting women from the requirement to register for the draft. 453 U.S. at 83.  Even though the suit had been filed in 1971, the Court relied on Congress's analysis of the issue nine years later, when it declined to amend the statute to permit the conscription of women at President Carter's urging.  *See id.* at 60–63.  In doing so, it rejected the argument that it "must consider the constitutionality of the [relevant statute] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted in its modern form."  *Id.* at 74.  Instead, because Congress in 1980 had "reconsider[ed] the question of exempting women from [the draft], and its basis for doing so," its views from that time were "highly relevant in assessing the constitutional validity of the exemption."  *Id.* at 75.

Second, whereas the Court has rejected certain evidentiary defenses of sex-based classifications in the civilian context, *see, e.g., Craig v. Boren*, 429 U.S. 190, 199–204 (1976), it has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including evidence from former military officials.  In *Goldman*, it rejected a free-exercise challenge to the Air Force's prohibition of a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital, even though that claim would have triggered strict scrutiny at the time had it been raised in the civilian context.  475 U.S. at 510; *see id.* at 506. The Court did so even in the face of "expert testimony" from a former Chief Clinical Psychologist

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 11
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

to the Air Force that religious exceptions to a military dress code would "increase morale," and even though the "Air Force's assertion to the contrary [was] mere *ipse dixit*, with no support from actual experience or a scientific study in the record." *Id.* at 509; *see* Br. for Pet'r at 21, *Goldman*, 475 U.S. 503 (No. 84-1097); 1985 WL 669072, at *21. In the Court's view, the beliefs of such "expert witnesses" were "quite beside the point," as current "military officials … are under no constitutional obligation to abandon their considered professional judgment." 475 U.S. at 509.[6]

Third, whereas concerns about "administrative convenience" ordinarily cannot be used to survive intermediate scrutiny, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205 (1977), they may play a key role in challenges to policies concerning the military. In *Rostker*, Congress "did not consider it worth the added burdens of including women in draft and registration plans" in light of the "administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards.'" 453 U.S. at 81. The Court reasoned that it was not its place "to dismiss such problems as insignificant in the context of military preparedness." *Id.* Again, the dissents criticized the Court for jettisoning requirements of intermediate scrutiny. *See id.* at 94 (Brennan, J.) ("This Court has repeatedly stated that … administrative convenience … is not an adequate constitutional justification under the *Craig v. Boren* test."); *id.* at 85 (White, J.) (same).

Fourth, the political branches enjoy significant latitude to choose "among alternatives" in furthering military interests. *Id.* at 72 (majority op.). In *Rostker*, President Carter and military leadership urged a sex-neutral alternative that they believed "would materially increase [military] flexibility,'" but Congress rejected it in favor of retaining its sex-based approach. 453 U.S. at 63; *see id.* at 70. Invoking the "deference due" Congress in this area, the Court refused "to declare unconstitutional [that] studied choice of one alternative in preference to another." *Id.* at 71–72. And again, the main dissent attacked the Court's approach as "significantly different from" its analysis in

---

[6] Likewise, in *Rostker*, President Carter recommended that Congress require women to register for the draft, 453 U.S. at 60, and provided "testimony of members of the Executive and the military in support of that decision," *id.* at 79. In light of the "testimony and hearing evidence presented to Congress by representatives of the military and the Executive Branch," a lower court held that Congress's refusal to require women to register was unconstitutional because "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'" *Id.* at 63. The Supreme Court reversed, noting that the lower court had "palpably exceeded its authority" in "relying on this testimony," as Congress had "rejected it." *Id.* at 81–82.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 12
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

ordinary sex-discrimination cases, as the government had not shown that "a gender-neutral statute would be a less effective means" of accomplishing military objectives.  *Id.* at 94 (Brennan, J.).

