1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                  AT SEATTLE

10    RYAN KARNOSKI, et al.,                    CASE NO. C17-1297-MJP

11                       Plaintiffs,            ORDER GRANTING IN PART
                                                AND DENYING IN PART
12         v.                                   PLAINTIFFS' AND
                                                WASHINGTON'S MOTIONS FOR
13    DONALD J. TRUMP, et al.,                  SUMMARY JUDGMENT;

14                       Defendants.            GRANTING IN PART AND
                                                DENYING IN PART
15                                              DEFENDANTS' MOTION FOR
                                                PARTIAL SUMMARY JUDGMENT
16

17         THIS MATTER comes before the Court on Plaintiffs' Motion for Summary Judgment

18  (Dkt. No. 129); the State of Washington's Motion for Summary Judgment (Dkt. No. 150); and

19  Defendants' Cross-Motion for Partial Summary Judgment (Dkt. No. 194.)  Having reviewed the

20  Motions, the Responses (Dkt. Nos. 194, 207, 209), the Replies (Dkt. Nos. 201, 202, 212) and all

21  related papers, and having considered arguments made in proceedings before the Court, the

22  Court rules as follows:  The Court GRANTS IN PART and DENIES IN PART Plaintiffs' and

23

24

Washington's Motions and GRANTS IN PART and DENIES IN PART Defendants' Cross-Motion.

**ORDER SUMMARY**

In July 2017, President Donald J. Trump announced on Twitter a ban on military service by openly transgender people (the "Ban").  Plaintiffs and the State of Washington ("Washington") challenged the constitutionality of the Ban, and moved for a preliminary injunction to prevent it from being carried out.

In December 2017, the Court—along with three other federal judges—entered a nationwide preliminary injunction preventing the military from implementing the Ban.  The effect of the order was to maintain the status quo, allowing transgender people to join and serve in the military and receive transition-related medical care.  For the past few months, they have done just that.

In March 2018, President Trump announced a plan to implement the Ban.  With few exceptions, the plan excludes from military service people "with a history or diagnosis of gender dysphoria" and people who "require or have undergone gender transition."  The plan provides that transgender people may serve in the military only if they serve in their "biological sex." Defendants claim that this plan resolves the constitutional issues raised by Plaintiffs and Washington.

In the following order, the Court concludes otherwise, and rules that the preliminary injunction will remain in effect.  Each of the claims raised by Plaintiffs and Washington remains viable.  The Court also rules that, because transgender people have long been subjected to systemic oppression and forced to live in silence, they are a protected class.  Therefore, any attempt to exclude them from military service will be looked at with the highest level of care,

and will be subject to the Court's "strict scrutiny."  This means that before Defendants can implement the Ban, they must show that it was sincerely motivated by compelling interests, rather than by prejudice or stereotype, and that it is narrowly tailored to achieve those interests.

The case continues forward on the issue of whether the Ban is well-supported by evidence and entitled to deference, or whether it fails as an impermissible violation of constitutional rights.  The Court declines to dismiss President Trump from the case and allows Plaintiffs' and Washington's claims for declaratory relief to go forward against him.

**BACKGROUND**

**I.    The Ban on Military Service by Openly Transgender People**[1]

***President Trump's Announcement on Twitter***:  On July 26, 2017, President Donald J. Trump (@realDonaldTrump) announced over Twitter that the United States would no longer "accept or allow" transgender people "to serve in any capacity in the U.S. military" (the "Twitter Announcement"):



(Dkt. No. 149, Ex. 1.)

---

[1] As used throughout this Order, and as explained in greater detail in this section, the "Ban" refers to Defendants' policy generally prohibiting military service by openly transgender people, as announced in President Trump's Twitter Announcement and 2017 Memorandum and as further detailed in the Implementation Plan and 2018 Memorandum.

1     ***The 2017 Memorandum***:  On August 25, 2017, President Trump issued a Presidential

2     Memorandum (the "2017 Memorandum") formalizing his Twitter Announcement, and directing

3     the Secretaries of Defense and Homeland Security to "return" to an earlier policy excluding

4     transgender service members.  (Dkt. No. 149, Ex. 2.)  The 2017 Memorandum authorized the

5     discharge of openly transgender service members (the "Retention Directive"); prohibited the

6     accession of openly transgender service members (the "Accession Directive"); and prohibited the

7     use of Department of Defense ("DoD") and Department of Homeland Security ("DHS")

8     resources to fund "sex reassignment" surgical procedures (the "Medical Care Directive").  (Id. at

9     §§ 1-3.)  The Accession Directive was to take effect on January 1, 2018; the Retention and

10    Medical Care Directives on March 23, 2018.  (Id. at § 3.)  The 2017 Memorandum also ordered

11    the Secretary of Defense to "submit to [President Trump] a plan for implementing both [its]

12    general policy . . . and [its] specific directives . . ." no later than February 21, 2018.  (Id.)

13    ***Secretary Mattis' Press Release and Interim Guidance***:  On August 29, 2017, Secretary

14    of Defense James N. Mattis issued a press release confirming that the DoD had received the

15    2017 Memorandum and, as directed, would "carry out" its policy direction.  (Dkt. No. 197, Ex.

16    2.)  The press release explained that Secretary Mattis would "develop a study and

17    implementation plan" and "establish a panel of experts . . . to provide advice and

18    recommendation on the implementation of the [P]resident's direction."  (Id.)

19    On September 14, 2017, Secretary Mattis issued interim guidance regarding President

20    Trump's Twitter Announcement and 2017 Memorandum to the military (the "Interim

21    Guidance").  (Dkt. No. 149, Ex. 3.)  The Interim Guidance again identified the DoD's intent to

22    "carry out the President's policy and directives" and "present the President with a plan to

23    implement the policy and directives in the [2017] Memorandum."  (Id. at 2.)  The Interim

24

1   Guidance provided (1) that transgender people would be prohibited from accession effective

2   immediately; (2) that service members diagnosed with gender dysphoria would be provided

3   "treatment," however, "no new sex reassignment surgical procedures for military personnel

4   [would] be permitted after March 22, 2018"; and (3) that no action would be taken "to

5   involuntarily separate or discharge an otherwise qualified Service member solely on the basis of

6   a gender dysphoria diagnosis or transgender status."  (Id. at 3.)

7        ***The Implementation Plan***:  On February 22, 2018, as directed, Secretary Mattis

8   delivered to President Trump a plan for carrying out the policies set forth in his Twitter

9   Announcement and 2017 Memorandum (Dkt. No. 224, Ex. 1) along with a "Report and

10  Recommendations on Military Service by Transgender Persons" (Dkt. No. 224, Ex. 2)

11  (collectively, the "Implementation Plan").  The Implementation Plan recommended the following

12  policies:

13      • Transgender persons with a history or diagnosis of gender dysphoria are
       disqualified from military service, except under the following limited
14     circumstances:  (1) if they have been stable for 36 consecutive months in their
       biological sex prior to accession; (2) Service members diagnosed with gender
15     dysphoria after entering into service may be retained if they do not require a
       change of gender and remain deployable within applicable retention
16     standards; and (3) currently serving Service members who have been
       diagnosed with gender dysphoria since the previous administration's policy
17     took effect and prior to the effective date of this new policy, may continue to
       serve in their preferred gender and receive medically necessary treatment for
18     gender dysphoria.

