|   |   |
|---|---|
| RYAN KARNOSKI, et al., <br><br>                     Plaintiffs, <br><br>         v. <br><br> DONALD J TRUMP, et al., <br><br>                     Defendants. | CASE NO. C17-1297 <br><br> ORDER RE MOTION TO COMPEL THE GOVERNMENT'S WITHHELD COMMUNICATIONS WITH THIRD PARTIES (DKT. NO. 440); <br><br> REQUIRING PRODUCTION OF DOCUMENTS AFTER *IN CAMERA* REVIEW |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

This matter comes before the Court on Defendants' submission of documents for *in camera* review pursuant to the Court's Order on Plaintiffs' Motion to Compel the Government's Withheld Communications with Third Parties. (Dkt. Nos. 438, 454, 461, 462.) The Special Master, having reviewed the approximately 1,500 pages of documents the Government filed with the Court, and the Court having conferred with the Master, finds that the deliberative process privilege may only apply to one of the documents submitted for review: "Gender Dysphoria Medical Utilization Comparison Methodology With Summary of Results" ("PrivWithhold page

numbers 110-119 and its duplicate copies). Further, only the email chains attached as Exhibit 6 to the Carmichael Declaration (Dkt. No. 462) are protected by the attorney-client privilege and/or attorney work product. No other privileges were properly asserted. Accordingly, the Court ORDERS:

(1) Defendants to produce the documents bearing the Priv/Withhold page numbers of 1-109, 120-174, 185-357, 368-496, and 517-1414.

(2) Defendants will also produce the Easton Declaration (Dkt. No. 461) and the Carmichael Declaration (Dkt. No. 462), except for the documents in Exhibit 6;

(3) Defendants are required to provide additional information about the document entitled "Gender Dysphoria Medical Utilization Comparison Methodology with Summary of Results" (Priv/Withhold 110-119; Duplicates at 175-84, 357-67, 507-16), as to why this document should be considered privileged under the deliberative process privilege in a sealed pleading by May 20, 2020.

## Background

This case involves challenges to the Trump Administration's decision to bar transgender troops from serving or enlisting to serve in the United States Armed Forces ("Mattis policy"), effectively reversing the policy adopted in 2016 ("Carter policy"). In February, upon suspicion that the Government had erroneously asserted the deliberative process privilege and attorney-client privilege over communications with third parties, Plaintiffs identified 487 custodians from Defendants' privilege logs who were potential third parties and asked the Government to produce all communications with those third parties, as neither privilege would apply to those communications. (Dkt. No. 438 at 7.) In the alternative, Plaintiffs moved to compel the Government to revise its privilege logs to assert appropriate privileges over those

documents and provide sufficient information to allow Plaintiffs to assess the identities of the 487 custodians. (Id.) In response, the Government argued that its communications with those third parties are shielded by the "consultant corollary" doctrine, which states that communications with third parties solicited by the Government to aid in its decision-making process are privileged. All. For the Wild Rockies v. Pena, 2017 WL 8778579, at *4-5 (E.D. Wash. Dec. 12, 2017).

   The Court granted Plaintiffs' motion, and to the extent the Government claimed privilege, ordered a privilege log be prepared, and privilege-claimed documents be submitted for *in camera* review. Where the Defendants asserted the consultant corollary privilege, the Court ordered Defendants to establish that (1) the third party was contacted to assist the agency in its decision-making process; (2) "the consultant[] [was] hired or solicited by the agency to provide neutral advice and did not . . . 'represent . . . the interest of any other client, when it advise[d] the agency that hire[d] it.'" Friends of the Earth v. United States Army Corps of Eng'rs, 374 F. Supp. 3d 1045, 1054 (W.D. Wash. 2019) (quoting Department of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 11 (2001)); and (3) that any communications the Government seeks to protect are indeed deliberative and pre-decisional. (Dkt. No. 454 at 5.)

   The Government submitted approximately 1,500 pages of documents, representing communications from only 14 of the the 487 persons identified by Plaintiffs. The submitted documents fit into three categories: (1) The RAND Corporation ("RAND") documents relating to the preparation and release of the Carter policy and the RAND Report, both publicly released on June 30, 2016, (Dkt. No. 505 at 6); (2) the Kennell documents from Kennell & Associates ("Kennell"), a consulting group that assisted the DoD with the Carter policy and the subsequent Mattis policy; and (3) email chains attached to the Carmichael declaration. (Dkt. No. 462.)

1  Each page, except for the email chains attached to the Carmichael Declaration, bears a separate
2  page notation "PrivWithhold," which the Court will use to identify specific documents in the
3  analysis that follows.

4      **A. Rand Documents**

5  Defendants claim that there are 70 documents and communications between RAND and
6  DoD officials to which the deliberative process privilege should attach. (Easton Decl., ¶ 13.)
7  These documents bear the PrivWithhold page designations of 638-1414. Defendants twice
8  asserted the deliberative process privilege applies to the actual RAND Report, although it was
9  made available to the public. (Dkt. No. 505 at 5.) Indeed, one of the copies makes it clear that
10 the RAND Report could be purchased for $22.50. (See PrivWithhold 1245.)

