1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

10   RYAN KARNOSKI, et al.,                 CASE NO. C17-1297 MJP

11              Plaintiffs,                 ORDER RE (DKT. NOS. 497, 514,
                                            536, 540-42);
12         v.
                                            ESTABLISHING A TIMEFRAME
13   DONALD J TRUMP, et al.,                FOR ASSERTION OF THE
                                            DELIBERATIVE PROCESS
14              Defendants.                 PRIVILEGE;

15                                          REQUIRING DEFENDANTS TO
                                            REVIEW THEIR DELIBERATIVE
16                                          PROCESS PRIVILEGE CLAIMS
                                            AND PRODUCE THOSE THAT
17                                          ARE NOT PREDECISIONAL OR
                                            DELIBERATIVE
18

19
20        This matter comes before the Court upon the Parties' Joint Submission Regarding

21   Defendants' Deliberative Process Privilege Claims (Dkt. No. 497).  Having reviewed the 850

22   documents submitted pursuant to the Court's Orders on the Joint Submission (Dkt. No. 514,

23   536), the Parties' responses to the questions posed by the Court (Dkt. Nos. 540-42), and two

24   earlier *in camera* document reviews, the Court finds and ORDERS:

(1) Defendants must produce all documents where the privilege category is designated with "N" in the spreadsheets attached to this Order by **July 22, 2020**.  As to those documents where the privilege category is marked "Y", the Court is satisfied that a *prima facie* case of deliberative process privilege ("DPP") privilege has been established, subject to a possible further review under the balancing test set out in FTC v. Warner Commc'ns Inc., 742 F.2d 1156, 1161 (9th Cir. 1984);

(2) Defendants will review their list of approximately 35,000 documents withheld solely on the basis of DPP and apply the temporal filter of July 13, 2015 through June 30, 2016 (Carter policy) and September 14, 2017 through January 11, 2018 (Mattis policy).  All documents falling outside of these two timeframes and withheld solely pursuant to the a DPP claim will be produced by **July 29, 2020**.  The only exception shall be any documents specifically subject to the pending appeal to the Ninth Circuit. The temporal time filter will also apply to the documents withheld on the basis of other privileges in addition to a DPP claim, and the Defendants shall delete DPP as a claim for withholding the documents that fall outside of this time frame.

(3)  Not later than **July 29, 2020**, the Defendants will filter the remaining documents withheld solely under a DPP claim, and file a privilege log of documents relating to those documents that fall within the designated time frames.

(4) Not later than **July 22, 2020**, the Defendants will produce paper copies of 500 documents submitted for *in camera* review that are not considered privileged as indicated in Attachment 2 to this Order, so the Court can review these documents to satisfy the "deliberative" test.  The documents will each bear the "PrivWithhold"

number on the bottom of the document corresponding to the "PrivWithhold"

designation in the privilege log submitted to the Court.

**Background**

In this ongoing discovery dispute, the Government has withheld approximately 50,000 documents from production claiming they are exempt from disclosure, at least in part, pursuant to the deliberative process privilege ("DPP").  Within these 50,000 documents, a subset of approximately 35,000 has been withheld *solely* on the basis of a DPP claim.  To test whether the Government has been properly asserting the DPP privilege, the Parties and the Court devised a process where 1% (350) of the documents withheld solely on a DPP claim were randomly selected and sent to the Court for an *in camera* review.  (See Dkt. Nos. 497, 514.)  After reviewing the first submission of 350 documents, and due to a problem of overreach in the claim of DPP privilege, the Court ordered the Government to submit another batch of 500 randomly selected documents for *in camera* review, in order to test the extent of Defendants' assertion of the privilege.  (Dkt. No. 536.)

The Court has had difficulty with the Government's over-assertion of the DPP in the past.  On two prior occasions, the Court has reviewed, with the assistance of the Special Master, more than 3,500 pages of documents, withheld for privilege claims, including the DPP.  In very few instances was the Government's assertion of the DPP sustained.

