UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RYAN KARNOSKI, et al.,<br><br>                Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>                Defendants. | CASE NO. C17-1297 MJP<br><br>ORDER DENYING MOTION TO QUASH THIRD-PARTY SUBPOENAS ISSUED TO GENERAL PAUL J. SELVA (DKT. NO. 556)<br><br>SECRETARY ROBERT WILKIE JR. (DKT. NO. 557);<br><br>SECRETARY JAMES N. MATTIS (DKT. NO. 558);<br><br>ADMIRAL WILLIAM F. MORAN (DKT. NO. 591) |

    THIS MATTER comes before the Court on Defendants' motions to quash third-party subpoenas issued to General Paul J. Selva (Dkt. No. 556), Secretary Robert Wilkie Jr. (Dkt. No. 557), Secretary James N. Mattis (Dkt. No. 558), and Admiral William F. Moran (Dkt. No. 591). Having reviewed the Motions, the Responses (Dkt. Nos. 577, 582, 587, 594), the Replies (Dkt. Nos. 578, 584, 589, 595), and the related record, the Court DENIES the Motions.

**Background**

Plaintiffs filed this action on August 28, 2017, following President Trump's July 2017 tweet announcing that transgender individuals would not be allowed to serve in the military and the President's August 2017 Memorandum implementing that announcement. The President's announcement reversed the year-old policy announced by then-Secretary of Defense Ashton Carter allowing transgender individuals to serve openly in the military.

In their initial complaint, Plaintiffs alleged that President Trump made his announcement without engaging in "any meaningful study, deliberation, or consultation with key military officials," providing then-Secretary of Defense James N. Mattis with only one day's notice of the decision and making his announcement while the Secretary was on vacation. (Dkt. No. 1 ("Compl.") ¶ 102.) Pointing to several statements from the President's political advisors, Plaintiffs also alleged that the President's announcement was meant to bolster his political standing and was divorced from any consideration of military needs. (Id. ¶¶ 103-06, 110-11.)

After this lawsuit and four related suits were filed, the DoD began developing a "plan to implement the policy and directives in the Presidential Memorandum." (Dkt. No. 587, Ex. 9 ("Mattis Memorandum"); Doe 1 v. Trump, 275 F. Supp. 3d 167, 177 (D.D.C. 2017); Stone v. Trump, 280 F. Supp. 3d 747, 769 (D. Md. 2017); Stockman v. Trump, No. EDCV 17-1799 JGB (KKx), 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017). One of the central questions the Court must evaluate is whether the resultant policy was "dictated" by the President and therefore "preordained," or whether it is the product of independent military judgment, separate and apart from the President's Tweet. Karnoski v. Trump, 926 F.3d 1180, 1201-02 (9th Cir. 2019); (See, e.g., Dkt. No. 575 at 10, Ex. E at 17; Dkt. No. 587 at 12-36.)

1     On September 14, 2017, the same day Plaintiffs filed their Motion for a Preliminary

2 Injunction, Secretary Mattis promised to "present the President with a plan to implement the

3 policy and directives in the Presidential Memorandum" no later than February 21, 2018 and

4 issued "Interim Guidance" providing that the pre-2016 policies prohibiting the accession of

5 transgender individuals into the military would remain in effect.  Secretary Mattis directed

6 General Paul Selva, then the Vice Chair of the Joint Chiefs of Staff ("VCJCS") and the Deputy

7 Secretary of Defense Patrick Shanahan "to lead the Department of Defense (DoD) in developing

8 an Implementation Plan on military service by transgender individuals, to effect the policy and

9 directives in Presidential Memorandum[.]"  (Dkt. No. 587, Ex. 11 at 1.)  General Selva and

10 Deputy Secretary Shanahan would be supported by a panel of experts comprised of the "Military

11 Department Under Secretaries, Service Vice Chiefs, and Service Senior Enlisted Advisors," who

12 reported directly to them.  (Id.)  The Panel held its first meeting on October 13, 2017.

13     On December 15, 2017 the Panel presented its Final Report to General Selva and Deputy

14 Secretary Shanahan.  (Dkt. No. 577 at 16.)  One observer to the briefing later wrote to the

15 Secretary of the Navy:

16 > General Selva doesn't believe SECDEF can defend the recommendations on the Hill or before the press.  [Deputy Secretary Shanahan] believes that given the competitive
17 > economy we need to compete for all people who can do the job and we need to be clear on the standards we expect – if you can meet them, regardless of what class of person you
18 > identify with, then you should be acceptable for military service.

