1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RYAN KARNOSKI, et al., | CASE NO. C17-1297 MJP |
| Plaintiffs, | ORDER RE: *IN CAMERA* REVIEW OF DOCUMENTS SUBMITTED BY DEFENDANTS RE: PRESIDENTIAL TWEET (DKT. NOS. 545, 569, 572) |
| v. | |
| DONALD J TRUMP, et al., | |
| Defendants. | |

This matter comes before the Court upon Defendants' recent submission of documents for *in camera* review (Dkt. No. 572), filed in response to the Court's recent Orders on Defendants' assertion of the deliberative process privilege.  (Dkt. Nos. 545, 569.)  After careful examination of each document submitted for *in camera* review, the Court finds that the documents do not fall within the proper scope of the Deliberative Process Privilege and ORDERS Defendants to produce the documents by **October 5, 2020**.

**Background**

In June 2016, then-Secretary of Defense Ashton Carter directed the armed forces to adopt a new policy on military service by transgender individuals ("Carter Policy"). The policy permitted transgender individuals to serve openly in the military, while being subject to the same standards and procedures as other members of the military regarding medical and physical fitness, deployability, and retention. In response, the branches of the military and Coast Guard began their implementation plans to carry out the Carter Policy.

On June 30, 2017, President Trump's confirmed Secretary of Defense, James Mattis, announced a delay to part of the Carter Policy regarding accessions (recruiting), just one part of the Policy. The branches of the military and Coast Guard continued with their plans regarding the balance of the Carter Policy relating to current transgender members of the military.

On July 26, 2017, the President announced over Twitter that the United States would no longer accept or allow transgender individuals to serve their country in the military:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you.

On September 14, 2017—the same day Plaintiffs filed a Motion for a Preliminary Injunction seeking to enjoin President Trump's new policy—Secretary Mattis impaneled a "Panel of Experts" to review the issue of transgender servicemembers. (See Dkt. No. 32; Dkt. No. 577, Ex. 4 at 4.) On December 11, 2017, this Court issued a preliminary injunction enjoining President Trump's policy. (Dkt. No. 103.) Four days later, the Panel presented its Final Report to the Vice Chair of the Joint Chiefs of Staff, General Paul Selva, and the Deputy Secretary of Defense, Patrick Shanahan. (See Dkt. No. 577, Ex. 2.) The Panel's recommendations were

1    rejected because General Selva and Deputy Secretary Shanahan did not believe Secretary Mattis

2    could "defend the recommendations on the Hill or before the press" and because, "given the

3    competitive economy," the military needed to "compete for all people who can do the job."  (Id.)

4          The Panel reformed in December 2018, and on January 11, 2018, forwarded its

5    recommendations to Secretary Mattis.  For the next month, officials within the Department of

6    Defense worked alongside lawyers at the Department of Justice—including several who have

7    entered appearances in this case—to draft the 44-page Report and Recommendation Secretary

8    Mattis sent to the President on February 22, 2018 ("Mattis Policy").  (Dkt. No. 576, Ex. 13 at

9    11-13.)  The President accepted the Mattis Policy on March 23, 2018.

10         As the Court recently noted, one of the central questions in this litigation is whether the

11    Mattis Policy was "dictated" by the President and therefore "preordained," or whether it is the

12    product of independent military judgment, separate and apart from the President's Tweet.  (Dkt.

