UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RYAN KARNOSKI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendant. | CASE NO. C17-1297 MJP<br><br>ORDER GRANTING IN PART MOTION TO STAY (DKT. NO. 601) |

THIS MATTER comes before the Court on Defendants' Motion to Stay. (Dkt. No. 601.) Having reviewed the Motion, the Response (Dkt. No. 613), the Reply (Dkt. No. 619), and the related record, the Court GRANTS the Motion in part and DENIES in part. The Court will STAY its Orders Denying Defendants' Motions to Quash (Dkt. No. 596, 606, Ex. 1) until the Parties' remaining discovery disputes are resolved and the Court issues an Order lifting the stay. The Court DENIES the Government's Motion to Stay discovery in this matter.

## Background

On September 2, 2020 the Court denied the Government's Motions to Quash third-party subpoenas issued to four high-ranking government officials: General Paul J. Selva (Dkt. No.

556), Secretary Robert Wilkie Jr. (Dkt. No. 557), Secretary James N. Mattis (Dkt. No. 558), and Admiral William F. Moran (Dkt. No. 591). (Dkt. No. 596 (as corrected Dkt. No. 606, Ex. 1).) Defendants argued that the subpoenas should be quashed under the apex doctrine, which provides that "[h]eads of government agencies are not normally subject to deposition." Kyle Eng'g Co. v. Kleppe, 600 F.2d 226, 231 (9th Cir. 1979). These officials "enjoy a mental process privilege." United States v. Wal-Mart Stores, Inc., No. CIV.A. PJM-01-1521, 2002 WL 562301, at *1 (D. Md. Mar. 29, 2002). But the privilege is not absolute. Bogan v. City of Bos., 489 F.3d 417, 423 (1st Cir. 2007). And in the case of the four officials here, the Court found the depositions justified because each official has "unique first-hand knowledge related to the litigated claims" that "cannot be obtained through other, less burdensome or intrusive means." Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199, 203 (2d Cir. 2013).

  The Government now moves to stay the Court's deposition Order and, additionally, "all discovery in this action" until the Government's two pending petitions for writs of mandamus are resolved by the court of appeals. (Dkt. No. 601 at 2.) After the Government filed its Motion to Stay, Plaintiffs offered to stay the depositions pending further order of the Court, and only then after providing the Government with a minimum of 30-days' notice before attempting to depose any of the witnesses. (Dkt. No. 608, Ex. 1 at 2.) Defendants rejected the stipulation but agreed not to oppose Plaintiffs' motion for an extension of time to file their opposition to the Government's Motion to Stay. (Id. at 3.) On September 16, 2020, the Court granted Plaintiffs' unopposed motion for additional time to respond. (Dkt. No. 609.) Two days later, the Government filed its third Petition for a Writ of Mandamus without waiting for the Plaintiffs' response brief or the Court's order on the Motion to Stay. (Dkt. No. 611.) Therefore, the Court

now considers the Government's Motion to Stay while the Government's Petition for a Writ of Mandamus on the Court's deposition Order is also pending before the Ninth Circuit.

**Discussion**

A stay pending appeal "is an intrusion into the ordinary processes of administration and judicial review." Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks and citation omitted). As such, it is "not a matter of right, even if irreparable injury might otherwise result." Id. at 433 (citation omitted). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." Id. (internal quotation marks and citation omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433-34.

In determining whether to grant a stay, the Court considers: (1) whether Defendants have made a strong showing that they are likely to succeed on the merits of their Mandamus Petition; (2) whether Defendants will be irreparably injured absent a stay; (3) whether a stay will substantially injure Plaintiffs; and (4) whether the public interest supports a stay. Id. at 434.

For the reasons discussed below, the Court finds that Defendants are unlikely to succeed on the merits of their Petition but concludes that the resolution of the Parties' current discovery disputes may render some of the contested depositions moot, or conversely, provide additional support for Plaintiffs' need to depose the witnesses. The Court therefore stays the deposition order, but denies Defendant's motion to stay all remaining discovery.

**A. Likelihood of Success on the Merits**

Defendants have not made a strong showing that they are likely to prevail on the merits of their Mandamus Petition, where they ask the Ninth Circuit not only to stay the depositions at

issue in the Court's Order, but also to stay all remaining discovery. The Court addresses each argument in turn.

1. Depositions

The Government argues it is likely to prevail on the merits of its Petition because the Court's deposition Order failed to consider alternative sources of discovery and would allow Plaintiffs to probe the witnesses' mental impressions without making a finding of bad faith. (Dkt. No. 601 at 6-12.) The Government also argues that the Court failed to adequately consider how military deference applies to the information sought from the officials at issue. (Id. at 11.) These arguments are not supported by the record.