Finally, arguable inconsistencies resulting from line-drawing have not been enough to render military decisions invalid.  In *Goldman*, the Court acknowledged that the Air Force had an "exception … for headgear worn during indoor religious ceremonies" and gave commanders "discretion" to allow "visible religious headgear … in designated living quarters." 475 U.S. at 509.  Additionally, service members could "wear up to three rings and one [I.D.] bracelet," even if those items "associate[d] the wearer with a denominational school or a religious or secular fraternal organization" and thereby served as "emblems of religious, social, and ethnic identity." *Id.* at 518 (Brennan, J., dissenting).  Yet the Court deferred to the Air Force's judgment that creating an exception for a psychologist who wanted to wear religious headgear in a hospital on base "would detract from the uniformity sought by [its] dress regulations." *Id.* at 510 (majority op.).  If this case was in the civilian context and strict scrutiny was applied, it is doubtful that the regulation would have been sustained.

Given the Court's substantial departure from core aspects of intermediate and even strict scrutiny in cases involving military deference, Defendants believe the most appropriate description of the applicable standard is rational basis review.  But at a minimum, even if the Court prefers to label the standard a peculiar form of "intermediate scrutiny," Op. 15, its substantive analysis of the new policy should track the Supreme Court's highly deferential approach in this area.  *See Rostker*, 453 U.S. at 69–70 (disavowing the utility of traditional scrutiny labels in cases involving military deference).  Said differently, regardless of the standard of review the Court ultimately employs, the basic elements of traditional intermediate scrutiny should not apply in this case.

### b.    The new policy survives highly deferential scrutiny

The new policy survives the applicable level of scrutiny.  As a threshold matter, certain aspects of the policy should not be at issue.  To start, its treatment of transgender individuals without gender dysphoria—who are eligible to serve in their biological sex—is consistent with the Carter policy and hence this Court's preliminary injunction.  *See* Dkt. 48-3, at 4.  Nor can those with gender dysphoria dispute being held to the same retention standards, including deployability requirements,

as all other service members.  And the 36-month period of stability for accession—as opposed to the Carter policy's 18 months—is not constitutionally significant, especially since it "is the same standard the Department currently applies to persons with a history of depressive disorder," whereas the 18-month period "has no analog with respect to any other mental condition listed in [the accession standards]."  Report 42.

The only change in the policy that is even arguably legally significant is its presumptive disqualification of individuals with gender dysphoria who require or have undergone gender transition, along with the corollary requirement that service members generally serve in their biological sex, and that change easily survives the highly deferential review applicable here.  In the Department's considered judgment, accommodating gender transition would create unacceptable risks to military readiness; undermine good order, discipline, and unit cohesion; and create disproportionate costs.  Mattis Memo 2.  There is no dispute that the need to avoid those harms constitutes at least an "important governmental interest[]." Op. 16.  Indeed, courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Winter*, 555 U.S. at 24, and here, the Department has concluded that minimizing these risks is "absolutely essential," Mattis Memo 2.  Thus, the only issue is whether this Court should defer to the military's judgment that the new policy is necessary to effectuating that critical interest.  *See, e.g.*, Report 32.  That should not be a close question.

### i.   Military Readiness

In the Department's professional military judgment, service by those who require or have undergone gender transition poses at least two significant risks to military readiness.  First, in light of "evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment" (including sex reassignment surgery) compared to others, as well as "considerable scientific uncertainty" over whether these "treatments fully remedy … the mental health problems associated with gender dysphoria," the Department found that "the persistence of these problems is a risk for readiness."  Report 32.  This risk-based assessment— grounded in an extensive review of evidence, including materials unavailable at the time the Carter

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 14
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

policy was adopted—is a classic military judgment meriting deference.  *See id.* at 19–27.[7]

The need to "proceed cautiously" in this area is particularly compelling given the uniquely stressful nature of a military environment.  *Id.* at 27.  Although none of the available studies "account for the added stress of military life, deployments, and combat," *id.* at 24, preliminary data show that service members with gender dysphoria are "eight times more likely to attempt suicide" and "nine times more likely to have mental health encounters" than service members as a whole, *id.* at 21–22.  Thus, in Secretary Mattis's judgment, the Department should not risk "compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations."  Mattis Memo 2.