19      • Transgender persons who require or have undergone gender transition are
       disqualified from military service.
20

21      • Transgender persons without a history or diagnosis of gender dysphoria, who
       are otherwise qualified for service, may serve, like all other Service members,
22     in their biological sex.

    (Dkt. No. 224, Ex. 1 at 3-4.)

23

24

1       ***The 2018 Memorandum***:  On March 23, 2018, President Trump issued another

2   Presidential Memorandum (the "2018 Memorandum").  (Dkt. No. 224, Ex. 3.)  The 2018

3   Memorandum confirms his receipt of the Implementation Plan, purports to "revoke" the 2017

4   Memorandum and "any other directive [he] may have made with respect to military service by

5   transgender individuals," and directs the Secretaries of Defense and Homeland Security to

6   "exercise their authority to implement any appropriate policies concerning military service by

7   transgender individuals."  (Id. at 2-3.)

8   **II.    The Carter Policy**

9       In 2010, Congress repealed the "Don't Ask, Don't Tell" policy that had previously

10   prevented gay, lesbian, and bisexual people from serving openly in the military.  (Dkt. No. 145 at

11   ¶ 10.)  The repeal of "Don't Ask, Don't Tell" raised questions about the military's policy on

12   transgender service members, as commanders became increasingly aware that there were capable

13   and experienced transgender service members in every branch of the military.  (Id. at ¶ 11; Dkt.

14   No. 146 at ¶ 7.)  In August 2014, the DoD eliminated its categorical ban on retention of

15   transgender service members, enabling each branch of military service to reassess its own

16   policies.  (Dkt. No. 145 at ¶ 12; Dkt. No. 146 at ¶ 8.)  In July 2015, then-Secretary of Defense

17   Ashton Carter convened a group to evaluate policy options regarding openly transgender service

18   members (the "Working Group").  (Dkt. No. 142 at ¶ 8.)  The Working Group included senior

19   uniformed officials from each branch, a senior civilian official, and various staff members.  (Id.

20   at ¶ 9.)  It sought to "identify and address all relevant issues relating to service by openly

21   transgender persons."  (Id. at ¶ 22.)  To do so, it consulted with medical experts, personnel

22   experts, readiness experts, and commanders whose units included transgender service members,

23   and commissioned an independent study by the RAND Corporation to assess the implications of

24

1   allowing transgender people to serve openly (the "RAND Study").  (Id. at ¶¶ 10-11, 22-27.)  In

2   particular, the RAND Study focused on:  (1) the health care needs of transgender service

3   members and the likely costs of providing coverage for transition-related care; (2) the readiness

4   implications of allowing transgender service members to serve openly; and (3) the experiences of

5   foreign militaries that allow for open service.  (Dkt. No. 144, Ex. B at 4.)  The RAND Study

6   found "no evidence" that allowing transgender people to serve openly would adversely impact

7   military effectiveness, readiness, or unit cohesion.  (Dkt. No. 144 at ¶ 14.)  Instead, the RAND

8   Study found that discharging transgender service members would reduce productivity and result

9   in "significant costs" associated with replacing skilled and qualified personnel.  (Dkt. No. 142 at

10  ¶ 21.)  The results of the RAND Study were published in a 113-page report titled "Assessing the

11  Implications of Allowing Transgender Personnel to Serve Openly."  (See Dkt. No. 144, Ex. B.)

12          After reviewing the results of the RAND Study and other evidence, the Working Group

13  unanimously agreed that (1) transgender people should be allowed to serve openly and (2)

14  excluding them from service based on a characteristic unrelated to their fitness to serve would

15  undermine military efficacy.  (Dkt. No. 142 at ¶¶ 26-27.)  On June 30, 2016, Secretary Carter

16  accepted the recommendations of the Working Group and issued Directive-type Memorandum

17  16-005 (the "Carter Policy"), which affirmed that "service in the United States military should be

18  open to all who can meet the rigorous standards for military service and readiness."  (Dkt. No.

19  144, Ex. C.)  The Carter Policy provided that "[e]ffective immediately, no otherwise qualified

20  service member may be involuntarily separated, discharged or denied reenlistment or

21  continuation of service, solely on the basis of their gender identity," and further provided that

22

23

24

1   transgender people would be allowed to accede into the military not later than July 1, 2017.[2]  (Id.

2   at 5.)  Consistent with the Carter Policy, each branch of military service issued detailed

3   instructions, policies, and regulations regarding separation and retention, accession, in-service

4   transition, and medical care.  (Dkt. No. 144 at ¶¶ 24-36, Exs. D, E, F; Dkt. No. 145 at ¶¶ 41-50,

5   Exs. A, B; Dkt. No. 146 at ¶¶ 27-34, Ex. A.)

6         In reliance upon the Carter Policy and the DoD's assurances that it would not discharge

7   them for being transgender, many service members came out to the military and had been

8   serving openly for more than a year when President Trump issued his Twitter Announcement

9   and 2017 Memorandum.  (Dkt. No. 144, ¶ 37; Dkt. No. 145 at ¶ 51; Dkt. No. 146 at ¶ 35.)

10   **III.**    **Procedural History**

11         On August 28, 2017, Plaintiffs filed this lawsuit challenging the constitutionality of the

12   Ban, as set forth in the Twitter Announcement and the 2017 Memorandum.  (See Dkt. No. 1.)

13   Plaintiffs include nine transgender individuals (the "Individual Plaintiffs") and three

14   organizations (the "Organizational Plaintiffs").  (Dkt. No. 30 at ¶¶ 7-18.)  Individual Plaintiffs

15   Ryan Karnoski, D.L., and Connor Callahan aspire to enlist in the military; Staff Sergeant

16   Cathrine Schmid, Chief Warrant Officer Lindsey Muller, Petty Officer First Class Terece Lewis,

17   Petty Officer Second Class Phillip Stephens, and Petty Officer Second Class Megan Winters

18   currently serve openly in the military.  (Id. at ¶¶ 7-13.)  Individual Plaintiff Jane Doe currently

19   serves in the military, but does not serve openly.  (Id. at ¶ 14.)  Organizational Plaintiffs include

20   the Human Rights Campaign ("HRC"), the Gender Justice League ("GJL"), and the American

21

22

23        [2] On June 30, 2017, Secretary Mattis extended the effective date for accepting

24   transgender recruits to January 1, 2018.  (Dkt. No. 197, Ex. 3.)

1    Military Partner Association ("AMPA").  (Id. at ¶¶ 16-18.)  Defendants include President Trump,

2    Secretary Mattis, the United States, and the DoD.  (Id. at ¶¶ 19-22.)

3           On November 27, 2017, the Court granted intervention to Washington, which joined to

4    protect its sovereign and quasi-sovereign interests in its natural resources and in the health and

5    physical and economic well-being of its residents.  (See Dkt. No. 101.)