11 As noted above, the RAND Report was released publicly on June 30, 2016, the same date
12 that the Carter policy was officially adopted. (Dkt. No. 505 at 7.) At some time during the
13 process of preparing the Carter policy, the Government decided that the RAND Report was
14 going to be made available to the public. The Government chose not to identify that date for the
15 Court. However, there are at least some clues.

16 For instance, Agnes Schaefer, the lead contact for RAND, wrote her DoD counterpart:

> I have begun to rework the transgender briefing per our discussion (please see
> attached file). I have reorganized the material into the new shell and I have begun
> to go through and eliminate the jargon, as well as boil down the findings so that
> they are less academic. <u>Knowing that these slides may go to a broader audience,
> the flavor of this revised briefing feels much better to me</u>. Look forward to
> talking with you in the morning.

(PrivWithhold 1106 (emphasis added).) A fair inference from this document is that at least as
early as February 2016, the DoD and the consultants were aware that the ultimate audience
would be greater than simply the DoD decision-makers. The document also suggests that as of
this date public release of the work was expected by both parties.

1    When asked about this, the Government asserts that it "understand[s] that language to
2    refer to a broader audience within DoD, not a broader audience of the public." (Dkt. No. 505 at
3    5.) The Court finds this unpersuasive because it fails to address Ms. Schaefer's goal of
4    eliminating "the jargon"; a broader audience within the DoD would be familiar with military
5    jargon and abbreviations. The Government has offered nothing from either RAND (with whom
6    it continues to do business) nor from the DoD to support its assertion.

7    The Government also contends that "[r]egarding the final version of the RAND Report,
8    that final document was published on the same date that the Carter policy went into effect, June
9    30, 2016. *See* DTM 16-005, "Military Service of Transgender Serrvice Members" (June 30,
10   2016), Dkt. 21-8. Defendants thus disagree that the Report itself was intended to be made public
11   prior to the formal adoption of the Carter policy." (Dkt. No. 505 at 7-8.)

12   The Government misses the point. Presumably at least by February 6, 2016, the
13   Government and RAND knew that the RAND Report was going to be made public, along with
14   the Carter policy. In fact, they were released the same day, a further indication that both
15   consultants and the government were aware of what the other was planning. Hence, the
16   underlying basis of the deliberative process privilege is not impacted by the release of any
17   RAND documents, at least those as early as February 2016.[1]

18   In an appeal in this case, the Ninth Circuit discussed the status of the deliberative process
19   privilege.

20   > The deliberative process privilege … still commands judicial consideration. We
21   > have held that '[a] litigant may obtain deliberative materials if his or her need for
22   > the materials and the need for accurate fact-finding override the government's
23   > interest in non-disclosure." (citing Warner). As the district court here correctly

---

[1] The February 2016 date is based upon the email referenced. If the Government has information that indicates an earlier or later date was when the DoD and the RAND consultants knew these works were going to be submitted to the public, it should file this information by **May 20, 2020**.

    recognized, we balance four factors in determining whether this exception to the deliberative process privilege is met "1) the relevance of the evidence: 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions."

Karnoski v. Trump, 926 F.3d 1180, 1206 (9th Cir. 2019). The Court held the first two factors favored plaintiffs but directed further review by this Court on the first[2] and fourth factor. As to the fourth factor, the Government has submitted only a boilerplate claim of harm:

> The release of DoD's communications with RAND and Kennell would have a harmful chilling effect on the DoD's future deliberations. The DoD decision-making process apparatus relies on open and candid conversations between DoD officials and nongovernmental consultants to address many of the difficult and complicated decisions that DoD faces. If such deliberations were disclosed, even pursuant to a protective order, DoD officials who interact with retained consultants would be less willing to engage in full and frank discussions about policy. Indeed, if DoD personnel knew that their thoughts, impressions, and opinions conveyed to contractors like RAND and Kennell would be open to scrutiny, they may hesitate to provide their true positions on potential sources of action out of concern that these discussions could be revealsed to wider audiences. The absence of such essential input from DoD personnel would degrade DoD's decision-making process and could expose the nations to greater overall risk.

(Easton Decl., ¶ 24.) This statement is the only "evidence" of harm submitted by the Government regarding the fourth Warner factor. There are at least five problems with the Government's position. First, it is so generic and non-specific as to be worthless. There is no attempt to relate these boilerplate assertions to this case. If this generic language and nothing more suffices, then under what circumstances could any claim of deliberative process privilege in any case be overcome?

---

[2] Plaintiffs have offered to withdraw their demands for the RAND documents if the Government enters into a stipulation regarding the Carter policy. (Dkt. No. 506 at 2.) If the Government accepts this stipulation, the issues regarding the RAND documents may become moot.