In light of the enormous task remaining before the Parties and the Court on this issue of privilege, the Court is setting out discovery standards to be followed relating to the remaining approximately 48,000 documents to which a DPP claim has been asserted.  This Order will describe the boundaries for documents that are presumptively not entitled to DPP protection.  The Order will deal specifically with the 850 random DPP-claimed documents submitted for *in*

*camera* review.  Finally, the Government will be directed to review its DPP claims for the remaining approximately 48,000 documents, and remove its claim of DPP protection from those documents that do not reach the *prima facie* threshold described in this Order, and to produce the documents not reaching this threshold to the Plaintiffs.

### Discussion

The DPP applies to protect the decision-making process.  To qualify, "a document 'must be *both* (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which policies are formulated.'"  National Wildlife Federation v. U.S. Forest Service, 861 F. 2d 1114, 1117 (9th Cir. 1988) (citation omitted, emphasis in original).  For the reasons that follow, the Court finds that the Government has asserted the DPP over many documents that do not meet this definition.

### A.  Predecisional

Before a document can be withheld pursuant to the DPP, it must be predecisional.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151-52 (1975) (explaining the privilege applies "prior to the time the decision is made" and not to "communications made after the decision and designed to explain it"); Lahr v. NTSB, 569 F.3d 964, 981 (9th Cir. 2009) (noting "we have rejected the argument that a continuing process of agency self-examination is enough to render a document 'predecisional,'" instead, "[t]he documents must be prepared to assist an agency decision-maker in arriving at a future particular decision") (internal quotations and citations omitted); Fishermen's Finest, Inc. v. Gutierrez, No. C07-1574MJP, 2008 WL 2782909, at *2 (W.D. Wash. July 15, 2008) ("A document that was prepared to support a decision already made is not predecisional.").  But, what, then, is predecisional in this case?

1    The Government appears to make the claim that because certain individuals began to

2    consider transgender policies in March 2014, and because policies continue to change even

3    today, the predecisional date begins in March of 2014, and everything since that date to the

4    present remains predecisional.  The Court rejects this reasoning, because the analysis fails to

5    focus on the specific policies at issue in this litigation.  The Government's position reads the

6    DPP "predecisional" requirement out of existence.

7    There are two policies at issue in this case: (1) The Carter policy which permitted

8    transgender service members to enlist and serve in the U.S. Military; and (2) the Mattis policy

9    which reversed the Carter policy.  While these two decisions resulted in a number of spin-off

10   plans designed to execute and implement the two underlying policies, the fundamental issue

11   being challenged by Plaintiffs is the reversal of the Carter policy in favor of the Mattis policy.

12   The implementation and execution plans are simply secondary to the policy switch.  As a result,

13   for purposes of determining the "predecisional" and "post-decisional" timeframes for *prima facie*

14   applicability of DPP, the timeframe around these two policy decisions is paramount.

15   For discovery purposes, documents outside the predecisional timeframe for these

16   decisions are presumptively not subject to the DPP.  In <u>National Wildlife</u>, <u>supra</u>, the court

17   recognized that there may be instances in which production of documents after the policy might

18   provide a roadmap as to the actual decision-making process, which could otherwise protect those

19   documents.  This is because the focus of the DPP is to protect the decision-making process.   In

20   reviewing the 850 documents submitted for DPP examination, the Court could identify but a

21   handful of documents as to which this could be seriously asserted.  However, as explained

22   below, the handful of these documents will continue to be protected under protective order with

23   claw back provisions in the process described.

24

1    The Court is exercising its discretion to manage discovery in this manner, for several

2    reasons.  First, this is consistent with the pleadings in this case, and as analyzed by the Ninth

3    Circuit in the previous appeal.  Second, based upon the Court's examination of four batches of

4    documents submitted for *in camera* review (approximately 8,813 pages of documents), the Court

5    finds that the Government has consistently been overbroad in asserting the DPP.