19 (Id. (citing id., Ex. No. 2 at 1.).)  The Panel's recommendation was rejected.  Due to decisions

20 made by the four subpoenaed witnesses and the Parties' long-standing discovery dispute, the

21 process that followed is particularly opaque.

22     After the Panel's recommendations were rejected, the Panel met four more times without

23 recording any meeting minutes.  (Dkt. No. 576, Ex. 14.)  Then on January 11, 2018, the

24

ADMIRAL WILLIAM F. MORAN (DKT. NO. 591) - 3

1  Undersecretary of Defense for Personnel and Readiness, Robert Wilkie, conveyed a one-and-a-half-page memorandum to Secretary Mattis that once again included the Panel's recommendations, which were identical to the recommendations that were previously rejected. (See, e.g., Dkt. No. 576, Ex. 20 at 1.) A month later, on February 22, 2018, the DoD issued a 44-page anonymous Report and Recommendation. In response to a discovery request, Defendants have now provided Plaintiffs with a list of the 53 individuals who took part in drafting the Report. (Dkt. No. 576, Ex. 13 at 11-13.) This list includes 25 Department of Justice lawyers, two of whom have entered appearances in this case. (Id.; Dkt. No. 96)

Other than the basic framework described above, Plaintiffs have little insight into the decision to delay implementation of the Carter policy, the initial rejection of the Panel's recommendations, the Panel's final four meetings, the decision-making process about what data was provided to the Panel, or the process used in drafting the Report and Recommendation. (See, e.g., Dkt. No. 594 at 13-17.) In large part, this is due to the Parties' years-long discovery dispute and Defendants' pending mandamus petition that seeks relief from the Court's Order requiring production of documents or communications relating to "Secretary of Defense Ash Carter's Directive Type Memo 16-005," and "Documents or Communications relating or referring to the February 2018 Department of Defense Report and Recommendations." (Dkt. No. 398 at 2-3; Dkt. No. 402 at 34:19-20.) Plaintiffs therefore seek to depose General Paul J. Selva, Secretary Robert Wilkie Jr., Secretary James N. Mattis, and Admiral William F. Moran, third-party witnesses who were personally involved in the decision to delay implementation of the Carter Policy, oversaw or served on the Panel, or worked on the DoD's Report and Recommendation. Defendants have moved to quash the subpoenas of these witnesses based on the apex doctrine.

1 **Discussion**

2   Under the judicially created apex doctrine "[h]eads of government agencies are not normally subject to deposition," especially where the information sought can be obtained through another witness or method. Kyle Eng'g Co. v. Kleppe, 600 F.2d 226, 231 (9th Cir. 1979); See also Jay E. Grenig, Jeffrey S. Kinsler Handbk. Fed. Civ. Disc. & Disclosure, § 1:70.50 (4th ed.).

  The need for controlling the use of subpoenas against high-ranking government officials was first recognized by the Supreme Court in United States v. Morgan, 313 U.S. 409, 421-22 (1941), where the Court held that allowing the Secretary of Agriculture's deposition interfered with the independence of the administrative process. Since Morgan, the apex doctrine has been applied widely to protect the time and decision-making processes of high-ranking government officials. See, e.g., In re U.S., 197 F.3d 310, 314 (8th Cir. 1999); In re United States (Kessler), 985 F.2d 510, 512 (11th Cir.1993) (per curiam); In Re Office of Inspector General, 933 F.2d 276, 278 (5th Cir.1991); Simplex Time Recorder Co. v.. Secretary of Labor, 766 F.2d 575, 586 (D.C.Cir.1985).

  Further, "the general rule prohibiting depositions of high-ranking government officials also applies to former high-ranking officials." Thomas v. Cate, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010), order clarified, No. 1:05CV01198LJOJMDHC, 2010 WL 797019 (E.D. Cal. Mar. 5, 2010). "Subjecting former officials decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." United States v. Wal-Mart Stores, Inc., No. CIV.A. PJM-01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002) ("If the

immunity Morgan affords is to have any meaning, the protections must continue upon the official's departure from public service.").