13    No. 596 at 2 (citing Karnoski v. Trump, 926 F.3d 1180, 1201-02 (9th Cir. 2019)); Dkt. No. 575

14    at 10, Ex. E at 17; Dkt. No. 587 at 12-36).)  In the previous appeal of this matter, the Ninth

15    Circuit noted that there were changed circumstances involved between the time of the 2017

16    Tweet and the ultimately adopted 2018 Mattis Policy that warranted reversal of the preliminary

17    injunction.  In doing so, the Circuit noted:

18            Although Plaintiffs on remand may present additional evidence to support this
             theory, the current record does not bear out the contention that the 2018 Policy
19          was nothing more than an implementation of the 2017 Memorandum, or that the
             review that produced the 2018 Policy was limited to this purpose.
20

21    Karnoski, 926 F.3d at 1202.  The documents at issue in this motion are directed to this central

22    question – whether the Mattis Policy was nothing more than the implementation of the 2017

23    Memorandum or an independent review.   Although there are other nuanced and

24

1    less-than-nuanced arguments posed in this litigation, it is with this brief background that the

2    Court turns to the discovery issue before it.

3         For two and a half years the Parties and the Court have been working through a discovery

4    dispute regarding the Government's assertion of the Deliberative Process Privilege ("DPP") over

5    35,000 to 50,000 documents.  This particular issue has been the subject of dozens of motions,

6    orders, and two of the Government's petitions for writs of mandamus to the Ninth Circuit.  Each

7    of these filings has focused on whether Plaintiffs are able to demonstrate that their need for the

8    documents outweighs the risk that the disclosure of the documents would hinder frank and

9    independent discussion regarding contemplated policies and decisions.  FTC v. Warner, 742 F.

10   2d 1156 (9th Cir. 1984).  Until March 2020, the Parties, the Court, and the Ninth Circuit were all

11   proceeding under the assumption that the Government had met its *prima facie* obligation of

12   properly asserting the privilege.

13        But in March, upon two motions to compel brought by Plaintiffs, the Court ordered the

14   Government to submit documents for *in camera* review for the first time.  These submissions

15   raised grave concerns about the Government's review process and privilege assertions.  For

16   example, the Court found that the Government had asserted the DPP over documents that were

17   sold on public websites or were created by foreign governments.  (See Dkt. No. 566 at 4-5.)  In

18   fact, before submitting the documents for *in camera* review, the Government itself conceded that

19   nearly 18% of the documents it had designated as privileged within the random sample were not

20   subject to a proper DPP claim.  Indeed, after reviewing the 850 documents, the Court found that

21   nearly 90% of the randomly selected DPP-claimed documents were not privileged.

22        Based on this finding, and in light of the enormous task of reviewing the remaining

23   documents over which the Government has claimed the DPP, on July 15, 2020, the Court

24

1    outlined a discovery management tool that would speed the Court's review going forward.  (Dkt.

2    No. 545.)  This discovery tool was designed to group documents that could easily be reviewed by

3    the Court for a granular analysis.  The temporal filter was not designed as a tool for analyzing

4    whether Plaintiffs can overcome the privilege under the balancing test outlined in <u>Warner</u>.

5    Rather, the test was designed to allow the Court to determine whether the Government has met

6    the *prima facie* factors necessary to claim the DPP in the first place.  Defendants were ordered to

7    review documents withheld solely on the basis of the DPP and apply the temporal filter of July

8    13, 2015 through June 30, 2016 and September 14, 2017 through January 11, 2018, the

9    timeframes that the Carter and Mattis Policies were being considered, respectively.  (<u>Id.</u> at 2.)

10    The Government was permitted to bring any privileged documents outside that timeframe to the

11    Court for an *in camera* review without motion practice.  (Dkt. No. 566 at 11-12.)

12        On August 28, 2020 the Government submitted for *in camera* review the first set of those

13    documents, approximately 115 pages of communications surrounding the President's Tweet.