The Court found that each witness had unique first-hand knowledge related to the litigated claims[1] and that the necessary information could not be obtained through other, less burdensome means. Lederman, 731 F.3d at 203; (Dkt. No. 606, Ex. 1 at 3-4). This is especially so considering the long-standing discovery dispute between the Parties that has obscured the process used to create the Mattis Policy. (See Dkt. No. 606, Ex. 1 at 3-4.) Further, the Government's proposed alternatives to each witness—Anthony Kurta, the former Deputy Assistant Secretary of Defense for Military Personnel Policy, and Lernes Hebert, who followed Mr. Kurta as Deputy Assistant—could provide only partial, piecemeal testimony on each of the relevant issues. (Id. at 8-13.) For Secretary Mattis, the Government suggests additional officials

---

[1] Strangely, the Government argues the Court failed to find that Secretary Wilkie possesses "any unique knowledge warranting his deposition" or point "to any evidence that Secretary Wilkie was involved in circumstances outside the Panel's official document[ed] meetings." (Dkt. No. 619 at 6.) To the contrary, the Court found that Secretary Wilkie had a role in controlling the flow of information to and from the Panel and worked to collect additional anti-transgender information after the Panel concluded its work. (See Dkt. No. 606, Ex. 1 (citing Dkt. No. 582 at 25-26, 28; Ex. Nos. 38-39, 42).) The Government also argues that the Court failed to take into account Secretary Wilkie's busy schedule as a sitting Cabinet Secretary, but as Plaintiffs note, "there is no special rule for cabinet secretaries, nor do Defendants cite one." (Dkt. No. 601 at 10; 613 at 11.) Deference to Secretary Wilkie's time and attention is built into the apex doctrine, which shields him from deposition unless he was personally involved in the litigated claims and the information cannot be obtained elsewhere.

who could "testify regarding the development of the challenged policy." (Dkt. No. 601 at 18-19.) However, none of these witnesses can provide complete testimony on Secretary Mattis's role in drafting the Mattis Memorandum and the DoD Report, the extent to which he obtained input from the Panel, whether he sought information from sources outside the Panel, or whether he was instructed to obtain particular information that was absent from the Panel's Final Report. (Dkt. No. 606, Ex. 1 at 11.)

Additionally, Plaintiffs intend to question General Selva, Secretary Wilkie, and Admiral Moran about actions they took in delaying the Carter Policy or creating the Mattis Policy, not probe their mental processes. (Id. at 8-10, 12-13.) Plaintiffs were therefore not required to make a showing of animus before questioning these witnesses. See, e.g., Franklin Sav. Ass'n v. Ryan, 922 F.2d 209, 210-11 (4th Cir. 1991) (absent a showing of bad faith, a high-ranking official was only required to answer factual questions, not questions going to his mental process).

On the other hand, where Plaintiffs' proposed questions concerned Secretary Mattis's mental impressions, including "the manner and extent of his study of the record and his consultations with subordinates," United States v. Morgan, 313 U.S. 409, 422 (1941), the Court found that Plaintiffs made the requisite showing of bad faith. This included Secretary Mattis's intent to solicit opinions from several anti-transgender activists, acknowledging that he would need to keep those discussions secret. (See Dkt. No. 587, Ex. 40.) This was done outside the Panel's "independent multi-disciplinary review and study of relevant data" and there is no evidence Secretary Mattis similarly attempted to discuss the Policy with individuals supportive of transgender rights. (Dkt. No. 224, Ex. 1 ("Mattis Memorandum") at 19 (citing Mattis, Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals (Sep. 14, 2017)).) The Government's contention that certain uncited studies suggest

1   "that individuals diagnosed with gender dysphoria have higher than normal associated rates of

2   depression and suicide" is irrelevant to the Court's finding of animus based on Secretary Mattis

3   secretly soliciting information from those with anti-transgender views in support of a facially

4   discriminatory policy. (See Dkt. No. 601 at 11 n. 7 (citing Dkt. No. 602, Ex. C, ¶ 10).)

5         Finally, the Court addressed the Government's arguments on military deference at length

6   in its Order, but noted that "'deference does not mean abdication,'" especially where

7   "Defendants bear the burden of establishing that they reasonably determined the policy

8   'significantly furthers' the government's important interests, [which][] is not a trivial burden."

9   (Dkt. No. 606, Ex. 1 at 7 (citing Karnoski v. Trump, 926 F.3d 1180, 1202 (9th Cir. 2019)

10  (additional citation omitted)).) The Court once again declines to equate military deference with a

11  prohibition on civil discovery in cases involving the military.

12        2.  Discovery

13        The Government also seeks to stay all discovery, arguing that Plaintiffs have conducted

14  enough discovery for the Court to resolve this matter on the current record. Specifically, the

15  Government argues that it has produced 60,000 documents, responded to 95 interrogatories, and

16  permitted the depositions of three witnesses. (Dkt. No. 601 at 3.) But these numbers alone fail

17  to demonstrate a burdensome discovery process; much larger volumes of materials are routinely

18  produced in run-of-the-mill civil cases over the course of several months. (Dkt. No. 412 at

19  26:15-23.) Here, four district courts and dozens of lawyers have been proceeding in tandem to

20  evaluate the Government's privilege claims for several years. See Doe 1 v. Trump, 275 F. Supp.