In short, the Department concluded that the military risks stemming from the uncertain efficacy of a particular medical treatment for a particular medical condition outweighed the possible benefits of allowing individuals with that condition to serve as a general matter.  That is precisely the sort of analysis the military must perform with respect to any medical accession or retention standard, and the cautious approach it took here is hardly out of the norm.  *See* Report 3.  Indeed, even the Carter policy implicitly acknowledged that gender dysphoria or gender transition could impede military readiness by requiring applicants to demonstrate that they had been stable or had avoided complications for an 18-month period.  *See* Dkt. 48-3.  Given that even administrative convenience concerns cannot be dismissed in this context, *see Rostker*, 453 U.S. at 81, then the military's assessment of the tolerable level of risk from a medical condition and treatment should not be second-guessed.

---

[7] For example, the Centers for Medicare and Medicaid Services (CMS) issued a study in August 2016, over a month after the Carter policy was announced, concluding that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."  Report 24.  Although this study was primarily concerned with Medicare beneficiaries, it "conducted a comprehensive review" of "the universe of literature regarding sex reassignment surgery," which consisted of "over 500 articles, studies, and reports" addressing a more general population.  *Id.*  Of these materials, only "33 studies" were "sufficiently rigorous to merit further review," and "[o]verall, the quality and strength of evidence" in even these studies "were low."  *Id.*  In fact, only "six studies" provided "useful information" on the efficacy of sex reassignment surgery in general, and "the four best designed and conducted" ones "did not demonstrate clinically significant changes or differences in psychometric test results" following the procedure.  *Id.*  And "one of the most robust" of those six studies, a Swedish "nationwide population-based, long-term follow-up" of those who had undergone the surgery, "found increased mortality [due to suicide and cardiovascular disease] and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group."  *Id.* at 25.  As that study concluded, "post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up," and "[e]ven though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."  *Id.* at 26.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 15
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by gender transition, "most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time." Report 35. In the military's view, that limitation on deployability itself posed a separate "readiness risk." *Id.* at 33. After documenting the restrictions associated with transition-related medical treatments—including reports by some commanders that some transitioning service members would be non-deployable for up to two-and-half-years—the Department made an assessment that these burdens on military readiness were unacceptable. *Id.* at 33–35. In addition to being inherently problematic in isolation, these limitations would more broadly harm the service members' units. After all, any "increase in the number of non-deployable military personnel places undue risk and personal burden" on those service members who are "qualified and eligible to deploy." *Id.* at 35. In addition to these personal costs, there are impacts on the families of service members who are deployed "more often to backfill or compensate for non-deployable" ones. *Id.* All of this poses a "significant challenge for unit readiness." *Id.*

This analysis should not be controversial. Even Secretary Carter noted that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs," Dkt. 48-3, at 5. So did RAND, which concluded that the relevant limitations on deployability would "have a negative impact on readiness." Report 34–35. Although RAND dismissed this harm as "minimal" due to its estimation of the "exceedingly small number of transgender Service members who would seek transition-related treatment," *id.*, in the Department's judgment, that was the wrong question: "The issue is not whether the military can absorb periods of non-deployability in a small population" but "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* at 35. After all, "by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers." *Id.* RAND "failed to analyze the impact" on "unit readiness" at

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 16
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

"the micro level" by taking a "macro" view of the entire military.  *Id.* at 14.  Given that even Congress may disagree with testimony by some military officers based on legislative concerns about deployability, *see Rostker*, 453 U.S. at 82, then military leadership between administrations should likewise be able to differ over what limitations on deployability are acceptable.

### ii.  Order, Discipline, Leadership, and Unit Cohesion

The Department similarly agreed with the RAND Report's analysis of "the intangible ingredients of military effectiveness"—namely, "leadership, training, good order and discipline," and "unit cohesion."  Report 3.  While RAND recognized that "unit cohesion" was "a critical input for unit readiness," it concluded that accommodating gender transition would likely have "no significant effect" based on the experiences of four foreign militaries that had "fairly low numbers of openly serving transgender personnel."  Dkt. 46-2, at 44–45.  By adopting this approach, however, RAND, in the Department's judgment, again failed to "examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy"—"all of which are critical to unit cohesion"—"at the unit and sub-unit levels."  Report 14.  Aside from potential harms to unit cohesion from limits on deployability, *see supra* Part I.B.1.b.i, accommodating gender transition would undermine the "good order and discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality" served by the military's sex-based standards in several ways, Report 28.