6           On December 11, 2017, the Court issued a nationwide preliminary injunction barring

7    Defendants from "taking any action relative to transgender individuals that is inconsistent with

8    the status quo that existed prior to President Trump's July 26, 2017 announcement."[3]  (Dkt. No.

9    103 at 23.)  The Court found that Plaintiffs and Washington had standing to challenge the Ban

10    and were likely to succeed on the merits of their claims for violation of equal protection,

11    substantive due process, and the First Amendment.  (Id. at 6-12, 15-20.)

12           On January 25, 2018, Plaintiffs and Washington filed separate motions for summary

13    judgment.[4]  (Dkt. Nos. 129, 150.)  Both seek an order declaring the Ban unconstitutional and

14    permanently enjoining its implementation.  (Dkt. No. 129 at 28-29; Dkt. No. 150-1.)

15           On February 28, 2018, Defendants filed an opposition and cross-motion for partial

16    summary judgment seeking dismissal of all claims brought against President Trump.  (Dkt. No.

17    194.)

18

19           [3] Three other district courts also entered preliminary injunctions against the Ban.  See

20    Doe 1 v. Trump, 275 F. Supp. 3d 167 (D.D.C. 2017); Stone v. Trump, 280 F. Supp. 3d 747 (D. Md. 2017); Stockman v. Trump, No. 17-cv-1799-JGB-KK, Dkt. No. 79 (C.D. Cal. Dec. 22, 2017).

21           [4] Plaintiffs are joined by amici the Constitutional Accountability Center (Dkt. No. 163,

22    Ex. 1); Legal Voice (Dkt. No. 169); Retired Military Officers and Former National Security Officials (Dkt. No. 152, Ex. A); and the Commonwealths of Massachusetts and Pennsylvania,

23    the States of California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and the District of Columbia (Dkt.

24    No. 170, Ex. A.)

1    On March 23, 2018, as these motions were pending and only days before the Court was

2    set to hear oral argument, President Trump issued the 2018 Memorandum.  (Dkt. No. 214, Ex.

3    1.)  On March 27, the Court ordered the parties to present supplemental briefing on the effect of

4    the 2018 Memorandum and the Implementation Plan.  (Dkt. No. 221.)  That briefing has now

5    been completed and this matter is ready for ruling.  (See Dkt. Nos. 226, 227, 228.)

**DISCUSSION**

**I.    Legal Standard**

8    Summary judgment is proper if "the movant shows that there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10   56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue

11   of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To defeat a motion for

12   summary judgment, the non-movant must point to facts supported by the record which

13   demonstrate a genuine issue of material fact.  Lujan v. National Wildlife Federation, 497 U.S.

14   871, 888 (1990).  Conclusory, non-specific statements are not sufficient.  Id.  Similarly, "a party

15   cannot manufacture a genuine issue of material fact merely by making assertions in its legal

16   memoranda."  S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc., 690

17   F.2d 1235, 1238 (9th Cir. 1982).

**II.    Plaintiffs' and Washington's Motions for Summary Judgment**

19   Plaintiffs and Washington contend that summary judgment is proper because the Ban is

20   unsupported by any constitutionally adequate government interest as a matter of law, and

21   therefore violates equal protection, substantive due process, and the First Amendment.  (Dkt. No.

22   129 at 15-28; Dkt. No. 150 at 13-23.)  Defendants respond that disputes of material fact preclude

23   summary judgment, including disputes as to (1) whether Plaintiffs' and Washington's challenges

24

are moot as a result of the 2018 Memorandum; (2) whether Plaintiffs and Washington have

standing; and (3) whether the Ban satisfies the applicable level of scrutiny.  (Dkt. No. 194 at

5-24; Dkt. No. 226 at 3-11.)  The Court addresses each of these issues in turn:

**A. Mootness**

Defendants claim that Plaintiffs' and Washington's challenges are now moot, as the

policy set forth in the 2017 Memorandum has been "revoked" and replaced by that in the 2018

Memorandum.  (Dkt. No. 226 at 3-7.)  Defendants claim the "new policy" has "changed

substantially," such that it presents a "substantially different controversy."  (Id. at 6 (citations

omitted.))  Plaintiffs and Washington respond that there is no "new policy" at all, as the 2018

Memorandum and the Implementation Plan merely implement the directives of the 2017

Memorandum.  (Dkt. No. 227 at 2; Dkt. No. 228 at 7-8.)

"The burden of demonstrating mootness 'is a heavy one.'"  Los Angeles County v. Davis,

440 U.S. 625, 631 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632-33

(1953)).  The Ninth Circuit has explained that a case is not moot unless "subsequent events make

it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to

recur," McCormack v. Herzog, 788 F.3d 1017, 1024 (9th Cir. 2015) (quoting Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)), such that "the

litigant no longer ha[s] any need of the judicial protection that is sought."  Jacobus v. Alaska,

338 F.3d 1095, 1102-03 (9th Cir. 2003) (quoting Adarand Constructors, Inc. v. Slater, 528 U.S.

216, 224 (2000)).  Accordingly, courts find cases moot only where the challenged policy has

been completely revoked or rescinded, not merely voluntarily ceased.  See Davis, 440 U.S. at

631 (holding that a case is moot only where "there can be no reasonable expectation" that the

alleged violation will recur and "interim relief or events have completely and irrevocably

1    eradicated the effects of the alleged violation"); City of Mesquite v. Aladdin's Castle, Inc., 455

2    U.S. 283, 289 (1982) (holding that "a defendant's voluntary cessation of a challenged practice

3    does not deprive a federal court of its power to determine the legality of the practice"); see also

4    McCormack, 788 F.3d at 1025 (noting that a case is not moot where the government never

5    "repudiated . . . as unconstitutional" the challenged policy).

6    The Court finds that the 2018 Memorandum and the Implementation Plan do not

7    substantively rescind or revoke the Ban, but instead threaten the very same violations that caused

8    it and other courts to enjoin the Ban in the first place.  The 2017 Memorandum prohibited the

9    accession and authorized the discharge of openly transgender service members (the Accession

10   and Retention Directives); prohibited the use of DoD and DHS resources to fund transition-

11   related surgical procedures (the Medical Care Directive); and directed Secretary Mattis to submit

12   "a plan for implementing" both its "general policy" and its "specific directives" no later than

13   February 21, 2018.  (Dkt. No. 149, Ex. 2 at §§ 1-3.)  The 2017 Memorandum did not direct

14   Secretary Mattis to determine *whether* or not the directives should be implemented, but instead

15   ordered the directives to be implemented by specific dates and requested a plan for *how* to do so.

16   The Implementation Plan adheres to the policy and directives set forth in the 2017

17   Memorandum with few exceptions:  With regard to the Accession and Retention Directives, the

18   Implementation Plan excludes from military service and authorizes the discharge of transgender

19   people who "require or have undergone gender transition" and those "with a history or diagnosis

20   of gender dysphoria" unless they have been "stable for 36 consecutive months in their biological

21   sex prior to accession."  (Dkt. No. 224, Ex. 1 at 3-4.)  With regard to the Medical Care Directive,

22   the Implementation Plan provides that the military will, with few exceptions, no longer provide

23

24

1   transition-related surgical care (as people who "require . . . gender transition" will no longer be

2   permitted to serve and those who are currently serving will be subject to discharge).  (Id.)