1     Second, the Government's claim of harm to the deliberative process is unsupported by evidence from any consultant in this case. This specifically ties into the fact that the release of the Carter policy and the RAND Report were being issued on the same date, with both sides aware that there would be public dissemination of both. This raises the question – why would RAND and the DoD be less than frank and candid with each other regarding the Carter policy and the RAND Report if they both knew each document was going to be publicly disseminated on the same day? Third, the government acknowledges that some policy briefings predating the release of the Carter policy and the RAND Report have already been produced. While this may not constitute a complete waiver, it highlights the expected public release of this information, thus undercutting the fundamental purpose of the deliberative process privilege. Fourth, a quick review of the earlier revisions of RAND drafts consist principally of editorial revisions. While typos might embarrass the RAND consultant, release is not likely to prevent RAND from giving the government its full frank and candid advice in the future. Finally, the copyright to the RAND Report is owned by RAND. It and other documents filed with the Library of Congress and that bear the Priv/Withhold number, identify RAND as the owner. As to these earlier versions and documents, the Government has not demonstrated that it has the standing to protect these from being disclosed.

    In sum, because it was known by all that the RAND Report and the Carter policy would be released publicly, the deliberative process privilege would not be harmed by the production of the RAND Report and related documents, including drafts. The fourth Warner factor does not prevent disclosure of these documents.

//

//

**B. Kennell Documents**

As discussed, Kennell is a consulting firm based in Falls Church, Virginia. It was asked to assist in cost analyses for the Carter policy. Later, it was asked to put together studies in a very short time frame to assist in the preparation of the Mattis policy. As part of its work on the Carter policy and RAND Report, Task Orders focused on cost issues were prepared both pre and post-dating the Carter policy and RAND Report. For the reasons set forth above, none of the documents created in furtherance of the Carter policy are properly withheld pursuant to the deliberative process privilege.

Kennell was also retained to assist the DoD in its work on the Mattis policy. The work appears to relate to the formulation of a statistically sound study, and assistance in the preparation of materials for a presentation to be made to DoD decision makers. Most of the email chains at issue involve questions regarding construction of a proper study, preliminary reports of data runs, and questions generated. None of these documents are privileged. First, most are not deliberative, but simply report information from the data runs. Second, they do not reach the level of high protection that the Court of Appeals addressed in this case, when it noted "[d]ocuments involving the most senior executives or branch officials, for example may require greater deference. (They may, of course, also be the most relevant.)" Karnoski, 926 F.3d at 1206. The email chains do not rise anywhere near this level. Third, to the extent that they simply report data run results, this is data and not deliberation.

The Government has suggested that some of these lower level documents may be protected by the Consultant's Corollary Doctrine ("CCD"). The CCD would require Defendants to show that "(1) the third party was contacted by the agency to assist it in its decision-making process; (2) the consultant [] [was] hired or solicited by the agency to provide advice and did not

… represent…the interest of any other client, when it advise[d] the agency that hire[d] it …; and (3) that any communications that the Government seeks to protect are indeed deliberative and predecisional." (footnote and citations omitted). The CCD does not shield these documents from disclosure because while elements 1 and 2 may be established in the record, the documents are not deliberative in any sense of the term. They report questions regarding limits and scope of a study, preliminary results of the study, and data. They do not involve the process of deliberation. They involve the process of data collection and reporting. Moreover, the CCD has not been recognized by the Ninth Circuit. Rojas v. Fed. Aviation Admin., 948 F.3d 952 (9th Cir. 2020).

However, one document may rise to the level of deliberative process privilege. That is the document entitled "Gender Dysphoria Medical Utilization Comparison Methodology with Summary of Results." (Priv/Withhold 110-119; Duplicates at 175-84, 357-67, 507-16.) While Defendants are not required to produce this document at this time, Defendants must provide an explanation for why the deliberative process privilege applies to this document in a sealed pleading filed not later than May 20, 2020.

**C.  Carmichael Declaration Documents Attached as Exhibit 6**

One of the 487 third party individuals identified by plaintiff was Amanda Samerson, who appears on several email chains. Defendants have established that she was a contract legal assistant providing support on discovery issues on behalf of the Department of Justice. Her presence on the email chain does not destroy the attorney-client privilege or the work product privilege associated with the email chain. The claim of privilege is sustained.

**Conclusion**

As directed by the Court of Appeals, the Court has applied a "granular" review of the documents claimed as privileged under the deliberative process privilege. Each individual

document has been reviewed. None of the documents so claimed fall within the confines of the deliberative process privilege, with the possible exception of the single document identified above. The Defendants will produce Priv/Withholding pages 1-109, 120-174, 185-357, 368-496, 517-1414 to plaintiffs not later than May 20, 2020. Defendants will provide further information on why Priv/Withhold document 110-119 should not be ordered produced not later than May 20, 2020. Defendants will produce copies of the Easton and Carmichael Declarations to plaintiffs (except Ex. 6 to Carmichael Declaration) not later than May 20,2020. Defendants claims of privilege relating to the email chain attached as Ex. 6 to the Carmichael Declaration are sustained.

The clerk is ordered to provide copies of this order to all counsel.

Dated May 12, 2020.

_____

Marsha J. Pechman
United States Senior District Judge