6    Third, the Government fails to segregate portions of documents which may be partially

7    protected by the DPP from those that are not, despite its obligation to do so.  See Karnoski v.

8    Trump, 926 F.3d 1180, 1204 (9th Cir. 2019) (quoting Army Times Publ'g Co. v. Dep't of Air

9    Force, 998 F.2d 1067, 1071 (D.C. Cir. 1993)) ("Unlike the presidential communications

10   privilege, the deliberative process privilege does not protect documents in their entirety; if the

11   government can segregate disclosed non-privileged factual information within a document, it

12   must.").  Thus far, the Government has not performed any segregation, instead simply tossing

13   this responsibility to the Court.

14   Fourth, the Government claims that 50,000 documents are covered by the DPP and other

15   privileges, and of that quantity, 35,000 are subject to the DPP and no other privilege.  Yet after

16   making a random selection of 500 documents for *in camera* inspection, the Government

17   acknowledged that 90 of the randomly selected documents (or 18% of the total) were not subject

18   to a proper DPP claim.  (Dkt. No. 542 n. 1.)  The Government produced these 90 documents to

19   Plaintiffs and then chose an additional 90 documents to submit to the Court for review.  This

20   does not give the Court much, if any, confidence that the Government is properly asserting the

21   DPP privilege, a concern that is amplified by the earlier poor showing on its DPP claims.

22   Finally, the Court opts for this arrangement because all documents produced will still be

23   subject to the protective order in place, and if it turns out that some documents falling outside the

24

1   predecisional and post-decisional date ranges are properly the subject of the DPP, specific

2   documents can be brought to the Court's attention on subsequent motion.  The Order includes a

3   claw-back provision for documents produced erroneously.  This decision is made for discovery

4   rather than for trial purposes.  Accordingly, as a discovery management tool, the Court sets the

5   following pre and post-decisional dates to establish a framework for evaluating the

6   Government's DPP assertions.

7          1.   Carter Policy

8          As to the Carter policy, on July 13, 2015, then-Secretary Carter announced the military

9   would begin to study the implications of allowing transgender troops to serve in the military.

10  (Dkt. No. 540, Ex. 14).  A working group was formed on July 28, 2015 to formulate a policy

11  decision on use of transgender troops.  (Dkt. No. 540, Ex. 15.)  The work of the committee was

12  completed and on June 30, 2016, Secretary of Defense Carter formally announced the new

13  policy.  (Dkt. No. 540, Ex. 12; Dkt. No. 542 at 7; Dkt. No. 505 at 7.)  This Court previously

14  ordered production of certain earlier Carter-policy documents on the grounds that it appeared

15  that the Department of Defense ("DOD") and RAND contemplated that the underlying RAND

16  studies would be published contemporaneously with the announcement of the Carter policy.

17  (Dkt. No. 540, Ex. 12; Dkt. No. 542 at 7; Dkt. No. 505 at 7.)  The Court found that the policy

18  was in effect before the public announcement, based on emails from February of that year

19  between the lead contact for RAND and her DoD counterpart discussing the public

20  announcement of the new policy.  (Dkt. No. 509 at 4 (citing PrivWithhold 1106).)  The practical

21  effect of this is to back up the post-decisional date of the Carter policy to February 6, 2016.

22  However, for purposes of this discovery management tool, the Court will use the announcement

23

24

1  date of the Carter policy – June 30, 2016 – to define the end of the predecisional time frame

2  relating to the Carter policy.

3      Thus, only documents within the date range July 13, 2015 through June 30, 2016  are

4  presumptively predecisional, and therefore subject to a proper DPP claim regarding the Carter

5  policy.  As a result, documents created prior to July 13, 2015 are presumptively not considered

6  pre-decisional regarding the Carter policy.  Documents created after June 30, 2016 are

7  presumptively considered post-decisional.  Just as the Court previously concluded, the end date

8  of the "predecisional" time frame may ultimately be backed up by applying the fourth factor of

9  the Warner test – an issue to be resolved at a later point.