In sum, "Morgan has come to stand for the notion that as for high-ranking government officials, their thought processes and discretionary acts will not be subject to later inspection under the spotlight of deposition. Decision-makers enjoy a mental process privilege." United States v. Wal-Mart Stores, Inc., No. CIV.A. PJM-01-1521, 2002 WL 562301, at *1 (D. Md. Mar. 29, 2002). "But this limitation is not absolute." Bogan v. City of Bos., 489 F.3d 417, 423 (1st Cir. 2007). The courts will require the high-ranking official to submit to deposition in litigation not specifically directed at his conduct if: 1) extraordinary circumstances are shown; or 2) the official is personally involved with the matter in a material way. United States v. Wal-Mart Stores, Inc., No. CIV.A. PJM-01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002).

In each of their four motions, Defendants argue that: (1) depositions are especially inappropriate in this case given the deference owed to military judgments, (2) the information Plaintiffs seek is privileged, and (3) Plaintiffs cannot establish exceptional circumstances justify taking the depositions. (See Dkt. Nos. 575, 580, 585, 592.) The Court addresses each argument in turn.

**A.  Military Deference**

Defendants argue that the rationale for the apex doctrine applies with particular force in the military setting, where "[t]he Supreme Court has recognized that '[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.'" (See, e.g., Dkt. No. 575 at 21 (quoting Rostker v. Goldberg, 453 U.S. 57, 71 (1981)). According to Defendants, "even testimony that 'contradict[s]' the reasons behind a military policy would be 'quite beside the

1  point,' so long as the policy had been 'decided by the appropriate military officials" in 'their

2  considered professional judgment.'" Goldman v. Weinberger, 475 U.S. 503, 509.  But

3  Defendants' argument highlights the very reason Plaintiffs are seeking to depose these four

4  witnesses: to determine whether the policy has been decided by the appropriate military officials.

5  (See, e.g., Dkt. No. 582 at 7.)

6  Additionally, while the Court is required to apply "appropriate military deference to its

7  evaluation of the 2018 Policy," "'deference does not mean abdication'" and "Defendants bear the

8  burden of establishing that they reasonably determined the policy 'significantly furthers' the

9  government's important interests, and that is not a trivial burden." Karnoski v. Trump, 926 F.3d

10 1180, 1202 (9th Cir. 2019) (quoting Witt, 527 F.3d at 821).  Further, Plaintiffs are permitted to

11 "present evidence to support their theory that 'the 2018 Policy was nothing more than an

12 implementation of the 2017 Memorandum, or that the review that produced the 2018 Policy was

13 limited to this purpose.'" Id.  Thus, even where Defendants are entitled to deference, Plaintiffs

14 must be permitted to obtain evidence in support of their theory through the discovery process,

15 including through the depositions of relevant witnesses.

16 **B.  Privileged Information**

17 Defendants next argue that the subpoenas should be quashed because any information

18 that Plaintiffs seek regarding deliberations outside of the Panel's development of the policy are

19 protected by the deliberative process privilege and questions about communications with the

20 President are subject to the presidential communications privilege.  (See, e.g., Dkt. No. 585 at

21 27-29.)  As Plaintiffs note, Defendants cite no authority allowing a court to quash a deposition

22 because some yet-unasked questions may draw a privilege objection.  (See Dkt. No. 594 at 8.)

23 The Court therefore finds Defendants privilege concerns are premature.

24

**C. Extraordinary Circumstances**

Finally, Defendants argue that Plaintiffs have failed to demonstrate that extraordinary circumstances justify the depositions of high-ranking government officials in this matter. (See, e.g. Dkt. No. 585 at 23-27.) To demonstrate that exceptional circumstances justify deposing a current or former high-ranking government official, a party must demonstrate "the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199, 203 (2d Cir. 2013). "Generally, the depositions of former government officials are granted where the official has been personally involved in the events at issue in the case." Toussie v. County of Suffolk, No. 05–1814, 2006 WL 1982687, at *2 (E.D.N.Y. July 13, 2006) (citing Gibson v. New York Police Officer Carmody, 1991 WL 161087, at *1 (S.D.N.Y. Aug. 14, 1991)). For the reasons discussed below, the Court finds that Plaintiffs have demonstrated that each witness has been personally involved in the events at issue in this case and that the necessary information cannot be obtained through other means.