14    (Dkt. No. 572.)  Each of these documents were withheld solely on the basis of the DPP.  The

15    Government also submitted the declarations of Andrew E. Carmichael (Dkt. No. 574) and Robert

16    E. Easton (<u>Id.</u>, Ex. 1) in support of its DPP claim on these documents.

17                                      **Discussion**

18        The DPP applies to protect the decision-making process.  To qualify, "a document 'must

19    be *both* (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2)

20    'deliberative,' meaning 'it must actually be related to the process by which policies are

21    formulated.'"  <u>National Wildlife Federation v. U.S. Forest Service</u>, 861 F. 2d 1114, 1117 (9th

22    Cir. 1988) (citation omitted, emphasis in original).

23

24

1      Before a document can be withheld pursuant to the DPP, it must be predecisional.  See

2   NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151-52 (1975) (explaining the privilege applies

3   "prior to the time the decision is made" and not to "communications made after the decision and

4   designed to explain it"); Lahr v. NTSB, 569 F.3d 964, 981 (9th Cir. 2009) (noting "we have

5   rejected the argument that a continuing process of agency self-examination is enough to render a

6   document 'predecisional," instead, "[t]he documents must be prepared to assist an agency

7   decision-maker in arriving at a future particular decision") (internal quotations and citations

8   omitted); Fishermen's Finest, Inc. v. Gutierrez, No. C07-1574MJP, 2008 WL 2782909, at *2

9   (W.D. Wash. July 15, 2008) ("A document that was prepared to support a decision already made

10   is not predecisional.").

11      The second test for whether a document is protected by the DPP is whether it is

12   deliberative.  In the Ninth Circuit, the DPP applies "whenever the unveiling of factual materials

13   would be tantamount to the 'publication of the evaluation and analysis of the multitudinous facts'

14   conducted by the agency."  National Wildlife, 861 F.2d at 1119 (citations omitted).  In National

15   Wildlife, the court confronted the issue of whether a document was deliberative or merely

16   factual.  The plaintiff argued that because certain information in an Environmental Impact

17   Statement ("EIS") was factual, rather than opinion, the document was not subject to a proper

18   DPP claim.  The Ninth Circuit held this distinction was too narrow.  Instead, the court held that

19   the analysis of whether a document was protected or not from disclosure should focus on the

20   "*deliberative process.*"  Id. at 1118 (emphasis in original).  Under this approach, nonbinding

21   recommendations on law or policy would be exempt from disclosure.  Factual material would be

22   exempt from disclosure to the extent that it revealed the mental processes of decisionmakers.

23   Ultimately, the court held that draft Environmental Impact Statements and "previews" were

24

1   subject to the DPP and concluded they were "predecisional" because they were drafts, subject to

2   change, and that disclosure would reveal the deliberative process of the Forest Service.

3          With respect to the documents here, there was no ongoing process dealing with what has

4   become the Mattis Policy, with the exception of the Carter Policy on accessions.  Instead, prior

5   to the President's Tweet, the transgender working group was busy with actual implementation

6   plans for the Carter Policy.  This came to a screeching halt with the President's Tweet.  One of

7   the challenged emails puts it quite bluntly when discussing the efforts of the transgender working

8   group the afternoon of the President's July 26, 2017 Tweet:

9          Pivoting TG workgroup from the previous DSD [Deputy Secretary of Defense]
          tasking regarding accessions to a review of the implications of the President's
10         announcement . . . . The SD, DSD, and GC offices are in communication w/the
          WH [White House] and NSC [National Security Council].  They are anticipating
11         further written guidance from POTUS <u>directing the change in policy.</u>

12   PrivWithhold9182 (emphasis added).  There was no ongoing process to protect.   Indeed, in one

13   of the emails, General Dunford wrote to the other Service Chiefs "I know yesterday's

14   announcement was unexpected . . . ."  (PrivWithhold 9266.)  The President's Tweet not only

15   caught the Service Chiefs off guard, it caused confusion about who would take responsibility

16   between the White House and the Department of Defense for handling the public relations

17   fallout, including press questions about the ongoing implementation plans for the Carter Policy

18   versus the President's Tweet.  In just one of the communications that reflects this confusion, the

19   sender writes:

20         I recommend the statement not come from SD [Secretary of Defense] but rather
          me (inconvenient as it is.)  I fear a SD statement pits him against POTUS.  This
21         statement feels a little bit too much like a clean up job by SD . . . My preference is
          that the SD with OGC walk this back slowly and show minimum daylight with
22         the WH.