21  3d 167, 177 (D.D.C. 2017); Stone v. Trump, 280 F. Supp. 3d 747, 769 (D. Md. 2017); Stockman

22  v. Trump, No. EDCV 17-1799 JGB (KKx), 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017).

And the volume of documents the Government has produced says nothing about quality, or whether these documents were responsive to Plaintiffs' requests.

The Government's three examples of the "unusually intrusive discovery" in this matter demonstrate how the Government's intransigent discovery posture has slowed the process and prevented the development of a full record. (Dkt. No. 601 at 4 (citing (Dkt. No. 455 at 4.)) The Government first objects to the Court's order requiring the production of documents about the cost of gender transition surgeries, but these documents were reviewed by Panel members and are necessary to evaluate Defendants' argument that transition-related care is "disproportionately costly on a per capita basis." (Dkt. No. 601 at 4 (citing Dkt. No. 455 at 5); (Dkt. No. 224, Ex. 2 ("Report and Recommendations") at 43.) The Government's next example misstates the record, asserting that the Court required production of "[a]ll deliberative communications with third parties withheld under the deliberative process privilege's consultant corollary." (Dkt. No. 454 at 5.) In fact, when the Court ordered the Government to submit these privilege-claimed documents for *in camera* review, the Government immediately withdrew its privilege claims over 97% of the documents. (Dkt. No. 509 at 9.) And after conducting an *in camera* review of the remaining 14 documents, the Court could find no basis for the Government's privilege assertions as to 13 of those documents.

The Government's third example also misstates the record—thereby exaggerating the threat associated with further discovery—by asserting that the Court has ordered production of "[a]ll deliberative communications within the government outside [two] narrow periods." (Dkt. No. 601 at 4.) In reality, the Court's Order concerns only those documents that are relevant to this case. Further, the Government is permitted to submit any privilege-claimed documents

1 | outside these timeframes for *in camera* review without separate motion practice. (Dkt. No. 566
2 | at 11.)

3 |       The Government also takes issue with the "exceedingly narrow timeframes" by which the
4 | Government has been ordered to produce documents, citing two examples where the Court
5 | ordered the Government to produce documents within two to three weeks. (Dkt. No. 601 at 4.)
6 | The timeframes provided by the Court are based on the Government's repeated representations
7 | that these materials were collected, segregated, and reviewed before the Government withheld
8 | the materials as privileged. (See, e.g., Dkt. No. 371, Ex. A, Declaration of Robert E. Easton.)
9 | Using the same discovery management software as the Government, Plaintiffs can quickly pull
10 | up lists of thousands of documents within a matter of hours. (Dkt. No. 537 at 25:9-11.) The
11 | Government fails to explain why it requires "two dozen people" (Dkt. No. 630 at 5:8-9) and
12 | several weeks to print documents that have already been reviewed and segregated as described in
13 | the Government's declarations to this Court.

14 | **B. Irreparable Harm**

15 |       Because the Court stays the deposition Order until the Parties' remaining discovery
16 | disputes are resolved, the question is whether Defendants will be irreparably injured absent a
17 | stay of all remaining discovery in this matter. Since the Government has a fail-safe option of
18 | submitting privilege-claimed documents to the Court for *in camera* review, and the Government
19 | has been over-asserting privileges as determined by both the Court and the Government, the
20 | Court finds that the Government has not shown that irreparable harm will result if discovery
21 | proceeds as planned.
22 | //
23 | //
24 |

**C. Injury to Plaintiffs and Impact on the Public Interest**

As the Court has previously written, delays in this matter affect "hundreds if not thousands" of servicemembers and potentially prevent countless potential servicemembers from "fulfilling a dream they have had their entire lives." (Dkt. No. 565 at 24:14-16, 22-23.) The public also has a strong interest in the timely determination of the issues of national and constitutional importance involved in this matter. But the Court weighs this urgency against Plaintiffs' announcement that they do not plan to reissue the subpoenas for the witnesses in the foreseeable future, in addition to the likelihood that obtaining additional discovery materials before deposing the witnesses will likely allow Plaintiffs to conduct better depositions. The Court therefore concludes that a stay in this matter until the completion of discovery will not cause injury to the Plaintiffs or the public interest.

**Conclusion**

Accordingly, the Court ORDERS as follows:

(1) The Court GRANTS in part, DENIES in part Defendants' Motion for a Stay (Dkt. No. 601):

    a. The Court GRANTS the Government's Motion to Stay the Court's Order denying Defendants' Motions to Quash the Third-Party Subpoenas (Dkt. Nos. 596, 606, Ex. 1). The Order is STAYED until the Parties' remaining discovery disputes are resolved <u>and</u> the Court issues an Order lifting the stay;

    b. The Court DENIES Defendants' Motion to Stay all remaining discovery in this matter.

//

//

1  The clerk is ordered to provide copies of this order to all counsel.

2  Dated November 9, 2020.

    Marsha J. Pechman
    United States Senior District Judge