First, the Department reasonably concluded that any accommodation policy that does not require full sex-reassignment surgery threatens to "erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline."  *Id.* at 37.  As the Department explained, "[g]iven the unique nature of military service," service members often must "live in extremely close proximity to one another."  *Id.*  To protect their reasonable expectations of privacy, the Department "has long maintained separate berthing, bathroom, and showering facilities for men and women."  *Id.*  Far from a suspect practice, the Supreme Court has acknowledged that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996), and "[i]n the context of recruit training, this

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 17
*Karnoski, et al. v. Trump, et al.*, No. 2:17-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

separation is even mandated by Congress," Report 37 (collecting statutes).

Accommodating gender transition, the Department reasoned, at least as to those individuals who have not undergone a full sex reassignment, would "undermine" these efforts to honor service members' "reasonable expectations of privacy." *Id.* at 36. Allowing transgender service members "who have developed, even if only partially, the anatomy of their identified gender" to use the facilities of either their identified gender or biological sex "would invade the expectations of privacy" of the non-transgender service members who share those quarters. *Id.* at 37. Absent the creation of separate facilities for transgender service members, which may well be both "logistically impracticable" for the Department and unacceptable to those individuals, the military would face irreconcilable privacy demands. *Id.* For example, the Panel received a report from a commander who faced dueling equal opportunity complaints under the Carter policy over allowing a transgender service member who identified as a female but had male genitalia to use the female shower facilities—one from the female service members in the unit and one from the transgender service member. *Id.* These concerns are consistent with reports from commanding officers in the Canadian military that "they would be called on to balance competing requirements" by "meeting [a] trans individual's expectations … while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness." *Id.* at 40.

In the Department's judgment, such collisions of privacy demands "are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." *Id.* at 37. Accommodating gender transition would mean the "routine execution of daily activities" could be a recurring source of "discord in the unit," requiring commanders "to devote time and resources to resolve issues not present outside of military service." *Id.* at 38. And any delayed or flawed solution to these conflicts by commanders "can degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline." *Id.*

In addition, accommodating gender transition, at least in the context of basic recruiting, puts the Department at risk of violating federal law. As it observed, Congress has "required by statute

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 18
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

that the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits during basic training and that access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy for recruits during basic training.'" *Id.* at 29. Accommodating the gender transition of recruits, drill sergeants, or training personnel in the context of basic recruiting places the Department in jeopardy of contravening those statutory mandates. The new policy advances the military's obvious interest in avoiding that legal risk.[8]

Second, accommodating gender transition creates safety risks for, and perceptions of unfairness among, service members by applying "different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology." Report 36. For example, "pitting biological females against biological males who identify as female, and vice versa," in "physically violent training and competition" could pose "a serious safety risk." *Id.* In addition, service members who are not transgender would likely be frustrated by a "biological male who identifies as female" but "remain[s] a biological male in every respect" and yet is "governed by female standards" in "training and athletic competition," which tend to be less exacting than male training and athletic standards. *Id.*

Again, these are legitimate concerns, as both Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for service members to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19 (citing statute requiring standards for women admitted to the service academies to "be the same as those … for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals"). Especially given that

---

[8] The Department cannot safely assume that courts will construe these statutes to accommodate gender transition. Instead, because these laws do not provide any specialized definition for "sex," "male," or "female," courts may conclude that the terms retain their ordinary meaning, *e.g.*, *Johnson v. United States*, 559 U.S. 133, 138 (2010), which turns on biology rather than gender identity, *see, e.g.*, *Oxford American English Dictionary* 622 (1980) (defining "sex" as "either of the two main groups (*male* and *female*) into which living things are placed according to their reproductive functions, the fact of belonging to these"); *id.* at 401 (defining "male" as "of the sex that can beget offspring by fertilizing egg cells produced by the female"); *id.* at 237 (defining "female" as "of the sex that can bear offspring or produce eggs"); *Webster's Third New International Dictionary* 836, 1366, 2081 (1993) (similar). That is likely given that Congress has confirmed this understanding by prohibiting discrimination on the basis of "gender identity" in addition to, rather than within, discrimination on the basis of "sex" or "gender." *See, e.g.*, 18 U.S.C. § 249(a)(2); 42 U.S.C. § 13925(b)(13)(A).