3          Defendants claim that the 2018 Memorandum and the Implementation Plan differ from

4   the 2017 Memorandum in that they do not mandate a "categorical" prohibition on service by

5   openly transgender people and "contain[] several exceptions allowing some transgender

6   individuals to serve."  (Dkt. No. 226 at 6-7).  The Court is not persuaded.  The Implementation

7   Plan prohibits transgender people—including those who have neither transitioned nor been

8   diagnosed with gender dysphoria—from serving, unless they are "willing and able to adhere to

9   all standards associated with their biological sex."  (Dkt. No. 224, Ex. 1 at 4, Ex. 2 at 7.)

10   Requiring transgender people to serve in their "biological sex" [5] does not constitute "open"

11   service in any meaningful way, and cannot reasonably be considered an "exception" to the Ban.

12   Rather, it would force transgender service members to suppress the very characteristic that

13   defines them as transgender in the first place.[6]  (See Dkt. No. 143 at ¶ 19 ("The term

14   'transgender' is used to describe someone who experiences any significant degree of

---

[5] The Court notes that the Implementation Plan uses the term "biological sex," apparently to refer to the sex one is assigned at birth.  This is somewhat misleading, as the record indicates that gender identity—"a person's internalized, inherent sense of who they are as a particular gender (i.e., male or female)"—is also widely understood to have a "biological component." (See Dkt. No. 143 at ¶¶ 20-21.)

[6] While the Implementation Plan contains an exception that allows current service members to serve openly and in their preferred gender and receive "medically necessary" treatment for gender dysphoria, the exception is narrow, and applies only to those service members who "were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter [P]olicy" (i.e., June 30, 2016) but "before the effective date" of the policy set forth in the Implementation Plan.  (Dkt. No. 224, Ex. 2 at 7-8.)  Further, this exception is severable from the remainder of the Implementation Plan.  (Id. at 7 ("[S]hould [the DoD]'s decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy.").)

1   misalignment between their gender identity and their assigned sex at birth."); Dkt. No. 224, Ex. 2

2   at 9 n.10 ("[T]ransgender" is "an umbrella term used for individuals who have sexual identity or

3   gender expression that differs from their assigned sex at birth.")

4       Therefore, the Court concludes that the 2018 Memorandum and the Implementation Plan

5   do not moot Plaintiffs' and Washington's existing challenges.

6   **B.  Standing**

7       Defendants claim that Plaintiffs and Washington lack standing to challenge the Ban, and

8   that the 2018 Memorandum and Implementation Plan "have significantly changed the analysis."

9   (Dkt. No. 194 at 6-12; Dkt. No. 226 at 7.)

10      Standing requires (1) an "injury in fact"; (2) a "causal connection between the injury and

11   the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable

12   decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation

13   marks and citations omitted).  An "injury in fact" exists where there is an invasion of a legally

14   protected interest that is both "concrete and particularized" and "actual or imminent, not

15   conjectural or hypothetical."  Id. at 560 (internal quotation marks and citations omitted).

16      While the Court previously concluded that both Plaintiffs and Washington established

17   standing at the preliminary injunction stage (Dkt. No. 103 at 7-12), their burden for doing so on

18   summary judgment is more exacting and requires them to set forth "by affidavit or other

19   evidence 'specific facts'" such that a "fair-minded jury" could find they have standing.  Id. at

20   561; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

21      The Court considers standing for the Individual Plaintiffs, the Organizational Plaintiffs,

22   and Washington in turn:

23

24

1                            **1.  Individual Plaintiffs**

2            Each of the Individual Plaintiffs has submitted an affidavit detailing the ways in which

3    they have already been harmed by the Ban, and would be further harmed were it to be

4    implemented.  (See Dkt. Nos. 130-138.)  While Defendants claim that "Plaintiffs are obviously

5    not suffering any harm from the revoked 2017 Memorandum," and "would neither sustain an

6    actual injury nor face an imminent threat of future injury" as a result of the 2018 Memorandum,

7    the Court disagrees and concludes that each of the Individual Plaintiffs has standing to challenge

8    the Ban.

9            Karnoski, D.L, and Callahan have "taken clinically appropriate steps to transition" and

10   would be excluded from acceding under the Implementation Plan.  (Dkt. No. 130 at ¶ 10; Dkt.

11   No. 132 at ¶ 8; Dkt. No. 137 at ¶ 8.)  Whether they could have acceded under the Carter Policy

12   and whether they might be able to obtain "waivers," as Defendants suggest, are irrelevant.  (See

13   Dkt. No. 226 at 8.)  As the Court previously found, their injury "lies in the denial of an equal

14   *opportunity* to compete, not the denial of the job itself," and the Court need not "inquire into the

15   plaintiff's qualifications (or lack thereof) when assessing standing."  (Dkt. No. 103 at 10 n.3

16   (citing Shea v. Kerry, 796 F.3d 42, 50 (D.C. Cir. 2015)) (emphasis in original).)

17           Doe does not currently serve openly, but was intending to come out and to transition

18   surgically before President Trump's Twitter Announcement.  (Dkt. No. 138 at ¶¶ 8-11.)  The Ban

19   unambiguously subjects her to discharge should she seek to do either.  (See Dkt. No. 224, Ex. 1.)

20   Schmid, Muller, Lewis, Stephens, and Winters have been diagnosed with gender dysphoria, and

21   likewise would be subject to discharge under the Ban.[7]  (Dkt. No. 131 at ¶ 9; Dkt. No. 133 at

22

23           [7] Defendants claim that the currently serving Plaintiffs were "diagnosed with gender
     dysphoria within the relevant time period" and "therefore would be able to continue serving in
24   their preferred gender, change their gender marker, and receive all medically necessary

¶ 15; Dkt. No. 134 at ¶ 10; Dkt. No. 135 at ¶ 10; Dkt. No. 136 at ¶ 10.)  The threat of discharge facing Doe, Schmid, Muller, Lewis, Stephens, and Winters is "actual or imminent, not conjectural or hypothetical," and clearly gives rise to standing.  See Lujan, 504 U.S. at 560 (internal quotation marks and citation omitted).

Importantly, even if each of the Individual Plaintiffs were granted waivers or otherwise not excluded, discharged, or denied medical care, there can be no dispute that they would nevertheless have standing to challenge the Ban.  This is because the Ban already has denied them the opportunity to serve in the military on the same terms as others; has deprived them of dignity; and has subjected them to stigmatization.  (See Dkt. No. 103 at 8.)  Policies that "stigmatiz[e] members of [a] disfavored group as 'innately inferior' . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."  Heckler v. Mathews, 465 U.S. 728, 737-740 (1984) (citation omitted).  Such stigmatic injury, when identified in specific terms, is "one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing."  Allen v. Wright, 468 U.S. 737, 755 (1984), abrogated on other grounds, 134 S. Ct. 1377 (2014).