10      2.  Mattis Policy

11      Secretary Mattis formed his working panel to consider the issues surrounding use of

12  transgender troops on September 14, 2017.  (Dkt. No. 542 at 8.)  And the Government has long

13  taken the position that the Panel's recommendations, issued on January 11, 2018, "were adopted

14  in their entirety by then-Secretary of Defense James Mattis."  (Dkt. No. 414-1, Pet. for

15  Mandamus at 8.)  When the Court asked the Government whether "the decision had been made"

16  once the Panel sent over its recommendations to the Office of the Secretary of Defense, the

17  Government responded that yes, at that point, "the final decision was made."  (Dkt. No. 402, Tr.

18  28:16-17, 19.)  As a result, documents created before September 14, 2017 are presumptively not

19  predecisional, and documents created after January 11, 2018 are presumptively post-decisional.

20      Although Plaintiffs have argued  that the Government adopted the challenged policy no

21  later than August 25, 2017, when the President issued a memorandum that formalized his July

22  26, 2017 Tweets banning transgender military service and ordered the military to implement that

23  policy (Dkt. No. 540 at 6), because the President's March 23, 2018 Presidential Memorandum

24

REQUIRING DEFENDANTS TO REVIEW THEIR DELIBERATIVE PROCESS PRIVILEGE CLAIMS AND
PRODUCE THOSE THAT ARE NOT PREDECISIONAL OR DELIBERATIVE - 8

1    revoked his 2017 Memorandum and because the Ninth Circuit determined that "the 2018 Policy

2    is a significant change from the 2017 Memorandum" Karnoski v. Trump, 926 F.3d 1180,

3    1189-92, 1202 (9th Cir. 2019), the Court's focus here is on the adoption of the Mattis policy.

4         Therefore, in the Government's privilege log, only documents that fall within the date

5    ranges of July 13, 2015 to June 30, 2016 (Carter policy) and September 14, 2017 to January 11,

6    2018 (Mattis policy) are presumptively predecisional and entitled to possible DPP protection.

7         **B. Deliberative**

8         In the Ninth Circuit, the DPP applies "whenever the unveiling of factual materials would

9    be tantamount to the 'publication of the evaluation and analysis of the multitudinous facts'

10   conducted by the agency." Nat'l Wildlife, 861 F.2d at 1119 (citations omitted).  In National

11   Wildlife, the court confronted the issue of whether a document was deliberative or merely

12   factual.  The plaintiff argued that because certain information in an Environmental Impact

13   Statement ("EIS") was factual, rather than opinion, the document was not subject to a proper

14   DPP claim.  The Ninth Circuit held this distinction was too narrow.  Instead, the court held that

15   the analysis of whether a document was protected or not from disclosure should focus on the

16   "*deliberative process.*"  Id. at 1118 (emphasis in original).  Under this approach, nonbinding

17   recommendations on law or policy would be exempt from disclosure.  Factual material would be

18   exempt from disclosure to the extent that it revealed the mental processes of decisionmakers.

19   Ultimately, the court held that draft Environmental Impact Statements and "previews" were

20   subject to the DPP and concluded they were "predecisional" because they were drafts, subject to

21   change, and that disclosure would reveal the deliberative process of the Forest Service.

22        In this case, many of the documents submitted by the Government for *in camera* review

23   contain no deliberative process thoughts or opinions.  Instead, many fall into the "factual" arena.