1. General Selva

General Selva is the only current or former member of the Joint Chiefs that Plaintiffs plan to depose. He was personally involved in the decision to delay implementation of the Carter Policy and was responsible for overseeing the Panel of Experts. Plaintiffs intend to question General Selva about his alleged recommendation that the Carter Policy be delayed and why he later raised an unspecified "Question/Concern" about the delay in a meeting with military leadership. (Dkt. No. 577 at 25, Ex. 37.) The reasons for the delay are material to assessing Defendants' assertion that prior to the President's Tweet, Secretary Mattis found it "necessary to defer" the Carter accession standards "so that the military could 'evaluate more carefully' the

effect of accessions by transgender individuals 'on readiness and lethality.'" (Dkt. No. 575 at 10.)

Plaintiffs also seek to understand the guidance and boundaries General Selva provided to the Panel, which reported directly to him. (Dkt. No. 18 at 27; citing id. Ex. 40 at 3 (email explaining that General Selva expects "all members of the panel to be knowledgeable on the President's TG guidance memo.") General Selva also has first-hand knowledge about the reasons the Panel's recommendations were initially rejected, and the subsequent decision to not document the Panel's reconvened meetings. (Dtk. No. 19 at 29.)

Defendants contend that Plaintiffs can obtain this information from the materials Defendants have already produced in discovery or by taking the depositions of Anthony Kurta, the former Deputy Assistant Secretary of Defense for Military Personnel Policy, or Lernes Hebert, who followed Mr. Kurta as Deputy Assistant. (Dkt. No. 575 at 27-30.) First, as discussed infra, Defendants have not produced materials that answer Plaintiffs questions. Defendants have produced no minutes for the last four meetings and Plaintiffs have provided evidence that at least one member of the Panel complained that the minutes that do exist are incomplete and inaccurate. (See Dkt. No. 577 at 14-15, Ex. 15 at 2-3 (Panel member Thomas Dee writing "for this panel to be credible, the minutes need to reflect the objectivity of our analysis. Current version of the minutes doesn't seem to do that"). Neither Mr. Kurta nor Mr. Hebert can address General Selva's role in delaying the Carter Policy or the role the President's order and directives played in General Selva's decision to reject the Panel's "Final Report."

2. Secretary Wilkie

As the Under Secretary of Defense for Personnel and Readiness, Secretary Wilkie chaired the final six meetings of the Panel, "signed the transmittal memorandum of the Panel's

1  recommendations to the Secretary of Defense, and briefed then-Secretary Mattis on the Panel's
2  findings." (Dkt. No. 580 at 29.) After General Selva's and Mr. Shanahan's rejection of the
3  Panel's initial recommendations, Mr. Wilkie created a schedule with due dates for
4  "deliverables," that appear to address General Selva's and Mr. Shanahan's concerns. (Id., Ex.
5  Nos. 2, 21.) Secretary Wilkie was also one of three former members or chairs of the Panel who
6  assisted in drafting the DoD Report. (Dkt. No. 580, Ex. 13 at 10-12.)

7  Plaintiffs intend to question Mr. Wilkie about circumstances outside the Panel's official
8  documented meetings, "most importantly during the critical time period between General Selva
9  and Mr. Shanahan's rejection of the Panel's Final Report on December 15, 2017, the preparation
10 of the Wilkie Memorandum on January 11, 2018, and the development of the February 2018
11 DoD Report and Mattis Memorandum." (Dkt. No. 582 at 25.) Plaintiffs will also question Mr.
12 Wilkie about his role controlling the flow of information to and from the Panel and his efforts to
13 collect evidence supporting the policy on his own, without Panel involvement. (Id. at 26, 28; Ex.
14 Nos. 38-39, 42.) Through this questioning, Plaintiffs seek to rebut "Defendants' claim that the
15 Panel—and not political appointees like Mr. Wilkie—was the driving force behind the Mattis
16 Policy." (Id.)

17 Defendants contend that Mr. Kurta, Mr. Wilkie's predecessor would provide
18 "substantially similar or superior expertise and information regarding the development of the
19 challenged policy." (Dkt. No. 580 at 30.) Defendants also suggest that Plaintiffs can obtain
20 similar information from Lernes J. Hebert, who facilitated the Panel's deliberations at each of the
21 meetings Mr. Wilkie chaired. (Id. at 31.) But neither Mr. Kurta nor Mr. Hebert can address Mr.
22 Wilkie's actions in re-convening the Panel to address Mr. Selva's and Mr. Shanahan's concerns,
23 collecting additional support for the Panel's findings, and drafting the DoD Report.
24

3.  Secretary Mattis

Plaintiffs seek to depose Secretary Mattis about the central issue in this case: whether the "Mattis Policy" was the result of Secretary Mattis following the orders of his Commander-in-Chief or the military's exercise of "independent judgment." (Dkt. No. 587 at 25.) Plaintiffs will ask Secretary Mattis about his role in drafting the Mattis Memorandum and the DoD Report, the extent to which he obtained input from the Panel, whether he sought information from sources outside the Panel, and whether he was instructed to obtain particular information that was absent from the Panel's Final Report. (Id. at 29.) Secretary Mattis played a central role in each of the key events in this case and his testimony is necessary for completing the record and evaluating the Parties' arguments.