23

24

1    PrivWithhold 9206.  In short, the documents demonstrate that there was no discernable process

2    regarding the transgender military policy, other than work on the accessions aspect of the Carter

3    policy, from which the working group immediately pivoted to deal with the President's Tweet.

4    Thus, the documents are not deliberative regarding any policy.

5          Nor are the documents predecisional.  Mr. Easton's declaration posits that the documents

6    are predecisional because they predated what ultimately issued as the Report and

7    Recommendation.  Under the Government's analysis, implementation plans are still being

8    undertaken, and under its view of the DPP coverage, documents being prepared even today

9    would be predecisional.  This notion eviscerates the concept of a predecisional requirement.  The

10   documents at issue include communications about how best to respond to media requests,

11   whether the response should come from the White House or the Secretary of Defense, and

12   whether proposed statements by Secretary Mattis would undermine the President's Tweet.  All

13   but two of the communications in question bear the date of July 26 or 27, the date of the

14   President's Tweets or the day afterwards.

15         Finally, these communications are material to Plaintiffs' theory of the case.  It is easy to

16   infer from the communications that many of those in the transgender working group believed the

17   President's Tweet was to be treated as an Order and required the working group to respond

18   accordingly:

19           1.  Regarding new applicants for military service, does the President's direction
             supersede the Secretary of Defense's review of the policy?  Answer:  Yes,
20           consistent with the President's direction, DoD will not allow transgender
             individuals to become new recruits to the armed forces.  2.  Regarding medical
21           care of transgender personnel, are high cost procedures now disallowed?  Answer:
             Yes, consistent with the President's direction, DoD will not provide or pay for
22           gender reassignment surgery for any military member or other DoD health care
             beneficiary.

23

24

1   PrivWithhold 9203; see also PrivWithhold 9280 ("DSD, OGC, and P&R will craft revised

2   guidance to the Department based on specific POTUS direction."); PrivWithhold 9263 ("The

3   Department of Defense has received the President's policy guidance on military service by

4   transgender personnel.  We are working with the White House to develop an implementation

5   plan to carry out the President's direction…."); PrivWithhold 9180 ("WRT implications for

6   those serving, OSD is working to quickly discern if the President's intent is to allow them to

7   transition, to finish the remainder of their commitments, or something else.").

8         The documents surrounding the President's Tweet go directly to Plaintiffs' theory.

9   They do not deal with a policy process.  They are not deliberative; they are not predecisional.

10  None refer to policymaking or processes.    There are no documents reflecting discussions

11  between the President and any of his "Generals or military experts."  These documents are

12  material and reflect an absence of policy process. [1]  The DPP is designed to protect the

13  deliberative process, it is not to be a method for avoiding production of "inconvenient" or

14  embarrassing documents.  Because the documents do not qualify as privileged under the DPP the

15  Court does not reach the balancing test under Warner.

16                                **Conclusion**

17        The Court therefore finds that the documents (PrivWithhold 9185-9289), except as

18  specifically detailed in Footnote 1, attached to the Easton Declaration (Dkt. No. 574, Ex. 1) were

19  not properly withheld under the DPP.  The Government is therefore ORDERED to produce these

20  documents by **October 5, 2020**.

21  //

22

23  [1] There are some documents included that are not material, see PrivWithhold 9282, or only partially material after
    the redaction of matters not related to transgender issues. See, e.g., PrivWithhold 9238-9256, 9274-79, 9219-24.
    The Government proposes redacting the non-transgender related materials and then producing the balance.  This is
24  appropriate.

ORDER RE: IN CAMERA REVIEW OF DOCUMENTS SUBMITTED BY DEFENDANTS RE: PRESIDENTIAL
TWEET (DKT. NOS. 545, 569, 572) - 9

The clerk is ordered to provide copies of this order to all counsel.

Dated September 25, 2020.

Marsha J. Pechman United
States Senior District Judge