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 19
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

"physical competition[] is central to the military life and indispensable to the training … of warriors," Report 36, the Department's concerns about the risks in this area should not be ignored.

Third, the Department was concerned that exempting transgender service members from uniform and grooming standards associated with their biological sex would create friction in the ranks. As it explained, "allowing a biological male to adhere to female uniform and grooming standards" would "create[] unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity." *Id.* at 31. That is particularly likely in cases where the standards prohibit non-transgender service members from expressing core aspects of their identity.

Given these concerns, the Department found that accommodating gender transition "risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline." Report 40. Due to "the vital interests at stake—the survivability of Service members, including transgender persons, in combat and the military effectiveness and lethality of our forces"—it therefore decided to take a cautious approach. *Id.* That careful military judgment merits significant deference. "Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08. Indeed, the Supreme Court has repeatedly deferred to similar judgments in this military context in the past. *See id.* at 509–10 (deferring to the military's judgment that "the wearing of religious apparel such as a yarmulke … would detract from the uniformity sought by the dress regulations"); *Rostker*, 453 U.S. at 57 (deferring to Congress's concerns about "'administrative problems such as housing and different treatment with regard to … physical standards'"). And it did so even though in each case, others, including current and former military officials, disagreed. *See supra* pp. 11–12. There is no reason why the military's judgment here should be treated any differently.

### iii.   Disproportionate Costs

Finally, the Department explained that in its experience with the Carter policy,

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 20
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

accommodating gender transition was "proving to be disproportionately costly on a per capita basis." Report 41.  Since the Carter policy's implementation, the medical costs for service members with gender dysphoria have "increased nearly three times—or 300%—" compared to others.  *Id.*  And that is "despite the low number of costly sex reassignment surgeries that have been performed so far"—only 34 non-genital sex reassignment surgeries and one genital surgery—which is likely to increase as more service members with gender dysphoria avail themselves of these procedures.  *Id.*  Notably, "77% of the 424 Service member treatment plans available for review"—*i.e.*, approximately 327 plans—"include requests for transition-related surgery" of some kind.  *Id.*[9]

In light of the military's general interest in maximizing efficiency through minimizing costs, the Department decided that its disproportionate expenditures on accommodating gender transition could be better devoted elsewhere.  *See id.* at 3, 41.  Such a conclusion is not to be second-guessed. Even when alleged constitutional rights are involved, judgments by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" are entitled to significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

\*      \*      \*

Based on these concerns, the Department made a "military judgment" that no longer providing a general accommodation for gender transition was "a necessary departure from the Carter policy." Report 32.  While it was "well aware that military leadership from the prior administration, along with RAND, reached a different judgment," the Department's latest review revealed that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed."  *Id.* at 44.  In fact, even RAND had "concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs," but dismissed "such harms [as] negligible in light of the small size of the

---

[9] Several commanders also reported that providing transition-related treatment for members of their units "had a negative budgetary impact because they had to use operations and maintenance funds to pay for [their] extensive travel throughout the United States to obtain specialized medical care."  *Id.*  This is not surprising given that "transition requires frequent evaluations" by both a mental health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services."  *Id.* at 41 n.164.  Service members therefore "may have significant commutes to reach their required specialty care," and those "stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations."  *Id.*

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 21
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-4336

transgender population." *Id.* But the Department was "not convinced that these risks could be responsibly dismissed or that even negligible harms" (at the macro level) "should be incurred given [its] grave responsibility." *Id.* It therefore "weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring," and concluded that the "balances struck" by the new policy "provide the best solution currently available." *Id.* That careful cost-benefit analysis by the military survives deferential review.