---

treatment" under the Implementation Plan's narrow exception.  (Dkt. No. 226 at 8.)  The record does not support this claim.  As noted previously, the exception applies only to current service members who "were diagnosed with gender dysphoria by a military medical provider *after* the effective date of the Carter [P]olicy" (i.e., June 30, 2016) but "before the effective date" of the policy set forth in the Implementation Plan.  (See supra, n.6; Dkt. No. 224, Ex. 2 at 7-8 (emphasis added).)  The record suggests that many, if not all, of the currently serving Plaintiffs were diagnosed *before* June 30, 2016.  For example, Schmid was diagnosed "approximately four years ago."  (Dkt. No. 131 at ¶ 9.)  Muller was diagnosed "approximately six years ago."  (Dkt. No. 133 at ¶ 15.)  Lewis, Stephens, and Winters were diagnosed "approximately three years ago," "approximately two and a half years ago," and "approximately two years ago" respectively.  (Dkt. No. 134 at ¶ 10; Dkt. No. 135 at ¶ 10; Dkt. No. 136 at ¶ 10.)  There is also no indication that any of the currently serving Plaintiffs received their diagnosis from a "military medical provider."

1     Each of the Individual Plaintiffs has detailed the stigmatic injuries they have suffered

2  through affidavits.  For example, Karnoski has explained that the Ban has caused him "great

3  distress, discomfort, and pain."  (Dkt. No. 130 at ¶ 21.)  Schmid has explained that the Ban's

4  "abrupt change in policy and implicit commentary on [her] value to the military and competency

5  to serve has caused [her] to feel tremendous anguish," and that since it was announced, she has

6  lost sleep and suffered "an immense amount of anxiety."  (Dkt. No. 131 at ¶¶ 23-24, 26.)  Muller

7  has explained that the Ban was "devastating" and "wounded [her] more than any combat injury

8  could."  (Dkt. No. 133 at ¶¶ 30-31.)  Doe has explained that the Ban precludes her from

9  expressing her authentic gender identity, and that as a result, she has not come out.  (Dkt. No.

10  138 at ¶¶ 10-11.)  Doe's self-censorship alone is a "constitutionally sufficient injury," as it is

11  based on her "actual and well-founded fear" of discharge.  See Cal. Pro-Life Council, Inc. v.

12  Getman, 328 F.3d 1088, 1095 (9th Cir. 2003) (holding that a person's "actual and well-founded

13  fear that [a] law will be enforced against him or her" may give rise to standing to bring

14  pre-enforcement claims under the First Amendment and that "self-censorship is 'a harm that can

15  be realized even without an actual prosecution'") (quoting Virginia v. Am. Booksellers Ass'n,

16  484 U.S. 383, 393 (1988)).

17     Therefore, the Court concludes that each of the Individual Plaintiffs has standing.

18                     **2.  Organizational Plaintiffs**

19     As each of the Individual Plaintiffs has standing, so too do the organizations they

20  represent.  An organization has standing where "(a) its members would otherwise have standing

21  to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

22  purpose; and (c) neither the claim asserted nor the relief requested requires the participation of

23  individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333,

24

1    343 (1977).  Each of the Organizational Plaintiffs satisfies these requirements.  Karnoski and

2    Schmid are members of HRC, GJL, and AMPA, and Muller, Stephens, and Winters are also

3    members of AMPA.  (Dkt. No. 130 at ¶ 3; Dkt. No. 131 at ¶ 5; Dkt. No. 133 at ¶ 5; Dkt. No. 135

4    at ¶ 4; Dkt. No. 136 at ¶ 4; Dkt. No. 140 at ¶ 3.)  The interests each Organizational Plaintiff seeks

5    to protect are germane to their organizational purposes, which include ending discrimination

6    against lesbian, gay, bisexual, transgender and queer ("LGBTQ") individuals (HRC and GJL)

7    and supporting families and allies of LGBT service members and veterans (AMPA).  (Dkt. No.

8    139 at ¶ 2; Dkt. No. 140 at ¶ 2; Dkt. No. 141 at ¶ 2.)

9         Therefore, the Court concludes that each of the Organizational Plaintiffs has standing.

10                    **3.   Washington**

11        Defendants claim that "Washington has not even attempted to satisfy its burden to

12   demonstrate standing," and that "in granting Washington's motion to intervene, the Court

13   expressly declined to decide whether Washington possessed standing to sue."  (Dkt. No. 194 at

14   12.)  To the contrary, the Court explicitly found that Washington had standing in its own right,

15   and not merely as an intervenor.  (Dkt. No. 103 at 11-12.)

16        A state has standing to sue the federal government to vindicate its sovereign and quasi-

17   sovereign interests.  See Massachusetts v. E.P.A., 549 U.S. 497, 518-520 (2007).  Sovereign

18   interests include a state's interest in protecting the natural resources within its boundaries.  Id. at

19   518-19.  Quasi-sovereign interests include its interest in "the health and well-being—both

20   physical and economic—of its residents," and in "securing residents from the harmful effects of

21   discrimination."  Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 607,

22   609 (1982).

23

24

1     Washington contends that the Ban will impede its ability to protect its residents and

2     natural resources and will undermine the efficacy of its National Guard.  (Dkt. No. 150 at 9-10.)

3     Washington is home to approximately 60,000 active, reserve, and National Guard members, and

4     the military is the second largest public employer in the state.  (Id. at 9.)  Washington is also

5     home to approximately 32,850 transgender adults, and its laws protect these residents against

6     discrimination on the basis of sex, gender, and gender identity.  (Id. at 9-10); RCW §§ 49.60.030;

7     49.60.040(25)-(26).

8         Washington relies on the National Guard to assist with emergency preparedness and

9     disaster recovery planning, and to protect the state's residents and natural resources from

10    wildfires, landslides, flooding, and earthquakes.  (Dkt. No. 150 at 9.)  When the Governor

11    deploys the National Guard for state active duty, Washington pays its members' wages and

12    provides disability and life insurance benefits for injuries they may sustain while serving the

13    state.  (Id.); RCW § 38.24.050.  The state also oversees recruitment efforts and exercises

14    day-to-day command over Guard members in training and most forms of active duty.  (Dkt. No.

15    170, Ex. A at 20.)  Further, the Governor must ensure that the Guard conforms to both federal

16    and state laws and regulations, including the state's anti-discrimination laws and, were the Ban to

17    be implemented, conflicting DoD policies regarding accession and retention.  (Dkt. No. 150 at

18    9-10; Dkt. No. 170, Ex. A at 21-22.)  Thus, in addition to diminishing the number of eligible

19    members for the National Guard, the Ban threatens Washington's ability to (1) protect its

20    residents and natural resources in times of emergency and (2) "assur[e] its residents that it will

21    act" to protect them from "the political, social, and moral damage of discrimination."  See

22    Snapp, 458 U.S. at 609.  Defendants have not offered any contrary evidence with respect to

23

24

1   Washington's sovereign and quasi-sovereign interests.  Therefore, the Court concludes that

2   Washington has standing.

3   **C.  Constitutional Violations**

4   Plaintiffs contend that the Ban violates equal protection, substantive due process, and the

5   First Amendment.  (Dkt. No. 129 at 15-28.)  Washington contends that the Ban violates equal

6   protection and substantive due process.  (Dkt. No. 150 at 13-23.)  Before it can reach the merits

7   of these constitutional claims, the Court must determine (1) the applicable level of scrutiny and

8   (2) the applicable level of deference owed to the Ban, if any.  The Court addresses each of these

9   issues in turn:

10  **1.  Level of Scrutiny**

11  At the preliminary injunction stage, the Court found that transgender people were, at

12  minimum, a quasi-suspect class.  (Dkt. No. 103 at 15-16.)  In light of additional evidence before

13  it at this stage, the Court today concludes that they are a suspect class, such that the Ban must

14  satisfy the most exacting level of scrutiny if it is to survive.