24

REQUIRING DEFENDANTS TO REVIEW THEIR DELIBERATIVE PROCESS PRIVILEGE CLAIMS AND
PRODUCE THOSE THAT ARE NOT PREDECISIONAL OR DELIBERATIVE - 9

1    Moreover, these "factual" documents do not amount to "previews" of the policies or otherwise

2    reveal the deliberative thought process of the Department of Defense.  Even if the documents

3    could be at least partially so classified, the Government has not sought to segregate any portions

4    of the documents which express an opinion (potentially protectible) from the facts portion of the

5    documents (generally not protectible, unless revealing thought processes), as required.  In the

6    attached analysis of DPP-claimed documents, those which fall into this "factual" arena, or which

7    are not otherwise substantive and thus not subject to DPP protection, are labelled "not

8    deliberative," and the privilege category is marked with "N" in the attachment to this Order.[1]

9         In the second batch of 500 documents submitted to the Court for *in camera* review, the

10   paper documents sent to the Court lacked corresponding identifying Bates numbers

11   corresponding to the privilege log.  The Special Master spent several hours attempting to use or

12   find certain identifying characteristics on the documents to match up with the privilege log.

13   Ultimately, the Special Master concluded that the second batch should simply be filtered on the

14   basis of disqualifying dates as set forth above.  For documents falling outside the date range as

15   described on the privilege log, the document was denied DPP status as being "Not

16   predecisional."  The Special Master could not conduct a "deliberative" process review.  For all

17   documents that fell within the time frame that defines the DPP in this case, no determination of

18   privilege could be made.  This does not require that all documents be sent to the Court with

19   appropriate PrivWithhold Bates numbers.  It does, however, require that the Government submit

20

21   _____

22   [1] The Court began its work by declaring some of the documents "not predecisional" and "not deliberative."  As the
     review continued, the Court stopped undertaking a dual analysis.  The Court only examined whether a document
23   was "deliberative" or "Not deliberative" after a predecisional determination had been made.  The Parties should not
     assume that because a document was determined to be "predecisional" that the absence of comment that the
24   document is "not deliberative" is a determination that the document was, in fact "deliberative."  To qualify for DPP
     protection, a document must be both predecisional and deliberative.

REQUIRING DEFENDANTS TO REVIEW THEIR DELIBERATIVE PROCESS PRIVILEGE CLAIMS AND
PRODUCE THOSE THAT ARE NOT PREDECISIONAL OR DELIBERATIVE - 10

1    properly labelled copies of the documents with appropriate Bates labels for those documents as

2    to which no ruling is reflected on Attachment 2.

3                                              **Conclusion**

4            After conducting an *in camera* review of the randomly selected sample of documents the

5    Government has withheld solely on the basis of the DPP, the Court finds that Defendants have

6    broadly over-asserted the privilege.  The Court therefore ORDERS Defendants to produce

7    documents, as indicated in the attachment to this Order.  As to those documents where the

8    privilege category is designated with "N", the Government is required to produce these

9    documents not later than **July 22, 2020**.  As to those documents where the privilege category is

10   marked "Y", the Court is satisfied that a *prima facie* case of DPP privilege has been established.

11   Further, Defendants must produce all documents that fall outside the date ranges of July 13, 2015

12   to June 30, 2016 (Carter policy) and September 14, 2017 to January 11, 2018 (Mattis policy) and

13   all documents or portions of documents that are purely factual by **July 29, 2020**.

14           This Order does not reach the issue of whether Plaintiffs can overcome Defendants'

15   privilege assertions under the factors described in <u>Warner</u>, 742 F.2d at 1161, but the Court will

16   entertain future briefing from the Parties as to specific documents the Government continues to

17   withhold after complying with this Order.  The Court will also review additional documents *in*

18   *camera* if necessary to determine the accuracy of the Government's privilege claims.

19

20           The clerk is ordered to provide copies of this order to all counsel.

21           Dated July 15, 2020.

22

23

24                                              Marsha J. Pechman
                                                United States Senior District Judge

REQUIRING DEFENDANTS TO REVIEW THEIR DELIBERATIVE PROCESS PRIVILEGE CLAIMS AND
PRODUCE THOSE THAT ARE NOT PREDECISIONAL OR DELIBERATIVE - 11