Defendants argue that Plaintiffs have failed to make a clear showing of "bad faith or improper behavior," which is required before they may probe Secretary Mattis's mental processes. (Dkt. No. 585 at 24.) First, Plaintiffs' proposed questions concern the facts surrounding the creation of the Mattis Policy, and as Plaintiffs note, Secretary Mattis's mental processes are irrelevant to Plaintiffs' claims.

Second, Plaintiffs have made the prerequisite showing of bad faith. The Ninth Circuit has already determined that the Mattis Policy "discriminates on the basis of transgender status on its face." Karnoski, 926 F.3d at 1201 n.18. Further, Plaintiffs point to evidence that Secretary Mattis's decision-making process may have been influenced by animus, noting his interest in contacting anti-transgender rights advocates, and his email correspondence with a former colleague, discussing the "psychological" problems of transgender persons. (Dkt. No. 585 at 32, Ex. 25 at 5.) In a note to himself, Secretary Mattis listed several anti-transgender advocates he was interested in speaking with, writing that they are "[a]uthoritative people, who defy PC

1  doctrine," while acknowledging that speaking with them would appear inappropriate: "[I] can't
2  talk to them, but perhaps someone trustworthy can."  (Dkt. No. 587, Ex. 40.)  Indeed, Secretary
3  Mattis's special assistant contacted these advocates to solicit their input after the Panel
4  completed its work.  (Id. at 32.)

      4.  <u>Admiral Moran</u>

6  Retired Admiral William Moran is one of only two voting members of that 17-member
7  Panel that Plaintiffs seek to depose.  Plaintiffs allege that Admiral Moran was the only voting
8  member who also served on the prior Working Group appointed by Secretary Carter, which only
9  a year before had recommended transgender persons be permitted to serve openly.  (Dkt. No. 14
10  at 7; Dkt. No. 2, Ex. E, Declaration of William F. Moran ("Moran Decl."), ¶ 6.)  He attended
11  seven of the thirteen Panel Meetings, where he "listen[ed] to the presentation of data and
12  testimony from a variety of sources" and "took part in the Panel's deliberations and voted on a
13  number of recommendations concerning the military's policy regarding service by transgender
14  individuals."  (Moran Decl., ¶¶ 7-8.)

15  Further, Admiral Moran expressed concerns that the ban on transgender persons serving
16  in the military was not supported by evidence, writing that "[t]he panel is unanimous in the
17  opinion that the data" presented to it was "so poor that it is nearly impossible to take a purely
18  analytic approach."  (Dkt. No. 594, Ex. 30.)  To this end, in a December 18, 2017 email to Panel
19  members, Admiral Moran proposed several questions seeking data that might show whether the
20  ban on transgender persons serving in the military was supported by military interests.  (Id.)
21  Plaintiffs intend to ask Admiral Moran whether this data was gathered, and if it was, why it was
22  not cited in the DoD Report.  (Id. at 24.)

1   While Defendants assert that Admiral Moran's testimony is unnecessary because
2   Defendants have agreed to allow depositions of another voting Panel member, Thomas Dee, and
3   the Panel chair, Anthony Kurta, these witnesses were not on the Carter working group and
4   therefore cannot compare the development of the Carter and Mattis Policies.  Further, Mr. Dee
5   and Mr. Kurta cannot speak to Admiral Moran's concerns about the data underlying the Mattis
6   Policy.  The Court finds that Admiral Moran "has unique first-hand knowledge related to the
7   litigated claims" which cannot be obtained from other sources.  Lederman, 731 F.3d at 203.

**Conclusion**

In conclusion, the Court finds that Plaintiffs have demonstrated that extraordinary circumstances justify the depositions of third-party witnesses General Paul J. Selva, Secretary Robert Wilkie Jr., Secretary James N. Mattis, and Admiral William F. Moran.  The Court therefore DENIES Defendants' motions to quash.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 14, 2020.

Marsha J. Pechman
United States Senior District Judge