### c.    The new policy is consistent with the Court's prior reasoning

The new policy addresses all of the concerns underlying the Court's preliminary injunction. To start, this Court declined to apply a deferential form of review at that point due to its belief that the President's directives were based on neither "considered reason or deliberation" nor the "'considered professional judgment of military officials.'" Op. 18 & n.7. Defendants respectfully disagree, but, in any event, both of those factors are obviously present with respect to the new policy.

Likewise, the reasons why this Court found the 2017 Memorandum would likely fail intermediate scrutiny are no longer present. *See* Op. 16–18.[10] First, the explanations for the new policy were not obviously "'*contradicted* by the studies, conclusions, and judgment of the military itself.'" Op. 16. To be sure, the former officials responsible for the Carter policy may object to the Department's current approach, but, as *Goldman* and *Rostker* illustrate, such disagreement does not alter the deferential analysis required. *See supra* pp. 11–12.

Second, the reasons for this nuanced policy are neither "'hypothetical'" nor "'extremely overbroad.'" Op. 16–17. Instead, they are rooted in extensive studies, *see, e.g.*, Report 19–27; experience under the Carter policy, *see, e.g.*, *id.* at 8, 34, 37, 41; and the considered professional judgment of military officials, *see, e.g.*, *id.* at 4, 18, 32, 41, 44. And even where the new policy appears to sweep broadly, the Department explained why it does so. For example, the Department considered, but rejected, allowing those individuals who had undergone "a full sex reassignment surgery" to serve. *Id.* at 31. As it explained, that measure would be "at odds with current medical practice, which allows for a wide range of individualized treatment" for gender dysphoria. *Id.* It also

---

[10] In other words, even if an ordinary form of intermediate scrutiny applied, the new policy would survive it. *A fortiori*, the policy would withstand rational basis review. *Cf.* Op. 18 n.8 (ruling otherwise with respect to the Memorandum).

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 22
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

1    would have little practical effect, as the "rates for genital surgery are exceedingly low." *Id.* And in
2    any event, it would not address concerns about "the inconclusive scientific evidence that transition-
3    related treatment restores persons with gender dysphoria to full mental health." *Id.* at 41.

4        Finally, far from being "abruptly" announced, the new policy was the product of a formal
5    process involving "considered reason [and] deliberation." Op. 18. The Department's independent
6    reexamination of the Carter policy—begun without any direction from the President and well before
7    his July 25, 2017 statement on Twitter—was an extensive deliberative process lasting over seven
8    months and involving many of the Department's high-ranking officials as well as experts in a variety
9    of subjects. *See* Mattis Memo 1–2; Report 17–18. The Department considered evidence that
10   supported and cut against its approach, including the materials underlying, and its experience with,
11   the Carter policy, and explained why it was departing from that policy to some extent. *See, e.g.,*
12   Report 18, 44. And while much of this deliberative process occurred while litigation was ongoing,
13   the same was true in *Rostker*, and that did not render Congress's decision suspect. *See supra* p. 11.

14       **2.    The new policy survives Plaintiffs' other constitutional challenges**

15       Plaintiffs are also unlikely to prevail on their substantive due process or First Amendment
16   claims. Although this Court held otherwise in issuing its preliminary injunction, that was due to its
17   belief that the 2017 Memorandum's alleged "intrusion" on their "fundamental liberty interest" and
18   "protected expression" was unnecessary "to further an important government interest." Op. 19–
19   20. For the reasons above, the same cannot be said about any such intrusion by the new policy.[11]

20   **II.    Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary Injunction**

21       Even if Plaintiffs could show a live controversy in which they were likely to succeed, they
22   cannot meet any of the equitable factors needed for an order barring adoption of the new policy.