15  In determining whether a classification is suspect or quasi-suspect, the Supreme Court

16  has observed that relevant factors include:  (1) whether the class has been "[a]s a historical

17  matter . . . subjected to discrimination," Bowen v. Gilliard, 483 U.S. 587, 602 (1987); (2)

18  whether the class has a defining characteristic that "frequently bears [a] relation to ability to

19  perform or contribute to society," City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432,

20  440-41 (1985); (3) whether the class exhibits "obvious, immutable, or distinguishing

21  characteristics that define [it] as a discrete group," Bowen, 483 U.S. at 602; and (4) whether the

22  class is "a minority or politically powerless."  Id.; see also Windsor v. U.S., 699 F.3d 169, 181

23  (2d Cir. 2012), aff'd on other grounds, 570 U.S. 744 (2013).  While "[t]he presence of any of the

24

1  factors is a signal that the particular classification is 'more likely than others to reflect

2  deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective,'"

3  the first two factors alone may be dispositive.  Golinski v. U.S. Office of Pers. Mgmt., 824 F.

4  Supp. 2d 968, 983 (N.D. Cal. 2012) (quoting Pyler v. Doe, 457 U.S. 202, 216 n.14 (1982)).

5           The Court considers each of these factors in turn:

6                          **i.     History of Discrimination**

7           The history of discrimination and systemic oppression of transgender people in this

8  country is long and well-recognized.  Transgender people have suffered and continue to suffer

9  endemic levels of physical and sexual violence, harassment, and discrimination in employment,

10  education, housing, criminal justice, and access to health care.  (See Dkt. No. 169, Ex. A at

11  9-12.)  According to a nationwide survey conducted by the National Center for Transgender

12  Equality in 2015, 48 percent of transgender respondents reported being "denied equal treatment,

13  verbally harassed, and/or physically attacked in the past year because of being transgender" and

14  47 percent reported being "sexually assaulted at some point in their lifetime."  (Id. at 10.)

15  Seventy-seven (77) percent report being "verbally harassed, prohibited from dressing according

16  to their gender identity, or physically or sexually assaulted" in grades K-12.  (Id. at 10-11.)

17  Thirty (30) percent reported being "fired, denied a promotion, or experiencing some other form

18  of mistreatment in the workplace related to their gender identity or expression, such as being

19  harassed or attacked."  (Id. at 11.)  Finally, "it is generally estimated that transgender women

20  face *4.3 times the risk* of becoming homicide victims than the general population."  (Id. at 10

21  (emphasis in original).)

22

23

24

1

### ii.   Contributions to Society

2      Discrimination against transgender people clearly is unrelated to their ability to perform

3 and contribute to society.  See Doe 1, 275 F. Supp. 3d at 209 (noting the absence of any

4 "argument or evidence suggesting that being transgender in any way limits one's ability to

5 contribute to society"); Adkins v. City of New York, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015)

6 (noting the absence of "any data or argument suggesting that a transgender person, simply by

7 virtue of transgender status, is any less productive than any other member of society").  Indeed,

8 the Individual Plaintiffs in this case contribute not only to society as a whole, but to the military

9 specifically.  For years, they have risked their lives serving in combat and non-combat roles,

10 fighting terrorism around the world, and working to secure the safety and security of our forces

11 overseas.  (See, e.g., Dkt. No. 133 at ¶¶ 7-9; Dkt. No. 134 at ¶¶ 5-6; Dkt. No. 135 at ¶¶ 6-7; Dkt.

12 No. 136 at ¶¶ 6-7.)  Their exemplary service has been recognized by the military itself, with

13 many having received awards and distinctions.  (See Dkt. No. 131 at ¶ 15; Dkt. No. 133 at ¶ 12;

14 Dkt. No. 134 at ¶ 7.)

15

### iii.   Immutability

16      Transgender people clearly have "immutable" and "distinguishing characteristics that

17 define them as a discrete group."  Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of

18 Educ., 208 F. Supp. 3d 850, 874 (S.D Ohio 2016) (quoting Lyng v. Castillo, 477 U.S. 635, 638

19 (1986)).  Experts agree that gender identity has a "biological component," and there is a

20 "medical consensus that gender identity is deep-seated, set early in life, and *impervious to*

21 *external influences*."  (Dkt. No. 143 at ¶¶ 21-22 (emphasis added).)  In other contexts, the Ninth

22 Circuit has held that "[s]exual orientation and sexual identity" are "immutable" and are "so

23 fundamental to one's identity that a person should not be required to abandon them."

24

1    Hernandez-Montiel v. I.N.S., 225 F.3d 1087, 1093 (9th Cir. 2000), overruled on other grounds,

2    409 F.3d 1177 (9th Cir. 2005).

3                    **iv.    Political Power**

4            Despite increased visibility in recent years, transgender people as a group lack the

5    relative political power to protect themselves from wrongful discrimination.  While the exact

6    number is unknown, transgender people make up less than 1 percent of the nation's adult

7    population.  (Dkt. No. 143, Ex. B at 3 (estimating 0.3 percent)); see also Doe 1, 275 F. Supp. 3d

8    at 209 (estimating 0.6 percent).  Fewer than half of the states have laws that explicitly prohibit

9    discrimination against transgender people.  (Dkt. No. 169, Ex. A at 12.)  Further, recent actions

10   by President Trump's administration have removed many of the limited protections afforded by

11   federal law.  (Id. at 12-13.)  Finally, openly transgender people are vastly underrepresented in

12   and have been "systematically excluded from the most important institutions of

13   self-governance."  SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 484 (9th Cir.

14   2014).  There are no openly transgender members of the United States Congress or the federal

15   judiciary, and only one out of more than 7,000 state legislators is openly transgender.  (Dkt. No.

16   169, Ex. A at 14); see also Adkins, 143 F. Supp. 3d at 140.

17           Recognizing these factors, courts have consistently found that transgender people

18   constitute, at minimum, a quasi-suspect class.[8]  See, e.g., Doe 1, 275 F. Supp. 3d at 208-10;

19

20   _____

21           [8] The Ninth Circuit applies heightened scrutiny to equal protection claims involving
     discrimination based on sexual orientation.  SmithKline, 740 F.3d at 484; Latta v. Otter, 771
22   F.3d 456, 468 (9th Cir. 2014).  This reasoning further supports the Court's conclusion as to the
     applicable level of scrutiny, as discrimination based on transgender status burdens a group that
     has in many ways "experienced even greater levels of societal discrimination and
23   marginalization."  Norsworthy, 87 F. Supp. 3d at 1119 n.8; see also Adkins, 143 F. Supp. 3d at
     140 ("Particularly in comparison to gay people . . . transgender people lack the political strength
24   to protect themselves. . . .  [A]lthough there are and were gay members of the United States

1    Stone, 280 F. Supp. 3d at 768; Adkins, 143 F. Supp. 3d at 139-40; Highland, 208 F. Supp. 3d at

2    873-74; Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).  Today, the Court

3    concludes that transgender people constitute a suspect class.  Transgender people have long been

4    forced to live in silence, or to come out and face the threat of overwhelming discrimination.