23       To start, Plaintiffs have not shown that they would suffer any irreparable injury under the
24   new policy. Indeed, they have not even proven that they would have standing to press a challenge
25   to this policy, and it is clear that most of them would not. At the outset, five of the nine individual

---

26   [11] In any event, Defendants respectfully maintain for preservation purposes that the new policy would not intrude on
27   any constitutional interest. Even if this policy were to deprive Plaintiffs of "career opportunities," Op. 19, no one has a
     fundamental right to serve in the U.S. military. Nor is this policy, which, like the Carter policy before it, simply requires
28   the disclosure of information concerning a medical condition, a "content-based restriction" on speech. Op. 20.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 23
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

Plaintiffs (Schmid, Muller, Lewis, Stephens, and Winter) would qualify for the new policy's reliance exception—and would therefore be able to continue serving in their preferred gender, obtain commissions, and receive medical treatment—because each received a diagnosis of gender dysphoria from a military medical provider during the time the Carter policy was in effect. *See* Dkt. 30, at 9, 12, 14–15, 17; Dkt. 72, at 2; Report 43. These Plaintiffs therefore will not sustain any injury under the new policy, let alone an irreparable one. And as for the remaining Plaintiffs and Washington, Defendants respectfully maintain for preservation purposes that these litigants cannot establish standing to challenge, or irreparable injury from, the new policy for the same reasons they failed to satisfy these requirements with respect to the 2017 Memorandum. *See* Dkt. 69.

Nor have Plaintiffs established that the balance of the equities or the public interest favors an injunction against the new policy. In contrast to the absence of any irreparable harm associated with dissolving the preliminary injunction, such an order will force the Defense Department to adhere to a policy that it has concluded poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Mattis Memo 2; *see also, e.g.*, Report 32–35, 41, 44. These "specific, predictive judgments" from "senior" military officials—including the Secretary of Defense himself—"about how the preliminary injunction would reduce the effectiveness" of the military merit significant deference. *Winter*, 555 U.S. at 27. After all, the military is not "required to wait until the injunction actually results in an inability" to effectively prepare "for the national defense before seeking its dissolution." *Id.* at 31 (internal quotation marks, brackets, and ellipsis omitted).[12]

## CONCLUSION

This Court should dissolve the preliminary injunction issued on December 11, 2017. In light of the Department of Defense's judgment that maintaining the Carter policy poses substantial risks to military readiness, Defendants respectfully request a ruling on this motion as soon as possible and no later than May 23, 2018.

---

[12] Although this Court held that the equities favored granting a preliminary injunction with respect to the 2017 Memorandum, that ruling hinged on its belief that the Carter policy had no "documented negative effects." Op. 22. The Defense Department has now detailed the harms associated with the Carter policy and explained why, in its professional military judgment, it was "necessary" to depart from that framework. Report 32.

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 24
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

Dated: March 23, 2018                    Respectfully submitted,

                                         CHAD A. READLER
                                         Acting Assistant Attorney General
                                         Civil Division

                                         BRETT A. SHUMATE
                                         Deputy Assistant Attorney General

                                         BRINTON LUCAS
                                         Counsel to the Assistant Attorney General

                                         JOHN R. GRIFFITHS
                                         Branch Director

                                         ANTHONY J. COPPOLINO
                                         Deputy Director

                                         */s/ Ryan B. Parker*
                                         RYAN B. PARKER
                                         Senior Trial Counsel

                                         ANDREW E. CARMICHAEL
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         Telephone: (202) 514-4336
                                         Email: ryan.parker@usdoj.gov

                                         *Counsel for Defendants*

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 25
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on March 23, 2018, I electronically filed the foregoing Motion to

3

Dissolve the Preliminary Injunction using the Court's CM/ECF system, causing a notice of filing to

4

be served upon all counsel of record.

5

6

Dated: March 23, 2018                    */s/ Ryan Parker*

7

RYAN B. PARKER

8

Senior Trial Counsel
United States Department of Justice

9

Civil Division, Federal Programs Branch
Telephone: (202) 514-4336

10

Email: ryan.parker@usdoj.gov

11

*Counsel for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION - 26
*Karnoski, et al. v. Trump, et al.*, No. 2:17-cv-1297 (MJP)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-4336**