5         Therefore, the Court GRANTS summary judgment in Plaintiffs' and Washington's favor

6    as to the applicable level of scrutiny.  The Ban specifically targets one of the most vulnerable

7    groups in our society, and must satisfy strict scrutiny if it is to survive.

8              **2.  Level of Deference**

9         Defendants claim that "considerable deference is owed to the President and the DoD in

10   making military personnel decisions," and that for this reason, Plaintiffs' and Washington's

11   constitutional claims necessarily fail.  (Dkt. No. 194 at 16.)

12        The Court previously found that the Ban—as set forth in President Trump's Twitter

13   Announcement and 2017 Memorandum—was not owed deference, as it was not supported by

14   "any evidence of considered reason or deliberation."  (Dkt. No. 103 at 17-18.)  Indeed, at the

15   time he announced the Ban, "all of the reasons proffered by the President for excluding

16   transgender individuals from the military were not merely unsupported, but were actually

17   *contradicted* by the studies, conclusions, and judgment of the military itself."  Doe 1, 275 F.

18   Supp. 3d at 212 (emphasis in original); see also Rostker v. Goldberg, 453 U.S. 57, 67-72 (1981)

19   (concluding that deference is owed to well-reasoned policies that are not adopted "unthinkingly"

20   or "reflexively and not for any considered reason"); Goldman v. Weinberger, 475 U.S. 503,

21   507-08 (1986) (concluding that deference is owed where a policy results from the "professional

22

23   _____

24   Congress . . . as well as gay federal judges, there is no indication that there have ever been any
     transgender members of the United States Congress or federal judiciary.")

ORDER ON PLAINTIFFS' AND WASHINGTON'S MOTIONS FOR SUMMARY JUDGMENT;
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 24

1    judgment of military authorities concerning the relative importance of a particular military

2    interest"); compare Owens v. Brown, 455 F. Supp. 291, 305 (D.D.C. 1978) (concluding that

3    deference is not owed where a policy is adopted "casually, over the military's objections and

4    without significant deliberation").

5           Now that the specifics of the Ban have been further defined in the 2018 Memorandum

6    and the Implementation Plan, whether the Court owes deference to the Ban presents a more

7    complicated question.  Any justification for the Ban must be "genuine, not hypothesized or

8    invented post hoc in response to litigation."  United States v. Virginia, 518 U.S. 515, 533 (1996).

9    However, the Court is mindful that "complex[,] subtle, and professional decisions as to the

10   composition . . . and control of a military force are essentially professional military judgments,"

11   reserved for the Legislative and Executive Branches.  Gilligan v. Morgan, 413 U.S. 1, 10 (1973).

12   The Court's entry of a preliminary injunction was not intended to prevent the military from

13   continuing to review the implications of open service by transgender people, nor to preclude it

14   from ever modifying the Carter Policy.

15          Defendants claim that the military has done just that, and that the Ban—as set forth in the

16   2018 Memorandum and the Implementation Plan—is now the product of a deliberative review.

17   In particular, Defendants claim the Ban has been subjected to "an exhaustive study" and is

18   consistent with the recommendations of a "Panel of Experts" convened by Secretary Mattis to

19   study "military service by transgender individuals, focusing on military readiness, lethality, and

20   unit cohesion," and tasked with "conduct[ing] an independent multi-disciplinary review and

21   study of relevant data and information pertaining to transgender Service members."  (See Dkt.

22   No. 226 at 9-10; Dkt. No. 224, Ex. 2 at 19.)  Defendants claim that the Panel was comprised of

23   senior military leaders who received "support from medical and personnel experts from across

24

1    the [DoD] and [DHS]," and considered "input from transgender Service members, commanders

2    of transgender Service members, military medical professionals, and civilian medical

3    professionals with experience in the care and treatment of individuals with gender dysphoria."

4    (Dkt. No. 224, Ex. 2 at 20.)  "Unlike previous reviews on military service by transgender

5    individuals," Defendants claim that the Panel's analysis was "informed by the [DoD]'s own data

6    obtained since the new policy began to take effect last year."  (Dkt. No. 224, Ex. 1 at 3.)  The

7    Panel's findings are set forth in a 44-page "Report and Recommendations on Military Service by

8    Transgender Persons," which concludes that "the realities associated with service by transgender

9    individuals are far more complicated than the prior administration or RAND had assumed," and

10   that because gender transition "would impede readiness, limit deployability, and burden the

11   military with additional costs . . . the risks associated with maintaining the Carter [P]olicy . . .

12   counsel in favor of" the Ban.  (Dkt. No. 224, Ex. 2 at 46.)

13        Having carefully considered the Implementation Plan—including the content of the

14   DoD's "Report and Recommendations on Military Service by Transgender Persons"—the Court

15   concludes that whether the Ban is entitled to deference raises an unresolved question of fact.

16   The Implementation Plan was not disclosed until March 29, 2018.  (See Dkt. No. 224, Exs. 1, 2.)

17   As Defendants' claims and evidence regarding their justifications for the Ban were presented to

18   the Court only recently, Plaintiffs and Washington have not yet had an opportunity to test or

19   respond to these claims.  On the present record, the Court cannot determine whether the DoD's

20   deliberative process—including the timing and thoroughness of its study and the soundness of

21   the medical and other evidence it relied upon—is of the type to which Courts typically should

22   defer.  See Fed. R. Civ. P. 56(e)(1).

23

24

1    Accordingly, the Court DENIES summary judgment as to the level of deference due.

2    The Court notes that, even in the event it were to conclude that deference is owed, it would not

3    be rendered powerless to address Plaintiffs' and Washington's constitutional claims, as

4    Defendants seem to suggest.  "'The military has not been exempted from constitutional

5    provisions that protect the rights of individuals' and, indeed, '[i]t is precisely the role of the

6    courts to determine whether those rights have been violated.'"  Doe 1, 275 F. Supp. 3d at 210

7    (quoting Emory v. Sec'y of Navy, 819 F.2d 291, 294 (D.C. Cir. 1987)); Chappell v. Wallace,

8    462 U.S. 296, 304 (1983) ("This Court has never held, nor do we now hold, that military

9    personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the

10   course of military service."); Rostker, 453 U.S. at 70 ("[D]eference does not mean abdication.").

11   Indeed, the Court notes that Defendants' claimed justifications for the Ban—to promote

12   "military lethality and readiness" and avoid "disrupt[ing] unit cohesion, or tax[ing] military

13   resources"— are strikingly similar to justifications offered in the past to support the military's

14   exclusion and segregation of African American service members, its "Don't Ask, Don't Tell"

15   policy, and its policy preventing women from serving in combat roles.  (Dkt. No. 224, Ex. 1 at

16   2-4; see also Dkt. No. 163, Ex. 1 at 8-16.)

17              **3.  Equal Protection, Due Process, and First Amendment Claims**

18       A policy will survive strict scrutiny only where it is motivated by a "compelling state

19   interest" and "the means chosen 'fit' the compelling goal so closely that there is little or no

20   possibility that the motive for the classification was illegitimate . . . prejudice or stereotype."

21   Grutter v. Bollinger, 539 U.S. 306, 333 (2003) (citation omitted).  In making this determination,

22   the Court must carefully evaluate "the importance and the sincerity of the reasons advanced" by

23   the government for the use of a particular classification in a particular context.  Id. at 327.

24

1    Whether Defendants have satisfied their burden of showing that the Ban is constitutionally

2    adequate (i.e., that it was sincerely motivated by compelling state interests, rather than by

3    prejudice or stereotype) necessarily turns on facts related to Defendants' deliberative process.

4    As discussed previously, these facts are not yet before the Court.  (See supra, § II.C.2.)  Further,

5    Defendants' responsive briefing addresses only the constitutionality of the Interim Guidance, a

6    document that has never been, and is not now, the applicable policy before the Court.  (See Dkt.

7    No. 194 at 19-24.)

8         For the same reasons it cannot grant summary judgment as to the level of deference due

9    at this stage, the Court cannot reach the merits of the alleged constitutional violations.

10   Accordingly, the Court DENIES summary judgment as to Plaintiffs' and Washington's equal

11   protection, due process, and First Amendment claims.

12   **IV.    Defendants' Motion for Partial Summary Judgment**

13        Defendants contend that the Court is without jurisdiction to impose injunctive or

14   declaratory relief against President Trump in his official capacity, and move for partial summary

15   judgment on all claims against him individually.  (Dkt. No. 194 at 25-27.)  Plaintiffs and

16   Washington do not oppose summary judgment as to injunctive relief, but respond that

17   declaratory relief against President Trump is proper.  (Dkt. No. 207 at 8-10; Dkt. No. 209 at 6-8.)

18        The Court is aware of no case holding that the President is immune from declaratory

19   relief—Rather, the Supreme Court has explicitly affirmed the entry of such relief.  See Clinton v.

20   City of New York, 524 U.S. 417, 425 n.9 (1998) (affirming entry of declaratory judgment

21   against President Clinton stating that Line Item Veto Act was unconstitutional); NTEU v. Nixon,

22   492 F.2d 587, 609 (1974) ("[N]o immunity established under any case known to this Court bars

23   every suit against the president for injunctive, declaratory or mandamus relief."); see also Hawaii

24

1    v. Trump, 859 F.3d 741, 788 (9th Cir. 2017) (vacating injunctive relief against President Trump,

2    but not dismissing him in suit for declaratory relief), vacated as moot, 874 F.3d 1112 (9th Cir.

3    2017).

4          The Court concludes that, not only does it have jurisdiction to issue declaratory relief

5    against the President, but that this case presents a "most appropriate instance" for such relief.

6    See NTEU, 492 F.2d at 616.  The Ban was announced by President Trump (@realDonaldTrump)

7    on Twitter, and was memorialized in the 2017 and 2018 Presidential Memorandums, which were

8    each signed by President Trump.  (Dkt. No. 149, Exs. 1, 2; Dkt. No. 224, Ex. 3.)  While

9    President Trump's Twitter Announcement suggests he authorized the Ban "[a]fter consultation

10   with [his] Generals and military experts" (Dkt. No. 149, Ex. 1), Defendants to date have failed to

11   identify even one General or military expert he consulted, despite having been ordered to do so

12   repeatedly.  (See Dkt. Nos. 204, 210, 211.)  Indeed, the *only* evidence concerning the lead-up to

13   his Twitter Announcement reveals that military officials were entirely unaware of the Ban, and

14   that the abrupt change in policy was "unexpected."  (See Dkt. No. 208, Ex. 1 at 9 (General

15   Joseph F. Dunford, Chairman of the Joint Chiefs of Staff stating on July 27, 2017 "Chiefs, I

16   know yesterday's announcement was unexpected . . ."); Dkt. No. 152, Ex. A at 11-12 ("The Joint

17   Chiefs of Staff were not consulted at all on the decision . . . The decision was announced so

18   abruptly that White House and Pentagon officials were unable to explain the most basic of

19   details about how it would be carried out.").)  Even Secretary Mattis was given only one day's

20   notice before President Trump's Twitter Announcement.  (Id.; Dkt. No. 163, Ex. 1 at 26.)  As no

21   other persons have ever been identified by Defendants—despite repeated Court orders to do so—

22   the Court is led to conclude that the Ban was devised by the President, and the President alone.

23

24

1    Therefore, the Court GRANTS Defendants' motion for partial summary judgment with

2    regard to injunctive relief and DENIES the motion with regard to declaratory relief.

3                                      **CONCLUSION**

4    The Court concludes that all Plaintiffs and Washington have standing; that the 2018

5    Memorandum and Implementation Plan do not moot their claims; and that transgender people

6    constitute a suspect class necessitating a strict scrutiny standard of review.  The Court concludes

7    that questions of fact remain as to whether, and to what extent, deference is owed to the Ban, and

8    whether the Ban, when held to strict scrutiny, survives constitutional review.

9    Accordingly, the Court rules as follows:

10   1.    The Court GRANTS Plaintiffs' and Washington's motions for summary judgment

11   with respect to the applicable level of scrutiny, which is strict scrutiny;

12   2.    The Court DENIES Plaintiffs' and Washington's motions for summary judgment

13   with respect to the applicable level of deference;

14   3.    The Court DENIES Plaintiffs' and Washington's motions for summary judgment

15   with respect to violations of equal protection, due process, and the First Amendment;

16   4.    The Court GRANTS Defendants' cross-motion for summary judgment with

17   respect to injunctive relief against President Trump and DENIES the cross-motion with respect

18   to declarative relief against President Trump.

19   5.    The preliminary injunction previously entered otherwise remains in full force and

20   effect.  Defendants (with the exception of President Trump), their officers, agents, servants,

21   employees, and attorneys, and any other person or entity subject to their control or acting directly

22   or indirectly in concert or participation with Defendants are enjoined from taking any action

23

24

1 | relative to transgender people that is inconsistent with the status quo that existed prior to

2 | President Trump's July 26, 2017 announcement.

3 | 6.      The Court's ruling today eliminates the need for Plaintiffs and Washington to

4 | respond to Defendants' Motion to Dissolve the Preliminary Injunction (Dkt. No. 223), which is

5 | hereby STRICKEN.

6 | 7.      The parties are directed to proceed with discovery and prepare for trial on the

7 | issues of whether, and to what extent, deference is owed to the Ban and whether the Ban violates

8 | equal protection, substantive due process, and the First Amendment.

10 | The clerk is ordered to provide copies of this order to all counsel.

11 | Dated April 13, 2018.

Marsha J. Pechman
United States District Judge